IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DIANA COFFEY, on her own behalf and on behalf
of the estate of ANDREW CRUTCHER, deceased,
and also, as next friend, on behalf of her minor
grandchildren, JOANELLE CRUTCHER,
RACHELLE CRUTCHER, ALEX BENALLY,
ANDREW CRUTCHER, VICK CRUTCHER,
KITANA CRUTCHER, and DREW CRUTCHER,

       Plaintiffs,

vs.                                          No. CIV 08-0588 JB/LFG

UNITED STATES OF AMERICA,

       Defendant.


DIANA COFFEY and DIANA COFFEY
on behalf of her minor grandchildren I-VII,
and the ESTATE OF ANDREW CRUTCHER,

       Plaintiffs,

vs.                                          No. CIV 09-0028 JB/LFG

McKINLEY COUNTY as it relates to its
DETENTION CENTER and UNKNOWN
STAFF NURSE, and UNKNOWN DETENTION
GUARDS 1-10, at the McKINLEY COUNTY
ADULT DETENTION CENTER,

       Defendants.


**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court[1] on: (i) the County Defendant's Motion for

Summary Judgment, filed August 1, 2011 (Doc. 78 in the civil case docket number 09-

---

[1]All docket entries refer to the docket entries for the civil case docket number 08-0588 unless
otherwise specified.

0028)("MSJ"); and (ii) the Defendants' Second Motion to Dismiss, filed August 14, 2011 (Doc. 83)("Motion to Dismiss"). The Court held a hearing on September 30, 2011. The primary issues are: (i) whether the Court should dismiss the unnamed Defendants in the case, Defendant Unknown Staff Nurse and Defendants Unknown Detention Guards 1-10; (ii) whether Defendant McKinley County's employees engaged in any Eighth Amendment violations; (iii) whether Plaintiff Diana Coffey may proceed on a substantive due-process theory on her claims against McKinley County; (iv) whether a McKinley County policy was the moving force behind any constitutional violation that occurred; (v) whether McKinley County engaged in conduct creating an affirmative link to and establishing its personal involvement in the alleged constitutional violations; (vi) whether McKinley County engaged in any constitutional violations on its own part by failing to adopt a policy or to train its employees; and (vii) whether the Court should dismiss Coffey's substantive due-process claims under rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court will grant the Motion for Summary Judgment and the Motion to Dismiss. The Court will dismiss the unnamed Defendants without prejudice, because Coffey has engaged in significant delay in adding named defendants as parties in this case to replace the unnamed Defendants and because granting leave to amend to join them as parties would be futile. While it is arguable that the medical staff at the McKinley County Detention Center acted negligently, the undisputed facts do not indicate that they acted with deliberate indifference. Additionally, while there is a genuine issue of material fact whether some of the guards at the facility acted with deliberate indifference based on some of their conduct in not taking Andrew Crutcher to receive medical care, Coffey may not proceed on these claims to trial absent a county policy that was the moving force behind a constitutional violation, because there are no guards who are parties to this case sued in their individual capacity. Because a specific constitutional provision applies to Coffey's claims against McKinley County, she may not proceed

under a substantive due-process theory on these claims.  The Court concludes that McKinley County's failure to adopt a fourteen-day screening policy for inmates or to train its employees regarding medical risks similar to those that caused Crutcher's death was not the moving force behind any constitutional violation that may have occurred.  Based on the lack of evidence regarding any McKinley County officials or McKinley County Detention Center officials, the Court concludes that these officials did not engage in conduct creating an affirmative link to or establishing their personal involvement in any constitutional violations that occurred.  Lastly, the Court will grant the Motion to Dismiss, as Coffey cannot proceed on a substantive due-process theory against McKinley County.

## FACTUAL BACKGROUND

Coffey attempts to dispute many of McKinley County's undisputed facts.  Coffey has included some of additional facts in her Plaintiffs' Amended Opposition to McKinley County's Motion for Summary Judgment, filed September 7, 2011 (Doc. 77)("Response").  Coffey has not attempted to separate her exhibits attached to her Response into different CM/ECF filings.  In contravention of D.N.M.LR-Civ. 56(b), Coffey has not attempted to distinguish between her facts that controvert McKinley County's facts and her additional material facts.  McKinley County disputes many of Coffey's additional facts.  See The County Defendant's Reply Memorandum in Support of Its Motion for Summary Judgment, filed September 27, 2011 (Doc. 100)("Reply").  McKinley County strenuously objects to the manner in which Coffey has organized her facts in violation of the local rules, stating that her chosen method has made it particularly difficult for McKinley County to properly address her additional facts.  See Reply at 3-4.  The Court notes that Coffey has structured her facts in a way that makes them difficult to navigate and that it has expended a great deal of effort to organize and present these facts.

Crutcher "seemed healthy" at the time he was sent to McKinley County Detention Center. MSJ ¶ 1, at 3 (setting forth this fact).  See Second Amended and Consolidated Complaint ¶ 21, at 5, filed July 28, 2011 (Doc. 61)(admitting this fact).[2]  Crutcher was first incarcerated there on October 8, 2006.  See Resident Receiving Screening Report at 1 (dated October 8, 2006), filed August 1, 2011 (Doc. 78-1); Second Amended and Consolidated Complaint ¶ 34, at 7 (admitting this fact).[3]  McKinley County Detention Facility picked Crutcher up from a previous detention facility

_____

[2]In her Response, Coffey asserts that Crutcher received his medication at the Washoe County Detention Facility.  See Prison Health Services Health Evaluation at 1 (dated May 31, 2006), filed September 7, 2011 (Doc. 77-1); Medical Information Transfer Form at 2 (dated October 7, 2006), filed September 7, 2011 (Doc. 77-1).  McKinley County contends that the evidence which Coffey cites does not support this proposition, because the evidence does not support the assertion that Crutcher "was given his medication" at this facility.  Reply at 4. D.N.M.LR-Civ. 56(b) provides: "Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56(b).  Rule 56 of the Federal Rules of Civil Procedure provides:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Here, these records indicate only that Crutcher at one point was prescribed certain medication, and not that anyone gave him medication at any facility.  See Prison Health Services Health Evaluation at 1; Medical Information Transfer Form at 2.  This evidence does not support Coffey's asserted fact that Crutcher was given his medication at some facility.  Thus, the Court will deem this fact not supported.

[3]Coffey asserts that "Crutcher was transported from Washoe County Detention Facility to Peach Springs, Arizona, where he was picked up by McKinley County Detention Facility without screening before transport for personal property or for medications."  See Response at 2. McKinley County argues that the evidence which Coffey cites does not support this assertion.  Coffey cites to the Deposition of Lorna Pettigrew-Garner (dated July 1, 2011), filed September 7, 2011 (Doc. 77-1)("Pettigrew-Garner Depo.").  The testimony Coffey cites involves a discussion of what items Pettigrew-Garner knew or saw were in Crutcher's possession, or came with Crutcher during transportation.  See Pettigrew-Garner Deposition at 16:9-22, 20:4-6, 21:2-10, at CM/ECF 3-5. This evidence does not support Coffey's assertion regarding the specifics of his transfer, such as the starting point and end point of the transfer.  Thus, the Court deems that fact not supported for the purposes of summary judgment.  See Fed. R. Civ. P. 56(c)(1).  Drawing all reasonable inferences

without screening for his personal property or for his medications.  See Deposition of Lorna Pettigrew-Garner at 16:9-22, 20:4-6, 21:2-10, at CM/ECF 3-5 (dated July 1, 2011), filed September 7, 2011 (Doc. 77-1)("Pettigrew-Garner Depo.").  When discussing the date of Crutcher's pickup, his transporter stated that the prison staff did not question inmates regarding medical property.  See Pettigrew-Garner Deposition at 16:9-22, 20:4-6, 21:2-10, at CM/ECF 3-5; Reply at 4 (not disputing this fact). Crutcher died on February 8, 2007.  See Report of Findings at 1 (dated March 3, 2007), filed August 1, 2011 (Doc. 78-2); Response at 2 (not disputing this fact).

Crutcher died from sepsis[4] resulting from infective endocarditis.[5]  See Report of Findings at 1-2; Response at 2 (not disputing this fact).  Crutcher died at age twenty-eight and left behind seven children.  See Response at 2 (setting forth this fact); Reply at 4 (not disputing this fact).  The medical examiner noted that endocarditis is commonly associated with intravenous drug use. See Report of Findings at 1-2.[6]  When Crutcher acquired a staph infection,[7] it entered his body and

---

and resolving all doubts in favor of Coffey, the cited evidence supports the remainder of the proposition.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).

[4]Sepsis is "[t]he presence of various pathogenic organisms, or their toxins, in the blood or tissues."  Stedman's Medical Dictionary 1749 (28th ed. 2006).  Pathogenic means "[c]ausing disease or abnormality."  Id. at 1442.

[5]Endocarditis is the "[i]nflammation of the endocardium."  Stedman's Medical Dictionary, supra, at 638.  The endocardium is the "innermost tunic of the heart."  Id. at 639.  A tunic is a "[c]oat or covering."  Id. at 2053.

[6]Coffey attempts to dispute this fact, pointing to testimony from Crutcher's physician and asserting that "Crutcher's own treating doctor was not willing to make such a statement, but knew that Mr. Crutcher's condition was aggravated by using meth."  Response at 2 (setting forth this fact). See Deposition of Dr. Ram Challapalli at 28:10-29:7, at CM/ECF 6-7 (dated April 5, 2011), filed September 7, 2011 (Doc. 77-1)("Challapalli Depo.").  Coffey also points to testimony from an inmate stating that drug and substance abuse was rampant at McKinley County, through drugs that the guards furnished to the inmates, but that Crutcher was too sick to use drugs and did not use drugs

blood stream and attacked his heart.  See Deposition of Dr. Joseph E. Paris at 39:4-12, 94:19-25, 95:1-96:10, at CM/ECF 10-13 (dated July 19, 2011), filed September 7, 2011 (Doc. 77-1)("Paris Depo.").[8]

---

while he was at the detention center.  See Affidavit of Elson Gyce, Sr. at 8-9 (executed August 12, 2011), filed September 7, 2011 (Doc. 77-1)("Gyce Aff.").  Coffey also states that a registered nurse at the facility confirmed that drug use was rampant.  McKinley County argues that these first two assertions do not controvert McKinley County's fact and that no citation to the record supports the third assertion.  Under D.N.M.LR-Civ. 56(b): "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56(b).  Here, the asserted fact is that the medical examiner noted a particular fact -- that endocarditis is commonly associated with intravenous drug use -- in his report.  Coffey's asserted facts do not controvert that the medical examiner noted this particular fact in his report.  Furthermore, Coffey's third asserted fact does not have any citation to evidence to support it.  See Fed. R. Civ. P. 56(c)(1) (requiring citations to evidence to support asserted facts).  Consequently, the Court will deem McKinley County's fact admitted.

[7]Staph, or staphylococcus, is a bacteria that produces a variety of toxins and is potentially pathogenic.  See Stedman's Medical Dictionary, supra, at 1828.  It is commonly found on the skin, in skin glands, and on the nasal and other mucous membranes of warm-blooded animals, and in various food products.  See id.

[8]McKinley County argues that the evidence Coffey cites to support this asserted fact does not support this asserted fact, including that Crutcher died from not having heart medication. See Reply at 4.  McKinley County also presents several asserted facts in its Motion for Summary Judgment that Crutcher received his heart medication.  Dr. Joseph E. Paris, an expert in prison medical care, discussed the employees at the McKinley County Detention Center failing to give Crutcher a physical examination and not establishing a medical plan for Crutcher.  See Paris. Depo. at 95:23-96:4, at CM/ECF 12-13.  Dr. Paris observed that none of the employees there observed Crutcher's physical characteristics that would predispose him to bacterial endocarditis.  See Paris Depo. at 95:23-96:10, at CM/ECF 12-13.  Dr. Paris discusses the effect of antibiotics slowing down the process of this kind of infection, but does not discuss heart medication.  See Paris Depo. at 95:14-19, at CM/ECF 12.  Drawing all reasonable inferences and resolving all doubts in Coffey's favor, the Court determines that this evidence supports some portions of the asserted fact, specifically that Crutcher acquired a staph infection that entered his body and blood stream, and attacked his heart.  See Hunt v. Cromartie, 526 U.S. at 551 (stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).  Coffey does not, however, dispute -- or in some cases does not successfully dispute -- several of McKinley County's asserted facts that Crutcher received heart medication while at the McKinley County Detention Center.  Given that Coffey has admitted to these facts regarding Crutcher receiving heart medication and that Dr. Paris does not discuss heart medication, only antibiotics, the Court concludes that McKinley County has

The parties dispute whether Crutcher arrived at the McKinley County Detention Center with any medications, or whether the previous detention centers listed or provided any specific medications or dosages.[9]  Reno, Nevada is approximately 900 miles from Gallup, New Mexico.  See Response at 4 (setting forth this fact); Reply at 5 (not disputing this fact).  If an inmate arrived without medication, the staff signed a release and sought the medication within ten to fifteen minutes.  See Deposition of Richard Holden at 12:22-13:12, at CM/ECF 12-13 (dated May 20, 2011), filed September 7, 2011 (Doc. 77-1); Reply at 5 (not disputing this fact).[10]  If an inmate needs

_____

specifically controverted Coffey's asserted fact that Crutcher died because he had no heart medication.  See D.N.M.LR-Civ. 56(b).  Alternatively, given that it is unclear what Coffey presents in her Response as additional material facts or facts disputing McKinley County's asserted facts, this evidence does not specifically controvert McKinley County's asserted fact that Crutcher received heart medication while he was at the McKinley County Detention Center.  See D.N.M.LR-Civ. 56(b).  This evidence does not controvert McKinley County's asserted facts, because Dr. Paris' testimony does not specifically discuss heart medication, and discusses only antibiotics, and does not specifically discuss Crutcher's cause of death other than that he received an infection.

[9]McKinley County presented in its Motion for Summary Judgment an asserted fact that Crutcher did not have any medications on him when he arrived and that the previous detention centers listed or provided specific medications or dosages.  See Resident Receiving Screening Report at 1.  Coffey counters that a licenced practical nurse stated that Bureau of Indian Affairs inmates generally arrive with a medical history from their hospital, a three- to seven-day supply of medications, and a contact number with a list of the prisoner's doctor, the prisoner's ailments, and a list of his or her medications.  See Deposition of Richard Holden at 17:17-24, at CM/ECF 15 (dated May 20, 2011), filed September 7, 2011 (Doc. 77-1)("Holden Depo.").  This evidence is sufficient to specifically controvert McKinley County's asserted fact, and the Court deems this fact controverted.  See D.N.M.LR-Civ. 56(b).

[10]Coffey presents several asserted facts that rely on the testimony of Judy Valle, a registered nurse at the McKinley County Detention Center.  Coffey states that Valle said that inmates rarely showed up with any of their medical records and that Valle instructed them to contact their family to resolve their medical issues.  See Deposition of Judy Valle at 29:7-21, at CM/ECF 17, filed September 7, 2011 (Doc. 77-1)("Valle Depo."); Response at 4-5 (setting forth this fact).  McKinley County argues that this deposition testimony does not support this fact.  See Reply at 5.  The question Valle answered was what she would do when someone arrived from Reno Sparks Indian Colony without medication.  See Valle Depo. at 29:7-10, at CM/ECF 17.  She never responds in a manner that indicates that inmates rarely arrived with any of their medical records, as she responds what she would do in the situation that the questioner presented.  See Valle Depo. at 29:11-21, at

medication, the nurse goes to the inmate.  <u>See</u> Holden Depo. at 19:6-13, at CM/ECF 19; Reply at

5 (not disputing this fact).  The guards take the inmate to the medical staff for medication.  <u>See</u>

Deposition of Leander Yamutewa at 19:10-20:5, at CM/ECF 21, filed September 7, 2011 (Doc. 77-

1)("Yamutewa Depo.").[11]

     Congestive heart failure requires a diuretic and other medication to maintain health.  <u>See</u>

Paris Depo. at 17:23-24, 18:1-13, at CM/ECF 28-29; Deposition of Dr. Ram Challapalli at 14:6-20,

47:8-48:25, 50:4-19, 52:6-19, at CM/ECF 30-35 (dated April 5, 2011), filed September 7, 2011

(Doc. 77-1)("Challapalli Depo.").[12]  Dr. Challapalli prepared a letter to explain the seriousness of

---

CM/ECF 17.  Thus, the Court concludes that the cited evidence does not support the asserted fact.
<u>See</u> Fed. R. Civ. P. 56(c)(1).  Coffey also presents an asserted fact based on this testimony that the
prison staff do not seek a prisoner's medication until the inmate sends a medical request.  <u>See</u> Valle
Depo. at 29:7-21, at CM/ECF 17; Response at 5 (setting forth this fact).  McKinley County argues
that this deposition testimony does not support the asserted fact.  <u>See</u> Reply at 5.  The cited
deposition testimony does not indicate that McKinley County sought this information only when an
inmate makes a request, as Valle testifies that, if a prisoner arrived without medication, she would
contact the family, check the release information for the prisoner, and contact the medical provider
by facsimile transmission, because the family sometimes provides old medication.  <u>See</u> Valle Depo.
at 29:7-21, at CM/ECF 17.  Thus, the Court concludes that the evidence Coffey cites does not
support the asserted fact that inmates rarely show up with any of their medical records and that Valle
instructed them to contact their families to resolve their medical issues, and will not consider the
asserted fact.  <u>See</u> Fed. R. Civ. P. 56(c)(1).

    [11]The Court notes that these two asserted facts regarding the method by which inmates
receive medical care are in tension.  The Court will take the view of the facts that is most favorable
to Coffey in deciding the Motion for Summary Judgment.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. at 551.

    [12]McKinley County asserts that the cited testimony does not support this proposition that
congestive heart failure requires a diuretic and other medication to maintain health, and that the
testimony establishes instead that there would have been no effect for years if Crutcher did not have
his medication.  The asserted fact maintains only that congestive heart failure requires certain
treatment to maintain health.  The cited testimony refers in various places that there is decreased
mortality if this treatment occurs.  <u>See</u> Challapalli Depo. at 14:6-20, 47:8-48:25, 50:4-19, 52:6-19,
at CM/ECF 30-35.  Drawing all reasonable inferences in Coffey's favor and resolving all doubts in
her favor, the Court concludes that this evidence supports the asserted fact.  <u>See</u> <u>Hunt v. Cromartie</u>,
526 U.S. at 551.

Crutcher's condition and the care that he needed before he entered jail.  See Letter to Ethyl M.

Henry from Dr. Ram M. Challapalli at 36-37[13] (dated May 15, 2006), filed September 7, 2011 (Doc.

77-1).[14]  Judy Valle, a registered nurse at the McKinley County Detention Center, did not know how

to recognize a defibrillator[15] at intake, even though it is a protrusion visible on the body.  See Valle

_____

[13]McKinley County objects to this letter as hearsay.  Because this letter is not attested and Coffey has not responded to this objection, the Court will consider this letter only for the non-hearsay purpose of showing notice of the facts contained in the letter to the person who received the letter.  See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1090 (10th Cir. 2001)("It is true that an out-of-court statement may be admitted over a hearsay objection if the statement is offered not for the truth of the matter asserted in the statement but merely to show that a party had knowledge of a material fact or issue.").

[14]Coffey presents an asserted fact that Crutcher repeatedly asked guards to get his medication.  See Response at 4 (setting forth this fact); Gyce Aff. at 8-9.  To support this asserted fact, Coffey relies on statements in an affidavit of a person who was an inmate along with Crutcher, Elson Gyce.  Gyce's affidavit states that Crutcher told him "that he had asked for his medication but nothing ever happened."  Gyce Aff. at 8.  McKinley County objects that this evidence is hearsay, as it repeats what Crutcher said, and contends that the cited evidence does not support the asserted proposition as it is not possible to tell to what Gyce refers.  See Reply at 5.  This statement is inadmissible hearsay, as it is offered for the truth of the matter asserted.  While it is true that a demand directed at someone oftentimes contains no statement of fact and thus qualifies as nonhearsay, this statement reports what Crutcher told Gyce -- a factual assertion -- rather than what Crutcher demanded from the guard.  See United States v. White, 639 F.3d 331, 337 (7th Cir. 2011)(recognizing that a demand note used during a bank robbery did not qualify as hearsay as it contained no assertions of fact).  Furthermore, Crutcher made this statement to Gyce, not any of the prison guards or other prison staff, so the Court may not consider it for purposes of showing notice to the listener.  See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d at 1090 ("It is true that an out-of-court statement may be admitted over a hearsay objection if the statement is offered not for the truth of the matter asserted in the statement but merely to show that a party had knowledge of a material fact or issue.").  There is no way to cross examine Crutcher's alleged statement or determine its reliability.  The issue of Gyce's notice whether Crutcher had asked for his medication is irrelevant given that the knowledge of the guards and medical staff is at issue.  Thus, the Court will not consider this asserted fact.

[15]A defibrillator is "[a]ny agent or measure, e.g., an electric shock, that arrests fibrillation of the ventricular muscle and restores the normal beat" of the heart.  Stedman's Medical Dictionary, supra, at 500.  Fibrilation is "[e]xceedingly rapid contractions or twitching of muscular fibrils, but not of the muscle as a whole."  Id. at 722.  A fibril is "[a] minute fiber or component of a fiber."  Id. at 722.

Depo. at 31:14-19, at CM/ECF 40; Deposition of Dr. Neal Shadoff at 20:8-15, at CM/ECF 41 (dated

July 1, 2011), filed September 7, 2011 (Doc. 77-1)("Shadoff Depo.").[16] One of the licensed practical

nurses ("LPN") at the facility knew that Crutcher had a defibrillator.  See Holden Depo. at 30:11-23,

at CM/ECF 42; Reply at 5 (not disputing this fact).[17]

_____

[16]McKinley County argues that the cited evidence does not support the asserted fact that Valle did not know how to recognize a defibrillator, even though it is a protrusion visible on the body.  Valle's testimony indicates that she did not know how to recognize a defibrillator.  See Valle Depo. at 31:14-19, at CM/ECF 40.  Dr. Shadoff's testimony described a defibrillator as an obvious protrusion.  See Shadoff Depo. at 20:8-15, at CM/ECF 41.  Drawing all reasonable inferences in Coffey's favor and resolving all doubts in her favor, this evidence is sufficient to support the asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551.  With respect to Valle, Coffey also asserts that she

> had no understanding of the necessity of the medication and did not ascertain the prescriptions needed until nearly four months after Andrew Crutcher arrived at the facility, but expected Andrew Crutcher to depend on his family for his medications when the BIA had transported Mr. Crutcher 900 miles away from his family.

Response at 4-5 (setting forth this fact); Valle Depo. at 20:18-21, 21:1-3, at CM/ECF 38.  McKinley County objects that these asserted facts either have no citation to support them or that the cited evidence does not support the proposition.  See Reply at 5.  Valle testifies in her deposition that her practice was to ascertain if prisoners have medication with them, and if they did not, she would call the family to see if they could provide the medication.  See Valle Depo. at 20:18-21, 21:1-3, at CM/ECF 38.  Valle testified that, if that method did not work, she informed the prisoners that, if they had a physical complaint, including trivial ones, they should file a medical request to alert the medical staff to the situation, and that she would address the situation.  See Valle Depo. at 21:1-9, at CM/ECF 38.  Even drawing all reasonable inferences in Coffey's favor, the cited portion of the deposition testimony does not support the asserted fact.  See Fed. R. Civ. P. 56(c)(1).  Furthermore, the cited testimony does not mention any specific information about Crutcher, his family, or the location of his family.  The Court will not consider these facts that Coffey has asserted.

[17]McKinley County does not dispute that one of the LPN's at the facility knew that Crutcher had a defibrillator, but disputes Coffey's asserted fact that the LPN did not know how important it was to check the defibrillator.  See Reply at 5.  McKinley County asserts that the cited evidence does not support this proposition.  See Reply at 5.  The cited deposition testimony includes statements from this LPN regarding his knowledge of how often a person must check a defibrillator.  See Holden Depo. at 30:11-23, at CM/ECF 42.  Nowhere in this cited testimony does Holden indicate that he did not know how important it was to check a defibrillator.  Thus, even drawing all reasonable inferences in Coffey's favor, the cited evidence does not support the asserted proposition.  See Fed. R. Civ. P. 56(c)(1).

McKinley County "failed to have a plan for the inmates within 14 days of arrival at the institution which is the accepted procedure for jails across the county both certified and non certified." Response at 5 (setting forth this fact).  See Deposition of Dr. Joseph Paris at 83:18-85:14, at CM/ECF 1-3 (dated July 19, 2011), filed September 7, 2011 (Doc. 77-2)("Paris Depo. #2"); Reply at 5 (not disputing this fact).  McKinley County Detention Center had no 14-day plan or physical. See Deposition of Richard Holden at 23:16-20, at CM/ECF 4 (dated May 20, 2011), filed September 7, 2011 (Doc. 77-2)("Holden Depo. #2"); Reply at 5 (not disputing this fact).  A registered nurse "attempted to justify this failure by stating that medical did not know how long BIA inmates would be there, even though she admitted that the examination and plan would be of no cost" to the McKinley County Detention Center.  Response at 5 (setting forth this fact).  See Deposition of Judy Valle at 50:15-21, at CM/ECF 7-8, filed September 7, 2011 (Doc. 77-2)(Valle Depo. #2"); Reply at 5 (not disputing this fact).

There is no evidence that Crutcher had valid prescriptions for any medication at the time of his incarceration with McKinley County.  See Bureau of Indian Affairs Internal Complaint at 1, filed August 1, 2011 (Doc. 78-3).[18]  Most corrections institutions take care of prescriptions for inmates

_____

[18]Coffey disputes this fact.  She points to testimony from Dr. Paris that most corrections institutions take care of prescriptions for the inmate through their own pharmacies or through other methods.  See Paris Depo #2 at 21:8-17, at CM/ECF 9. She also notes that various prison employees testified that there was no method of indexing or referencing prisoner's property.  See Holden Depo. #2 at 31:13-19, at CM/ECF 10; Deposition of Leander Yamutewa at 15:24-16:4, at CM/ECF 11, filed September 7, 2011 (Doc. 77-2)("Yamutewa Depo. #2").  Additionally, Coffey points out that, based on this lack of an indexing system and that the nurses were seeing over 200 inmates for medical referrals, "how could they have been able to say that Andrew Crutcher arrived with no medication or prescriptions."  Response at 6 (setting forth this fact); Holden Depo. #2 at 19:17-21, at CM/ECF 12.  "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56(b).  Evidence that corrections institutions normally take care of prescriptions for inmates does not controvert the asserted fact that Crutcher arrived without a prescription.  Evidence that there was no indexing system and that the nurses were seeing over 200 inmates does not specifically controvert this assertion -- that Crutcher had no valid

through their own pharmacy or through other means.  See Paris Depo. #2 at 21:8-17, at CM/ECF 9; Reply at 3 (not disputing this fact).  The records reflect that Crutcher did not make any request to see medical personnel until December 9, 2006, and that was concerning a bump on his leg.  See Health Service Request Form at 1 (dated December 9, 2006), filed August 1, 2011 (Doc. 78-4).[19] The only way for the prisoners to get medical help was to contact a guard.  See Gyce Aff. at 8-9; Reply at 6 (not disputing this fact).[20]  Most of the guards did not care about helping the inmates.

_____

prescription for any medication at the time of his incarceration with McKinley County.  That evidence may indicate that records regarding these facts may have been misplaced, but they do not controvert the asserted fact.  Thus, the Court deems this fact admitted.

   [19]Coffey disputes this fact, arguing that the records at McKinley County are non-existent, because "[s]ome box where inmates were supposed to place their requests existed or ceased to exist at some time."  Response at 6 (setting forth this fact); Holden Depo. #2 at 14:15-20, at CM/ECF 13.  The evidence Coffey cites includes testimony from Holden that the detention center stopped using a box where inmates could put medical requests slips at some point.  This evidence does not specifically controvert the asserted fact as required by D.N.M.LR-Civ. 56(b).  Thus, the Court will deem this fact admitted.

   [20]McKinley County argues that the cited evidence does not support this asserted fact that the only way to get medical help was to contact a guard.  See Reply at 6.  Gyce states in his affidavit: "There was a box where we as inmates could put medical requests and other requests but nothing ever happened if we didn't corner a guard who was one of the good ones and willing to help us."  Gyce Aff. ¶ 14, at 8.  Drawing all reasonable inferences in favor of Coffey and resolving all doubts in her favor, the Court concludes this evidence is sufficient to support her asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551.  Coffey asserts a variety of other facts without including a citation to evidence, including that guards rarely came to the cell block and that the guards locked Crutcher down for getting angry because he did not receive his medication.  See Response at 6-7.  McKinley County objects that Coffey has not cited evidence to support these asserted facts.  Given that rule 56(c)(1) requires a party to support their asserted facts with citations to evidence, the Court will disregard these asserted facts.  See Fed. R. Civ. P. 56(c)(1).  It is not the Court's responsibility to scour Coffey's exhibits to determine which exhibits may support her asserted facts.  See Gonzales v. City of Albuquerque, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)("[I]t is not the Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary Judgment . . . ."); Hauff v. Petterson, 755 F.Supp.2d 1138, 1150 (D.N.M. 2010)(Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.' " (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996))).

See Gyce Aff. at 8-9.[21]  Crutcher "was transported and treated for" this bump on his leg at Gallup

Indian Medical Center ("GIMC") on December 9, 2006.  See MSJ ¶ 3, at 3 (setting forth this fact);

Emergency Visit Record at 1-2 (dated December 10, 2006), filed August 1, 2011 (Doc. 78-6).[22]

---

[21]McKinley County argues that the asserted fact that most of the guards did not care about the inmates contains no citation to the record.  See Reply at 6.  In his affidavit, Gyce discusses some facts about some of the guards not wanting to help the inmates.  See Gyce Aff. at 8-9.  Coffey cites to this affidavit near this asserted proposition.  Drawing all reasonable inferences in Coffey's favor, this evidence supports the asserted proposition.  See Fed. R. Civ. P. 56(c)(1).

[22]Coffey sets forth several asserted facts in relation to McKinley County's asserted fact that Crutcher was transported and treated for this bump on his leg at GIMC on December 9, 2006, including that: (i) Crutcher was sick with the flu for three to four weeks and could get no help; (ii) Valle stated that, rather than having a medical plan, she expected the inmates to tell the medical staff if they had a medical problem; and (iii) Crutcher had no medical training and was thus dependent on the medical staff.  See Response at 6-7 (setting forth these facts); Incident Statement of Derrick Reiser at 14 (dated February 8, 2007), filed September 7, 2011 (Doc. 77-2).  McKinley County objects to this first asserted facts, as it relies on hearsay.  See Reply at 6.  McKinley County contends that the second two assertions have no evidentiary citations to support them.  See Reply at 6.  The Incident Statement of Derrick Reiser contains a handwritten statement from Reiser, another inmate at the prison.  The statement at issue is: "About 3 to 4 weeks ago, Andrew Crutcher came down with the flu or something."  Incident Statement of Derrick Reiser at 14.  This statement is unattested, and thus qualifies as hearsay because it is offered for the truth of the matter asserted.  See Sigler v. Amer. Honda Motor Co., 532 F.3d 469, 480-81 (6th Cir. 2008)(holding that the district court improperly considered three unsworn expert reports when ruling on a motion for summary judgment); Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)("Because the preliminary report was submitted without attestation, it had no probative value and properly was not considered by the district judge in ruling on the officers' summary judgment motions.").  Furthermore, it does not fall within any exception.  While the incident statement itself may be a public record under rule 803(8) of the Federal Rules of Evidence, the handwritten statement from Reiser, an inmate at the prison, is double hearsay; Reisner is not a government official, so his statements do not fall within rule 803(8).  See John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d 632, 636 (3d Cir. 1977).  As the United States Court of Appeals for the Third Circuit recognized:

> The Advisory Committee's Notes make clear that Federal Rule of Evidence 803(8) exempts from the hearsay rule only reports by officials; and of course the pilots and other witnesses are not officials for this purpose.  Moreover, the memoranda submitted to the government by its investigators often contained statements from witnesses which would make such memoranda encompass double hearsay.

See John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d at 636.  Thus, the Court will not consider this asserted fact.  Additionally, the Court will not consider these second two asserted facts, as there

Once, during the period from 2006-2007, an inmate had a seizure, and it took thirty minutes for the guards to respond. See Gyce Aff. ¶ 18, at 9.[23]  No screening report went with Crutcher to GIMC to indicate that Crutcher needed medication for his congestive heart failure. See Valle Depo. #2 at 39:2-12, at CM/ECF 15; Holden Depo. #2 at 17:12-14, at CM/ECF 16; Reply at 6 (not disputing this fact).  Crutcher received an antibiotic prescription at GIMC, and McKinley County Detention Center received instructions regarding wound care.  See Medical Report of Duty Status at 1 (dated December 10, 2006), filed October 8, 2011 (Doc. 78-6); Response at 7 (not disputing this fact).  Anyone with congestive heart failure must be treated aggressively for infection, because the insertion of a defibrillator in the body provides a pathway for infection.  See Paris Depo. #2 at 80:3-82:25, at CM/ECF 17-19.[24]  Aggressive treatment for infection was the "only standard of care that should have been pursued because infections in heart patients are critical and very serious." Response at 7 (citing to Dr. Challapalli, a heart specialist and Crutcher's treating physician)(setting forth this fact).  See Deposition of Dr. Ram Challapalli at 15:10-16:22, at CM/ECF 20-21 (dated April 5, 2011), filed September 7, 2011 (Doc. 77-2)("Challapalli Depo. #2"); Reply at 6 (not

_____

is no citation to evidence to support them.  See Fed. R. Civ. P. 56(c)(1).

    [23]McKinley County argues that Coffey has not cited any evidence to support this proposition. In the preceding sentence in her Response, Coffey cites an affidavit that contains this assertion. See Response at 6 (citing Gyce Aff. at 8-9).  Thus, the Court concludes that she has cited evidence to support this asserted fact.

    [24]Coffey sets forth that a basic medical response to the situation would have been intravenous antibiotics.  See Response at 7 (setting forth this fact).  McKinley County objected to this asserted fact as there is no citation to evidence to support this fact.  Because there is no citation to evidence to support this fact, the Court will disregard this asserted fact.  See Fed. R. Civ. P. 56(c)(1).  It is not the Court's responsibility to scour Coffey's exhibits to determine which exhibits may support her asserted facts.  See Gonzales v. City of Albuquerque, 2011 WL 1114830, at *24; Hauff v. Petterson, 755 F.Supp.2d at 1150 (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)).

disputing this fact).

Crutcher went back to GIMC a couple days after this initial visit for a follow-up

examination. See Emergency Visit Record at 1 (dated December 12, 2006), filed August 1, 2011

(Doc. 78-7)("Emergency Visit Record #2"); Response at 7-8 (not disputing this fact).[25]  The records

reflect that on January 16, 2007, Crutcher again requested medical attention, this time for a cold that

was not improving. See Health Service Request Form at 1 (dated January 16, 2007), filed August

1, 2011 (Doc. 78-8)("Health Service Request Form #2"); Response at 8-9 (not disputing this fact).[26]

_____

[25]Coffey presents several asserted facts that: (i) McKinley County still did not observe after
this follow-up visit Crutcher's lack of medication for his congestive heart failure and GIMC did not
remedy this problem; (ii) BIA required McKinley County to take Native Americans to GIMC to
avoid expense; (iii) and GIMC did not take any vital signs for Crutcher on this follow-up visit.
McKinley County objects to the first and third asserted fact, because Coffey does not cite any
evidence to support the asserted fact.  McKinley County objects to the second asserted fact because
the cited evidence does not support the proposition.  Because Coffey has not cited any evidence for
the first or third asserted fact, the Court will not consider those facts as there is no evidence to
support them.  See Fed. R. Civ. P. 56(c)(1).  It is not the Court's responsibility to scour Coffey's
exhibits to determine which exhibits may support her asserted facts.  See Gonzales v. City of
Albuquerque, 2011 WL 1114830, at *24; Hauff v. Petterson, 755 F.Supp.2d at 1150 (quoting
Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)).  With respect to the
second asserted fact, Coffey cites to Vincente Anchondo's deposition, where he testifies about
requesting medical documentation for prisoner treatment whenever McKinley County sends a
person to an outside facility for medical treatment.  See Deposition of Vincente Anchondo at 43:24-
44:5, at CM/ECF 22-23 (dated July 1, 2011), filed September 7, 2011 (Doc. 77-2)("Anchondo
Depo.").  This testimony does not support the asserted fact, that BIA required McKinley County to
take Native Americans to GIMC in order to avoid expense.  The cited testimony does not refer to
BIA or GIMC, or imply that McKinley County had to send Native Americans to GIMC.  Thus,
because Coffey's cited evidence does not support her asserted fact, the Court will not consider it.
See Fed. R. Civ. P. 56(c)(1).

[26]For several of her asserted facts that relate to this doctor visit in January, Coffey relies on
statements in Dr. Paris' report regarding the quality of the treatment Crutcher received.
See Response at 8-9 (quoting excerpts from Dr. Paris' report); Report of Dr. Joseph E. Paris at 25-26
(dated July 5, 2011), filed September 7, 2011 (Doc. 77-1)("Dr. Paris Report").  McKinley County
objects to this report as inadmissible hearsay, because the report is not attested.  See Reply at 7.  The
report recounts various forms of treatment the physicians at the jail gave Crutcher and reaches
conclusions about the decision to render that form of care when presented with Crutcher's
symptoms, predominantly that the decisions did not comply with the requisite standard of care.  See

After the receipt of Crutcher's request, the doctor diagnosed Crutcher with sinusitis[27] and prescribed antibiotics.  See Health Service Request Form #2 at 1; Response at 8-9 (not disputing this fact).  On January 26, 2007, GIMC saw Crutcher for assessment of his cardiomyopathy.[28]  See Emergency Visit Record at 1-2 (dated January 26, 2007), filed August 1, 2011 (Doc. 78-9)("Emergency Visit Record #3"); Response at 9 (not disputing this fact).  GIMC restarted Crutcher's medications at that time.  See Medication Administration Chart at 1, filed August 1, 2011 (Doc. 78-10).[29]

_____

Dr. Paris Report at 25-26.  Coffey offers the report for the truth of the matters asserted therein. Consequently, this evidence is hearsay, because it is unattested.  See Sigler v. Amer. Honda Motor Co., 532 F.3d at 480-81 (holding that the district court improperly considered three unsworn expert reports when ruling on a motion for summary judgment); Carr v. Tatangelo, 338 F.3d at 1273 n.26 ("Because the preliminary report was submitted without attestation, it had no probative value and properly was not considered by the district judge in ruling on the officers' summary judgment motions.").  The Court does not see any portions that Coffey has cited which would be nonhearsay or fall within an exception to the hearsay rule.  Thus, the Court will not consider this evidence.

[27]Sinusitis is the "[i]nflammation of the mucous membrane of any sinus."  Stedman's Medical Dictionary, supra, at 1777.

[28]Cardiomyopathy is a "[d]isease of the myocardium."  Stedman's Medical Dictionary, supra, at 313.  The myocardium is the "middle layer of the heart, consisting of cardiac muscle."  Id. at 1271.

[29]Coffey cites several exhibits to dispute this asserted fact that GIMC restarted Crutcher's medications on January 26, 2007.  See Response at 9.  First, she cites to Dr. Paris' testimony. See Paris Depo. #2 at 58:16-59:13, at CM/ECF 24-25.  Second, she states that, by January 26, 2007, the fact that Mr. Crutcher had not received his heart medication finally occurred to someone, because Valle finally sent a facsimile transmission requesting that the Indian Health Services Clinic at Reno Sparks and promptly got the return prescriptions necessary for Crutcher.  See Facsimile Transmission from Judy Valle to Reno Sparks Indian Colony Health Unit at 26-27 (dated January 18, 2007), filed September 7, 2011 (Doc. 77-2).  Third, Coffey asserts that, notwithstanding Valle's testimony to the contrary, "it is obvious that the Indian Health Services responded promptly," as Valle had "no evidence whatsoever that she had ever contacted them earlier nor obtained a signed release from Crutcher earlier."  Response at 9.  See Valle Depo. #2 at 73:7-14, at CM/ECF 28. McKinley County responds that none of these citations are sufficient to dispute this fact.  See Reply at 7.  McKinley County notes that the second asserted fact relies on a facsimile transmission dated January 18, 2007, which predates January 26, 2007, the date GIMC purportedly restarted Crutcher's medications.  See Reply at 7.  McKinley County notes that the cited evidence does not support the third asserted fact.  See Reply at 7.

-16-

On January 28, 2007, Crutcher requested medical attention for kidney pain.  See Health

Service Request Form at 1 (dated January 24, 2007), filed August 1, 2011 (Doc. 78-11)("Health

Service Request Form #3"); Response at 9 (not disputing this fact).  Doctors saw and evaluated

---

Regarding Dr. Paris' testimony, in response to the question, "Do you have any evidence that [Crutcher] did not begin taking medication on 1-26-07," Dr. Paris responded: "I think there is a note by another doctor that that had not happened . . . . Dr. Lisko said on January 29, [that Crutcher] did not get the medications."  Paris Depo. #2 at 58:16-22, at CM/ECF 24.  When confronted with the medical record that McKinley County cited in its Motion for Summary Judgment, Dr. Paris did not state that he believed or disbelieved this record regarding the administration of medication, but responded instead: "Yes, I see that.  However, Dr. Lisko wrote otherwise," and that, "I will say there's an inconsistency between the doctor and the MAR or medication administration record."  See Paris Depo. #2 at 59:3-15, at CM/ECF 25.  Additionally, Coffey does not present sufficient information for the Court to conclude who Dr. Lisko is.  "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56(b).  Given that Dr. Paris would not specifically dispute the medical records that McKinley County has cited, the Court concludes that this evidence is not sufficient to specifically controvert McKinley County's asserted fact.   See D.N.M.LR-Civ. 56(b).   The following evidence would have controverted the asserted fact: (i) a more direct answer from Dr. Paris that this medical record was inaccurate -- i.e., statements to the effect that Dr. Paris disbelieved the medical record and believed Dr. Lisko instead; (ii) the other doctor's records; or (iii) testimony from the other doctor asserting that Crutcher did not receive this medication on this date.  The Court also notes that it does not have sufficient information to conclude who Dr. Lisko is or why his conclusion would be important.

The Court notes that the facsimile transmission Valle sent to the Indian Health Services Clinic at Reno Sparks is dated January 18, 2007.  See Facsimile Transmission from Judy Valle to Reno Sparks Indian Colony Health Unit at 26-27.  Given that the facsimile transmission Valle sent to the Indian Health Services Clinic at Reno Sparks requesting Crutcher's prescriptions is dated January 18, 2007, and the asserted fact states that GIMC restarted Crutcher's medications on January 26, 2007, the Court finds that Valle's facsimile transmission does not specifically controvert McKinley County's asserted fact that GIMC restarted Crutcher's medications on January 26, 2007.  See D.N.M.LR-Civ. 56(b).  Furthermore, the Court does not see the reasonable inference that could be drawn that would dispute that GIMC restarted Crutcher's medications on January 26, 2007, when Valle made a request for his prescriptions roughly a week before this date.  Furthermore, in the cited portion of Valle's deposition on which Coffey relies to state that it was obvious that the Indian Health Services responded promptly and that Valle had no evidence whatsoever that she had ever contacted the Indian Health Services Clinic at Reno Sparks earlier nor obtained a signed release from Crutcher earlier, Valle discusses only the date she sent the facsimile transmission -- January 18, 2007.  This cited testimony does not support Coffey's assertion.  Thus, the Court deems this fact admitted.

Crutcher on January 28, 2007, and provided ibuprofen and flexeril[30] for the diagnosis of back pain.

See Health Service Request Form at 1; Response at 9 (not disputing this fact). These doctors' report

lacked Crutcher's vital signs and other information. See Paris Depo. #2 at 94:4-18, at CM/ECF 29;

Reply at 7 (not disputing this fact).[31]  As of February 8, 2007, Crutcher had been unable to get up

from his bed for four or five days, and on February 8, 2007, the other inmates staged a riot to get

help for Crutcher.  See Gyce Aff. ¶ 19, at 9.[32]  The guards had earlier observed that

---

[30]Flexeril is a brand name muscle relaxant "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last updated Oct. 1, 2010).

[31]Coffey presents two asserted facts in this section by pointing to: (i) testimony from Dr. Paris that these doctors' report lacked vital signs and other information; and (ii) stating that Dr. Challapalli reported that some of these symptoms would have indicated congestive heart failure. See Response at 9. McKinley County responds that the cited evidence does not support the first proposition and that the second asserted fact does not cite to any evidence. The testimony from Dr. Paris that Coffey cites involves Dr. Paris discussing whether Crutcher was having episodes of fibrillation, whether a defibrillator would have worked as there are no tracings during those possible episodes, and that he cannot be certain whether the defibrillator "was called to work" based on the lack of evidence. Paris Depo. #2 at 94:4-18, at CM/ECF 29. Drawing all reasonable inferences and resolving all doubts in Coffey's favor, the Court concludes that the cited evidence supports the first asserted fact. See Hunt v. Cromartie, 526 U.S. at 551. The testimony discusses the lack of documentation and evidence during the period immediately preceding Crutcher's death. The second asserted fact regarding Dr. Challapalli's conclusion cites to no portion of the record, nor are there any citations in the surrounding sentences that cite to any testimony from Dr. Challapalli. It is not the Court's responsibility to scour Coffey's exhibits to determine which exhibits may support her asserted facts. See Gonzales v. City of Albuquerque, 2011 WL 1114830, at *24; Hauff v. Petterson, 755 F.Supp.2d at 1150 (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)). Thus, the Court will disregard this second asserted fact.

[32]Coffey presents additional asserted facts in relation to these events. First, she notes that, as of February 8, 2007, Crutcher had been unable to get up from his bed for four to five days, and the other inmates staged a riot to get attention so that Crutcher would receive medical help. See Response at 10. Second, she notes that the guards "had noted earlier that Andrew Crutcher was failing, but did nothing because of the fear of losing money for the jail." Response at 10. McKinley County objects that Coffey has provided no citations to evidence for these asserted facts. See Reply at 7. Because Coffey has included no citations to evidence to support these asserted facts, the Court could disregard these asserted facts. See Fed. R. Civ. P. 56(c)(1). It is not the Court's responsibility

-18-

to scour Coffey's exhibits to determine which exhibits may support her asserted facts.  See Gonzales v. City of Albuquerque, 2011 WL 1114830, at *24; Hauff v. Petterson, 755 F.Supp.2d at 1150 (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)).  Assuming that Coffey has not waived presentation of these facts by failing to cite to evidence to support them, the Court has found evidence in Gyce's affidavit to support these asserted facts.  Gyce states: "Some of the guards kept looking at Andrew Crutcher in the last four or five days when he couldn't get out of bed, but they were worried about losing money or something."  Gyce Aff. ¶ 16, at 9.  McKinley County asserts that this statement is hearsay and is too vague to be of evidentiary value.  See Reply at 7.  McKinley County does not discuss its hearsay objection in any detail.  It is difficult to see how the phrase "[s]ome of the guards kept looking at Andrew Crutcher in the last four or five days when he couldn't get out of bed" could be hearsay, because Gyce could observe all of those actions.  Gyce Aff. ¶ 16, at 9.  While the guards conduct could be hearsay if they intended it to be assertive in nature, there is no indication that by looking at Crutcher they intended to assert anything.  See United States v. McIntyre, 997 F.2d 687, 703 (10th Cir. 1993)("Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement.").  Thus, this portion of the statement is not hearsay.  Drawing all reasonable inferences and resolving all doubts in Coffey's favor, this evidence supports the portion of her asserted fact that the guards had earlier observed that Crutcher was failing and did nothing.

The Court is more concerned about the rest of the sentence -- "but they were worried about losing money or something."  Gyce Aff. ¶ 16, at 9.  It is not clear how Gyce could know this fact without someone telling him that fact, or it may be speculation by Gyce, or not based on personal knowledge.  McKinley County did not object that the statement was speculative or that Gyce lacked personal knowledge.  See Reply at 7.  While it at first appears that this second portion of Gyce's statement discusses no particular oral statement by the guards or the inmates, a statement may still be hearsay by implication if it contains another person's statement by implication.  See United States v. Reyes, 18 F.3d 65, 69 (2d Cir. 1994)("[A]lthough the jury was not told exactly what words Francisco and Fernando had spoken, Caggiano's testimony clearly conveyed the substance of what they had said."); United States v. Brown, 548 F.2d 1194, 1204-05 (5th Cir. 1977)("Because her testimony had to have been based directly on the out-of-court statements of these taxpayers, defendant had no opportunity to test their ultimate assumptions through cross-examination.").  If not speculation or lacking in personal knowledge, Gyce's statement falls within this category of implied hearsay, as it impliedly relates what someone told Gyce.  Coffey has not presented any basis -- sound or otherwise -- for the admissibility of this evidence, such as that it falls within a hearsay exception or is nonhearsay.  Based on the lack of context in Gyce's affidavit, the Court cannot reasonably determine who exactly may have made the statement.  Thus, the Court will disregard the portion of Coffey's asserted fact regarding why the guards did not act, specifically that they were worried about the McKinley County Detention Center losing money.

The Court does not have sufficient information, specifically the identity of the speaker, to conclude whether the guards were -- assuming without deciding that they were the declarants -- worried about losing money or something would qualify as an admission by party opponent.  See Fed. R. Evid. 801(2)(D) (excepting from the hearsay rule a "statement . . . offered against a party [that] is . . . a statement by the party's agent or servant concerning a matter within the scope of the

agency or employment, made during the existence of the relationship").  It is true that an employee does not need authority to make a particular decision within a business or entity for his statement on that issue to concern a matter within the scope of his employment, but the Court does not have sufficient information about the context of the statement or identity of the speaker to make that determination.  See Rainbow Travel Serv., Inc. v. Hilton Hotels Corp., 896 F.2d 1233, 1242 (10th Cir. 1990)(recognizing that a shuttle bus driver's statement regarding a hotel's reservation practices was admissible under rule  801(2)(D), even though there was no evidence he was involved in making reservations, when the shuttle bus driver often transported hotel customers who had lost their reservations).

For the same reasons -- the lack of information about the identity of the speaker or any context for the statement -- the Court cannot determine whether the statement might be admissible for the nonhearsay purpose of proving the declarant's state of mind circumstantially or whether it would fall within the state-of-mind exception to the hearsay rule.  A party may offer a statement that would otherwise be hearsay for the purpose of proving the declarant's state of mind circumstantially. See United States v. Rodriguez-Pando, 841 F.2d 1014, 1020 (10th Cir. 1988).  As the Tenth Circuit has explained:

> The same statement can be hearsay in one trial and nonhearsay in another because the purpose for which it is offered determines whether the statement is hearsay.  A statement not offered to prove the truth of the matter asserted but rather to indirectly infer a party's state of mind or to show the effect of a statement on a party has long been recognized as nonhearsay.  The subject matter of the assertion is not an express articulation of state of mind; instead the declarant's state of mind may be inferred from the fact that the assertion was made. Whether the actual subject matter of the assertion is true or not is irrelevant.

> . . . .

> The exception to the hearsay rule enunciated in Rule 803(3) only comes into play when the statement is undeniably hearsay because it is a direct and explicit declaration of state of mind, i.e., it is offered to prove the truth of the substance of what the declarant said. For example, "I intended to kill John" is hearsay if it is offered to prove the declarant's mens rea of intent. . . . [N]o extrapolation from the subject matter of the assertion is necessary in order to infer the declarant's state of mind, and the truth of the subject matter of the assertion is the critical inquiry.  The contemporaneous requirement in Rule 803(3) is the putative circumstantial guarantee of trustworthiness that justifies allowing the trier of fact to consider the substance of the hearsay utterance as proof of the declarant's state of mind at the time he or she commented on it.  The advisory committee notes on the rules make this clear when they state, "Exception (3) is essentially a specialized application of Exception (1) [present sense impression], presented separately to enhance its usefulness and accessibility."

Crutcher was failing, but did nothing.  See Gyce Aff. ¶ 16, at 9.  Leander Yamutewa, a McKinley

County Detention Officer, observed Crutcher as ill and jaundiced on February 8, 2007.  See

Deposition of Leander Yamutewa at 36:1-38:25, 47:1-25 (dated May 19, 2011), filed August 1, 2011

(Doc. 78-12)("Yamutewa Depo. #3"); Response at 9-10 (not disputing this fact).  Yamutewa

immediately took Crutcher to the medical unit.  See Yamutewa Depo. #3 at 36:1-38:25, 47:1-25;

Response at 10 (not disputing this fact).  It is disputed whether Crutcher walked to the medical unit

or required assistance to get there.  See Holden Depo. #2 at 26:9-11, at CM/ECF 26; Gyce Aff. at

8-9.[33]  At the medical unit, Holden, a nurse at the McKinley County Detention Center, spoke to

---

United States v. Rodriguez-Pando, 841 F.2d at 1020-21 (emphasis in original)(citation omitted).
Alternatively, statements that might otherwise qualify as hearsay may be offered under rule 803(3)
of the Federal Rules of Evidence for the purpose of proving the declarant's state of mind.  See Fed.
R. Evid. 803(3).  Rule 803(3) of the Federal Rules of Evidence excepts from the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or
> physical condition (such as intent, plan, motive, design, mental feeling, pain, and
> bodily health), but not including a statement of memory or belief to prove the fact
> remembered or believed unless it relates to the execution, revocation, identification,
> or terms of declarant's will.

Fed. R. Evid. 803(3) (emphasis added).  Based on the affidavit alone, the Court cannot conclude who
made the statement, its context, or when the declarant made the statement.  With that information,
the Court might have been able to conclude that the statement was admissible for the purposes of
proving state of mind circumstantially or that it fell within the state-of-mind exception to the hearsay
rule contained in rule 803(3).

   [33]McKinley County argues that the evidence on which Coffey relies to establish that Crutcher
needed assistance to reach the medical unit, Gyce's Affidavit, does not establish that Gyce had any
personal knowledge of the events he reported.  See Reply at 7.  Gyce presents in his affidavit a
variety of observations and interactions with Crutcher.  See Gyce Aff. at 8-9.  Gyce reports that,
once Crutcher left during this time period for medical help, Crutcher's "cell mate had to help him
downstairs because he couldn't walk by himself."  Gyce Aff. ¶ 19, at 9.  "[G]enerally Rule 56(e)'s
requirements of personal knowledge and competence to testify may be inferred if it is clear from the
context of the affiant is testifying from personal knowledge."  Told v. Tig Premier Ins. Co., 149
F.App'x 722, 725-26 (10th Cir. 2005)(unpublished).  Drawing all reasonable inferences and
resolving all doubts in favor of Coffey, Gyce's statements regarding his interactions with Crutcher
throughout his affidavit support the conclusion that he had personal knowledge regarding this

Crutcher.  See Deposition of Richard Holden at 25:1-27:25 (dated May 20, 2011), filed August 1, 2011 (Doc. 78-13)("Holden Depo. #3").[34]  Holden gave Crutcher a medical assessment and determined that he should go to a hospital.  See Holden Depo. #3 at 25:1-27:25; Response at 10 (not disputing this fact).  Instead of calling an ambulance, McKinley County transported Crutcher to the hospital by officer vehicle.  See Bureau of Indian Affairs Internal Report at 35-36 (Case No. KOL120-07-10), filed September 7, 2011 (Doc. 77-2).[35]  A BIA investigation found that this chosen method of transportation violated McKinley County's internal policies.  See Bureau of Indian Affairs Internal Report at 35-36.[36]  Crutcher was pronounced dead at GIMC at 17:52 (military time)

_____

statement.  See Hunt v. Cromartie, 526 U.S. at 551.

[34]Coffey asserts: "The credibility of Mr. Holden's 'talking to' Mr. Crutcher to determine his condition is highly suspect."  Response at 10.  Coffey does not specifically dispute this asserted fact otherwise.  McKinley County argues that Coffey has attempted to attack Holden's credibility with some of her asserted facts.  See Reply at 7.  Because the Court cannot resolve issues of credibility in deciding a motion for summary judgment, the Court will not decide any issues regarding Holden's credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  It will determine only whether there is a genuine dispute as to material facts.  See Fed. R. Civ. P. 56(a).

[35]McKinley County asserts that Coffey has not cited any evidence to support her asserted facts regarding Crutcher's transport to the hospital.  See Reply at 7.  At the end of the paragraph where Coffey presents these facts, she cites to this Bureau of Indian Affairs Internal Report.  See Response at 10-11.  This report sets out the method which McKinley County staff chose to transport Crutcher and that BIA concluded that the staff should have transported him by ambulance.  See Bureau of Indian Affairs Internal Report at 35-36.  Drawing all reasonable inferences in Coffey's favor and resolving all doubts in her favor, the Court concludes that the cited evidence supports Coffey's asserted facts regarding Crutcher's transport, including that Crutcher could not receive emergency care in the officer's vehicle.  See Hunt v. Cromartie, 526 U.S. at 551.

[36]Coffey presents an asserted fact that, "McKinley County in conjunction with the negligence of the BIA caused the death of Mr. Crutcher by deliberate indifference to his critical medical needs.  But for the deliberate indifference of McKinley County and the negligence of the BIA, Andrew Crutcher could have lived for more than 13 years."  Response at 10 (setting forth this fact).  McKinley County objects that the evidence Coffey cites does not support this conclusion.  Coffey cites testimony from Dr. Challapalli where he opines on how much longer Crutcher would have lived had these events not occurred.  See Challapalli Depo. #2 at 44:1-3, at CM/ECF 34.  The Bureau of Indian Affairs Internal Report does not draw any conclusions about McKinley County's

on February 8, 2007.  See Report of Findings at 1-2; Response at 10-11 (not disputing this fact).

## PROCEDURAL BACKGROUND

On August 1, 2011, McKinley County filed its Motion for Summary Judgment.  In its Motion for Summary Judgment, McKinley County argues that the Court should dismiss the unnamed Defendants in the case.  See MSJ at 5-6.  McKinley County asserts that Coffey has not offered any additional description of these unnamed Defendants which would assist in identifying them for eventual service and inclusion in this case.  See MSJ at 5.  Additionally, McKinley County contends that Coffey has not attempted to join any named individuals to replace these unnamed Defendants even though she has amended her pleadings several times in this case.  See MSJ at 5-6. McKinley County notes that dismissal of unnamed defendants is proper when they remain unnamed for a lengthy period of time.  See MSJ at 6.  McKinley County argues that Coffey cannot establish that a constitutional violation occurred in this case or that there was a county policy that was the moving force behind the violation.  See MSJ at 6.  McKinley County notes that, even assuming Coffey could establish a constitutional violation, she has not identified any policy.  See MSJ at 6-7. McKinley County emphasizes that the standard for a constitutional violation under the Eighth Amendment is that the deprivation must be sufficiently serious and result from deliberate indifference to an inmate's health or safety.  See MSJ at 7.  McKinley County notes that, at best, Coffey's allegations establish that the prison staff acted negligently.  See MSJ at 8.  McKinley County asserts that the undisputed facts show that medical staff saw Crutcher each time he sought medical attention.  See MSJ at 8.  McKinley County argues that medical malpractice is not sufficient

---

fault or the BIA's fault, concluding only that McKinley County violated its internal policies by transporting Crutcher by officer vehicle rather than by ambulance.  See Bureau of Indian Affairs Internal Report at 35-36.  This evidence does not support Coffey's asserted fact.  Thus, the Court will disregard this asserted fact.  See Fed. R. Civ. P. 56(c)(1).

to establish deliberate indifference under the Eighth Amendment. <u>See</u> MSJ at 9. McKinley County argues that Coffey cannot proceed under a substantive due-process theory based on the limitations <u>Graham v. Connor</u>, 490 U.S. 386 (1989), imposes when a plaintiff has recourse to an explicit textual source of constitutional protection. <u>See</u> MSJ at 9. Lastly, McKinley County contends that Coffey cannot meet the conscience shocking standard under the Fourteenth Amendment. <u>See</u> MSJ at 10.

Coffey filed her Response on September 7, 2011.[37] Coffey argues that prison administrators have a duty to protect prisoners. <u>See</u> Response at 12. She asserts that the Eighth Amendment imposes this affirmative duty when prisoners are in state custody. <u>See</u> Response at 12. She contends that jail officials and personnel are deliberately indifferent when they fail to act in response to obvious and unreasonable risks. <u>See</u> Response at 14. Coffey argues that the need for training was obvious at McKinley County. <u>See</u> Response at 15. She points out that a "medical plan was not instituted to determine the serious medical needs of Andrew Crutcher within the first fourteen days of the inmate's incarceration." Response at 15. She notes that "[t]his is the standard operating procedure for jails across the country as stated by Dr. Joseph Paris, an undenied expert in prison medical care." Response at 15. She also notes that municipal liability for failure to train is proper when "it can be shown that repeated instances of non response to serious medical problems of inmates occurred constituting a pattern of constitutional violations involving the exercise of jail personnel discretion." Response at 15. Coffey contends that the risk regarding Crutcher was obvious, because "it was specifically communicated to the defendants" when "he was screened" during booking "and told the screening nurse that he had congestive heart failure." Response at 16.

---

[37]In a separate Memorandum Opinion and Order, the Court authorized Coffey to file an amended response to the Motion for Summary Judgment. <u>See</u> Memorandum Opinion and Order at 2, filed November 14, 2011 (Doc. 110)("MOO").

She notes that Crutcher's doctor also gave a letter to the jail regarding the seriousness of his condition.  See Response at 16.  She argues that the prison officials put the burden on Crutcher to tell prison staff what his medical needs were or to call his family "who was 900 miles away." Response at 17.  Coffey asserts that the unnamed Defendants should remain in this case, because she has now had the chance to discover their identity.  See Response at 18-19.  She also argues that Crutcher had a serious medical condition for purposes of the Eighth Amendment.  See Response at 20-22.  Coffey contends that the facts of this case permit an inference that the prison officials were deliberately indifferent to Crutcher's situation.  See Response at 22-24.

McKinley County filed its Reply on September 27, 2011.  McKinley County argues that Coffey does not provide any authority or contrary legal citation for her argument that the unnamed Defendants should remain in the case.  See Reply at 8.  McKinley County notes that Coffey has admitted that she has identified, and in fact even deposed, some of the individuals she alleges committed constitutional violations against Crutcher.  See Reply at 8-9.  McKinley County contends that, in spite of this knowledge, Coffey has not attempted to join them as parties to this litigation, even though she has filed numerous pleadings.  See Reply at 9.  McKinley County also notes that Coffey has not provided any indication of the efforts she has made to determine the identity of the guards involved in the alleged misconduct.  See Reply at 9.  McKinley County then asserts that, given that there are no individual defendants named in the suit, Coffey must show that a constitutional violation occurred and that a county policy was the moving force behind the violation. See Reply at 9.  McKinley County notes that Coffey has included citations to facts in her arguments that have no citation to the record.  See Reply at 9.  McKinley County argues that officials must have actual or constructive notice to be liable for a failure to act to institute a policy to prevent constitutional violations.  See Reply at 10.  McKinley County asserts that Coffey has not

acknowledged that <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009), precludes her theory regarding failure

to train or institute a policy.  <u>See</u> Reply at 10.  McKinley County contends that the failure to institute

a fourteen-day plan does not result in a constitutional violation.  <u>See</u> Reply at 10.

On September 14, 2011, McKinley County filed its Motion to Dismiss.  In its Motion to

Dismiss, it argues that the Court should dismiss Coffey's substantive due process claims under rule

12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  <u>See</u> Motion to Dismiss

at 1.  McKinley County contends that Coffey has "failed to frame a complaint with enough factual

matter to suggest that she is entitled to relief with respect to her claims for deprivation of life

without due process under 42 U.S.C. § 1983."  Motion to Dismiss at 3.  McKinley County contends

that the facts as alleged in Coffey's pleadings do not give rise to a plausible inference that McKinley

County's conduct shocks the conscience.  <u>See</u> Motion to Dismiss at 4.  On September 27, 2011,

Coffey filed her Opposition to McKinley County's Second Motion to Dismiss.  <u>See</u> Doc. 97

("Opposition to Motion to Dismiss").  She argues that motions to dismiss are disfavored.

<u>See</u> Opposition to Motion to Dismiss at 2.  She asserts that the "specific facts of allowing her son

to die a miserable and suffering death are more than adequately pled against the Defendants who

each individually contributed to the demise of her son."  Opposition to Motion to Dismiss at 4.  She

contends that she has pled "the kinds of acts of failure and omission and blatant disregard for the

health, safety and welfare of an inmate who was 900 miles from home and dependent upon his jailer

for care and treatment of his serious medical condition."  Opposition to Motion to Dismiss at 4.[38]

The Court held a hearing on September 30, 2011.  At the hearing, McKinley County pointed

---

[38]McKinley County filed a Reply to Coffey's Opposition to Motion to Dismiss, but the substance of the Reply responds to the issues raised by the Motion for Summary Judgment as opposed to Motion to Dismiss.  <u>See</u> Reply.

out that Coffey has brought suit against only McKinley County and one of its successive divisions, the detention center.   See Transcript of Hearing at 41:23-42:3 (taken September 30, 2011)("Tr.")(Martinez).[39]   McKinley County noted that there is no individual sued in the case. See Tr. at 42:2-4 (Martinez).  As a result, McKinley County contends that Coffey must establish to prove her constitutional claims that McKinley County had a policy and practice that the employees implemented.   See Tr. at 42:2-4 (Martinez).   McKinley County argued that there are no named individual defendants and that Coffey has not alleged that McKinley County was a policymaker. See Tr. at 42:7-9 (Martinez).   McKinley County noted that, although Coffey makes some factual allegations against some of the nursing staff, she points to no policy or practice from McKinley County that the nurses followed.   See Tr. at 42:9-12 (Martinez).   McKinley County argued that the United States Court of Appeals for the Tenth Circuit has held that municipalities cannot be liable on a 42 U.S.C. § 1983 claim unless the municipality's policy caused a constitutional tort.   See Tr. at 42:20-22 (Martinez).   Additionally, McKinley County argued that the municipal policy must be a policy statement, ordinance, regulation, or decision that the municipality's officers officially adopted and promulgated.   See Tr. at 42:22-25 (Martinez).   McKinley County argued that the theory of respondeat superior does not apply to municipalities.   See Tr. at 43:6-9 (Martinez).   McKinley County also contended that the violation must be persistent and widespread to establish that a custom exists.   See Tr. at 44:3-6 (Martinez).   McKinley County asserted that, to establish liability, a plaintiff must show deliberate indifference or tacit approval of misconduct under the policy after the municipality has notice of such misconduct.   See Tr. at 44:6-8 (Martinez).

McKinley County argued that, based on the undisputed facts, every time Crutcher requested

---

[39]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

medical care he received it.  See Tr. at 44:17-20 (Martinez).  Thus, McKinley County contended that there was no policy that deprived Crutcher of medical care.  See Tr. at 44:20-22 (Martinez). McKinley County noted that Coffey did not point, in her Response, to any policy or custom leading to the deprivation of Crutcher rights.  See Tr. at 44:23-45:1 (Martinez).  McKinley County stated that the Court could address its Motion to Dismiss along with the Motion for Summary Judgment. See Tr. at 45:9-10 (Martinez).  McKinley County argued that the facts as alleged in Coffey's pleadings do not constitute a substantive due-process violation.  See Tr. at 45:12-17 (Martinez). McKinley County also argued that the Eighth Amendment applies to Coffey's claims instead of the Fourteenth Amendment's substantive due-process standard.  See Tr. at 46:2-8 (Martinez).

Coffey argued that the supervising nurse set a policy by stating certain matters repeatedly to the other employees.  See Tr. at 47:6-8 (Hearne).  Coffey argued that there was disputed evidence whether the employees had patients' information.  See Tr. at 47:8-13 (Hearne).  Coffey contended that there was a lack of a plan to provide medical care to inmates, specifically the lack of a fourteen-day policy.  See Tr. at 47:13-20 (Hearne).  She noted that the supervising nurse stated that, if a patient came in without their medication, that the patient should contact his or her family for the medication.  See Tr. at 48:8-10 (Hearne).  Coffey contended that Crutcher's repeated requests for medical care indicate McKinley County's repeated omission.  See Tr. at 48:16-23 (Hearne).  The Court questioned whether the lack of a fourteen-day policy was sufficient to meet the requirement that McKinley County must have a policy in place.  See Tr. at 49:14-17 (Hearne).  Coffey reiterated that the policy was that there was no policy in place.  See Tr. at 50:1-2 (Hearne).

McKinley County responded that it could not find any federal case law which states that a detention facility must give all inmates full medical screenings within fourteen days.  See Tr. at 50:9-13 (Martinez).  McKinley County also argued that a failure to have such a policy would

amount to negligence at best.  See Tr. at 50:14-15 (Martinez).  McKinley County also noted that

there was no evidence that Crutcher died because he did not receive his heart medication and

contended that he died of an infection unrelated to his heart medication.  See Tr. at 52:14-18

(Martinez).  McKinley County reiterated that, without a policy in place, the facts regarding

Crutcher's death are irrelevant, because Coffey cannot point to other inmates which suffered the

same problems as Crutcher.  See Tr. at 52:19-25 (Martinez).  McKinley County argued that, without

evidence that other inmates suffered the same problems, there is no indication that the conduct was

widespread.  See Tr. at 52:21-25 (Martinez).  McKinley County reiterated that the facts in this case

would only establish negligence as opposed to a greater degree of misconduct.  See Tr. at 53:16-54:6

(Martinez).  The Court noted that it was unsure that the conduct amounts to a substantive due-

process violation.  See Tr. at 54:9-18 (Court).  The Court also stated that it was inclined to think that

the lack of a policy is not the same as what federal courts have required -- the existence of a policy.

See Tr. at 54:19-55:1 (Martinez).  The Court noted that it was inclined to believe that the conduct

in this case amounts to only negligence as opposed to deliberate indifference.  See Tr. at 55:1-4

(Court).  The Court noted that it would address the Motion for Summary Judgment and the Motion

to Dismiss in the same order.  See Tr. at 72:17-20 (Court).

### LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial

burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."

Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation

marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets

this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides:

> A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d

1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot

rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment

in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL

2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

      Genuine factual issues must exist that "can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at

250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11

F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be

sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co.

v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no

evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly

probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at

249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not

find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

      When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255

("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor."). Third, the court cannot decide any issues of credibility. See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for
> redress, . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive

rights; substantive rights must come from the Constitution or federal statute. See Spielman v.

Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if

federal law does not create enforceable rights."). Rather, 42 U.S.C. § 1983 authorizes an injured

person to assert a claim for relief against a person who, acting under color of state law, violated the

claimant's federally protected rights. To state a claim upon which relief can be granted under

§ 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who

deprived the plaintiff of that right acted under color of state law. See West v. Aikins, 487 U.S. 42,

48 (1988). Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or
> created by federal statute or regulation, (2) proximately caused (3) by the conduct
> of a "person" (4) who acted under color of any statute, ordinance, regulation,
> custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. 09-0281, 2010 WL 1608884, at *11 (D.N.M. Mar. 30, 2010)(Browning,

J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-

rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to

-32-

displace state law through the creation of a body of general federal tort law.  See Paul v. Davis, 424

U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101-102

(1971)(civil-rights statute).

The Supreme Court has made clear that there is no respondeat superior liability under 42

U.S.C. § 1983.  See Ashcroft v. Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable

to Bivens[40] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through

the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v.

Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the

existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. New York

City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978).  Further, the Tenth Circuit has held that

supervisors are not liable under 42 U.S.C. § 1983 "unless there is an affirmative link between the

constitutional deprivation and the supervisor's exercise of control or direction, his personal

participation, or his failure to supervise."  Kiesling v. Troughton, 107 F.3d 880, 1997 WL 111256,

at *2 (10th Cir. 1997)(unpublished table decision)(citing Meade v. Grubbs, 841 F.2d 1512, 1527

(10th Cir. 1988)).  They can be held liable only for their own unconstitutional or illegal policies, and

not for the tortious acts of their employees.  Supervisory liability requires a showing that such

policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th

Cir. 1998)(citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v.

Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct

properly attributable to the municipality.  The plaintiff must also demonstrate that, through its

---

[40]Bivens v. Six Unknown Named Agents, 403 U.S. 388, 395-397 (1971)(authorizing a federal cause of action for damages under certain constitutional provisions when government officials violate those respective constitutional rights).

deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, and may have even eliminated, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  129 S.Ct. at 1948.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct."  Dodds v. Richardson, 614 F.3d at 1200-01 (second omission in original).  The specific example that the Tenth Circuit gave to illustrate this principle was Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to

hold a mayor, police commissioner, and other city officials liable under 42 U.S.C. § 1983 for constitutional violations committed by unnamed individual police officers.   See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).   The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations." Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

Liability can extend to a municipality for failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons.   Barney v. Pulsipher, 143 F.3d at 1309 & n.8.   "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable.   Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08; Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d 360, 369 (6th Cir. 2005)("The evidence must show that the need to act is so obvious that the School Board's 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to Doe's constitutional rights." (emphasis omitted)).   Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations." Barney v. Pulsipher, 143 F.3d at 1308.

## LAW REGARDING THE EIGHTH AMENDMENT

The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828 (1994). An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258-59 (10th Cir. 2006)("To establish a cognizable Eight Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." See Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. On the issue of what qualifies as a serious medical problem, it is unnecessary to show that a plaintiff is presently suffering from serious medical problems if the conditions of confinement are certainly or very likely to cause serious

injury.  See Helling v. McKinney, 509 U.S. 25, 33 (1993).  Additionally, it may be in some cases appropriate to look at several conditions of confinement to determine whether they establish an Eighth Amendment violation when combined, if each alone would not do so.  See Wilson v. Seiter, 501 U.S. 294, 304 (1991).  Courts may only consider conditions of confinement in combination, however, when "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets."  Wilson v. Seiter, 501 U.S. at 304.  Thus, courts should normally consider each condition of confinement separately.  Wilson v. Seiter, 501 U.S. at 304-05.

The second element regarding the government official's state of mind is a subjective inquiry.  See Wilson v. Seiter, 501 U.S. at 298.  Courts apply this subjective inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred.  Wilson v. Seiter, 501 U.S. at 299.  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness."  Farmer v. Brennan, 511 U.S. at 836.  The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F.App'x 821, 823-24 (10th Cir. 2007)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct.  See Graham v. Connor, 490 U.S. at 394-95.   More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'"  Graham v. Connor, 490 U.S. at 395.  The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct." Graham v. Connor, 490 U.S. at 395.  The Supreme Court has later clarified that this holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).  To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory.  See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.").

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments."  83 F.3d at 1202.  In

determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in <u>Riddle v. Mondragon</u>, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing <u>Berry v. City of Muskogee</u>, 900 F.2d 1489, 1493 (10th Cir. 1990). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. <u>See</u> <u>Riddle v. Monragon</u>, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment.").

## LAW REGARDING SUBSTANTIVE DUE-PROCESS RIGHTS

"The touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." <u>Graves v. Thomas</u>, 450 F.3d 1215, 1220 (10th Cir. 2006)(quoting <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998)). Because "only the most egregious conduct can be said to be 'arbitrary in the constitutional sense,'" <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. at 846 (quoting <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 129 (1992)), the Supreme Court has been reluctant to expand the doctrine of substantive due process, and has cautioned that "[o]nly fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' qualify for such protection," <u>Chavez v. Martinez</u>, 538 U.S. 760, 775 (2003)(quoting <u>Washington v. Glucksberg</u>, 521 U.S. 702, 721 (1997)). <u>See</u> <u>Graves v. Thomas</u>, 450 F.3d at 1220 ("Substantive due process claims are not based on state law but are founded upon

deeply rooted notions of fundamental personal interests derived from the Constitution." (quoting
Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998))).

The ultimate measure whether state actors' conduct violates due process is whether "the
challenged government action 'shocks the conscience' of federal judges." Ruiz v. McDonnell, 299
F.3d 1173, 1183 (10th Cir. 2002)(quoting Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995)).  To
succeed on a substantive due-process claim, a "plaintiff must demonstrate a degree of
outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."
Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting Uhlrig v. Harder,
64 F.3d at 574).  More specifically, "a § 1983 violation based on substantive due process 'must be
predicated on a state action manifesting one of two traditional forms of wrongful intent -- that is,
either (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm." Ward
v. Anderson, 494 F.3d 929, 938 (10th Cir. 2007)(quoting Uhlrig v. Harder, 64 F.3d at 573).  In
determining whether a defendant's actions shock the conscience, three principles guide a court's
analysis: (i) the need for restraint in defining the scope of substantive due process; (ii) the
recognition that 42 U.S.C. § 1983 should not be used to replace state tort law; and (iii) the propriety
of deferring  to local policymakers' decisions regarding public safety.  See Valdez v. New Mexico,
109 F.App'x 257, 262 (10th Cir. 2004); Ruiz v. McDonnell, 299 F.3d at 1184.  Lastly, ordinary
negligence does not shock the conscience, and even permitting unreasonable risks to continue is not
necessarily conscience shocking.  Rather, a plaintiff must demonstrate a degree of outrageousness,
and a magnitude of potential or actual harm, that is truly conscience shocking.  See Ruiz v.
McDonnell, 299 F.3d at 1184.

## LAW REGARDING UNNAMED DEFENDANTS AS PARTIES

"Courts have generally recognized the ability of a plaintiff to use unnamed defendants so

long as the plaintiff provides an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served." Roper v. Grayson, 81 F.3d 124, 126 (10th Cir. 1996)(citing Billman v. Indiana Dep't of Corrs., 56 F.3d 785, 789 (7th Cir. 1995); Colle v. Brazos County, Tex., 981 F.2d 237, 243 (5th Cir. 1993); Dean v. Barber, 951 F.2d 1210, 1216 (11th Cir. 1992); Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985); Maggette v. Dalsheim, 709 F.2d 800, 803 (2d Cir. 1983); Schiff v. Kennedy, 691 F.2d 196, 197-98 (4th Cir. 1982); Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)). See Gose v. Bd. of Cnty. Comm'rs of Cnty. of Mckinley, 778 F.Supp.2d 1191, 1205. Rule 4(m) of the Federal Rules of Civil Procedure states:

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

To avoid dismissal of unnamed defendants, a plaintiff must provide an adequate description sufficient to identify the unnamed defendants. See Roper v. Grayson, 81 F.3d at 126 (finding that the plaintiff provided an adequate description sufficient to identify the unnamed defendants when, given the plaintiff's description, it was clear who the unnamed defendants were from the use-of-force reports the defendants attached to their motion for summary judgment). In Fiser v. Oklahoma of Department of Corrections Unknown State Actor and/or Actors, 213 F.App'x 704 (10th Cir. 2007)(unpublished), the Tenth Circuit stated that the district court did not err in entering summary judgment in favor of the unnamed defendants when the "plaintiffs' amended complaint did not describe the person or persons they claim injured them." 213 F.App'x at 708 n.2.

Additionally, the Tenth Circuit has recognized that dismissal of unnamed defendants may be appropriate when they remain unidentified for a lengthy period of time. See Lujan ex rel. Lujan

v. Cnty. of Bernalillo, 354 F.App'x 322, 325 (10th Cir. 2009)(unpublished)(citing Roper v. Grayson,

81 F.3d at 126).  To explain this point, the Tenth Circuit cited to a United States Court of Appeals

for the Seventh Circuit decision, Williams v. Rodriguez, 509 F.3d 392 (7th Cir. 2007).  In Williams

v. Rodriguez, the Seventh Circuit modified the district court's grant of summary judgment -- for an

unknown and unnamed police officer whom the plaintiff sued pursuant to § 1983 for deliberate

indifference to medical needs -- to a dismissal of the defendant from the case.  See 509 F.3d at 402.

The Seventh Circuit stated:

> Williams brought this deliberate indifference claim against Officer Rodriguez and
> an unknown and unnamed Chicago police officer.  In his complaint, Williams stated
> that he would seek leave to amend his complaint once he learned the identity of this
> unknown and unnamed defendant.  Discovery was Williams's opportunity to identify
> this defendant, and he failed to do so before discovery closed on August 18, 2006.
> Due to Williams's failure to identify this defendant and the lack of any record that
> this individual was served with process, the district court's grant of summary
> judgment for this unknown and unnamed defendant is modified to dismiss this
> defendant from the case.

509 F.3d at 402.  In Roper v. Grayson, 81 F.3d at 126, the Tenth Circuit also cited a United States

Court of Appeals for the Fifth Circuit case, Colle v. Brazos Cnty., Tex., 981 F.2d 237 (5th Cir 1993).

In that case, the Fifth Circuit dismissed a suit against unnamed defendants for failure to prosecute

when the defendants remained unnamed for three years.  See Colle v. Brazos Cnty., Tex., 981 F.2d

at 243.

## ANALYSIS

The Court will dismiss the unnamed Defendants without prejudice, because Coffey has

engaged in significant delay in adding any named individuals as parties to the case to replace the

unnamed Defendants, and because granting leave to amend to join them as parties would be futile.

While it is arguable that the medical staff at the McKinley County Detention Center acted

negligently, the undisputed facts do not indicate that they acted with deliberate indifference.  There

-42-

is a genuine issue of material fact whether some of the guards at the facility acted with deliberate indifference.  Coffey may not proceed on a substantive due-process theory against McKinley County, as a specific constitutional amendment, the Eighth Amendment applies to her claim.  While McKinley County not putting certain policies in place could in some circumstances result in municipal liability under 42 U.S.C. § 1983, the undisputed facts do not indicate that: (i) McKinley County had actual or constructive notice of the situation; (ii) its failure to act was substantially certain to result in a constitutional violation; or (iii) it consciously or deliberately chose to disregard the risk of harm.  Additionally, there is no affirmative link between the alleged unconstitutional acts by McKinley County's subordinates and their adoption of any plan or policy -- express or otherwise -- showing their authorization or approval of such misconduct.  Lastly, the Court will grant the Motion to Dismiss, as Coffey cannot proceed on a substantive due-process theory against McKinley County.

## I.    THE COURT WILL DISMISS WITHOUT PREJUDICE THE UNNAMED DEFENDANTS.

McKinley County argues that the Court should dismiss the unnamed Defendants in the case. See MSJ at 5-6.  McKinley County asserts that Coffey has not offered any additional description of these unnamed Defendants in her pleadings that would assist in identifying them for eventual service and inclusion in this case.  See MSJ at 5.  Additionally, McKinley County contends that Coffey has not attempted to join any named individuals to replace these unnamed Defendants, even though she has amended her pleadings several times in this case.  See MSJ at 5-6.  McKinley County notes that dismissal of unnamed defendants is proper when they remain unnamed for a lengthy period of time. See MSJ at 6.  Coffey asserts that the unnamed Defendants should remain in this case, because she has now had the chance to discover their identity.  See Response at 18-19.  McKinley County argues

that Coffey does not provide any authority or contrary legal citation for her argument that the unnamed Defendants should remain in the case.  <u>See</u> Reply at 8.  McKinley County notes that Coffey has admitted that she has identified, and in fact even deposed, some of the individuals she contends committed constitutional violations against Crutcher.  <u>See</u> Reply at 8-9.  McKinley County contends that, in spite of this knowledge, Coffey has not attempted to join them as parties to this litigation in spite of the number of pleadings she has filed.  <u>See</u> Reply at 9.  McKinley County also notes that Coffey has not provided any indication of the efforts she has made to determine the identity of the guards involved in the alleged misconduct.  <u>See</u> Reply at 9.

The Court will dismiss the unnamed Defendants without prejudice.  Under the Court's Scheduling Order, discovery in this case closed on July 20, 2011.  <u>See</u> Scheduling Order at 2, filed November 22, 2010 (Doc. 42).  Additionally, under the Scheduling Order, the deadline for filing pretrial motions, including motions to amend pleadings, was August 1, 2011.  Coffey has filed at least five different complaints in this case, and in none of these pleadings has she attempted to name these unnamed Defendants.  Coffey filed her Original Complaint against McKinley County on January 12, 2009.  <u>See</u> Civil Complaint (Doc. 1 in the civil case docket number 09-0028)("Original Complaint").  On January 17, 2011, Coffey filed a motion seeking leave to amend her pleadings.  <u>See</u> Motion for Leave to File Amended Complaint (Doc. 44 in the civil case docket number 09-0028).  On January 24, 2011, this Court granted Coffey leave to amend her pleadings.  <u>See</u> Order Granting Motion for Leave to File Amended Complaint (Doc. 45 in the civil case docket number 09-0028).  Following consolidation of the civil case docket number 08-0588, Coffey's case against the United States, with civil case docket number 09-0028, Coffey's case against McKinley County, Coffey filed her Second Amended and Consolidated Complaint on July 28, 2011.  <u>See</u> Doc. 61.  On August 24, 2011, Coffey filed an Amended and Consolidated Complaint without the Court's leave.

See Doc. 69.[41]  On September 7, 2011, following the filing of the current Motion for Summary Judgment seeking dismissal of these unnamed Defendants, Coffey filed a motion seeking leave to amend her pleadings and to file a Third Amended and Consolidated Complaint.  See Motion for Leave to File Amended and Consolidated Complaint and Motion to File Amended Response to Motion for Summary Judgment and Request for Leave to File Additional Pages of Exhibits (Doc. 79).  On November 14, 2011, the Court granted in part and denied in part Coffey's request seeking leave to amend her pleadings.  See Memorandum Opinion and Order at 2 (Doc. 110)("MOO").

The Tenth Circuit has recognized that dismissal of unnamed defendants may be appropriate when they remain unidentified for a lengthy period of time.  See Lujan ex rel. Lujan v. Cnty. of Bernalillo, 354 F.App'x at 325 (citing Roper v. Grayson, 81 F.3d at 126).  Here, almost three years have passed since Coffey filed her Original Complaint against McKinley County, which she filed on January 12, 2009.  It is currently November 2011.  The discovery phase of this case has closed under the Scheduling Order.  The time for filing motions to amend pleadings has passed under the Scheduling Order.  Coffey has filed at least five pleadings in this case.  After the time authorized under the Scheduling Order to amend pleadings had expired, the Court recently granted Coffey leave to amend her pleadings.  See MOO at 2.  Coffey has had the opportunity to investigate what occurred at McKinley County Detention Center and has deposed some of purported wrongdoers.  Given Coffey's lengthy delay in adding any named individual defendants to this case in spite of several opportunities to do so, the Court concludes that dismissal of the unnamed Defendants without prejudice is proper.

The Court also notes that allowing amendment to add any named individual defendants as

---

[41]On November 14, 2011, the Court granted Defendants United States of America and McKinley County's motion to strike this pleading filed without the Court's leave.  See MOO at 2.

parties would likely be futile, as under rule 15(c), any amendment adding in these unnamed defendants as parties would not relate back for statute of limitations purposes. See Garrett v. Fleming, 362 F.3d 692 (10th Cir. 2004). Under rule 15(c)(1)(C), an amendment to a pleading relates back to the date of the original pleading when:

> (C)    the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) [regarding the claim arising out of the same transaction or occurrence as that alleged in the original pleadings] is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i)    received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii)    knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C) (emphasis added). The Tenth Circuit has held that this relation back provision does not apply when the plaintiff sues an unnamed defendant and later tries to amend his pleadings to sue the previously unnamed individual. See Garrett v. Fleming, 362 F.3d at 696-97 ("A plaintiff's designation of an unknown defendant as 'John Doe' in the original complaint is not a formal defect of the type Rule 15(c)(3) was meant to address.").[42] Specifically, the Tenth Circuit concluded that no mistake concerning the proper party's identity occurs under these circumstances within the definition of rule 15(c)(1)(C)(ii). See Garrett v. Fleming, 362 F.3d at 696-97.

"The statute of limitations period for a § 1983 claim is dictated by the personal injury statute of limitations in the state in which the claim arose . . . ." McCarty v. Gilchrist, 646 F.3d 1281, 1289

---

[42]In 2007, amendments to rule 15 changed the numbering of the subsections within rule 15. The old rule 15(c)(3) is the current rule 15(c)(1)(C). See Fed. R. Civ. P. 15 cmt. (2007 Amendment)("The language of Rule 15 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.").

(10th Cir. 2011).  While there are potentially some complex choice-of-law issues in this case given that some of the alleged misconduct might have occurred on Native American territory, Coffey has proceeded in this case as if her case arose under New Mexico law.[43]  In her Original Complaint, Coffey asserted claims under the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 through 41-4-27.  See Original Complaint at 10-14.  In her response to the first motion to dismiss that McKinley County filed, she cited and discussed New Mexico law in defending dismissal of her claims.  See Opposition to McKinley County Defendants' Motion to Dismiss at 3-6, filed February 18, 2011 (Doc. 50).

Additionally, Coffey alleges that Crutcher was incarcerated in Gallup, New Mexico while the complained of conduct occurred and that he died in Gallup, not that he died on Native American

---

[43]As New Mexico is the forum state for the United States District Court for the District of New Mexico, the Court looks to New Mexico choice-of-law rules to determine which state's substantive law applies.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., No. 10-1020, 2010 WL 5559750, at *6 (D.N.M. Nov. 30, 2010)(Browning, J.).  In New Mexico, choice-of-law analysis is a two-step process.  See Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).  First, the Court must characterize the "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue."  Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  The next step is to apply New Mexico's choice-of-law rule. See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.

In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place.  See Torres v. State, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995).  See also Mosley v. Titus, 762 F.Supp.2d 1298, 1314 (D.N.M. 2010)(Browning, J.).  The place of the wrong is the location of the last act necessary to complete the injury.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976).  The Supreme Court of New Mexico has said that it will not use the place-of-wrong-rule, however, if application of the rule would violate New Mexico public policy.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  The Court of Appeals of New Mexico has interpreted this principle to mean that, although there is a strong presumption in favor of application of the place-of-the-wrong rule, in some situations a court may depart from the general rule if another state has a more significant interest in having its law apply.  See Estate of Gilmore, 124 N.M. 119, 946 P.2d 1130 (Ct. App. 1997).

territory.   See Second Amended and Consolidated Complaint ¶ 45, at 10; Amended and

Consolidated Complaint ¶ 45, at 10, filed September 7, 2011 (Doc. 79-1)("Third Amended and

Consolidated Complaint").   The Record of Findings issued after Crutcher died also confirms this

fact.   See Report of Findings at 1.   The Court takes judicial notice that Gallup, New Mexico is not

on any Native American territory.   See Official Highway Map of New Mexico at 1, available at

http://newmexico.org/map/images/State_map020220052.pdf.[44]  It appears that all of the complained

of conduct occurred in Gallup, New Mexico, which is not on Native American territory.   In tort

actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the

place where the wrong took place.   See Torres v. State, 119 N.M. at 613, 894 P.2d at 390.   Since all

of the complained of conduct took place in Gallup, New Mexico and not on Native American

territory, New Mexico would apply New Mexican law.   See Torres v. State, 119 N.M. at 613, 894

P.2d at 390.

New Mexico's statute of limitations for wrongful death actions is three years.   See N.M.S.A.

1978, § 41-2-2 ("Every action instituted by virtue of the provisions of this and the preceding section

must be brought within three years after the cause of action accrues.   The cause of action accrues

as of the date of death.").   Here, it is undisputed that Crutcher died on February 8, 2007, more than

four years ago.   Given that a cause of action for wrongful death "accrues as of the date of death,"

without relation back, any claims Coffey asserted against these individuals would be untimely.   See

N.M.S.A. 1978, § 41-2-2.   As the Tenth Circuit has concluded, relation back under rule 15(c)(1)(C)

_____

[44]"A court may take judicial notice, whether requested or not."  Fed. R. Evid. 201(c).  "A
judicially noticed fact must be one not subject to reasonable dispute that it is . . . capable of
accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
Fed. R. Evid. 201(b).  The Tenth Circuit has stated: "Whether an offense occurred within particular
geographical boundaries is an appropriate subject for judicial notice."  United States v. Burch, 169
F.3d 666, 671-72 (10th Cir. 1999).

is not appropriate when the plaintiff chooses to sue unnamed defendants, as there is no mistake as to their identity.   See Garrett v. Fleming, 362 F.3d at 696-97 ("A plaintiff's designation of an unknown defendant as 'John Doe' in the original complaint is not a formal defect of the type Rule 15(c)(3) was meant to address.").

Consequently, the Court will dismiss without prejudice the unnamed Defendants in this case, Defendants Unknown Staff Nurse and Unknown Detention Guards 1-10, from this case.  Coffey has chosen to not join any named individual defendants for a lengthy period of time, nearly three years, in spite of various opportunities to do so.  Additionally, granting leave to amend to add in named individual defendants would be futile.  While it concerns the Court that Coffey may not be able to pursue a claim against McKinley County Detention Center employees who may have committed wrongs against her, it is not the role of the Court to question the wisdom behind statutes of limitation and the rules governing relation back for statute of limitations purposes.  Additionally, Coffey has not presented any evidence or arguments to establish that equitable tolling would apply to her claims against the McKinley County Detention Center employees.  Coffey still has the option of pursuing these claims in a separate lawsuit where she may argue that equitable tolling should apply.

## II.      THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER SOME OF THE GUARDS COMMITTED AN EIGHTH AMENDMENT VIOLATION, BUT COFFEY MAY NOT PROCEED ON A SUBSTANTIVE DUE-PROCESS THEORY.

There is a genuine issue of material fact whether some of the guards at the McKinley County Detention Center acted with deliberate indifference.  On the other hand, while it is arguable that the medical staff at the McKinley County Detention Center acted negligently, the undisputed facts do not indicate that they acted with deliberate indifference.  Furthermore, Coffey may not proceed on a substantive due-process theory against McKinley County, as a specific constitutional amendment, the Eighth Amendment, applies to her claim.

-49-

**A.    THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER SOME OF THE GUARDS AT THE MCKINLEY COUNTY DETENTION CENTER VIOLATED CRUTCHER'S EIGHTH AMENDMENT RIGHTS.**

McKinley County emphasizes that the standard for a constitutional violation under the Eighth Amendment is that the deprivation must be sufficiently serious, and result from deliberate indifference to an inmate's health or safety.  See MSJ at 7.  McKinley County notes that, at best, Coffey's allegations establish that the prison staff acted negligently.  See MSJ at 8.  McKinley County points out that the undisputed facts show that medical staff saw Crutcher each time he sought medical attention.  See MSJ at 8.  McKinley County argues that medical malpractice is not sufficient to establish deliberate indifference under the Eighth Amendment.  See MSJ at 9.  McKinley County then asserts that, given that there are no individual defendants named in the suit, Coffey must show that a constitutional violation occurred and that a county policy was the moving force behind the violation.  See Reply at 9.  McKinley County argues that the Supreme Court requires officials to have actual or constructive notice to be liable for a failure to act to prevent constitutional violations that their subordinates commit.  See Reply at 10.  McKinley County asserts that Coffey has not acknowledged that Ashcroft v. Iqbal, precludes her theory regarding failure to train or institute a policy.  See Reply at 10.  McKinley County contends that the failure to institute a fourteen-day plan does not result in a constitutional violation.  See Reply at 10.

Coffey argues that prison administrators have a duty to protect prisoners.  See Response at 12.  She asserts that the Eighth Amendment imposes this affirmative duty when prisoners are in state custody.  See Response at 12.  She contends that jail officials and personnel are deliberately indifferent when they fail to act in response to obvious and unreasonable risks.  See Response at 14.  Coffey argues that the need for training was obvious at McKinley County.  See Response at 15.  She points out that a "medical plan was not instituted to determine the serious medical needs of Andrew

Crutcher within the first fourteen days of the inmate's incarceration." Response at 15.  She notes

that "[t]his is the standard operating procedure for jails across the country as stated by Dr. Joseph

Paris, an undenied expert in prison medical care." Response at 15.  She also notes that municipal

liability for failure to train is proper when "it can be shown that repeated instances of non response

to serious medical problems of inmates occurred constituting a pattern of constitutional violations

involving the exercise of jail personnel discretion." Response at 15.  Coffey contends that the risk

regarding Crutcher was obvious, because "it was specifically communicated to the defendants"

when "he was screened" during booking "and told the screening nurse that he had congestive heart

failure." Response at 16.  She notes that Crutcher's doctor also gave a letter to the jail regarding the

seriousness of his condition.  <u>See</u> Response at 16.  She argues that the prison officials put the burden

on Crutcher to tell prison staff what his medical needs were or to call his family, "who was 900

miles away." Response at 17.  She also argues that Crutcher had a serious medical condition for

purposes of the Eighth Amendment.  <u>See</u> Response at 20-22.  Coffey contends that the facts of this

case permit an inference that the prison officials were deliberately indifferent to Crutcher's situation.

 <u>See</u> Response at 22-24.

The Court considers virtually all of the parties' asserted facts to be material.  The material

facts are as follows.  Crutcher was first incarcerated at the McKinley County Detention Center on

October 8, 2006.  Crutcher seemed healthy when he arrived.  Crutcher was transported from a

previous detention facility where McKinley County Detention Facility picked him up without

screening for his personal property or for his medications.  When discussing the date of Crutcher's

pickup, his transporter stated that the prison staff did not question inmates regarding medical

property.  Crutcher died from sepsis because of infective endocarditis.  Crutcher died at age twenty-

eight.  When Crutcher acquired a staph infection, it entered his body and blood stream, and attacked

his heart.  The parties dispute whether Crutcher arrived at the McKinley County Detention Center with any medications or whether the previous detention centers listed or provided any specific medications or dosages.  An LPN stated that, if an inmate arrived without medication, the staff signed a release and sought the medication within ten to fifteen minutes.  This LPN stated that if an inmate needs medication, the nurse goes to the inmate.  A guard stated that the guards take the inmate to the medical staff for medication.

Congestive heart failure requires a diuretic and other medication to maintain health.  Anyone with congestive heart failure must be treated aggressively for infection because of the fact that the insertion of a defibrillator in the body provides a pathway for infection.  This was the "only standard of care that should have been pursued because infections in heart patients are critical and very serious."  Response at 7 (setting forth this fact).  Dr. Challapalli prepared a letter to explain the seriousness of Crutcher's condition and the care that he needed before he entered jail.  Valle, a registered nurse at the McKinley County Detention Center, did not know how to recognize a defibrillator at intake, even though it is a protrusion visible on the body.  One of the LPN's at the facility knew that Crutcher had a defibrillator.  McKinley County "failed to have a plan for the inmates within 14 days of arrival at the institution which is the accepted procedure for jails across the county both certified and non certified."  Response at 5 (setting forth this fact).  An LPN at McKinley County Detention Center confirmed that they had no fourteen-day plan or physical.  A registered nurse "attempted to justify this failure by stating that medical did not know how long BIA inmates would be there, even though she admitted that the examination and plan would be of no cost" to the McKinley County Detention Center.  Response at 5 (setting forth this fact).

There is no evidence that Crutcher had valid prescriptions for any medication at the time of his incarceration with McKinley County.  Most corrections institutions take care of prescriptions

for inmates through their own pharmacy or through other means.  The records reflect that Crutcher did not make any request to see medical personnel until December 9, 2006, and that was concerning a bump on his leg.  The only way for the prisoners to get medical help was to contact a guard. Crutcher "was transported and treated for" this bump on his leg at GIMC on December 9, 2006. Once, during the period from 2006-2007, an inmate had a seizure, and it took thirty minutes for the guards to respond.

No screening report went with Crutcher to GIMC to indicate that Crutcher needed medication for his congestive heart failure.  Crutcher received an antibiotic prescription at GIMC, and McKinley County Detention Center received instructions regarding wound care.  Crutcher went back to GIMC a couple days after this initial visit for a follow-up examination.  The records reflect that on January 16, 2007, Crutcher again requested medical attention, this time for a cold that was not improving.  After the receipt of Crutcher's request, the doctor diagnosed Crutcher with sinusitis and prescribed antibiotics.  On January 26, 2007, GIMC saw Crutcher for assessment of his cardiomyopathy.  GIMC restarted Crutcher's medications at that time.

On January 28, 2007, Crutcher requested medical attention for kidney pain.  Doctors saw and evaluated Crutcher on January 28, 2007, and provided ibuprofen and flexeril for the diagnosis of back pain.  These doctors' report lacked Crutcher's vital signs and other information.  As of February 8, 2007, Crutcher had been unable to get up from his bed for four or five days, and on February 8, 2007, the other inmates staged a riot to get help for Crutcher.  The guards had earlier observed that Crutcher was failing, but did nothing.  On February 8, 2007, Yamutewa, a McKinley County Detention Officer, observed Crutcher as ill and jaundiced.  Yamutewa immediately took Crutcher to the medical unit.  It is disputed whether Crutcher walked or required assistance to get to the medical area. At the medical unit, Holden, a nurse at the McKinley County Detention Center,

spoke to Crutcher.  Holden gave Crutcher a medical assessment and determined that he should go

to a hospital.  Instead of calling an ambulance, McKinley County transported Crutcher to the

hospital by officer vehicle.  A BIA investigation found that this method of transportation violated

McKinley County's internal policies.  Crutcher was pronounced dead at GIMC at 17:52 (military

time) on February 8, 2007.

The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial

risk of serious harm" implicates the Eighth Amendment.  Farmer v. Brennan, 511 U.S. at 828.  An

official violates the Eighth Amendment when two elements are met: (i) the official causes an injury

that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal

civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of

mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).

Analyzing whether the plaintiff has satisfied the first element, the objective element,

"requires more than a scientific and statistical inquiry into the seriousness of the potential harm and

the likelihood that such an injury to health will actually be caused."  Helling v. McKinney, 509 U.S.

at 36.  Courts should also consider "whether society considers the risk that the prisoner complains

of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly

to such a risk."  Helling v. McKinney, 509 U.S. at 36 (emphasis in original).  "In other words, the

prisoner must show that the risk of which he complains is not one that today's society chooses to

tolerate."  Helling v. McKinney, 509 U.S. at 36.

The second element regarding the government official's state of mind is a subjective inquiry.

See Wilson v. Seiter, 501 U.S. at 298.  Courts making this subjective inquiry ask whether the

allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or

"systemic" violations occurred.  Wilson v. Seiter, 501 U.S. at 299.  The Supreme Court has stated:

"With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836.  The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F.App'x at 823-24.

In the context of medical care for prisoners, the Supreme Court has noted that, to establish an Eighth Amendment violation, "an inadvertent failure to provide adequate medical care" is not sufficient.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  Estelle v. Gamble, 429 U.S. at 106.  Furthermore, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. at 106.  The Tenth Circuit has also recognized that "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm."  Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993).  A "difference of opinion" with medical providers likewise "does not support a claim of cruel and unusual punishment."  Olson v. Stotts, 9 F.3d at 1477.

In <u>Mata v. Saiz</u>, 427 F.3d 745 (10th Cir. 2005), the Tenth Circuit found that it was not proper to enter summary judgment on the plaintiff's Eighth Amendment claim against one prison employee but affirmed entering summary judgment on the claims against other prison employees.  <u>See</u> 427 F.3d at 758-59.  In that case, the plaintiff was incarcerated at a facility and sought medical attention relating to her chest pain.  <u>See</u> <u>id</u>. at 750.  She reported her chest pain to a nurse.  <u>See</u> <u>id</u>.  The nurse responded that there was nothing she could do because the infirmary was closed.  <u>See</u> <u>id</u>.  The nurse told the plaintiff that she would need to "return to sick call at the infirmary the following morning." <u>Id</u>.  The next morning, the plaintiff informed a different nurse that her chest pain was an eight on a scale from zero to ten -- with ten being the "the worst pain a patient can imagine."  <u>Id</u>.  The second nurse assessed the plaintiff and performed an electrocardiogram.[45]  <u>See</u> <u>id</u>.  The nurse noted that the electrocardiogram was normal, and gave the plaintiff permission to miss work and other prison-related assignments that day.  <u>See</u> <u>id</u>.  The plaintiff claimed her pain persisted through the day and that she reported it to several guards, but she did not return to the infirmary.  <u>See</u> <u>id</u>.  The next day, the plaintiff returned to the infirmary, where a third nurse evaluated her.  <u>See</u> <u>id</u>.  This third nurse administered a second electrocardiogram and told the plaintiff it was normal.  <u>See</u> <u>id</u>.  It was undisputed that the electrocardiogram showed changes from the one performed the prior day.  <u>See</u> <u>id</u>.  A nurse practitioner then appeared, who also read the electrocardiogram as normal.  <u>See</u> <u>id</u>.  The nurse practitioner sent the electrocardiogram to a doctor, who instructed the nurses to send the plaintiff to the hospital.  <u>See</u> <u>id</u>.  The nurse practitioner told the plaintiff to go back and change her clothes, which required the plaintiff to walk two blocks uphill and then walk back to the main

---

[45]An electrocardiogram is a "[g]raphic record of the heart's integrated action currents obtained with the electrocardiograph displayed as voltage changes over time." <u>Stedman's Medical Dictionary</u>, <u>supra</u>, at 639.

facility.  See id.  At the hospital, doctors determined that she suffered a heart attack.  See id.

With respect to the first nurse, the Tenth Circuit concluded that there was a genuine issue of material fact as to her Eighth Amendment liability, because that nurse had actively refused to assist the plaintiff in spite of evidence that the first nurse was aware of severe chest pains.  See id. Additionally, the plaintiff's expert testified that this nurse's conduct was a "gross abdication of duty and responsibility, and a gross deviation from standards of nursing care," because she did not treat the situation as an emergency and contact a physician, physician's assistant, or nurse practitioner to assess the situation.  Id. at 756.  Additionally, because the first nurse knew that she played only a gatekeeping function to alert other medical staff to more serious medical emergencies, the Tenth Circuit found that her denial of access to medical care to the plaintiff created a genuine issue of material fact as to deliberate indifference.  See id. at 757.  As the Tenth Circuit stated:

> [If] the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.

Id.  The Tenth Circuit also noted that violation of internal procedures could provide some circumstantial evidence of a constitutional violation.  See id. at 757.

With respect to the second nurse, the Tenth Circuit determined that she had performed her gatekeeping function by reporting the plaintiff's symptoms to the nurse practitioner in accordance with the relevant protocol.  See id. at 759.  The Tenth Circuit reached the same conclusion regarding the nurse practitioner, as she had transmitted the electrocardiogram to a doctor, told the plaintiff to change into different clothes to go to the hospital, and then sent her to the hospital.  See id. at 759-60.  The Tenth Circuit concluded that the district court properly entered summary judgment on the claims against the third nurse.  See id. at 760-61.  That nurse's notes indicated that she subjectively

-57-

believed that the plaintiff was not having a heart attack and that the situation was otherwise under control, which her interactions with the plaintiff otherwise supported.

In Lemay v. Winchester, 382 F.App'x 698 (10th Cir. 2010)(unpublished), the Tenth Circuit found that there was sufficient evidence to raise a genuine issue of material fact as to a nurse's deliberate indifference.  In that case, the plaintiff was a diabetic dependent on insulin.  See id. at 700.  When he first arrived, he completed a health questionnaire indicating that he was a diabetic and was on a doctor-prescribed diabetic diet.  See id.  Before the incident in question, he had been hospitalized for severely high blood sugar levels, and his hospital-discharge instructions included an instruction to give him a diabetic diet.  See id.  The plaintiff alleged that, throughout his incarceration, his blood-sugar level was not checked often enough, the level was frequently too high, and the staff did not refill his insulin pump when needed.  See id.  It was undisputed that he never received a diabetic diet at the prison.  See id.  A form from the department of corrections indicated that the plaintiff was on a physician-ordered diabetic diet, and he saw department of corrections personnel place his medication and this form in a bag, and hand it to the deputy at the facility.  See id.  A nurse, whom the plaintiff later sued, stated that she had no authority to order a diabetic diet when the plaintiff asked for her assistance.  See id.  The Tenth Circuit concluded that there was a fact issue as to her deliberate indifference based on some of these documents, which supported a conclusion that she knew about the plaintiff's condition, and other indications that she would have been aware that the plaintiff should have been on a diabetic diet.  See id. at 702.  Additionally, by stating that she had no authority to order a diabetic diet and not contacting any higher-level physicians, there was a genuine issue of material fact as to whether she performed her gatekeeping role.  See id. at 702.

The Court agrees that the first element in the Eighth Amendment analysis -- the objective

element -- is met here.  The Tenth Circuit has recognized that the ultimate harm of death rises to the level of harm sufficiently serious to be cognizable under the Eighth Amendment.  See Martinez v. Beggs, 563 F.3d 1082, 1088-89 (10th Cir. 2009).  Because Crutcher died while he was at McKinley County Detention Center, this harm is "sufficiently serious to satisfy the objective component." Martinez v. Beggs, 563 F.3d at 1088-89 ("We agree with Martinez and the district court that 'the ultimate harm to Mr. Ginn, that is, his heart attack and death, w[as], without doubt, sufficiently serious to meet the objective component' necessary to implicate the Fourteenth Amendment.").

The Court finds that the second element of the Eighth Amendment analysis is met here -- the subjective element -- with respect to some of the guards but not any of the medical staff at the McKinley County Detention Center.  Based on the letter that Dr. Challapalli sent to the McKinley County Detention Center, there is some indication that the staff was aware of Crutcher's cardiomyopathy and congestive heart failure.  That letter, however, did not discuss any heightened risk of infection to Crutcher.  Crutcher died from sepsis, an infection, because of infective endocarditis.  The parties dispute whether Crutcher arrived with any specific mediation or dosages listed based on any materials that accompanied him from the previous detention center.  With respect to Valle, a registered nurse at the facility, there is some indication that she did not understand the importance of a defibrillator.  Crutcher arrived on October 8, 2006.  It is undisputed that he did not request medical care until December 9, 2006, and that this request concerned a bump on his leg. There are no facts to indicate to whom the request was specifically made or who handled the request. On that same day, December 9, 2006, the staff transported him to GIMC for treatment.  Valle and Holden testified that no screening report went with Crutcher to GIMC to indicate that Crutcher needed medication for his congestive heart failure.  For the bump on his leg, Crutcher received an antibiotic prescription at GIMC, and McKinley County Detention Center received instructions

regarding wound care.  Dr. Paris and Dr. Challapalli both agreed that treatment for infection was important, because the insertion of a defibrillator in the body provides a pathway for infection.  After this December 9, 2006 visit, Crutcher went back to GIMC for a follow-up examination.  On January 16, 2007, he again requested medical attention, this time for a cold that was not improving.  After receipt of this request, a doctor diagnosed Crutcher with sinusitis and prescribed antibiotics.  On January 26, 2007, GIMC saw Crutcher for assessment of his cardiomyopathy and restarted his medications at that time.  On January 28, 2007, Crutcher requested medical attention for kidney pain, and doctors saw him and evaluated him that same day.  They provided him with ibuprofen and flexeril based on a diagnosis of back pain.  On February 8, 2007, Crutcher's condition began to decline.  One guard observed him as ill and jaundiced and took him to the medical unit.  There is some dispute whether Crutcher walked himself or required assistance to get to the medical unit.  Holden then gave Crutcher a medical assessment and determined that he should go to the hospital.  Instead of calling an ambulance, someone -- the undisputed facts only refer to McKinley County -- transported Crutcher to the hospital by officer vehicle.  This decision violated McKinley County's internal policies, as he should have been transported by ambulance.  Crutcher was pronounced dead later that day on February 8, 2007.

The facts indicate that, in response to the first time Crutcher requested medical care, he received medical care.  Each subsequent time Crutcher requested medical care, the facts indicate that he received medical care on that day.  Thus, whether the inmates had to ask a guard for medical care or whether the nurses came directly to the guards is not a dispute as to a material fact, as the facts indicate that Crutcher received medical care each time he requested it.  See Fed. R. Civ. P. 56(a) (requiring a genuine dispute as to a material fact).  In the case of his reported cold that was not improving, drawing all reasonable inferences in favor of Coffey would lead to the conclusion that

there was a several day delay in seeing Crutcher for his cold.  As the Tenth Circuit has recognized, however, "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." Olson v. Stotts, 9 F.3d at 1477.  A delay of several days in seeing an inmate for a cold that will not improve does not constitute deliberate indifference given the relatively minor nature of that situation.  Coffey has presented no evidence that a delay in treating a cold would significantly increase Crutcher's chance of suffering serious harm or that any prison officials were aware of such a fact.  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d at 794). Furthermore, Crutcher died several weeks after the doctors treated him for this cold.  While medical staff may have misdiagnosed the situation at various points in time, Coffey has not presented facts establishing that they were reckless, in that they knew the facts giving rise to the potential harm and drew that inference.  To define reckless conduct that would satisfy the subjective element needed to establish an Eighth Amendment violation, the Supreme Court has provided the following standard:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  Once the movant meets their initial burden to show there is no genuine issue of material fact, which McKinley County has met here with the facts it has presented, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477

U.S. at 256.

While Valle and Holden testified that Crutcher's records indicating that he needed medication for congestive heart failure did not go with him the first time he went to GIMC on December 9, 2006, Coffey has not presented any facts indicating who was responsible for that situation or why it occurred.  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d at 794).  More importantly, Crutcher went to GIMC on that day for a bump on his leg, and not for complaints of any heart trouble.  That factual distinction makes this case different from Lemay v. Winchester, where the plaintiff was a known diabetic who never received proper treatment for his condition and the nurse refused to contact other doctors to address this situation, or Mata v. Saiz, where one of the nurses was presented with specific facts indicating a risk of significant heart problems and she refused to contact other medical staff.  The undisputed facts indicate that Crutcher complained about a bump on his leg and that the medical staff sent him for treatment for that condition.  He then received antibiotics to fight off infection, and McKinley County Detention Center received instructions on how to treat his wound.  While some of the nurses may have misunderstood the potential risk of infection as it related to Crutcher's cardiomyopathy and congestive heart failure, there are no facts to suggest that they were aware that Crutcher had a heightened risk of infection that could lead to his death.  For example, Valle was admittedly ignorant about the importance of a defibrillator.  "[A]n inadvertent failure to provide adequate medical care" is not sufficient to establish a claim under the Eighth Amendment.  Estelle v. Gamble, 429 U.S. at 105-06 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

-62-

Amendment.").  Furthermore, the facts indicate that Crutcher went for a follow-up examination to GIMC the next day after this visit to GIMC for treatment of the bump on his leg.  Additionally, on January 26, 2007, GIMC saw Crutcher for assessment of his cardiomyopathy and restarted his medications at that time.

The facts indicate that, when Crutcher ultimately was in a particularly poor medical condition on February 8, 2007, Yamutewa responded quickly in taking him to the medical unit. There is some dispute whether Crutcher walked or required assistance to get to the medical unit, but that is not a dispute as to a material fact given that Crutcher immediately received medical assistance.  See Fed. R. Civ. P. 56(a) (requiring that there be a genuine dispute as to a material fact); Mata v. Saiz, 427 F.3d at 759-60 (recognizing that entering summary judgment for a nurse was proper when she responded quickly to a doctor's order to send the plaintiff to the hospital even though the nurse made the plaintiff walk two blocks over hilly roads to change clothes before sending the plaintiff to the hospital).

While the facts do not indicate that Yamutewa delayed in responding to Crutcher's condition, because it is undisputed that he responded immediately when he saw Crutcher in bad health on February 8, 2007, there is a genuine issue of material fact whether the other guards acted with deliberate indifference when they saw how sick Crutcher was.  While Coffey's asserted fact that most of the guards did not care about the inmates would not help Coffey without additional evidence to illustrate how that negatively impacted Crutcher, she has presented other facts to illustrate that they may have acted with deliberate indifference.  The Court notes that Coffey did not cite any evidence to support these asserted facts, but that the Court found evidence in Gyce's affidavit that supported her asserted facts.  The Court assumes that Coffey sufficiently presented these facts to avoid waiving their presentation.  As of February 8, 2007, Crutcher had been unable to get up from

his bed for four or five days, and the other inmates staged a riot to get help for Crutcher.  The guards had earlier observed that Crutcher was failing, but did nothing.  Here, Coffey has presented facts that support an inference that some of the guards: (i) knew of and disregarded an excessive risk to inmate health or safety; (ii) the guards were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (iii) and drew that inference.  See Farmer v. Brennan, 511 U.S. at 837.  Drawing all reasonable inferences and resolving all doubts in Coffey's favor, guards observing an inmate who was too sick to get out of bed for four to five days and failing to act on this situation creates a genuine issue of material fact whether they knew of and disregarded an excessive risk to Crutcher's health or safety.  That Crutcher was too sick to leave bed for several days would indicate that he was not suffering from some minor illness, but rather a potentially serious one that could worsen with no medical attention.  See Olson v. Stotts, 9 F.3d at 1477.  Furthermore, Coffey has presented facts indicating that the guards saw Crutcher's condition failing, but did nothing.  In conjunction with the evidence that Crutcher could not get out of bed for four to five days, which the Court concluded permitted an inference that Crutcher may have been suffering from a major illness, these asserted facts permit an inference that the guards knew a substantial risk of serious harm existed.  They directly observed Crutcher's inability to get out of bed for several days and did nothing.  As of February 8, 2007, he became visibly ill and jaundiced, his condition became serious, and his condition ultimately resulted in his death.  Additionally, that the guards observed Crutcher's condition and failed to act creates a genuine issue of material fact whether they drew the inference that a substantial risk of serious harm existed.  These facts permit an inference that the guards acted with deliberate indifference.

Coffey has presented no facts, however, indicating that, once Crutcher was in this ill and jaundiced condition, anyone other than the guards knew about his condition until he arrived at the

medical unit.  Coffey has also not presented any facts that Crutcher requested medical attention once he was in this condition, which might have supported an inference that the medical staff had actual or constructive knowledge of his condition.  The only facts which Coffey presents regarding the medical staff once Crutcher became this ill were that, once Holden saw Crutcher's condition on February 8, 2007 and performed a medical assessment, he determined that Crutcher should go to the hospital.  Acting in this manner fulfilled his gatekeeping function to correctly address a situation and obtain assistance of other professionals, such as doctors, which was Holden's primary responsibility as a nurse under the circumstances presented.  See Mata v. Saiz, 427 F.3d at 757.

While it is undisputed that the BIA determined that McKinley County sent Crutcher in an officer vehicle rather than an ambulance to the hospital in violation of its internal policies, Coffey has presented no facts as to who made that decision, which would aid in determining whether the person acted with deliberate indifference, or why that decision constituted deliberate indifference rather than negligence.  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1.  Furthermore, while that conduct may have been negligent under the circumstances, deliberate indifference requires a higher degree of culpability akin to recklessness.  Rather than "disregard[ing] an excessive risk to inmate health or safety," these facts indicate that the staff were responding to the risk to Crutcher's health by sending him to the hospital -- albeit in a potentially negligent manner.  Farmer v. Brennan, 511 U.S. at 837.  In comparison, if Holden -- or whoever ordered Crutcher to go to the hospital in an officer vehicle -- had known of the risk posed by Crutcher's medical condition and failed to take any action at all, that conduct would potentially suggest deliberate indifference.  See Mata v. Saiz, 427 F.3d at 758 ("[I]f Ms. Weldon knew that appellant

had unexplained chest pain, it would have been more than mere malpractice or negligence to fail to call an ambulance or contact qualified medical personnel that could properly assess and assist Ms. Mata." (internal quotation marks omitted)).  A BIA investigation found that this chosen method of transportation violated McKinley County's internal policies.  See Bureau of Indian Affairs Internal Report at 35-36.  Coffey argues that failing to transport Crutcher in an ambulance prevented him from receiving medical care on the way to the hospital.  It is true that violation of internal policies can in some cases constitute circumstantial evidence of subjective knowledge of a risk.  See Mata v. Saiz, 427 F.3d at 758 ("[T]he DOC protocol mandating that Ms. Weldon treat severe chest pain as a cardiac symptom constitutes circumstantial evidence of her knowledge of the seriousness of such pain.").  Unlike the situation in Mata v. Sitz, however, the issue here is not whether the staff recognized Crutcher's medical condition and in the face of that knowledge chose to do nothing, but whether the staff responded appropriately in light of the risk that they did recognize -- Crutcher's poor medical condition.  As the Tenth Circuit has noted, "[t]he failure to abide by [a] federal policy" does not qualify as "automatic or per se proof of deliberate indifference," even when the Tenth Circuit assumed that the federal policy bound the county in that case.  Porro v. Barnes, 624 F.3d 1322, 1329 (10th Cir. 2010).  More specifically, a "policy and the Constitution" will often not be "congruent," because "[p]olicies are often prophylactic, setting standards of care higher than what the Constitution requires."  Porro v. Barnes, 624 F.3d at 1329 ("[T]he failure to enforce a prophylactic policy imposing a standard of care well in excess of what due process requires cannot be . . . enough by itself to create a triable question over whether county officials were deliberately indifferent to the Constitution.").  Coffey has presented no facts that any employee was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" in ordering Crutcher's transportation in an officer's vehicle as opposed to an

ambulance and that anyone "dr[e]w the inference." Farmer v. Brennan, 511 U.S. at 837. Coffey has not identified the driver of the officer's vehicle or the person who ordered Crutcher to go in the officer's vehicle. She has not directed the Court to authority suggesting that this conduct resulted in a constitutional violation. Once the movant meets its initial burden to show there is no genuine issue of material fact, which McKinley County has met here with the facts it has presented, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Coffey has not met her burden. Thus, drawing all reasonable inferences and resolving all doubts in Coffey's favor, the Court concludes that there is a genuine issue of material fact whether some of the guards committed an Eighth Amendment violation, but not whether the medical staff committed an Eighth Amendment violation.

### B.   COFFEY MAY NOT PROCEED ON A SUBSTANTIVE DUE-PROCESS THEORY.

McKinley County argues that Coffey cannot proceed under a substantive due-process theory based on the limitations Graham v. Connor imposes when a plaintiff has recourse to an explicit textual source of constitutional protection. See MSJ at 9. In Graham v. Connor, the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they had engaged in physically abusive conduct. See Graham v. Connor, 490 U.S. at 394-95. It held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'" Graham v. Connor, 490 U.S. at 395. The Supreme Court gave

-67-

as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments,"
because it is one of the "two primary sources of constitutional protection against physically abusive
governmental conduct." Graham v. Connor, 490 U.S. at 395.  The Supreme Court has later clarified
that this holding "simply requires that if a constitutional claim is covered by a specific constitutional
provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard
appropriate to that specific provision, not under the rubric of substantive due process." United
States v. Lanier, 520 U.S. at 272 n.7.  To illustrate this point, the Supreme Court has recognized that,
if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the
plaintiff may proceed on a substantive due-process theory.  See Cnty. of Sacramento v. Lewis, 523
U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took
place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.").

In Riddle v. Mondragon, the Tenth Circuit addressed a case where the plaintiff asserted
claims that they were "denied necessary medical care [in prison] in violation of their rights under
the Eighth and Fourteenth Amendments." 83 F.3d at 1202.  In determining whether to apply Eighth
Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims
in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded
under specific constitutional provisions, alleged violations of the protection should be analyzed
under those provisions and not under the more generalized provisions of substantive due process."
83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d at 1493).  Thus, the Tenth Circuit
reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and
did not consider the plaintiffs' substantive due-process theory.  See Riddle v. Monragon, 83 F.3d
at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made
applicable to the states through the Fourteenth Amendment.").

Applying those principles, Coffey cannot proceed on a substantive due-process theory here. The Tenth Circuit addressed whether a plaintiff could proceed on a substantive due-process theory and an Eighth Amendment theory as a threshold issue in Riddle v. Mondragon rather than after concluding that no Eighth Amendment violation occurred. See 83 F.3d at 1202. The Tenth Circuit concluded that the plaintiff could proceed only on an Eighth Amendment theory based on the nature of the allegations -- denial of access to medical care in prison in violation of the prisoner's constitutional rights. Riddle v. Mondragon, 83 F.3d at 1202. In comparison, in Fourth Amendment cases, if no search or seizure occurred, then the plaintiff can proceed on a substantive due-process theory, because the Fourth Amendment applies only to searches or seizures. See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.").

### III.   COFFEY HAS NOT ESTABLISHED THAT ONE MCKINLEY COUNTY'S POLICIES WAS THE MOVING FORCE BEHIND ANY CONSTITUTIONAL VIOLATION THAT MAY HAVE OCCURRED.

While McKinley County not putting certain policies in place could in some circumstances result in municipal liability under 42 U.S.C. § 1983, the undisputed facts do not indicate that: (i) McKinley County had actual or constructive notice of the situation; (ii) its failure to act was substantially certain to result in a constitutional violation; or (iii) it consciously or deliberately chose to disregard the risk of harm. Additionally, there is no affirmative link between the unconstitutional acts by McKinley County's subordinates, and their adoption of any plan or policy -- express or otherwise -- showing their authorization or approval of such misconduct.

-69-

**A.  COFFEY HAS NOT PUT FORWARD EVIDENCE RAISING A GENUINE ISSUE OF MATERIAL FACT THAT MCKINLEY COUNTY'S FAILURE TO ADOPT A POLICY WAS THE MOVING FORCE BEHIND ANY CONSTITUTIONAL VIOLATION THAT MAY HAVE OCCURRED.**

"[I]n order to hold a municipality liable for an employee's constitutional violations, a plaintiff must show not only that a constitutional violation occurred, but also that some municipal policy or custom was the moving force behind the violation." Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1320 (10th Cir. 1998).  While a genuine issue of material fact exists as to whether some of the guards committed a constitutional violation, the Court concludes that Coffey has failed to present a genuine issue of material fact whether a county policy which was a moving force behind the violation.  Thus, she may not proceed to trial on her claims against McKinley County.

McKinley County argues that Coffey cannot establish that there was a county policy that was the moving force behind the violation.  See MSJ at 6.  McKinley County notes that, even assuming Coffey could establish a constitutional violation, she has not identified any policy.  See MSJ at 6-7. Coffey argues that the need for training was obvious at McKinley County and that this lack of training qualifies as a policy.  See Response at 15.  She points out that a "medical plan was not instituted to determine the serious medical needs of Andrew Crutcher within the first fourteen days of the inmate's incarceration."  Response at 15.  She notes that "[t]his is the standard operating procedure for jails across the country as stated by Dr. Joseph Paris, an undenied expert in prison medical care."  Response at 15.  She also notes that municipal liability for failure to train is proper when "it can be shown that repeated instances of non response to serious medical problems of inmates occurred constituting a pattern of constitutional violations involving the exercise of jail personnel discretion."  Response at 15.

Liability can extend to a municipality for failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons. Barney v. Pulsipher, 143 F.3d at 1309 & n.8. "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable. Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08. See Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d at 369 ("The evidence must show that the need to act is so obvious that the School Board's 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to Doe's constitutional rights." (emphasis omitted)). Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations." Barney v. Pulsipher, 143 F.3d at 1308.

Coffey has not demonstrated that a pattern of violations occurred, as courts would normally require to establish that the failure to adopt a policy was the moving force behind a constitutional violation. See Barney v. Pulsipher, 143 F.3d at 1308. The only other incident to which Coffey points involved guards not responding to an inmate having a seizure until about thirty minutes into the seizure. Even drawing all reasonable inferences in favor of Coffey, this one incident does not lead the Court to the conclusion that McKinley County needed to adopt a fourteen-day screening policy to avoid future constitutional violations, assuming that this delay in treating the seizure would

qualify as a constitutional violation.  Coffey has presented the following facts: (i) most of the guards did not care about the inmates; (ii) as of February 8, 2007, Crutcher had been unable to get up from his bed for four or five days, and the other inmates staged a riot to get attention to get help for Crutcher; and (iii) before February 8, 2007, the guards had earlier observed that Crutcher was failing, but did nothing.  While these facts show a genuine issue of material fact exists whether the guards committed a constitutional violation against Crutcher, Coffey must present facts regarding incidents besides the one in this case to establish a pattern or practice of violations.  A pattern of violations sufficient to demonstrate deliberate indifference, particularly in the context of allegations that officials failed to train or adopt a policy, requires "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees."

Connick v. Thompson, 131 S.Ct. 1350, 1360 (2011).  Generally, the incidents must also be sufficiently similar to put officials on notice of the situation.  As the Supreme Court illustrated in Connick v. Thompson:

> Although Thompson does not contend that he proved a pattern of similar Brady violations, he points out that, during the ten years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of Brady violations by prosecutors in Connick's office.  Those four reversals could not have put Connick on notice that the office's Brady training was inadequate with respect to the sort of Brady violation at issue here.  None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.  Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.

131 S.Ct. at 1360 (footnote omitted)(citations omitted).  Guards failing to respond to a seizure for thirty minutes, particularly without any additional facts explaining why this delay occurred and suggesting the guards acted with deliberate indifference, is not a comparable situation to guards waiting four to five days to act on an inmate's bad health.  See Connick v. Thompson, 131 S.Ct. at

-72-

1360 (discussing that a plaintiff proceeding on a pattern-or-practice theory has the obligation to prove a pattern of similar constitutional violations).  With respect to the seizure incident, Coffey has put forward no facts indicating that the guards knew about the situation before they responded.  A delay of thirty minutes is not by itself a violation of the Eighth Amendment unless that delay was the result of deliberate indifference.  See Olson v. Stotts, 9 F.3d at 1477 ("Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm.").  Thus, because Coffey has not presented facts indicating that this prior incident resulted in a constitutional violation, she cannot rely on the incident to establish a pattern or practice of violations.  See Connick v. Thompson, 131 S.Ct. at 1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."); Jojola v. Chavez, 55 F.3d 488, 490 (10th Cir. 1995)("In order to show actual knowledge by Fraissenet and Hayes, the plaintiffs must prove 'the defendants received notice of a pattern of violations of female students' constitutional rights to be free of sexual abuse at the hands of the school district's employees.'" (emphasis added)).

Even assuming that guards failing to respond to a seizure for thirty minutes was a constitutional violation sufficiently similar to Crutcher's situation, Coffey has not put forward any evidence to suggest that any McKinley County officials or McKinley County Detention Center officials had actual or constructive notice of that previous incident.  Coffey has not identified any people who are McKinley County officials or McKinley County Detention Center officials.  For example, a single decision by a municipal officer with final policymaking authority may support municipal liability under 42 U.S.C. § 1983.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).  Furthermore, "the identification of policymaking officials is a question of state law," and "may be granted directly by a legislative enactment or may be delegated by an official who

possesses such authority." City of St. Louis v. Praprotnik, 485 U.S. at 124. The Tenth Circuit has also provided three elements to help determine whether an official is a final policymaker: (i) whether the official is meaningfully constrained by policies not of that official's own making; (ii) whether the official's decisions are final -- in other words whether they are subject to any meaningful review; and (iii) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. See Randle v. City of Aurora, 69 F.3d 441, 448 (10th Cir. 1995). She has presented some facts that Valle was a registered nurse who supervised other nurses. Coffey has presented no facts that address, however, what authority Valle has in terms of making policy, either by virtue of her position or based on power other officials have delegated to her. Coffey pointed to some testimony where Valle discusses that implementing a fourteen-day policy at McKinley County Detention Center would not impose any additional cost, but Valle does not mention who would have the power to make such a policy decision or that she had any such power. Absent additional evidence, the Court cannot reasonably conclude that she had any responsibility for making policy. Likewise, Coffey has identified no other McKinley County or the McKinley County Detention Center official or presented facts indicating that they would have the authority to make policy.

Additionally, while it was unfortunate that it took the guards thirty minutes to respond to an inmate having a seizure, Coffey has not put forward any evidence or cited to authority suggesting that a fourteen-day policy would have avoided that situation. Even if the medical staff knew about that inmate's condition, a fourteen-day policy would not likely avoid a delayed response by the guards. Without providing any explanation or evidence establishing what would have been an appropriate response, policy, or training to avoid the thirty-minute delay in this seizure incident, Coffey argues that there was a lack of response to medical emergency. See Response at 15 n.1. Even assuming Coffey has identified a policy or training that would have avoided this situation,

Coffey's failure to identify other potential constitutional violations that would have put the McKinley County Detention Center on notice of the situation undercuts her argument that McKinley County's "failure to act [was] substantially certain to result in a constitutional violation," or that "it consciously or deliberately" chose "to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d at 1307. Coffey has not presented any facts regarding the officials at McKinley County or the McKinley County Detention Center.

Even assuming the officials had actual or constructive notice of the harm, Coffey would still need to show that they deliberately chose to disregard the risk of harm. Coffey has presented no facts here suggesting any county official engaged in this conduct. This absence of evidence does not permit an inference that the respective officials "had actual or constructive notice" of any problem, or that they deliberately chose to disregard the risk, particularly given that Coffey has not identified any person or official that should have recognized the risk. Barney v. Pulsipher, 143 F.3d at 1309 & n.8. Once the movant meets its initial burden to show there is no genuine issue of material fact, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Even assuming adopting a fourteen-day policy was a standard practice at other jails, a "policy and the Constitution" will often not be "congruent," because "[p]olicies are often prophylactic, setting standards of care higher than what the Constitution requires." Porro v. Barnes, 624 F.3d at 1329. Coffey has not presented evidence that the county officials: (i) had actual or constructive notice of facts that would inform them that they should adopt such a policy; or (ii) acted with deliberate indifference in light of those facts. Likewise, given that the undisputed facts indicate that McKinley County staff responded to Crutcher's requests for medical attention on a timely basis, gave him antibiotics to avoid infection, would normally seek an inmate's medication

within ten to fifteen minutes after they arrived if they did not arrive with medication, and restarted Crutcher's heart medication during one of his later medical visits a few weeks before his death, the facts do not permit an inference that the risk of constitutional deprivations at the McKinley County Detention Center was "highly predictable" or "plainly obvious."  Barney v. Pulsipher, 143 F.3d at 1307-08.  While inmates with health problems would be a recurring situation, the responsiveness of the medical staff as presented under these undisputed facts did not create an "obvious potential for constitutional violations" in the absence of a fourteen-day policy.  Barney v. Pulsipher, 143 F.3d at 1307-08.  Even when drawing all reasonable inferences in Coffey's favor, the Court cannot conclude that the failure to adopt a fourteen-day policy for screening inmates was the moving force behind any constitutional violation that may have occurred.

Coffey also argues that a failure to train the McKinley County staff was the moving force behind the constitutional violations that allegedly occurred in this case.  See Response at 15.  Coffey does not readily distinguish between her theory that McKinley County should have adopted this fourteen-day policy and that it should have trained its personnel more thoroughly.  See Response at 15.  She does not articulate what training would be necessary other than adopting a fourteen-day policy.  See Response at 15.  She mentions that the medical staff should not have relied on inmates to contact their families to receive medication, but she has not successfully presented any evidence to support her argument that the medical staff engaged in this behavior.  See Response at 15 n.1. Assuming Coffey has sufficiently presented this failure-to-train argument to the Court to avoid waiving it, the Court recognizes that Coffey has presented various facts in her Response suggesting that the McKinley County staff -- Valle in particular -- did not adequately recognize the risk of infection posed to Crutcher based on his heart problems and his defibrillator, which created a potential entryway for heart infection.  Coffey has not identified, however, any pattern of violations

of this nature.  Even drawing all reasonable inferences in Coffey's favor, this risk of heart infection posed by Crutcher's particular medical circumstances is a relatively specific risk.  The Tenth Circuit has recognized that proceeding on the basis of a failure-to-train theory normally requires a pattern of violations.  See Barney v. Pulsipher, 143 F.3d at 1308.  It has also stated, however:

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  Coffey has pointed to no facts suggesting McKinley County staff had ever dealt with a similar situation.  Thus, she has not established that there was a pattern of violations.  She has not presented any evidence suggesting that Crutcher's specific medical condition was a "recurring situation[]" which presented an "obvious potential for constitutional violations" that would require specific training.  Barney v. Pulsipher, 143 F.3d at 1307-08.  Once the movant meets its initial burden to show there is no genuine issue of material fact, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  Even when drawing all reasonable inferences in Coffey's favor, the Court cannot reasonably conclude that the failure to adopt training to deal with those in Crutcher's situation -- a person with heart conditions that posed a risk of infection -- was the moving force behind any constitutional violation that may have occurred.

**B.      COFFEY HAS NOT DEMONSTRATED A GENUINE ISSUE OF MATERIAL FACT REGARDING THE EXISTENCE OF AN AFFIRMATIVE LINK BETWEEN ANY UNCONSTITUTIONAL ACTS THAT MCKINLEY COUNTY EMPLOYEES COMMITTED AND MCKINLEY COUNTY'S ADOPTION OF ANY PLAN OR POLICY SHOWING THEIR AUTHORIZATION OR APPROVAL OF SUCH MISCONDUCT.**

Recognizing that the Supreme Court may have abolished or significantly limited supervisory liability under 42 U.S.C. § 1983, the Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct." Dodds v. Richardson, 614 F.3d at 1200-01 (second omission in original).  To articulate this principle, the Tenth Circuit discussed a prior Supreme Court opinion, Rizzo v. Goode.  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. at 374-75).  In Rizzo v. Goode, the plaintiffs had alleged in their complaint that various city officials, including the mayor and chief of police, had adopted and enforced deliberate policies of excluding and removing the plaintiff's labor organizers, which the city officials implemented by force and violence through the individual policemen.  See 423 U.S. at 374.  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city

officials' conduct, because there was a deliberate plan by named defendants to "crush the nascent labor organizations." Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

Applying those principles to Dodds v. Richardson, the Tenth Circuit concluded that there was an affirmative link between the conduct of the defendant in that case, a sheriff, and the alleged misconduct by the sheriff's subordinates. The plaintiff in that case was not allowed to post bond until a judge had arraigned him based on a local county rule that was non-binding. See Dodds v. Richardson, 614 F.3d at 1189-90. A judge had already set the bond before arraignment. See id. at 1189. The plaintiff alleged that the defendant had a statutory responsibility for his county jail and had a duty to allow arrestee's to post bond. See id. at 1190. The plaintiff alleged that the defendant acquiesced in these non-binding policies in spite of his statutory duties. See id. The defendant's subordinates -- who he directly supervised -- enforced these policies. See id. Based on those facts, the Tenth Circuit concluded that there was a sufficient evidence to conclude that the defendant "may have played more than a passive role in the alleged constitutional violation" in that "he may have deliberately enforced or actively maintained the policies in question at the jail." Id. at 1203-04.

In comparison, Coffey has identified no McKinley County officials or McKinley County Detention Center officials who had any involvement in the purported misconduct, such as acquiescing to employee misconduct or encouraging employees to behave in an improper manner. Coffey has not presented evidence demonstrating a "direct causal link between the municipal action and deprivation of federal rights." Barney v. Pulsipher, 143 F.3d at 1307. Coffey has presented no information to identify these officials or set forth facts that demonstrate their involvement in setting any policies. Coffey has not presented evidence regarding how any of the facts at issue gave these officials actual or constructive notice of any problems. Coffey has pointed to no evidence that these

officials authorized or approved any potential misconduct in which the McKinley County Detention Center employees engaged.  Coffey put forward some evidence that Valle was a registered nurse who supervised other nurses, but has presented no facts indicating that Valle had any authority to set policy.  See Dodds v. Richardson, 614 F.3d at 1200-01.  Additionally, the Court has concluded that no medical staff committed any constitutional violations, which undercuts any affirmative link between Valle and any constitutional violations that occurred.  See Dodds v. Richardson, 614 F.3d at 1200-01.  Coffey has presented no facts connecting Valle to any of the guards or indicating that she had any authority over them.  See Dodds v. Richardson, 614 F.3d at 1200-01.  McKinley County has argued that Coffey "must show that the institution's policies caused the constitutional violation" and articulated why Coffey cannot do so.  MSJ at 6-9.  Once the movant meets its initial burden to show there is no genuine issue of material fact, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  Coffey has not satisfied that burden. Even drawing all reasonable inferences and resolving all doubts in Coffey's favor, the Court concludes that, given the facts presented, Coffey cannot establish that these officials caused or were personally involved in any potential constitutional violation.

## C.  THE COURT DOES NOT DECIDE WHETHER ASHCROFT V. IQBAL AFFECTS A SUPERVISORY-LIABILITY CLAIM.

McKinley County argues that Coffey has not responded to its argument that Ashcroft v. Iqbal has changed or abolished the standard for supervisory liability under 42 U.S.C. § 1983.  See MSJ at 6; Reply at 10.[46]  The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, and may have

---

[46]The Court notes that Coffey's pleadings do not make entirely clear whether she attempts to set forth a supervisory-liability theory along with a municipal-policy-liability theory.  The Tenth Circuit has stated that some of the changes Ashcroft v. Iqbal may have made to supervisory liability

even eliminated, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  129 S.Ct. at 1948.  The Tenth Circuit in Dodds v. Richardson did not resolve completely how Ashcroft v. Iqbal affected supervisory liability.  See Dodds v. Richardson, 614 F.3d at 1200 ("Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case.").

The Supreme Court's and the Tenth Circuit's decisions bind the Court.  See Tootle v. USDB Commandant, 390 F.3d 1280, 1283 (10th Cir. 2004).  The Tenth Circuit has recognized that Ashcroft v. Iqbal may create a conflict with its prior precedent on supervisory liability and has not yet decided to resolve that Supreme Court decision with its prior precedent.  See Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit is not bound to follow the decision of a prior panel when the Supreme Court issues a superceding decision to the contrary of that decision. See Mendiola v. Holder, 585 F.3d 1303, 1310 (10th Cir. 2009).  The Tenth Circuit has stated: "We are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings."  United States v. Langford, 641 F.3d 1195, 1198 n.2 (10th Cir. 2011).

The Tenth Circuit recognized before Ashcroft v. Iqbal that supervisory liability was a valid theory on which a plaintiff could hold a government official liable, at least under some

---

do not affect the standard for municipal liability.  See Porro v. Barnes, 624 F.3d at 1328 (recognizing that Ashcroft v. Iqbal did not affect standards for municipal liability under 42 U.S.C. § 1983).

circumstances, for conduct in which his or her subordinates engaged. See Dodds v. Richardson, 614 F.3d at 1196-97 (discussing prior Tenth Circuit precedent on supervisory liability); Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir.2006)("In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution."); Jenkins v. Wood, 81 F.3d 988, 995 (10th Cir. 1996)("A plaintiff may satisfy this [supervisory-liability] standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance.").  District courts within the Tenth Circuit are bound to follow the Tenth Circuit's decisions. See Citizen Band Potawatomi Indian Tribe of Okla v. Okla Tax Comm'n, 969 F.2d 943 (10th Cir. 1992)("As the district court is bound by our mandate, we of course are bound by the Supreme Court's mandate."); United States v. Sandoval, No. 04-2362, 2006 WL 1228953, at *10 (D.N.M. Mar. 7, 2006)(Browning, J.)("The Tenth Circuit's precedent, however, binds the Court.  The Court is not free to decide that the Supreme Court will, at some future point, overrule [a Tenth Circuit decision].").  There is some confusion among courts as to the effect Ashcroft v. Iqbal had on supervisory liability.  The dissent in Ashcroft v. Iqbal, written by Justice Souter and joined by three other Justices, concluded that the majority had eliminated supervisory liability in its entirety.  See Ashcroft v. Iqbal, 129 S.Ct. at 1957 (Souter, J., dissenting); Dodds v. Richardson, 614 F.3d at 1198 ("Justice Souter in his dissent, joined by Justices Stevens, Ginsburg, and Breyer, concluded the majority did not merely narrow, but rather eliminated supervisory liability altogether.").  The United States Court of Appeals for the Ninth Circuit has, on the other hand, opined that the decision may have only required purposeful conduct by supervisors in racial discrimination cases, as those were the facts in Ashcroft v. Iqbal.  See al-Kidd v. Ashcroft, 580 F.3d 949, 976 n.5 (9th Cir. 2009), rev'd on other grounds 131 S.Ct. 2074 (2011).  The Tenth Circuit has

recognized, besides these two positions, "[m]any intermediate positions are also surely plausible."
Lewis v. Tripp, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010).

Given that the Tenth Circuit has not yet determine whether Ashcroft v. Iqbal has overruled its prior opinions on supervisory liability, including Serna v. Colorado Department of Corrections and Jenkins v. Wood, given that a district court is bound by Tenth Circuit law until the Tenth Circuit overrules a prior panel's decision,[47] given that the Tenth Circuit has recognized this conflict that Ashcroft v. Iqbal has created with supervisory liability but has not yet decided the scope of the conflict, given that the parties have not briefed this issue in detail, given that Coffey may not even be asserting a supervisory liability claim, and given that anything the Court would say would be dicta, the Court declines to address the effect Ashcroft v. Iqbal had on supervisory liability.[48]  As the Court previously concluded, no McKinley County policy was the moving force behind any violation that may have occurred, and there is no affirmative link between McKinley County's conduct and any of its employees' constitutional violations.  Thus, as those grounds resolve Coffey's claims, it is not necessary to address Ashcroft v. Iqbal's effect on supervisory liability.

---

[47]It is not necessary for the Tenth Circuit to overrule its prior decisions when sitting en banc if the Supreme Court issues a superceding decision to the contrary.  See  Mendiola v. Holder, 585 F.3d at 1310 ("We are bound by the precedent of prior panels absent en banc consideration or a superseding contrary decision by the Supreme Court." (emphasis added)).

[48]The Court notes that limitations on municipal and supervisory liability are not constitutional concerns, but rather limitations which 42 U.S.C. § 1983 imposes. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. at 690 n.54 ("There is certainly no constitutional impediment to municipal liability."); id. at 695 (recognizing that statutory-construction stare decisis principles applied rather than constitutional stare decisis principles when determining whether to overrule prior precedent regarding municipal liability).  Thus, the doctrine of constitutional avoidance would not apply to reaching decisions on these issues.  See ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1186 n.8 (10th Cir.1998).

**IV.    THE COURT WILL GRANT THE MOTION TO DISMISS AS COFFEY MAY NOT PROCEED ON A SUBSTANTIVE DUE-PROCESS THEORY FOR THESE CLAIMS.**

The Court has already concluded that entering summary judgment on all of Coffey's claims is proper.  The Court will also grant the Motion to Dismiss.  The Court concluded earlier that Coffey may not proceed on a substantive due-process theory against McKinley County.  The Motion to Dismiss requests that the Court dismiss Coffey's claims for failure to adequately allege a substantive due-process violation.  Coffey has alleged in her pleadings claims related to "McKinley County operat[ing] and maintain[ing] an adult detention facility," and "refus[ing] to provide reasonable medical care to its detainees in violation of their civil rights pursuant to the federal and state constitutions."   Second Amended and Consolidated Complaint at 2; Third Amended and Consolidated Complaint at 2.  Her pleadings then proceed to allege facts regarding the inadequacy of the medical care and procedures at the McKinley County Detention Center.  See Second Amended and Consolidated Complaint at 5-10; Third Amended and Consolidated Complaint at 5-10.  As the Court has already concluded, allegations such as these fall under the more specific constitutional provision of the Eighth Amendment as opposed to the broader Fourteenth Amendment guarantee of substantive due process.  Thus, the Court will dismiss Coffey's substantive due-process claims, as Coffey could not proceed on a substantive due-process theory based on these alleged facts.

**IT IS ORDERED** that: (i) the County Defendant's Motion for Summary Judgment, filed August 1, 2011 (Doc. 78 in the civil case docket number 09-0028): and (ii) the Defendants' Second Motion to Dismiss, filed August 14, 2011 (Doc. 83), are granted.  The Court will dismiss the unnamed Defendants without prejudice.  While there is a genuine issue of material fact whether some of the unnamed guards at the facility acted with deliberate indifference, Plaintiff Diana Coffey

may not proceed on these claims against Defendant McKinley County to trial, because she has not demonstrated that any McKinley County policy was the moving force behind a constitutional violation, or that there was an affirmative link between McKinley County and the constitutional violations that may have occurred.  Plaintiff Diana Coffey may not proceed under a substantive due-process theory on these claims against McKinley County.  Lastly, the Court will grant the Motion to Dismiss, as Coffey cannot proceed on a substantive due-process theory against McKinley County.


_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Scott E. Borg
Barber & Borg, LLC
Albuquerque, New Mexico

*-- and --*

Robert R. Hager
Treva J. Hearne
Hager & Hearne
Reno, Nevada

      *Attorneys for the Plaintiff*

Kenneth J. Gonzales
  United States Attorney
Jan Elizabeth Mitchell
Dori Ellen Richards
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for Defendant United States of America*

-85-

Jonlyn M. Martinez
Slease & Martinez, P.A.
Albuquerque, New Mexico

*Attorneys for Defendant McKinley County*