IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DIANA COFFEY, on her own behalf and on behalf
of the estate of ANDREW CRUTCHER, deceased,
and also, as next friend, on behalf of her minor
grandchildren, JOANELLE CRUTCHER,
RACHELLE CRUTCHER, ALEX BENALLY,
ANDREW CRUTCHER, VICK CRUTCHER,
KITANA CRUTCHER, and DREW CRUTCHER,

      Plaintiffs,

vs.                                                                                   No. CIV 08-0588 JB/LFG

UNITED STATES OF AMERICA,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant United States of America's Motion

and Memorandum to Dismiss Plaintiffs' Errata Amended and Consolidated Complaint [Doc. No.

118] Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary

Judgment Pursuant to Fed. R. Civ. P. 56, filed February 23, 2012 (Doc. 123)("Motion"). The Court

held a hearing on March 2, 2012. The primary issues are: (i) which States' law applies to the

negligence/wrongful death claim and theories Plaintiff Diana Coffey has asserted against Defendant

United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80,

("FTCA"); (ii) whether Coffey has met her burden to establish a waiver of sovereign immunity

under the FTCA to invoke the Court's subject-matter jurisdiction; and (iii) whether the Court should

permit Coffey to assert negligence/wrongful death theories beyond those the Court permitted her

to include in her pleadings as stated in the Court's Memorandum Opinion and Order, filed

November 14, 2011 (Doc. 110)("Nov. 14, 2011 MOO"). The Court will deny the Motion. The

Court concludes that, applying FTCA conflicts-of-law principles and the applicable States' law, Arizona and Nevada would apply New Mexico law to Coffey's negligence/wrongful death claim and her respective theories.  The Court concludes that there is a waiver of immunity under the FTCA against the United States, because New Mexico courts would recognize the appropriateness of liability of private individuals under like circumstances to those in this case.  The Court will not permit Coffey to assert any negligence/wrongful death theories beyond those it permitted her to include in her pleadings as stated in the Court's Nov. 14, 2011 MOO.  Lastly, the Court concludes that genuine issues of material fact preclude the entry of summary judgment.

## FACTUAL BACKGROUND

Coffey disputes only one of the United States' asserted facts.  Coffey does not include a section in her Opposition to Motion to Dismiss or in the Alternative Motion for Summary Judgment, see Doc. 127 ("Response"), where she sets forward any numbered or lettered asserted facts.  See D.N.M.LR-Civ. 56.1 ("The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered . . . .").  Both Coffey and the United States cite exhibits in the argument sections of filings without setting forth asserted facts that refer to those exhibits.  Particularly, by not at least condensing their asserted facts in one section of their briefs, the parties have not provided the Court with a basis for determining whether they intend to put forward any asserted facts in relation to the exhibits they cite in the bodies of their filings.  That practice violates D.N.M.LR-Civ. 56.1(b).  The Court has already instructed Coffey in a previous Memorandum Opinion and Order to follow this local rule because otherwise the Court might not know which facts she intends to assert.  See Memorandum Opinion and Order at 3, filed November 28, 2011 (Doc. 113)("Nov. 28, 2011 MOO")("In contravention of D.N.M.LR-Civ. 56[.1](b), Coffey has not attempted to distinguish

between her facts that controvert McKinley County's facts and her additional material facts."); id.

at 3 ("The Court notes that Coffey has structured her facts in a way that makes them difficult to

navigate and that it has expended a great deal of effort to organize and present these facts.").

D.N.M.LR-Civ. 56.1(b) is designed to isolate the relevant facts and to present them in an

orderly fashion to the Court, and when parties do not follow the procedures listed in this local rule,

the Court may have difficulty properly determining what the relevant facts are.  Furthermore, it is

not the Court's responsibility to scour the parties' evidence and filings to determine what facts are

in dispute and what facts will defeat a motion for summary judgment.  See Gonzales v. City of

Albuquerque, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)("[I]t is not the

Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary

Judgment . . . ."); Hauff v. Petterson, 755 F.Supp.2d 1138, 1150 (D.N.M. 2010)(Kelly, J.)("Nor is

it the court's function to 'scour the record in search of evidence to defeat a motion for summary

judgment.' " (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996))).

The Court will do its best to present the facts that the parties have set out in their factual sections

of their briefs, or what appear to be the factual sections of their briefs, but may not be able to

consider what may or may not be asserted facts set out in the argument section of the parties' filings.

The Court can think of no sound basis to distinguish between what might be arguments and what

might be asserted facts when parties include those matters in the argument section of their filings

but not their factual sections of their filings.

In April 2006, Andrew Crutcher, a Native American, was tried in the Reno Sparks Indian

Colony Tribal Court and convicted by a jury of discharging a firearm on the Reno Sparks Indian

Colony in Nevada.  See  Motion ¶ 1, at 4 (setting forth this fact); Errata: Amended and Consolidated

Complaint ¶ 11, at 4, filed February 1, 2012 (Doc. 118)("Errata Complaint"); Response at 6-7 (not

disputing this fact).  In May 2006, Crutcher was sentenced to 365 days in jail for the weapons offense by the Reno Sparks Indian Colony Tribal Court and was committed into custody at an available detention facility, the Washoe County Jail, per a procurement contract with the Bureau of Indian Affairs ("BIA").  Motion ¶ 2, at 4 (setting forth this fact); Errata Complaint ¶ 19, at 4; Response at 6-7 (not disputing this fact).[1]  On October 7, 2006, BIA employees transported Crutcher and a number of other inmates from the Washoe County Jail.  See Motion ¶ 4, at 4 (setting forth this fact); Errata Complaint ¶ 23, at 5-6; Response at 6-7 (not disputing this fact).  The BIA does not require by contract that detention facilities medically screen inmates within any particular timeframe or when an inmate is transferred.  See Supplement to Opposition to USA's Motion for Summary Judgment at 2, filed April 10, 2012 (Doc. 136)("Supplement")(setting forth this fact); Deposition of Patricia Broken Leg Brill at 38:8-39:3, 48:12-49:7, 53:11-22, 55:1-19, 56:11-17 (taken Wednesday March 21, 2012), filed April 10, 2012 (Doc. 136-1)("Brill Depo.").  BIA officials are not directed to pick up medical records for patients.  See Supplement at 2 (setting forth this fact); Brill Depo. at 35:15-36:10.  There is no requirement that BIA officials conduct medical screenings before transporting an inmate.  See Supplement at 2 (setting forth this fact); Brill Depo. at 54:21-55:19.  In Peach Springs, Arizona, Crutcher and some of the other inmates were transferred to the custody of officers from the McKinley County Detention Center ("MCDC") and taken to Gallup,

---

[1] The United States puts forward an asserted fact that Crutcher was held at the Washoe County Jail for a number of months until a space became available at a BIA contract detention facility.  See Motion ¶ 3, at 4.  Coffey objects to this asserted fact, because the United States has not cited any evidence to support that asserted fact.  See Response at 6-7.  A party is generally obligated to cite to evidence to support their asserted facts as part of a motion for summary judgment.  See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); D.N.M.LR-Civ. 56.1(b) ("The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.").  Because the United States does not cite to any evidence to support this asserted fact, the Court will disregard this asserted fact.

New Mexico, for incarceration at the MCDC.  See Motion ¶ 4, at 4 (setting forth this fact); Errata

Complaint ¶ 23, at 5-6; Response at 6-7 (not disputing this fact).  BIA officials decided to transport

Crutcher 900 miles from his home and primary doctor to save money on the cost of Crutcher's

incarceration.  See Response at 7-8 (setting forth this fact); Deposition of Vincente Anchando at

22:17-23:6, 23:19-25:9 (dated July 1, 2011), filed March 12, 2012 (Doc. 127-2); Reply at 3-4 (not

disputing this fact).

Crutcher was incarcerated at the MCDC on October 8, 2006.  See Motion ¶ 5, at 5 (setting

forth this fact); Nov. 28, 2011 MOO at 4; Response at 6-7 (not disputing this fact).  Crutcher seemed

healthy at the time he was sent to the MCDC.  See Motion ¶ 6, at 5 (setting forth this fact); Second

Amended and Consolidated Complaint ¶ 21, at 5, filed July 28, 2011 (Doc. 61).[2]  Crutcher was

supposed to have the defibrillator[3] attached to his body checked every three to four months and was

on heart medication to avoid heart failure.  See Response at 7 n.10 (setting forth this fact);

Deposition of Ram Challapalli, M.D. at 13:8-17 (dated April 5, 2011), filed March 7, 2012 (Doc.

---

[2]It is not clear whether Coffey attempts to dispute this asserted fact, as she refers to statements about Crutcher's heart condition in a discussion of this asserted fact that Crutcher seemed healthy on the day he was transported.  See Response at 7 & n.10.  The United States' asserted fact tracks a statement in one of Coffey's superseded pleadings where she states that Crutcher "seemed healthy when he was there" at the Washoe County Jail.  Second Amended and Consolidated Complaint ¶ 21, at 5.  Statements in a party's superseded pleadings qualify as admissions by party opponents.  See O'Hearon v. Castleview Hosp., 156 F.3d 1244, 1998 WL 480161, at *3  (10th Cir. 1998)(unpublished table decision)("[A]lthough assertions made in a superseded pleading are not binding judicial admissions, such assertions may be treated as ordinary evidentiary admissions.").  Thus, to the extent Coffey challenges this asserted fact, the asserted fact appropriately relies on one of Coffey's superseded pleadings -- which contains statements that are admissions by Coffey that may be offered against her.

[3]A defibrillator is "[a]ny agent or measure, e.g., an electric shock, that arrests fibrillation of the ventricular muscle and restores the normal beat" of the heart.  Stedman's Medical Dictionary 500 (28th ed. 2006).  Fibrillation is "[e]xceedingly rapid contractions or twitching of muscular fibrils, but not of the muscle as a whole."  Id. at 722.  A fibril is "[a] minute fiber or component of a fiber."  Id. at 722.

127-3); Reply at 3-4 (not disputing this fact).  The MCDC was a contract facility for detention pursuant to a contract between the BIA and MCDC.  See Motion ¶ 7, at 5 (setting forth this fact); Errata Complaint ¶ 39, at 8; Response at 6-7 (not disputing this fact).  After the transfer in Peach Springs on October 7, 2006 to the MCDC officers, BIA employees had no further contact with Crutcher.  See Motion ¶ 8, at 5 (setting forth this fact); Response at 6-7 (not disputing this fact).  On February 8, 2007, while incarcerated at the MCDC, an officer at this facility observed that Crutcher was ill and that he needed to be taken to the medical unit.  See Motion ¶ 9, at 5 (setting forth this fact); Errata Complaint ¶ 42, at 9; Response at 6-7 (not disputing this fact).  Crutcher was transported to the Gallup Indian Medical Center, where he died a few hours later.  See Motion ¶ 9, at 5 (setting forth this fact); Errata Complaint ¶ 42, at 9; Response at 6-7 (not disputing this fact).  Crutcher died from sepsis[4] resulting from infective endocarditis.[5]  See Motion ¶ 10, at 5 (setting forth this fact); Nov. 28, 2011 MOO at 5; Response at 6-7 (not disputing this fact).

## PROCEDURAL BACKGROUND

On June 17, 2008, Coffey filed her Civil Complaint for Damages for Wrongful Death and Civil Rights Violations against the United States.  See Doc. 1 ("Original Complaint").  On November 14, 2011, the Court filed its Memorandum Opinion and Order granting in part and denying in part Coffey's motion seeking leave to amend her pleadings.  See Nov. 14, 2011 MOO at 1-2.  The Court allowed Coffey to amend her pleadings, but did not permit her to assert a medical

---

[4]Sepsis is "[t]he presence of various pathogenic organisms, or their toxins, in the blood or tissues." Stedman's Medical Dictionary 1749 (28th ed. 2006). Pathogenic means "[c]ausing disease or abnormality." Id. at 1442.

[5]Endocarditis is the "[i]nflammation of the endocardium." Stedman's Medical Dictionary, supra, at 638. The endocardium is the "innermost tunic of the heart." Id. at 639. A tunic is a "[c]oat or covering." Id. at 2053.

malpractice claim against the United States.  See Nov. 14, 2011 MOO at 2.  The Court permitted her

to assert the following theories of wrongful death/negligence against the United States: (i) negligent

screening; (ii) negligent transfer; and (iii) negligent hand off.  See Nov. 14, 2011 MOO at 1-2.  On

January 23, 2012, Coffey filed her most recent live pleading, her Amended and Consolidated

Complaint.  See Doc. 116.  On February 1, 2012, Coffey filed an errata to her pleadings, but did not

specify the reason for the errata.  See Doc. 118.  The United States filed an answer to this Errata

Complaint.  See Defendant United States of America's Answer to Plaintiffs' Errata -- Amended and

Consolidated Complaint, Doc. No. 118, filed February 10, 2012 (Doc. 119).

The basic premise of Coffey's negligent screening theory is that: (i) the Washoe County Jail

kept complete medical records for Crutcher; (ii) the BIA had no policy or procedure to take that

information from the Washoe County Jail; (iii) there were not adequate procedures in place to screen

inmates' medical conditions to ensure that transferring them would be appropriate; and (iv) the BIA

did not transmit any information regarding Crutcher's medical condition to MCDC officials when

it transferred him to the MCDC's custody.  See Errata Complaint ¶¶ 20, 23, at 5-6.  The basic

premise of Coffey's negligent transfer theory is that: (i) the BIA transferred Crutcher "nearly 900

miles from his family" where he could not easily reach his family; (ii) the BIA transferred him to

a facility, the MCDC, that "did not have adequate examinations or preventative medical care as

adopted by other similar jails in the United States"; and (iii) the BIA did not have procedures in

place to transfer medical property, such as medications, as part of transferring inmates.  Errata

Complaint ¶¶ 27-28, 31-33, at 7.  Coffey's negligent-hand-off theory relies on many of the same

facts as the other two theories she has asserted, including that "[t]he BIA did not determine that the"

MCDC "was adequate to house an inmate with Andrew Crutcher's medical problems," specifically

his congestive heart failure.  Errata Complaint ¶¶ 33, 35, at 7-8.  The Court precluded Coffey from

asserting any other theories in its Nov. 14, 2011 MOO, including a medical negligence theory.  See Nov. 14, 2011 MOO at 1-2.  At the September 30, 2011, hearing, the United States noted that other theories that Coffey has sought to assert that implicate conduct in which the MCDC was involved would be subject to certain defenses under the FTCA, including an independent-contractor defense. See Transcript of Hearing at 17:24-18:12 (taken September 30, 2011)(Mitchell).[6]

On February 23, 2012, the United States filed its Motion seeking dismissal of Coffey's negligence/wrongful death claim against it.  The United States argues that the Court lacks subject-matter jurisdiction to hear Coffey's FTCA claim against it, because Coffey has not established that a private person under like circumstances would be liable for the alleged misconduct.  See Motion at 9.  It notes that the relevant inquiry is whether a private person, rather than a state or municipal entity, would be liable under state law.  See Motion at 9.  It asserts that "[i]nternal policies, procedures, or statutes governing federal action cannot serve to create a substantive cause of action under the FTCA unless the conduct is independently tortious under applicable state law."  Motion at 11.  It asserts that there are no BIA regulations that impose a duty to perform medical screenings on inmates prior to transfer.  See Motion at 11.  Alternatively, the United States argues that Coffey has failed to state a claim upon which relief may be granted and that it is entitled to summary judgment against her.  See Motion at 13-16.  The United States asserts that "there is no evidence that BIA detention/transfer officers failed to exercise due care with respect to Mr. Crutcher during the time he was in their custody."  Motion at 14.  The United States relies on authority from Nevada and Arizona.  See Motion at 14.  The United States argues that, under both Arizona and Nevada law, Coffey has the obligation to establish the existence of a duty of care.  See Motion at 14.  It contends

---

[6]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

that no authority supports Coffey's proposition that a cause of action may be "based upon the failure of a private person to perform medical screening under like circumstances." Motion at 14. It asserts that: (i) "Crutcher was in the custody of the BIA detention/transfer officers for a limited period of time -- less than a day"; (ii) and "[t]here is no evidence that his medical status was poor at the time of the handoff to the" MCDC officers. Motion at 15. The United States notes that the MCDC "had a medical unit which was staffed with medical care providers who performed medical screenings on incoming inmates." Motion at 15. The United States represents that the MCDC, "as the receiving facility, performed a medical screening after Mr. Crutcher arrived at the facility." Motion at 15. The United States also contends that, given the four-month gap in time between when BIA officials transferred Crutcher to the MCDC and Crutcher's death, there is no legal causation "between any alleged breach by employees of the United States and Mr. Crutcher's death." Motion at 16.

On March 7, 2012, Coffey filed her Opposition to Motion to Dismiss or in the Alternative Motion for Summary Judgment. See Doc. 127 ("Response"). Coffey contends that, "[u]nder Nevada law when the BIA transported and released this inmate to McKinley County, the defendant as a public official had the duty to exercise reasonable care to avoid foreseeable harm." Response at 2. Coffey requests "leave to amend to supply additional facts supporting" her claims should the Court dismiss her claims. Response at 4. Coffey argues that the BIA was the proper party to incarcerate Crutcher. See Response at 8. Coffey notes that, under 25 U.S.C. § 2802, the BIA is "responsible for providing . . . law enforcement services in Indian country." Response at 8 (citing 25 U.S.C. § 2802). Coffey cites to Nevada law for the proposition that "state officials have a duty to exercise ordinary care in performing their duties." Response at 9 (citing Butler ex rel. Biller v. Bayer, 123 Nev. 450, 168 P.3d 1055 (2007)). She argues that, during the BIA's transport of

Crutcher, it "failed to have Crutcher's medical records, his necessary medication and transported him 900 miles from his home and doctor." Response at 9. Coffey argues that "the restriction invoked by the United States that it must be the negligence of a private person" that is considered under the FTCA "is absurd." Response at 11.

On March 23, 2012, the United States filed its Reply to Plaintiffs' Opposition to Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. See Doc. 129 ("Reply"). The United States asserts that Coffey has not raised in her pleadings any argument that the BIA was negligent by not incarcerating Crutcher itself as opposed to having some other facility incarcerate him. See Reply at 4-5. The United States asserts that "[t]here is absolutely no evidence that it was foreseeable that Mr. Crutcher would become ill and die from sepsis resulting from infective endocarditis four months after he entered the McKinley County Detention Facility." Reply at 7-8. The United States asserts that there is no evidence that: (i) BIA employees were given any medical records or medication for Crutcher from the Washoe County Jail employees; (ii) that transporting Crutcher from his "home and doctor" was negligent; and (iii) that there was a duty to inform the MCDC about Crutcher's medical condition. Reply at 8.

At the hearing on April 9, 2012, the United States emphasized that the FTCA requires that courts consider the analogous private liability under state law as opposed to the liability of state actors. See Transcript of Hearing at 3:16-25 (taken April 9, 2012)(Mitchell)("Apr. 9, 2012 Tr."). The United States clarified that the allegedly negligent act of picking up and transporting Crutcher without his medical records began in Reno, Nevada. See Apr. 9, 2012 Tr. at 9:3-16 (Mitchell). The United States asserted that the allegedly negligent transfer occurred in Peach Springs. See Apr. 9, 2012 Tr. at 9:17-21 (Mitchell). Coffey argued that it is not appropriate to consider whether private individuals would be liable given that there is no comparable activity as what occurred in this case

-10-

in the private sector.  See Apr. 9, 2012 Tr. at 17:1-22 (Hearne).  She contended that the BIA had a responsibility to transport Crutcher in a reasonably safe manner.  See Apr. 9, 2012 Tr. at 20:20-21:16 (Hearne).  The United States asserted that it is not necessary to get into the issues raised in a case Coffey cited, Hanson v. United States, 712 F.Supp.2d 321 (D.N.J. 2010), because BIA detention officers are not police officers, and there is not a sufficient analogy to excessive force cases here.  See Apr. 9, 2012 Tr. at 24:21-25:2 (Mitchell).  Coffey argued that Nevada law applies to all of the theories upon which she bases her negligence claim, because the decision to transfer Crutcher was made in Nevada.  See Apr. 9, 2012 Tr. at 27:19-28:2 (Hearne).  The United States asserted that the decision to transfer was made in Arizona.  See Apr. 9, 2012 Tr. at 28:7-23 (Mitchell).

On April 10, 2012, Coffey filed her Supplement.  See Doc. 136.  Coffey refers to a deposition from Patricia Broken Leg Brill that "was held in Washington D.C. at her office on March 21, 2012" and thus "was not available when the Opposition to Motion for Summary Judgment/Motion to Dismiss was filed."  Supplement at 1-2.  Coffey argues that "[i]t is a dispute of fact whether transporting [Crutcher] 900 miles away from his medical provider to McKinley County, New Mexico, without making a decision about the effect on his health was negligent because the receiving facility was inadequate and not providing adequate medical care."  Supplement at 2.

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's

jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104

(1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise the defense of the

court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P.12(b)(1).  The

United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of

subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency

of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts

upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th

Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in
> opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations
> to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645
> F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts
> themselves, a district court may not presume the truthfulness of those allegations.
> A court has wide discretion to allow affidavits, other documents, and a limited
> evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In
> such instances, a court's reference to evidence outside the pleadings does not convert
> the motion to a Rule 56 [summary-judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. 10-0133, 2011 WL 6013025, at *8 (D.N.M. Sept. 30,

2011)(Browning, J.).  As the United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.
> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very
> power to hear the case -- there is substantial authority that the trial court is free to
> weigh the evidence and satisfy itself as to the existence of its power to hear the case.
> In short, no presumptive truthfulness attaches to plaintiff's allegations, and the
> existence of disputed material facts will not preclude the trial court from evaluating
> for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10thCir.1995). In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'" Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

### STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Moore v. Guthrie, 438

-13-

F.3d 1036, 1039 (10th Cir. 2006); <u>Hous. Auth. of Kaw Tribe v. City of Ponca</u>, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 546 (2007). <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements"). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 545 (citation omitted). To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570; <u>Mink v. Knox</u>, 613 F.3d 995 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." <u>Ridge at Red Hawk, LLC v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or

her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not

find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING SOVEREIGN IMMUNITY AND THE FTCA

"The United States cannot be sued without its consent."  Garcia v. United States, 709 F.Supp.2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  "Congressional consent -- a waiver of the traditional principle of sovereign immunity --  is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F.Supp.2d at 1137-38.  "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F.Supp.2d at 1138.  Accord Bork v. Carroll, 449 F.App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v.

-17-

United States, 710 F.2d 656, 662 (10th Cir. 1983)).

### 1.    **General Principles of Sovereign Immunity.**

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted).  Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994): United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).  As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

### 2.    **The FTCA.**

The only statutory authority to sue the United States for common-law torts is under the FTCA.  The FTCA waives the United States' sovereign immunity in certain specific tort actions against the United States for money damages.  Congress has explicitly provided, however, that the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F.Supp. 1017, 1018 n.1 (D.P.R. 1984)(holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F.Supp. 232, 236 (N.D. Ga. 1982)(holding that "[t]he FBI may not be sued eo nomine").

In enacting the FTCA, Congress defined the terms and conditions under which the United States may be sued in tort.  28 U.S.C. § 1346(b) provides, in pertinent part:

[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims

against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

A companion section of the FTCA provides that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." Garcia v. United States, No. 08-0295, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir.1970)).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice. As the Tenth Circuit has stated: "A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice." Mecca v. United States, 389 F.App'x 775, 780 (10th Cir. 2010)(quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)). The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims. See 389 F.App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile. We therefore remand with instructions to enter dismissal of these claims without prejudice.").

3.      **Scope of Liability Under the FTCA.**

The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law.  See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").  "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC, 585 F.Supp.2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F.Supp.2d at 1284.  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F.Supp.2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

a.      **Liability Under the Same Circumstances Versus Like Circumstances.**

The Supreme Court has rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.'   But the statutory language is 'under like circumstances[]' . . . .").  The FTCA did not spur "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence."  Feres v. United States, 340 U.S. 135, 141 (1950).  It is important for a court to consider the liability of the

United States under all the circumstances presented in the case as opposed to selectively considering only a few of the circumstances.  Feres v. United States, 340 U.S. at 141-42.  As the Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States.  We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving.  Nor is there any liability 'under like circumstances,' for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.  The nearest parallel, even if we were to treat 'private individual' as including a state, would be the relationship between the states and their militia.  But if we indulge plaintiffs the benefit of this comparison, claimants cite us no state, and we know of none, which has permitted members of its militia to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case.  It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability.  In the usual civilian doctor and patient relationship, there is of course a liability for malpractice.  And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant.  But the liability assumed by the Government here is that created by 'all the circumstances,' not that which a few of the circumstances might create.  We find no parallel liability before, and we think no new one has been created by, this Act.  Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

> **b.**    **Considering the Liability Under State Law of Private Actors Versus Governmental Actors.**

The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or additional obligations under that State's law.  See Ewell v. United States, 776 F.2d 246, 248-49 (10th Cir. 1985); Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability

is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d

893, 895 (10th Cir. 1989)(citing Proud v. United States with approval)("This and other courts have

applied the same rationale in holding that the United States may invoke the protection of a [private]

recreational use statute.").  The Tenth Circuit illustrated some of these same principles in Ewell v.

United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. at 65, 76 S.Ct. at 124, wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances. It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

776 F.2d at 249.[7]

---

[7]Some courts have taken into account special expertise that government officials might have in particular areas when evaluating liability under the FTCA.  See Allen v. United States, 588 F.Supp. 247, 354-56 (D. Utah 1984)("As far as nuclear fallout is concerned, the Government possessed an overwhelming superiority in knowledge, as well as an effective monopoly of the special skills, training and experience relevant to open-air atomic testing."), rev'd on other grounds, 816 F.2d 1417 (10th Cir. 1987).  But see Gowdy v. United States, 412 F.2d 525, 534 (6th Cir.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable."  United States v. Olson, 546 U.S. 43, 44 (2005).  As the Supreme Court discusses in United States v. Olson, the Ninth Circuit based its decision to find a waiver of liability under the FTCA based on two principles:

> In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine.  The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances.  The Ninth Circuit, in a brief per curiam opinion, reversed this determination.  It reasoned from two premises.  First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'"  Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections."  The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises."  United States v. Olson, 546 U.S. at 45.  Regarding the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable.  Our cases have consistently adhered to this "private person" standard.  In Indian Towing Co. v. United States, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'"  It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform."  In Rayonier Inc. v. United States, the Court

_____

1969)("The mere fact that the Government may have had superior knowledge of safety standards did not increase its duty to exercise ordinary care.").

rejected a claim that the scope of FTCA liability for "'uniquely governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances. And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity. Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (emphasis in original)(citations omitted).  The Supreme

Court rejected the Ninth Circuit's second premise based on the following rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow.  The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  As this Court said in Indian Towing, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield.  The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating."  These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance."  It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the principles

enunciated in United States v. Olson.  The United States Court of Appeals for the Third Circuit has

since held, relying on United States v. Olson, that: "Under the FTCA, the federal government can

only be held liable for breaches of duties imposed on private, rather than state, parties."  DeJesus

v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007).  The Fifth Circuit has held,

also relying on United States v. Olson: "Because the federal government could never be exactly like

a private actor, a court's job in applying the standard is to find the most reasonable analogy.

Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations omitted).

According to one commentator, courts have generally had little difficulty in finding a comparable factual analogy in the private sector for conduct in which the United States engages:

> Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving "quasi-legislative" actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations.

2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011).  The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999). It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.

> Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the FAA's failure to take enforcement action against an entity not complying with federal laws and rules; (2) the USDA's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures.

United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

### 4.      Conflicts of Law Under the FTCA.

The FTCA addresses conflicts of law in 28 U.S.C. § 1346(b)(1).  See 28 U.S.C. § 1346(b)(1). Specifically, this subsection states that courts determine liability under the FTCA "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The

Supreme Court has recognized in <u>Richards v. United States</u>, 369 U.S. 1 (1962), that this provision

operates as follows in FTCA actions involving conduct in multiple States:

> In the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred, and we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. We believe that it would be difficult to conceive of any more precise language Congress could have used to command application of the law of the place where the negligence occurred than the words it did employ in the Tort Claims Act. Thus we first reject the alternative urged by American Airlines. The legislative materials cited to us by American not only lack probative force in a judicial sense, but they are completely unpersuasive to support the argument that Congress intended the words 'act or omission' to refer to the place where the negligence had its operative effect. The ease of application inherent in the rule urged by American lends a certain attractiveness, but we are bound to operate within the framework of the words chosen by Congress and not to question the wisdom of the latter in the process of construction. We conclude that Congress has, in the Tort Claims Act, enacted a rule which requires federal courts, in multistate tort actions, to look in the first instance to the law of the place where the acts of negligence took place.

369 U.S. at 9-10 (footnotes omitted). The Tenth Circuit has further explained how this rule in

<u>Richards v. United States</u> operates:

> It is of course true, as a generality, that a mere act of negligence is not legally tortious and becomes an actionable wrong, a tort, only when harm results to the claimant. Damage is the last event necessary to impose liability and the place of the occurrence of damage may become important when the doctrine of conflicts of laws must be applied. The state in which damage occurs is said to be the 'place of wrong,' Restatement, Conflicts of Laws, § 377, and under the first Restatement § 378, it is the law of the place of wrong which governs. A less mechanistic approach has been adopted by the Restatement (Second) § 379 (Tent. Draft No. 9, 1964), and the Supreme Court in <u>Richards v. United States</u>, 369 U.S. 1 . . . , making reference to the latter approach, has expressly held that the 'place of wrong' doctrine does not apply to cases arising under the Federal Tort Claims Act. Thus in <u>Richards</u>, it was held that the amount of damages recoverable under the Act was controlled by the whole law of the State of Oklahoma, the place of negligence rather than the place of wrong, which state, in turn, recognized the law of Missouri, the place of damage, as determinative of that element of the tort. . . .

> Although an act of negligence, here the misdiagnosis, is not actionable without damage it is apparent that after damage occurs the initial premise of the tort is the act of negligence. The liability of the United States for the completed tort shall

> be 'in accordance with the law of the place where the act or omission (negligence) occurred.' 28 U.S.C. § 1346(b). These statutory words 'command application of the law of the place where the negligence occurred' and dispose of any conflict of law question in the first instance. Richards v. United States, supra, 369 U.S. at p. 9 . . . . Appellant's claim is thus dependent upon the law of Taiwan, a foreign country . . . .

Manemann v. United States, 381 F.2d 704, 705 (10th Cir. 1967). Once a court has determined the State that governs the law of the place where the act or omission occurred, the Court then applies "the whole law of the place where the negligence occurred," including that State's choice-of-law rules:

> Recently there has been a tendency on the part of some States to depart from the general conflicts rule in order to take into account the interests of the State having significant contact with the parties to the litigation. We can see no compelling reason to saddle the Act with an interpretation that would prevent the federal courts from implementing this policy in choice-of-law rules where the State in which the negligence occurred has adopted it.

Richards v. United States, 369 U.S. at 10-13 (footnote omitted)); id. at 14 ("Certainly there is nothing in the legislative history that even remotely supports the argument that Congress did not intend state conflict rules to apply to multistate tort actions brought against the Government."). As the Tenth Circuit has stated: "The 'whole law' of the state includes that state's rules regarding choice of law." Bodrug v. United States, 832 F.2d 136, 137 (10th Cir. 1987), abrogated on other grounds as stated in Mountain Fuel Supply v. Reliance Ins. Co., 933 F.2d 882 (10th Cir. 1991).

## RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages. See Herrera v. Quality Pontiac, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."

Ramirez v. Armstrong, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983), overruled on other grounds by Folz v. State, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990).  Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of County Comm'rs, 101 N.M. 671, 672, 687 P.2d 728, 729 (1984).  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear v. Bd. of County Comm'rs, 101 N.M. at 672, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  Schear v. Bd. of County Comm'rs, 101 N.M. at 672, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 107 N.M. 48, 51, 752 P.2d 240, 243 (1988).

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff.  See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.  The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 134 N.M. at 49, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the obligation of the defendant is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  Grover v. Stechel, 132 N.M. 140, 143, 45 P.3d 80, 84 (Ct. App. 2002).  "[C]ertain relationships, however, that give rise to such a duty: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 132 N.M. at 143, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether

innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 117 N.M. 623, 626, 875 P.2d 379, 382 (1994).

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 134 N.M. at 56, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

## ANALYSIS

The Court concludes that, applying FTCA conflicts-of-law principles and the applicable States' law, Arizona and Nevada would apply New Mexico law to Coffey's negligence/wrongful death claim and her respective theories. The Court concludes that there is a waiver of immunity under the FTCA against the United States, because New Mexico courts would recognize the appropriateness of liability of private individuals under like circumstances to those in this case. The

Court will not permit Coffey to assert any negligence/wrongful death theories beyond those it permitted her to include in her pleadings as stated in the Court's Nov. 14, 2011 MOO.  Lastly, the Court concludes that genuine issues of material fact preclude the entry of summary judgment.

I.  **APPLYING FTCA CONFLICTS-OF-LAW PRINCIPLES AND THE APPLICABLE STATES' LAW, THE COURT CONCLUDES THAT ARIZONA AND NEVADA WOULD APPLY NEW MEXICO LAW TO CRUTCHER'S NEGLIGENCE CLAIMS.**

The parties agree that BIA officials picked up Crutcher in Nevada at the Washoe County Jail, where the allegedly negligent failure to screen took place.  The parties agree that BIA officials transferred Crutcher to the custody of MCDC officials in Arizona.  The parties disagree where the decision to transfer Crutcher was made.  Neither party has directed the Court to evidence that would clarify where the decision to transfer was made.  At the April 9, 2012 hearing, Coffey argued that Nevada law applies to all of the theories upon which she bases her negligence claim, because the decision to transfer Crutcher was made in Nevada.  See Apr. 9, 2012 Tr. at 27:19-28:2 (Hearne).  The United States asserted that the decision to transfer was made in Arizona, relying on an unnamed deponent's deposition testimony.  See Apr. 9, 2012 Tr. at 28:7-23 (Mitchell).  Neither party has attempted to present the Court with an evidentiary basis for its conclusion that the decision to make the transfer occurred in either one of those States.

In Manneman v. United States, the Tenth Circuit provides a good illustration of how to handle conflicts-of-law problems under the FTCA:

> It is of course true, as a generality, that a mere act of negligence is not legally tortious and becomes an actionable wrong, a tort, only when harm results to the claimant.  Damage is the last event necessary to impose liability and the place of the occurrence of damage may become important when the doctrine of conflicts of laws must be applied.  The state in which damage occurs is said to be the 'place of wrong,' Restatement, Conflicts of Laws, § 377, and under the first Restatement § 378, it is the law of the place of wrong which governs.  A less mechanistic approach has been adopted by the Restatement (Second) § 379 (Tent. Draft No. 9, 1964), and the Supreme Court in Richards v. United States, 369 U.S. 1, 82 S.Ct. 585,

> 7 L.Ed.2d 492, making reference to the latter approach, has expressly held that the 'place of wrong' doctrine does not apply to cases arising under the Federal Tort Claims Act.  Thus in <u>Richards</u>, it was held that the amount of damages recoverable under the Act was controlled by the whole law of the State of Oklahoma, the place of negligence rather than the place of wrong, which state, in turn, recognized the law of Missouri, the place of damage, as determinative of that element of the tort. . . .
>
> Although an act of negligence, here the misdiagnosis, is not actionable without damage it is apparent that after damage occurs the initial premise of the tort is the act of negligence.  The liability of the United States for the completed tort shall be 'in accordance with the law of the place where the act or omission (negligence) occurred.'  28 U.S.C. § 1346(b).  These statutory words 'command application of the law of the place where the negligence occurred' and dispose of any conflict of law question in the first instance.  <u>Richards v. United States</u>, <u>supra</u>, 369 U.S. at p. 9, 82 S.Ct. 585.  Appellant's claim is thus dependent upon the law of Taiwan, a foreign country . . . .

<u>Manemann v. United States</u>, 381 F.2d at 705.  Once a court has determined the State that governs the law of the place where the act or omission occurred, the Court then applies "the whole law of the place where the negligence occurred," including that State's choice-of-law rules.  <u>Richards v. United States</u>, 369 U.S. at 10-13.  As the Tenth Circuit has stated: "The 'whole law' of the state includes that state's rules regarding choice of law."  <u>Bodrug v. United States</u>, 832 F.2d at 137.

Here, the allegations are that the ultimate injury occurred in New Mexico, where Crutcher died.  Nevertheless, courts do not apply the law of the place where the ultimate harm occurred under the FTCA, but rather the law of the place where the act or omission occurred.  <u>See Manemann v. United States</u>, 381 F.2d at 705.  It is undisputed that Crutcher was picked up in Nevada, where the BIA allegedly did not screen his medical condition.  Thus, that alleged act or omission that gives rise to Coffey's negligent screening theory occurred in Nevada, and "whole law" of Nevada, including its choice-of-law rules, would apply to that negligence theory.  <u>Bodrug v. United States</u>, 832 F.2d at 137.  It is disputed where the decision to transfer Crutcher was made, and the parties have provided the Court with no evidentiary basis to resolve that dispute.  The theory that BIA

-31-

negligently transferred Crutcher depends upon acts and omissions that occurred primarily in Nevada, given that Coffey alleges that the transfer itself was negligent under the circumstances.  Thus, the alleged acts and omissions that give rise to Coffey's negligent transfer theory occurred in Nevada, and the "whole law" of Nevada, including its choice-of-law rules, would apply to that negligence theory.  Bodrug v. United States, 832 F.2d at 137.  The allegedly negligent hand off, which includes allegations that the BIA failed to provide MCDC officials with proper medical records and other medical items for Crutcher, occurred in Arizona.  The alleged acts and omissions for this theory occurred in Arizona.  Thus, the alleged acts and omissions that give rise to Coffey's negligent-hand-off theory occurred in Arizona, and the "whole law" of Arizona, including its choice-of-law rules, would apply to that negligence theory.  Bodrug v. United States, 832 F.2d at 137.

"Arizona courts follow the Restatement (Second) of Conflict of Laws (1971)(Conflict of Laws Restatement) to determine the controlling law."  Winson v. Glasswerks PHX, LLC, 204 Ariz. 303, 307, 63 P.3d 1040, 1044 (Ariz App. 2003)(citing Bates v. Superior Court (Nationwide Ins. Co.), 156 Ariz. 46, 48, 749 P.2d 1367, 1369 (1988)).  "Cases sounding in tort should be resolved under the law of the state having the most significant relationship to both the occurrence and the parties with respect to the particular issue."  Winson v. Glasswerks PHX, LLC, 204 Ariz. at 307, 63 P.3d at 1044.  Arizona recognizes that, consistent with section 146 of the Restatement (Second) of Conflict of Laws, there is a general rule that the local law of the state where the injury occurs applies.  See Baroldy v. Ortho Pharm. Corp., 157 Ariz. 574, 580, 760 P.2d 574, 580 (Ariz. App. 1988).  Arizona courts consider the following factors to determine which State's law to apply in tort actions: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Winson v.

Glasswerks PHX, LLC, 204 Ariz. at 307, 63 P.3d at 1044.  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  Knoell v. Cerkvenik-Anderson Travel, Inc., 181 Ariz. 394, 400, 891 P.2d 861, 867 (Ariz. App. 1994), vacated on other grounds by 185 Ariz. 546, 917 P.2d 689 (1996).  Arizona courts also consider as part of this determination, to the extent the factors are relevant: (i) the needs of the interstate and international systems; (ii) the relevant policies of the forum; (iii) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (iv) the protection of justified expectations; (v) the basic policies underlying the particular field of law; (vi) certainty, predictability and uniformity of result; and (vii) ease in determination and application of the law to be applied.  See Knoell v. Cerkvenik-Anderson Travel, Inc., 181 Ariz. at 400, 891 P.2d at 867.

Nevada also applies the Restatement (Second)'s "most significant relationship" test to determine which State's law to apply in tort actions.  Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. 466, 473, 134 P.3d 111, 116 (2006).  Nevada has "adopted the Restatement (Second) of Conflict of Laws as the relevant authority for Nevada's choice-of-law jurisprudence in tort cases and [has] concluded that the most significant relationship test of section 6 of the Second Restatement governs a choice-of-law analysis, 'unless another, more specific section . . . applies.'"  Dictor v. Creative Mgmt Servs., LLC, 223 P.3d 332, 353 (Nev. 2010)(alteration in original)(emphasis in original).  Section 6 provides the following factors to consider as part of this choice-of-law analysis: (i) the needs of the interstate and international systems; (ii) the relevant policies of the forum; (iii) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (iv) the protection of justified expectations; (v) the basic policies underlying the particular field of law;

(vi) certainty, predictability and uniformity of result; and (vii) ease in determination and application of the law to be applied.  See Restatement (Second) of Conflicts of Law § 6.  Nevada courts also apply four other factors when applying these section six principles, as required by section 145(2) of the Restatement (Second) of Conflicts of Law: (i) the place where the injury occurred; (ii) the place where the conduct causing the injury occurred; (iii) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (iv) the place where the relationship, if any, between the parties is centered.  Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 472 & n.2, 134 P.3d at 115 & n.2.  Nevada courts have recognized that "Section 146 of the Second Restatement provides a particularized framework for analyzing choice-of-law issues in personal injury cases."  Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 474, 134 P.3d at 117.  "Section 146 states that the rights and liabilities of the parties are governed by the 'local law of the state where the injury occurred' unless 'some other state has a more significant relationship' to the occurrence under the principles stated in section 6."  Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 474, 134 P.3d at 117.  The Supreme Court of Nevada has also stated:

> The general rule in section 146 requires the court to apply the law of the state where the injury took place.  We conclude that in order for the analysis to move past this general rule and into the section 6 principles, a party must present some evidence of a relationship between the nonforum state, the occurrence giving rise to the claims for relief, and the parties.  If no evidence is presented, then the general rule of section 146 governs.  However, if a party does present evidence of a relationship between the nonforum state, the occurrence giving rise to the claims for relief, and the parties, then the analysis moves to an evaluation of that evidence under the section 6 principles to determine which state has a more significant relationship to the occurrence and the parties.

Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev.

at 475, 134 P.3d at 117.

The Court notes that it is deciding these choice-of-law issues without the benefit of any briefing from the parties, who did not address the issue.  In personal injury actions, there is a presumption in both Nevada and Arizona that a court should apply the law of the place where the injury occurred, New Mexico in this case, based on section 146 of the Restatement (Second) of Conflicts of Law.  See Baroldy v. Ortho Pharm. Corp., 157 Ariz. 574, 580, 760 P.2d 574, 580 (Ariz. App. 1988); Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 474, 134 P.3d at 117.  As to the negligent screening and negligent transfer theories, where the law of Nevada governs for FTCA purposes, the Court concludes that Nevada would apply New Mexico law.  The parties have not presented any evidence that counters the presumption that New Mexico law applies based on Crutcher dying here in New Mexico.  Additionally, weighing the four factors in section 145(2) of the Restatement (Second) of Conflicts of Law does not lead to an alternate conclusion.  First, the injury occurred in New Mexico, where Crutcher was housed in the MCDC and where he died.  Second, the conduct causing the injury occurred in various places, as the alleged failure to screen Crutcher and his initial transfer occurred in New Mexico, but there were allegedly various problems relating to his health and medical care that arose in New Mexico.  Third, based on the limited record before the Court, Crutcher's domicile appears to be Nevada, and it is unclear to what States the BIA has a significant connection, although, given the facts before the Court, the Court would assume that many western States have significant connections to the BIA.[8] Fourth, the connection between the BIA and Crutcher arose out of his conviction in Nevada,

---

[8]There appear to be approximately twenty-one federally recognized Native American tribes in Nevada.  See Federal and State Recognized Tribes, National Conference of State Legislatures, http://www.ncsl.org/issues-research/tribal/list-of-federal-and-state-recognized-tribes.aspx#nv (last updated Feb. 2012).

although the BIA appears to have arranged for his incarceration in different prison facilities in different States, including both in Nevada and in New Mexico.  Lastly, none of the more generalized factors listed in section 6 of the  Restatement (Second) of Conflicts of Law weigh to any significant degree in favor of the application of any State's law.  Thus, while there are some connections to Nevada, they are not sufficient to rebut the presumption under Nevada law that a court would apply the law of the State where the injury took place.

For many of the same reasons, the Court concludes that Arizona would apply New Mexico law to the negligent-hand-off theory.  In personal injury actions, there is a presumption that a court should apply the law of the place where the injury[9] occurred, New Mexico in this case, based on section 146 of the Restatement (Second) of Conflicts of Law.  See Baroldy v. Ortho Pharm. Corp., 157 Ariz. 574, 580, 760 P.2d 574, 580 (Ariz. App. 1988).  Additionally, weighing the four factors in section 145(2) of the Restatement (Second) of Conflicts of Law does not lead to an alternate conclusion.  First, the injury occurred in New Mexico, where Crutcher was housed in the MCDC and where he died.  Second, the conduct causing the injury occurred in various places, as the allegedly negligent hand off occurred in Arizona, Crutcher was originally incarcerated in Nevada, and he ultimately died when incarcerated in New Mexico.  Third, based on the limited record before the Court, Crutcher's domicile appears to be Nevada, and it is unclear to what States the BIA has a significant connection, although given the large Navajo population in Arizona the Court would

_____

[9]Section 146 of the Restatement (Second) Conflicts of Law refers to "personal injury" actions when referring to the "law of the state where the injury occurred."  Restatement (Second) of Conflicts of Law § 146.  Comment b to this section notes that "personal injury" includes matters such as "physical harm or mental disturbance, such as fright and shock, resulting from physical harm or from threatened physical harm or other injury to oneself or another."  Restatement (Second) of Conflicts of Law § 146 cmt. b.

assume that it has a significant connection to the BIA.[10]  Fourth, the connection between the BIA and Crutcher arose out of his conviction in Nevada, although it appears to have arranged for his incarceration in different prison facilities in different States, including both in Nevada and in New Mexico.  The connection to Arizona is relatively minor, as the hand off appears to be the only relevant conduct that occurred there.  Lastly, none of the more generalized factors listed in section 6 of the  Restatement (Second) of Conflicts of Law weigh to any significant degree in favor of the application of any State's law.  Thus, the Court concludes that Arizona would apply New Mexico law to the negligent-hand-off theory.

## II.   NEW MEXICO COURTS WOULD RECOGNIZE THAT LIABILITY FOR NEGLIGENCE MAY BE APPROPRIATE FOR PRIVATE INDIVIDUALS UNDER LIKE CIRCUMSTANCES TO THOSE PRESENTED IN THIS CASE.

The Court will not adopt Coffey's argument that the Court should not follow the Supreme Court's holding in United States v. Olson.  While Coffey has not identified like circumstances where private individuals would be liable comparable to the facts of this case, she has sufficiently argued the issue for the Court to make this determination.  New Mexico courts have recognized that a private individual can be liable under like circumstances to those presented in this case.

### A.   COFFEY'S ARGUMENT THAT THE COURT SHOULD NOT FOLLOW THE SUPREME COURT'S HOLDING IN UNITED STATES V. OLSON IS NOT PERSUASIVE.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply

---

[10]There also appear to be approximately twenty-one federally recognized tribes in Arizona. See Federal and State Recognized Tribes, supra.  The population of the Navajo Nation, which stretches from New Mexico to Arizona and Utah, has, according to a 2000 estimate, a population of 173,987 enrolled tribal members.  See Navajo Nation, Wikipedia, http://en.wikipedia.org/wiki/Navajo_Nation (last visited Apr. 20, 2012).

upon a finding that local law would make a 'state or municipal entit[y]' liable." United States v. Olson, 546 U.S. at 44.  As the Supreme Court discussed in United States v. Olson, the Ninth Circuit based its decision to find a waiver of liability under the FTCA based on two principles:

> In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine.  The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances.  The Ninth Circuit, in a brief per curiam opinion, reversed this determination.  It reasoned from two premises.  First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'"  Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections."  The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises." United States v. Olson, 546 U.S. at 45.  Regarding the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable.  Our cases have consistently adhered to this "private person" standard.  In Indian Towing Co. v. United States, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'"  It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform."  In Rayonier Inc. v. United States, the Court rejected a claim that the scope of FTCA liability for "'uniquely governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances.  And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity.  Indeed, we have found nothing in the Act's context, history, or objectives or in the

opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (emphasis in original)(citations omitted).  The Supreme

Court rejected the Ninth Circuit's second premise based on the following rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow.  The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  As this Court said in Indian Towing, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield.  The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating."  These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance."  It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).  The Fifth Circuit has held, relying

on United States v. Olson: "Because the federal government could never be exactly like a private

actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent

differences between the government and a private person cannot be allowed to disrupt this analysis."

In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d at 288 (citations

omitted).

Rather than try to establish that private individuals would be liable under like circumstances

as those in this case, Coffey has insisted that the Court should not follow the Supreme Court's

holding in United States v. Olson and that the Court should not require her to establish an analogy

to liability in the private sector.  See Response at 11 ("Since there would nearly never be a non

public official or a private individual incarcerating a person, the restriction invoked by the United

States that it must be the negligence of a private person is absurd." (footnote omitted)).  The Court

-39-

recognizes that the scope of liability under the FTCA, specifically as defined in 28 U.S.C. § 2674, is in many cases not a simple question.  The Supreme Court, for example, has felt the need to address the scope of liability under this statutory section in various cases over a period of decades. The Supreme Court's decision in United States v. Olson, decided in 2005, is a good indication that questions regarding the scope of FTCA liability as defined in 28 U.S.C. § 2674 still pose difficult problems for courts to this day.  Nevertheless, despite the difficulty, the Court must follow the Supreme Court's directions and determine whether private individuals would be liable under like circumstances.

Coffey's reliance on case law from Nevada is not appropriate given that those cases contradict the principles announced in United States v. Olson.  One of the cases she cites includes a discussion of the liability of government actors under Nevada law, see Butler ex rel. Biller v. Bayer, 123 Nev. at 454, 168 P.3d at 1059 (discussing "the duty of prison officials to protect inmates from attacks by other inmates" and "the duty of care when prison officials release disabled inmates"), and a federal district court case that appears to mistakenly rely on a Nevada case's discussion of the liability of government actors to determine FTCA liability, see Chehade Refai v. Lazaro, 614 F.Supp.2d 1103, 1125 n.12 (D. Nev. 2009)(relying on Butler ex rel. Biller v. Bayer for the proposition that "government officials have 'a duty to exercise reasonable care to avoid foreseeable harm' to inmates.").  The Supreme Court in United States v. Olson held that analogizing to the liability of government actors under state law is not sufficient to establish a waiver of sovereign immunity under the FTCA.  See 546 U.S. at 45-46.  These cases are not persuasive on the issue of waiver of sovereign immunity.

Other authority upon which Coffey relies to avoid the restrictions in United States v. Olson is also not persuasive on this issue.  She relies on a district court opinion from the United States

-40-

District Court for the District of New Jersey, specifically <u>Hanson v. United States</u>.  This case deals with a relatively narrow issue, specifically whether courts may consider defenses and/or immunities that police officers have under state law in circumstances where the officer allegedly used excessive force.  <u>See</u> <u>Hanson v. United States</u>, 712 F.Supp.2d at 328-30.  <u>Hanson v. United States</u> acknowledges that, even if state law enforcement might have greater defenses than private individuals under state law, there were comparable situations in the private sector with claims against private individuals for assault and battery:

> Application of the law enforcement privilege to an FTCA claim based on alleged excessive force by law enforcement agents entails applying the law of a private citizen -- common law torts of assault and battery -- without consideration of whether a municipality would be liable under local law, but taking into consideration the extraordinary obligations of law enforcement officers recognized by both federal and state law.

<u>Hanson v. United States</u>, 712 F.Supp.2d at 329.  <u>Hanson v. United States</u> deals with a much narrower principle than the one before the Court: whether courts should apply the more favorable defenses and/or immunities state law enforcement officers receive when deciding cases under the FTCA.  In the present case, there is no argument that state law enforcement would have greater defenses and/or immunities under state law than private citizens.  <u>Hanson v. United States</u>, in fact, acknowledges the limitations in <u>United States v. Olson</u> by analyzing liability through analogy to private citizens.  <u>See</u> <u>Hanson v. United States</u>, 712 F.Supp.2d at 329.  Thus, to the extent <u>Hanson v. United States</u> is consistent with <u>United States v. Olson</u>, there is no need to follow this New Jersey case's logic under the facts of this case.

While Coffey has not identified like circumstances where private individuals would be liable comparable to the facts of this case, she has sufficiently argued the issue for the Court to make this determination.  New Mexico courts have recognized that a private individual can be liable under like

circumstances to those presented in this case. To make this determination, the Court will first separate out Coffey's theories in terms of the individual wrongs she alleges occurred. Second, the Court will identify the most like analogies in the private sector to the facts presented in this case. Third, the Court will assess whether courts have recognized triable issues of negligence in those cases. Fourth, the Court will determine whether New Mexico courts would recognize a triable issue of negligence in those cases. Fifth, the Court will assess the nature of the duty that the BIA would owe to Crutcher in each of those scenarios. Sixth, the Court will address whether there are genuine issues of material fact whether there was a breach of that duty under the circumstances. Seventh, the Court will address whether there is a genuine issue of material fact as to causation for each alleged wrong.

When the Court granted in part and denied in part Coffey's request for leave to amend her pleadings on November 14, 2011, the Court permitted her to assert the following theories of wrongful death/negligence against the United States: (i) negligent screening; (ii) negligent transfer; and (iii) negligent hand off. See Nov. 14, 2011 MOO at 1-2. The basic premise of Coffey's negligent screening theory is that: (i) the Washoe County Jail kept complete medical records for Crutcher; (ii) the BIA had no policy or procedure to take that information from the Washoe County Jail; (iii) there were not adequate procedures in place to screen inmates' medical conditions to ensure that transferring them would be appropriate; and (iv) the BIA did not transmit any information regarding Crutcher's medical condition to MCDC officials when it transferred him to the MCDC's custody. See Errata Complaint ¶¶ 20, 23, at 5-6. The basic premise of Coffey's negligent transfer theory is that: (i) the BIA transferred Crutcher "nearly 900 miles from his family" where he could not easily reach his family; (ii) the BIA transferred him to a facility, the MCDC, that "did not have adequate examinations or preventative medical care as adopted by other similar jails

in the United States"; and (iii) the BIA did not have procedures in place to transfer medical property, such as medications, as part of transferring inmates.  Errata Complaint ¶¶ 27-28, 31-33, at 7. Coffey's negligent-hand-off theory relies on many of the same facts as the other two theories she has asserted, including that "[t]he BIA did not determine that the" MCDC "was adequate to house an inmate with Andrew Crutcher's medical problems," specifically his congestive heart failure. Errata Complaint ¶¶ 33, 35, at 7-8.  The Court has precluded Coffey from asserting any other theories, including a medical negligence theory, in its Nov. 14, 2011 MOO.  See Nov. 14, 2011 MOO at 1-2.

The Court will not separately draw analogies to conduct in the private sector for Coffey's negligent-hand-off theory, because it incorporates the same underlying facts and rationale as those behind her negligent screening and negligent transfer theory.  The Court also notes that, while the negligent screening and negligent transfer theory are distinct, there does not appear to be a bright line between the two theories, because they rely on some of the same underlying facts and some of the same alleged misconduct.  Coffey basically alleges four alleged wrongs, regardless of the particular theory to which those wrongs relate: (i) the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail; (ii) the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility; (iii) the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition; and (iv) given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition.  The Court will address each of these wrongs separately.

**B.   THERE ARE LIKE CIRCUMSTANCES IN THE PRIVATE SECTOR TO THE FIRST ALLEGED WRONG OF THE BIA CONDUCTING INADEQUATE SCREENING FOR CRUTCHER BEFORE HIS TRANSFER.**

Notably, courts have generally found waivers of sovereign immunity under the FTCA absent relatively unique conduct in which there is no analogous private sector parallel.  According to one commentator: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving 'quasi-legislative' actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations." 2 L. Jayson & R. Longstreth, supra § 9.08[1], at 9-219.  The Tenth Circuit has similarly stated:

> Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the FAA's failure to take enforcement action against an entity not complying with federal laws and rules; (2) the USDA's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures.

United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

First, there are analogies in the private sector to those presented in Coffey's first alleged wrong that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail.  Second, courts have recognized triable issues of negligence in those cases.  Third, New Mexico courts have recognized triable issues of negligence under like circumstances in the private sector.  Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to conduct some screening of his medical condition to determine whether the transfer to the MCDC was appropriate.  Fifth, there are genuine issues of material fact whether the BIA breached that duty.  Sixth, there are genuine issues of material fact whether that breach caused

Crutcher's death.

### 1.     Scope of the Alleged Wrong.

The first alleged wrong is that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail.   Coffey alleges that "Crutcher received the proper medication" for his heart condition "at the Washoe County Detention Facility as required," because his treating physician was able to provide it for him there.   Errata Complaint ¶¶ 18-19, at 5.   Coffey alleges that, in spite of Crutcher's medical condition and the information available about his medical condition at the Washoe County Jail, "[t]he BIA did not screen Andrew Crutcher or other inmates for medical conditions" as part of the transportation process.   Errata Complaint ¶¶ 23-24, at 5-6.

### 2.     Closest Analogies in the Private Sector.

The Court has thought of the closest analogies in the private sector to Coffey's first alleged wrong that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail.   First, one analogous scenario would be a private school not having procedures in place to identify a young child's potential health problems and the child later suffering injuries as a result of that lack of procedures.   Children are a comparable group of individuals to prisoners, because children are subject to significant control from the school while they are in its custody and do not have the same ability to take care of their personal welfare as adults.   Prisoners are also subject to a variety of restrictions while in prison.   Another analogous scenario would be employees at an amusement park not screening the height of children who seek to ride amusement park rides and the children then suffering harm as a result.   A third analogous scenario would be a private hospital not screening patients for allergies to medication or anesthesia and a patient suffering injury because of an allergic reaction to the anesthesia or the medication.

### 3.     How Courts Have Approached Negligence Cases in Like Circumstances.

Courts have found triable issues in negligence cases when facing analogous scenarios in the private sector to the facts presented in this case.  While the Court has not located any authority specifically mirroring the private school analogy the Court drew, the Court has found a Tennessee case where the appellate court affirmed the trial court's conclusion that a public school district "was negligent in failing to inform its employees of [a child's] health issues and" for failing "to implement a PE program for [the child], taking into account his health issues." Small ex rel. Russell v. Shelby Cnty. Sch., No. W2007-00045-COA-R3-CV, 2008 WL 360925, at *1-2 (Tenn. Ct. App. 2008)(unpublished).  Private schools are highly analogous to public schools even though one is a governmental entity and the other is not, because they operate in a largely identical manner.  It would be hard to imagine a private school not asking the parents and/or students to provide some medical information when children who are going to be in its custody for approximately eight hours a day.  Teachers and staff need to know about matters such as peanut allergies, epilepsy, and a host of other health issues that can arise for the staff to respond appropriately.  The Court thinks it is likely that courts would find a duty to screen in a private school setting.

A California appeals court concluded that an amusement park owner had a duty to take reasonable steps to minimize risks on a bumper car ride:

> Here, respondent is the owner of an amusement park.  It holds the park open to the public with the promise of safe fun and excitement.  Within the confines of state regulation, respondent maintains complete control over the design, maintenance and operation of the bumper car ride.  Without question, it is best situated to minimize any risks associated with its rides, both because of its control and because of the profits such parks make.
>
> Although bumping is part of the experience of a bumper car ride, head-on bumping is not.  In fact, it is a prohibited activity.  The evidence submitted in support and opposition of the motion showed that respondent was aware of the perils of allowing head-on collisions, and, as owner of the park, respondent had a duty to take

reasonable steps to minimize those risks without altering the nature of the ride.

Nalwa v. Cedar Fair, LP, 126 Cal. Rptr. 3d 341, 353-54 (Cal. App.), granting petition for review 129 Cal. Rptr. 3d 668 (2011). A Pennsylvania court upheld a jury verdict in a medical malpractice action where the evidence was consistent with the jury's conclusion that the doctors negligently prescribed large amounts of a penicillin-based medication to a patient when they should have discovered she was having an allergic reaction to the drug. See Gunn v. Grossman, 748 A.2d 1235, 1239-40 (Pa. Super. Ct. 2000)("Dr. Crane testified that Appellants breached their duty of care by prescribing large doses of [a drug] when they should have discovered that decedent was suffering from an allergic reaction . . . .").

### 4. How New Mexico Courts Have Approached Similar Negligence Cases.

While the Court has not found a New Mexico case dealing with a doctor improperly prescribing a patient medication to which they may be allergic, the Supreme Court of New Mexico has recognized that a doctor generally owes the "patient a duty to properly diagnose his relevant medical conditions." Provencio v. Wenrich, 150 N.M. 457, 261 P.3d 1089, 1095 (2011). Requiring a doctor to properly diagnose a patient's relevant medical conditions is sufficiently analogous to this scenario that the Court believes New Mexico courts would follow the Pennsylvania decision of Gunn v. Grossman. One New Mexico case affirmed a finding of reckless conduct when a business charged with inspecting and repairing amusement park rides failed to do so, causing injury to the plaintiff. See Atler v. Murphy Enters., Inc., 136 N.M. 701, 707, 104 P.3d 1092, 1098 (Ct. App. 2004). While the opinion dealt with a public school, the Supreme Court of New Mexico found a triable issue of negligence under general negligence principles where a school, which had knowledge of a student's asthmatic condition, failed to advise a substitute teacher, who required the child to engage in significant exercise that led to an asthma attack and then her death, of the

student's condition.  See Upton v. Clovis Mun. Sch. Dist., 140 N.M. 205, 208, 141 P.3d 1259, 1262 (2006).  That situation is sufficiently similar to the Court's analogy of a private school not screening a child's medical condition in a manner that results in harm to the child for the Court to believe that New Mexico courts would recognize a triable issue of negligence in a case such as this one.  The New Mexico courts would likely find that a private school has to engage in some screening of its students so that it has some medical information about the students in their care.

The Court also finds it significant that New Mexico courts have adopted section 314A of the Restatement (Second) of Torts.[11]  See Baldonado v. El Paso Natural Gas Co., 143 N.M. 288, 292 n.3, 176 P.3d 277, 281 n.3 (2007)("We recognize that special relationships, such as the doctor-patient or employer-employee relationship, can create a duty to rescue." (citing Restatement (Second) of Torts § 314A)).  Section 314A(4) states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take reasonable action . . . to protect [their customers] against unreasonable risk of physical harm."  Restatement (Second) of Torts § 314A.  The duty is one of "reasonable care under the circumstances," which can depend upon facts such as whether the defendant knew or should have known "of the unreasonable risk, or of the illness or injury."  Restatement (Second) of Torts

---

[11]The New Mexico courts often look to the law as stated in the Restatement (Second) of Torts.  See Montanez v. Cass, 89 N.M. 32, 38, 546 P.2d 1189, 1195 (Ct. App.1975)("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd on other grounds sub nom N.M. Elec. Serv. Co. v. Montanez, 89 N.M. 278, 551 P.2d 634 (1976). Accord Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F.Supp.2d 1145, 1177 n.24 (D.N.M. 2011)(Browning, J.).  In Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990), the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."  109 N.M. at 393, 785 P.2d at 736.

§ 314A cmt. e.  Relying on the <u>Restatement (Second) of Torts</u> in an FTCA case, the Tenth Circuit

found under Colorado law a duty to provide medical care for a prisoner in need of such care:

> Likewise, the Restatement (Second) of Torts § 314A (1965) imposes a duty
> on "[o]ne who is required by law to take . . . the custody of another under
> circumstances such as to deprive the other of his normal opportunities for
> protection," including the requirement "to give them first aid after it knows or has
> reason to know that they are ill or injured, and to care for them until they can be
> cared for by others."

<u>Kikumura v. Osagie</u>, 461 F.3d 1269, 1301 (10th Cir. 2006), <u>overruled on other grounds by</u> <u>Robbins</u>

<u>v. Oklahoma</u>, 519 F.3d 1242.  This section of the <u>Restatement (Second) of Torts</u> is sufficiently

analogous here, because the BIA officials who have custody of Crutcher are like those contemplated

within subsection (4) of this section who are "required by law" to take or "who voluntarily" take

"the custody of another under circumstances such as to deprive the other of his normal opportunities

for protection."  <u>Restatement (Second) of Torts</u> § 314A.

### 5.    <u>Nature of the Duty Owed to Crutcher.</u>

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff,

breach of that duty, which is typically based on a standard of reasonable care, and the breach being

a cause-in-fact and proximate cause of the plaintiff's damages.  <u>See</u> <u>Herrera v. Quality Pontiac</u>, 134

N.M. at 47-48, 73 P.3d at 185-86. "In New Mexico, negligence encompasses the concepts of

foreseeability of harm to the person injured and of a duty of care toward that person."  <u>Ramirez v.</u>

<u>Armstrong</u>, 100 N.M. at 541, 673 P.2d at 825.  Generally, negligence is a question of fact for the

jury.  <u>See</u> <u>Schear v. Bd. of County Comm'rs</u>, 101 N.M. at 672, 687 P.2d at 729.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the

inquiry into whether the defendant owed a duty to the plaintiff.  <u>See</u> <u>Herrera v. Quality Pontiac</u>, 134

N.M. at 48, 73 P.3d at 186.  New Mexico courts have recognized that, "[u]ltimately, a duty exists

only if the obligation of the defendant [is] one to which the law will give recognition and effect."
 Herrera v. Quality Pontiac, 134 N.M. at 49, 73 P.3d at 187 (internal quotation marks omitted).  To
determine whether the obligation of the defendant is one to which the law will give recognition and
effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality
Pontiac, 134 N.M. at 48, 73 P.3d at 186.

        The clearest source of a duty under New Mexico law that applies to this first alleged wrong
is section 314A of the Restatement (Second) of Torts.  Section 314A(4) of the Restatement Second
of Torts § 314A states that "[o]ne who is required by law to take or who voluntarily takes the
custody of another under circumstances such as to deprive the other of his normal opportunities for
protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take
reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and
to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or
injured, and to care for them until they can be care for by others."  Restatement (Second) of Torts
§ 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise
reasonable care under the circumstances."  Restatement (Second) of Torts § 314A cmt. b.

        The BIA planned to transfer Crutcher approximately 900 miles to another detention facility.
The Court believes it is consistent with the case law the Court has set out to impose, based on the
high level of control the BIA has over Crutcher when he is in its custody and the potential risk
transport could pose to an inmate, a duty to take some steps to screen his health condition.  The
Court believes that analogous private entities in like circumstances, such as a private school, would
have similar obligations, such as to screen in some manner the medical condition of the children
attending the school.  The specific conduct in which the BIA would need to engage to comply with
that duty could vary under the factual circumstances presented.  For instance, the BIA may have no

additional obligation beyond screening a prisoner at intake about his or her health history and relying upon that information if the prisoner states that he has no health problems.  Checking the intake form for the inmate that lists any pertinent medical conditions might be sufficient if nothing significant appears on the form.  A cursory inspection of the inmate's health records might also be sufficient.  Having some kind of screening performed on the inmate before the transfer, such as having the initial facility fill out forms or answer questions regarding the prisoner's medical condition, might also be sufficient in some cases.  The issue of what conduct was appropriate under the circumstances is largely a question of breach rather than duty.

### 6.    **Breach.**

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 134 N.M. at 56, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

The first alleged wrong is that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail.  The parties do not present a detailed picture of what occurred before or when the BIA employees came to pick up Crutcher. Coffey directed the Court to evidence indicating that the BIA does not require by contract that detention facilities screen inmates before transport and to evidence that BIA officials are not required to perform medical screenings before transport.  The transport was approximately 900

miles.  The United States put forward asserted facts that Crutcher appeared healthy at the time of the transport.  There is no dispute that Crutcher had medical problems with his heart and a defibrillator on his body which, drawing all reasonable inferences in Coffey's favor, BIA employees would have been able to see.  It is not clear exactly what took place before Crutcher's transport, such as if the BIA employees asked Crutcher any questions or asked employees at the Washoe County Jail any questions regarding Crutcher.  Given that there appears to be no BIA requirement in place to require any form of medical screening before transport, there is a genuine issue of material fact whether the BIA engaged in conduct that breached its duty to Crutcher.  Drawing all reasonable inferences in Coffey's favor, there is a potentially unreasonable risk posed by the BIA's conduct and a foreseeable risk of injury to inmates such as Crutcher.  See Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

### 7. Causation.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Id., 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Id., 134 N.M. at 57, 73 P.3d at 195.

There were several months that intervened between Crutcher's death and the BIA's transport.  Nevertheless, drawing all reasonable inferences in Coffey's favor, the BIA's alleged failure to screen Crutcher could have resulted in transporting him when doing so would have not been appropriate in light of his medical condition.  It may have been more prudent to leave him at the Washoe County Jail, and transferring him to another facility not familiar with his medical condition

could have set off a chain of events leading to his death.  A proximate cause of an individual's harm "need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  Notably, there are also other alleged wrongs in which Coffey asserts the BIA engaged, such as not properly screening the MCDC to determine if it was an appropriate facility to address inmates' medical concerns.  Taking these facts into account, there is a genuine issue of material fact whether the BIA's conduct caused Crutcher's death.  Drawing all reasonable inferences in Coffey's favor, there is sufficient evidence for a factfinder to conclude that the BIA's conduct was the cause of Crutcher's death.

C.     **THERE ARE LIKE CIRCUMSTANCES IN THE PRIVATE SECTOR TO THE SECOND ALLEGED WRONG OF THE BIA NOT HAVING PROCEDURES IN PLACE TO TRANSFER AN INMATE'S MEDICAL INFORMATION AND PROPERTY.**

First, there are like analogies in the private sector to those presented in Coffey's second alleged wrong that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.  Second, courts have recognized triable issues of negligence in those cases.  Third, New Mexico courts have recognized triable issues of negligence in like circumstances in the private sector.  Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to take some steps to ensure that the next facility would learn of his pertinent medical conditions.  Fifth, there are genuine issues of material fact whether the BIA breached that duty.  Sixth, there are genuine issues of material fact whether that breach caused Crutcher's death.

1.     **Scope of the Alleged Wrong.**

The second alleged wrong is that the BIA did not have procedures in place to facilitate

transferring a prisoner's medical information and property to a new facility.  Coffey alleges that all of Crutcher's medications were at the Washoe County Jail and that the Washoe County Jail kept complete medical records for Crutcher.  See Errata Complaint ¶¶ 19-20, at 5.  She alleges that the BIA had no procedures in place to transmit his medications and medical records to the MCDC when the BIA transported him there.  See Errata Complaint ¶ 23, at 5-6.

### 2.   Closest Analogies in the Private Sector.

The Court has thought of the closest analogies in the private sector to Coffey's second alleged wrong that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.  A like circumstance would be a private school on a field trip transferring the custody and care of the students to another person, to another family, or to a substitute teacher.  Another similar scenario would also be an investment advisor failing to transfer a client's financial records to a new investment advisor the client retains and the client suffering harm as a result of that failure to transfer information.  Like the relationship between a prisoner and those arranging for his incarceration, an investment advisor would have a greater degree of control over the situation than the client in part based on the investment advisor's superior knowledge and position.  Another analogous scenario would be a lawyer failing to transmit a client's case files to a newly retained attorney in a way that harms the client.  A similar scenario would also be a doctor failing to transfer a patient's medical records to another doctor after the patient had requested the doctor to do so in a way that harms the patient.

### 3.   How Courts Have Approached Negligence Cases in Those Circumstances.

In the public school context, a New York court recognized that a school generally has an obligation to exercise reasonable care when relinquishing custody of a student to another person, including making sure that the person is a proper person with whom to send the student.  See

Sprecher ex rel. Tenenbaum v. Port Wash. Union Free Sch. Dist., 166 A.D.2d 700, 700-01, 561 N.Y.S.2d 284, 285-86 (N.Y. App. Div. 1990). Courts have recognized that there is a cognizable legal malpractice action that can arise from an attorney's failure to surrender the client's records to the client once the client has discharged the attorney. See Lefebvre v. Cawley, No. 2009-194, 2010 WL 286731, at *3 (Vt. 2010)(unpublished)("Plaintiff fares no better with respect to his return-of-file claim. That claim is based on defendant's ethical duty as an attorney under the Vermont Rules of Professional Responsibility . . . and thus is, at essence, a legal malpractice claim actionable upon a theory of negligence, not contract."). One Tennessee court recognized the potential for negligence liability in a scenario where an "independent adjusting firm . . . . misplaced the claim file and failed to deliver it to plaintiff's attorney" in relation to an automobile claim, which resulted in a default judgment against the plaintiff. Gay & Taylor, Inc. v. Amer. Cas. Co. of Reading, Pa., 53 Tenn. App. 120, 122-23, 381 S.W.2d 304, 305 (Tenn. Ct. App. 1964). Similarly, a Kansas court recognized that a "hospital could be sued when it negligently rendered direct medical care to a patient (by failing to provide the records of past X-rays when it had undertaken a duty to do so)." Cady v. Schroll, 235 P.3d 385, 2011 WL 2535004, at *4 (Kan. Ct. App. 2011)(unpublished table decision). While some of these scenarios are not identical to the analogies which the Court drew, they are sufficiently similar for the Court to reasonably conclude that courts would find triable issues of negligence for those analogous situations.

### 4.   How New Mexico Courts Have Approached Similar Negligence Cases.

The Court believes that New Mexico courts would find that a private school would have an obligation to make certain that -- when it transfers custody of children to someone besides its staff -- the new custodian has any known important medical information about the child. If the school drops its students off at a museum, the museum's staff should be aware of potential problems, such as

epilepsy, peanut allergies, or other pertinent medical conditions.  If a class receives a substitute teacher, the school would have some obligation to communicate relevant medical concerns to the substitute teacher.

Notably, New Mexico has a similar professional obligation for attorneys to follow as that the Vermont court discussed in Lefebvre v. Cawley: "Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client.  The lawyer may retain papers as security for a fee only to the extent permitted by law." N.M. Rules of Prof'l Conduct 1.16 cmt. 9.  Other jurisdictions have adopted similar laws.  See Tex. Rules of Prof'l Conduct 1.16 cmt. 9 (outlining the same requirement).  As the Court in Lefebvre v. Cawley recognized, that obligation can serve as a basis for malpractice in some circumstances, including improperly refusing to transfer possession of the client's records.  See 2010 WL 286731, at *3.  New Mexico courts have also recognized the failure to transfer or transmit information can lead to negligence liability in other contexts.  For instance, the Court of Appeals of New Mexico found it appropriate for a jury to award damages to an employee who sued a polygraph examiner for failing to transmit information to her employer that the polygraph results were inaccurate. See Conant v. Rodriguez, 113 N.M. 513, 517, 828 P.2d 425, 428 (Ct. App. 1992), criticized on other grounds by Baker v. Benjamin, 117 N.M. 278, 817 P.2d 374 (1994).  While not identical to the present case, these analogies are strong enough to convince the Court that New Mexico courts would recognize that a jury could permissibly find liability for negligence based on Coffey's second alleged wrong that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.

### 5.    **Nature of the Duty Owed to Crutcher.**

The clearest source of a duty under New Mexico law that applies to the second alleged

wrong is section 314A of the <u>Restatement (Second) of Torts</u>.  Section 314A(4) of the <u>Restatement</u> <u>Second of Torts</u> § 314A states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others."  <u>Restatement (Second) of Torts</u> § 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise reasonable care under the circumstances."  <u>Restatement (Second) of Torts</u> § 314A cmt. b.

It is notable that the BIA planned to transfer Crutcher approximately 900 miles to another detention facility.  The Court believes it is consistent with the case law the Court has set out to impose, based on the high level of control the BIA has over Crutcher when he is in its custody and the potential risk transport could pose to an inmate, a duty to take some steps to ensure that the next facility will learn of an inmate's pertinent medical conditions.  The Court believes that analogous private entities in like circumstances would have similar obligations.  The parties do not present the Court with a complete picture of what exactly transpired before, during, and after Crutcher's transfer to the MCDC.  The specific conduct in which the BIA would need to engage to comply with that duty would likely vary under the factual circumstances presented.  For instance, there may be a scenario where the first facility had lost or did not maintain medical records, in which case the BIA could arrange for some information gathering of prisoner's medical condition at the next facility.  In that scenario, something as minimal as a questionnaire given to the prisoner about his or her medical needs might be sufficient.  Additionally, it is easy to hypothesize a scenario where a prisoner was a diabetic or had some other condition that necessitated medication for the inmate to

survive, in which case the BIA would likely need to transfer a prisoner's medication with the prisoner and to inform the next facility of that condition.  If an inmate had no significant medical problems, there would not likely be the same obligation to take steps to inform the next facility of the inmate's medical condition.  The issue of what course of action was appropriate under the circumstances presented is largely a question of breach rather than duty.

      6.    **Breach.**

      The second alleged wrong is that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.  The parties do not present a detailed picture of what occurred when BIA employees came to pick up Crutcher and what transpired when they transferred him to the custody of MCDC employees.  Coffey has directed the Court to evidence indicating that the BIA does not require its employees to obtain or transfer a prisoner's medical records or property as part of a transfer to a new facility.  The transport was approximately 900 miles.  The United States put forward asserted facts that Crutcher appeared healthy at the time of the transport.  There is no dispute that Crutcher had medical problems with his heart and a defibrillator on his body, which, drawing all reasonable inferences in Coffey's favor, BIA employees would have been able to see.  It is not clear exactly what took place before Crutcher's transport, such as if the BIA employees asked Crutcher any questions or asked employees at the Washoe County Jail any questions regarding Crutcher.  It is not clear what transpired when Crutcher arrived at the MCDC.  Given that there is no BIA requirement in place to require transport of medical information and property, and that it does not otherwise appear that the BIA employees transported Crutcher's medical information or property along with him, there is a genuine issue of material fact whether the BIA engaged in conduct that breached its duty to Crutcher.  Drawing all reasonable inferences in Coffey's favor, the BIA's conduct posed a potentially unreasonable risk

and a foreseeable risk of injury to inmates such as Crutcher.  See Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

### 7.  Causation.

Several months intervened between Crutcher's death and the BIA's transport.  Nevertheless, drawing all reasonable inferences in Coffey's favor, the BIA's alleged failure to transport medical information and medical property for Crutcher could have resulted in, at the very least, the acceleration of his medical deterioration and eventual death.  Coffey has put forward evidence that Crutcher's medical condition required medication to maintain.  Coffey directed the Court to evidence indicating that the BIA does not require its employees to obtain or transfer a prisoner's medical records or property as part of a transfer to a new facility.  While there may have been some additional contributing causes at the MCDC, the BIA's conduct could have set off a chain of events leading to Crutcher's death.  A proximate cause of an individual's harm "need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  Taking these facts into account, there is a genuine issue of material fact whether the BIA's conduct caused Crutcher's death.  Drawing all reasonable inferences in Coffey's favor, there is sufficient evidence for a factfinder to conclude that the BIA's conduct was the cause of Crutcher's death.

### D.   THERE ARE LIKE CIRCUMSTANCES IN THE PRIVATE SECTOR TO THE THIRD ALLEGED WRONG OF THE BIA NOT ADEQUATELY SCREENING WHETHER THE MCDC WAS AN APPROPRIATE FACILITY TO HOUSE CRUTCHER IN LIGHT OF HIS CONDITION.

First, there are like analogies in the private sector to those presented in Coffey's third alleged wrong that the BIA did not adequately screen the MCDC to determine whether it was an appropriate

-59-

facility to house Crutcher in light of his condition. Second, courts have recognized triable issues of negligence in those cases. Third, New Mexico courts have recognized triable issues of negligence under like circumstances in the private sector. Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to take reasonable steps to ensure that his medical needs were addressed when it chose to transfer him to MCDC. Fifth, there are genuine issues of material fact whether the BIA breached that duty. Sixth, there are genuine issues of material fact whether that breach caused Crutcher's death.

### 1. Scope of the Alleged Wrong.

Coffey's third alleged wrong is that the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition. Coffey alleges that "[t]he facility to which BIA committed Andrew Crutcher did not have proper medical screening, did not have adequate examinations or preventative medical care as adopted by other similar jails in the United States." Errata Complaint ¶ 28, at 7. She alleges that "[t]he BIA did not determine that the McKinley County Adult Detention Facility was adequate to house an inmate with Andrew Crutcher's medical problems." Errata Complaint ¶ 33, at 7.

### 2. Closest Analogies in the Private Sector.

The Court has thought of the closest analogies in the private sector to Coffey's third alleged wrong. One would be a private hospital contracting with an ambulance service without screening that ambulance service's credentials and the ambulance service then engaging in improper conduct that harms patients. Another analogous scenario would be a business hiring a transportation service without screening their credentials and the transportation service injuring individuals while working for the business. Another would be that a construction company selected a contractor to build part of a building without doing any investigation into the contractor's credentials, which resulted in that

portion of the building collapsing and injuring the occupants.

### 3.       How Courts Have Approached Negligence Cases in Those Circumstances.

Notably, section 411 of the Restatement (Second) of Torts contemplates a situation where an employer hires a contractor in a negligent manner by failing to employ "a competent and careful contractor":

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)      to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)      to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411.  Various courts, including New Mexico courts, have adopted this provision.  See, e.g., Talbott v. Roswell Hosp. Corp., 144 N.M. 753, 756, 192 P.3d 267, 271 (Ct. App. 2008).  For instance, the Supreme Court of Alaska adopted this provision in a case where a construction business hired a roofing company to install a roof on a building.  See Sievers v. McClure, 746 P.2d 885, 886, 891 (Alaska 1987)("The rule of section 411 of the Restatement is a rule of personal negligence.").  A Florida court recognized that a landlord has, under section 411, an obligation "to use reasonable care in selecting a competent independent contractor to make improvements or repairs in the premises occupied by a tenant." Suarez v. Gonzalez, 820 So.2d 342, 346 (Fla. Dist. Ct. App. 2002).  A Kansas court found that application of section 411 was appropriate when the plaintiff suffered physical harm from a contractor's conduct.  See McDonnell v. Music Stand, Inc., 20 Kan. App. 2d 287, 293-94, 886 P.2d 895, 900 (Kan. Ct. App. 1994).  It seems to be a basic proposition that a defendant cannot avoid liability by merely closing its eyes and hiring a contractor.  It appears that a defendant like the BIA cannot avoid all responsibilities

regarding the medical condition of prisoners in its custody by relying upon contractors.

### 4.    How New Mexico Courts Have Approached Similar Negligence Cases.

Although New Mexico courts have recognized that the "employer of an independent contractor is not liable for physical harm caused to a third person by a negligent act or omission of the independent contractor," they have also relied on section 411 of the Restatement (Second) of Torts to impose the following obligation:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)    to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)    to perform any duty which the employer owes to third persons.

Talbott v. Roswell Hosp. Corp., 144 N.M. at 756, 192 P.3d at 271.  The Court of Appeals of New Mexico in Talbott v. Roswell Hosp. Corp. recognized triable negligence questions when a business allegedly negligently employed an air ambulance service: "[T]he question regarding the lengths to which the Hospital was required to go to investigate the Business's reputation, based on the skill required to provide air ambulance services and the dangerousness of such work, was a factual one that was correctly left to the jury's discretion."  144 N.M. at 757, 192 P.3d at 271.[12]  That theory of

---

[12]Federal courts must determine what a state's Supreme Court would do if confronted with the same issue.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  311 U.S. at 467.  "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."  Stoner v. N.Y. Life Insurance Co., 311 U.S. at 467.  See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court

negligence is sufficiently similar to the third alleged wrong that the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition.

### 5.   Nature of the Duty Owed to Crutcher.

The clearest source of a duty under New Mexico law that applies to the third alleged wrong is section 411 of the Restatement (Second) of Torts.  New Mexico courts have, based on section 411 of the Restatement (Second) of Torts, held that:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)   to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)   to perform any duty which the employer owes to third persons.

Talbott v. Roswell Hosp. Corp., 144 N.M. at 756, 192 P.3d at 271.

It is not disputed that the BIA contracted with the MCDC to house Crutcher and that the BIA

---

decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case.").  As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court. . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . .  In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . .  Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

transferred him to the MCDC's custody.  It is also not disputed that Crutcher died while he was in the MCDC's care.  The Court believes that it is consistent with the case law the Court has set out, based on the BIA contracting with the MCDC for Crutcher's incarceration and the risk of physical harm given Crutcher's medical condition, to recognize that the BIA had a duty to exercise reasonable care to employ a competent and careful contractor to incarcerate Crutcher.  The Court believes that New Mexico courts would recognize that analogous private entities in like circumstances would have similar obligations.  The specific conduct in which the BIA would need to engage to properly assess whether the MCDC was a competent and careful contractor would likely vary under the factual circumstances presented.  The issue of what course of action was appropriate under the circumstances presented is largely a question of breach rather than duty.

### 6.    Breach.

The third alleged wrong is that the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition.  It is not disputed that the BIA contracted with the MCDC to house Crutcher and that the BIA transferred him to the MCDC's custody.  It is also not disputed that Crutcher died while he was in the MCDC's care. Coffey has come forward with evidence indicating that the BIA does not have specific requirements for its contracting facilities to follow with regard to conducting medical screenings of inmates.  The Court notes that the parties do not present a detailed picture of what occurred once the BIA employees handed off Crutcher to the custody of MCDC employees.  Given that Crutcher died while in the MCDC's custody, that the BIA does not require any specific procedures for medical screenings of inmates, and that the BIA contracted with the MCDC to house Crutcher, there is a genuine issue of material fact whether the BIA engaged in conduct that breached its duty to Crutcher.  Drawing all reasonable inferences in Coffey's favor, the BIA's conduct posed a

potentially unreasonable risk of harm and a foreseeable risk of injury to inmates such as Crutcher.
See Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

### 7.   **Causation.**

The third alleged wrong revolves around the BIA's alleged inadequate screening of the
MCDC to determine whether it was an appropriate facility to house Crutcher in light of his
condition.  While several months intervened between Crutcher's death and the BIA's transfer of
Crutcher to the MCDC's custody, the theory is that he should have never been transported there,
because the facility could not have properly addressed his medical needs.   "A proximate cause of
an injury is that which in a natural and continuous sequence [unbroken by an independent
intervening cause] produces the injury, and without which the injury would not have occurred."
 Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  Drawing all reasonable inferences in
Coffey's favor, there is a genuine issue of material fact whether the BIA's alleged failure to
adequately screen the MCDC creates a natural and continuous sequence of events that led to
Crutcher's death.  Furthermore, given that the BIA was responsible for the transfer, a factfinder
could permissibly conclude that Crutcher's death would not have occurred without the BIA's
conduct.  While there may have been some additional contributing causes at the MCDC, the BIA's
conduct could have set off a chain of events leading to Crutcher's death.  A proximate cause of an
individual's harm "need not be the only cause, nor the last nor nearest cause."   Herrera v. Quality
Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting
at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 134
N.M. at 57, 73 P.3d at 195.  Taking these facts into account, there is a genuine issue of material fact
whether the BIA's conduct caused Crutcher's death.  Drawing all reasonable inferences in Coffey's
favor, there is sufficient evidence for a factfinder to conclude that the BIA's conduct was the cause

of Crutcher's death.

  **E.**  **THERE ARE LIKE CIRCUMSTANCES IN THE PRIVATE SECTOR TO THE FOURTH ALLEGED WRONG THAT, BASED ON THE SURROUNDING CIRCUMSTANCES, MCKINLEY COUNTY WAS NOT AN APPROPRIATE FACILITY IN LIGHT OF CRUTCHER'S MEDICAL CONDITION.**

  First, there are like analogies in the private sector to those presented in Coffey's fourth alleged wrong that, given Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition. Second, courts have recognized triable issues of negligence in those cases. Third, New Mexico courts have recognized triable issues of negligence under like circumstances in the private sector. Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to act reasonably in terms of sending him to another facility. Fifth, there are genuine issues of material fact whether the BIA breached that duty. Sixth, there are genuine issues of material fact whether that breach caused Crutcher's death.

    **1.**  <u>**Scope of the Alleged Wrong.**</u>

  Coffey's fourth alleged wrong is that, given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition. Coffey alleges that, once transported to the MCDC, "Crutcher was nearly 900 miles from his family" and his physician in Nevada. Errata Complaint ¶¶ 19, 23, at 4. Coffey alleges that "the BIA had no procedure in place to assist families in reaching inmates or in providing assistance to inmates from families of persons incarcerated under the management and control of the BIA." Errata Complaint ¶ 26, at 5. Coffey alleges that she "had no means of

contacting either the McKinley County Detention Facility or the BIA to get help for her son." Errata Complaint ¶ 27, at 5.

### 2. **Closest Analogies in the Private Sector.**

The Court has thought of the closest analogies in the private sector to Coffey's fourth alleged wrong. One would be a parent sending his or her child to a dangerous place or placing the child in a dangerous situation and the child having a tort cause of action against the parent. Another would be a babysitter placing a child in a dangerous situation and the child suffering harm as a result. Another would be some third party voluntarily assuming care of a child and then placing them in a dangerous situation.

### 3. **How Courts Have Approached Negligence Cases in Those Circumstances.**

While many of these cases arise in the context of a state agency bringing an action against a parent, courts have recognized that a parent can be grossly negligent for engaging in such activities as leaving "an unattended infant in a filled bathtub" or placing a child "on a twin bed without rails" that is "near a [hot] radiator." N.J. Div. of Youth and Family Servs. v. A.R., 419 N.J. Super. 538, 545-46 17 A.3d 850, 855 (N.J. Super. Ct. App. Div. 2011). A New Jersey court recognized that a cognizable negligence claim against a mother who attempted "to cross a street with [her] child at a dangerous location without making proper observation." Mancinelli v. Crosby, 247 N.J. Super. 456, 461, 589 A.2d 664, 666 (N.J. Super. Ct. App. Div. 1991). A California court discussed a similar negligence scenario where a babysitter left a child "unsupervised in the bedroom with [an] open window." Yolanda G. v. Furman, No. D042933, 2005 WL 281179, at *7 (Cal. Ct. App. 2005)(unpublished). Notably, courts have also applied section 314A of the Restatement (Second) of Torts when an individual voluntarily undertakes the custody of a child, thus triggering an obligation to protect the child from foreseeable injury and unreasonable danger. Peyer v. Ohio

Water Serv. Co., 130 Ohio App.3d 426, 434, 720 N.E.2d 195, 201 (Ohio Ct. App. 1998)(recognizing that "[a] jury may decide that, based on its resolution of the disputed facts, Section 314A(4) establishes a duty upon [the defendant]" who "voluntarily took custody of [an] eleven-year-old [child] with permission of [the child's] mother").

### 4.    How New Mexico Courts Have Approached Similar Negligence Cases.

The Court believes New Mexico would recognize a triable question of negligence in like circumstances in the private sector to the circumstances underlying Coffey's fourth alleged wrong, and would reach results similar to those that courts in other jurisdictions have reached.  Notably, the Supreme Court of New Mexico has abolished the doctrine of parental immunity:

> The second ground for granting the motion to dismiss was the public policy barring suits between children (or their representative) and their parents.  This judicially-created intrafamily immunity is based upon the public policies of preventing collusion and maintaining family relationships.
>
> Other intrafamily immunities based on these same policies have been abolished in recent years. In Maestas v. Overton, interspousal immunity for non-intentional torts was abolished.  Interspousal immunity for intentional torts had previously been abolished in Flores v. Flores.
>
> There is no stronger public policy for barring intrafamily suits between parents and children than existed for barring intraspousal suits.  The arguments that family relationships will be weakened or destroyed by bringing a lawsuit is not persuasive.  The relationships will be affected to a much greater extent by the conduct between the parties that causes the lawsuit to be filed.  We hold that a suit may be maintained between a child and his or her representative and the parents or their personal representative.

Guess v. Gulf Ins. Co., 96 N.M. 27, 29 627 P.2d 869, 871 (1981)(citations omitted).  Thus, the Court believes New Mexico would follow other jurisdictions that have found a negligence cause of action when a parent places a child in danger.  While the Court has not found any New Mexico cases dealing with negligent babysitters, the Court believes that, because New Mexico law would allow a cause of action against the parents in a negligence case, it would allow a cause of action against

the babysitter under the same facts.  Notably, like the Ohio court in Peyer v. Ohio Water Service Co.

New Mexico courts have adopted section 314A of the Restatement (Second) of Torts.   See

Baldonado v. El Paso Natural Gas Co., 143 N.M. at 292 n.3, 176 P.3d at 281 n.3 ("We recognize

that special relationships, such as the doctor-patient or employer-employee relationship, can create

a duty to rescue." (citing Restatement (Second) of Torts § 314A)).   The Court concludes that New

Mexico courts would apply that provision to a situation in the private sector under like

circumstances to those presented in this case.

### 5.    Nature of the Duty Owed to Crutcher.

The clearest source of a duty under New Mexico law that applies to the fourth alleged wrong

is section 314A of the Restatement (Second) of Torts.  Section 314A(4) of the Restatement Second

of Torts § 314A states that "[o]ne who is required by law to take or who voluntarily takes the

custody of another under circumstances such as to deprive the other of his normal opportunities for

protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take

reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and

to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or

injured, and to care for them until they can be care for by others."  Restatement (Second) of Torts

§ 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise

reasonable care under the circumstances."  Restatement (Second) of Torts § 314A cmt. b.

The Court believes it is consistent with the case law the Court has set out to impose, based

on the high level of control the BIA has over Crutcher when he is in its custody and based on the

potential risk transport could pose to an inmate, a duty to act reasonably under the circumstances

in selecting a place to transport him.  The Court believes that analogous private entities in like

circumstances would have similar obligations.  While there is no obligation under negligence

principles to place Crutcher in the precise detention facility where he wants to be imprisoned, there is some basic duty to act reasonably in selecting a place to house him. The issue of what course of action was appropriate under the circumstances presented is largely a question of breach rather than duty.

      **6.**    **Breach.**

      The fourth alleged wrong is that, given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition. It is not disputed that the BIA contracted with the MCDC to house Crutcher and that the BIA transferred him to its custody. It is also not disputed that the MCDC was approximately 900 miles from his family and primary care doctor. Coffey asserts that this distance contributed to Crutcher's death, because he could not communicate with his family easily or get attention from his doctor back in Nevada. It is also not disputed that Crutcher died while in the MCDC's custody. Coffey has directed the Court to evidence indicating that the BIA does not require its employees to obtain or transfer a prisoner's medical records or property as part of a transfer to a new facility. Viewing all the facts in the light most favorable to Coffey and drawing all reasonable inferences in her favor, there is a genuine issue of material fact whether the BIA's decision to transfer him was negligent under the circumstances. The Court recognizes that, when considering the three allegations alone that Crutcher was transported 900 miles, was transported away from his family, and was transported away from his doctor, there would not likely be a genuine issue of material fact as to the BIA's negligence. Taking into account the alleged failure to transport medical information and property, however, adds another dimension to the alleged wrong such that there is a genuine issue of material fact. Taking those facts into consideration,

-70-

weighing the potential risks and the burden on the BIA in taking a particular course of action is a contextual inquiry that may not, given the record before the Court, be decided as a matter of law on summary judgment.  Drawing all reasonable inferences in Coffey's favor, there is a at least a fact question whether the BIA's conduct posed a potentially unreasonable risk of harm and a foreseeable risk of injury to inmates such as Crutcher.  See Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

### 7.    Causation.

There are also genuine issues of material fact as to causation for the fourth alleged wrong. While several months intervened between Crutcher's death and the BIA's transfer of Crutcher to the MCDC's custody, the theory is that he should have never been transported there, because the facility was not appropriate in light of the distance from his family, his primary care doctor, and Crutcher's medical condition.   "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  Drawing all reasonable inferences in Coffey's favor, there is a genuine issue of material fact whether the BIA's conduct created a natural and continuous sequence of events that led to Crutcher's death. While the United States argues that the MCDC's conduct was a superseding cause of Crutcher's injuries, it is not disputed that the BIA placed him in the MCDC's custody.  It is also difficult to decide this causation issue as a matter of law against Coffey given that the Court must view the facts in the light most favorable to her and draw all reasonable inferences in her favor at this stage.  Furthermore, a proximate cause of an individual's harm "need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it,

causes the injury." <u>Herrera v. Quality Pontiac</u>, 134 N.M. at 57, 73 P.3d at 195.  Taking these facts

into account, there is a genuine issue of material fact whether the BIA's conduct caused Crutcher's

death.  Drawing all reasonable inferences in Coffey's favor, there is sufficient evidence for a

factfinder to conclude that the BIA's conduct was the cause of Crutcher's death.

## III.    THE COURT WILL NOT PERMIT COFFEY TO PURSUE ANY THEORIES OF NEGLIGENCE BEYOND THOSE IT PERMITTED HER TO ASSERT IN ITS NOV. 14, 2011 MOO.

When the Court granted in part and denied in part Coffey's request for leave to amend her

pleadings on November 14, 2011, the Court permitted her to assert the following theories of

wrongful death/negligence against the United States: (i) negligent screening; (ii) negligent transfer;

and (iii) negligent hand off.  <u>See</u> Nov. 14, 2011 MOO at 1-2.  The Court has precluded Coffey from

asserting any other theories in its MOO, including a medical negligence theory, in its Nov. 14, 2011

MOO.  <u>See</u> Nov. 14, 2011 MOO at 1-2.

Coffey has attempted to argue additional theories in her Response to the Motion.  She argues

that the BIA was the proper party to incarcerate Crutcher based on its "fundamental trust

responsibility to the Indian population to protect the public health and safety," and on Crutcher's

"birthright as a Native American," propositions for which Coffey provides no citation to authority,

and based on 25 U.S.C. § 2802.  Response at 8.  25 U.S.C. § 2802(a) provides that the BIA "shall

be responsible for providing, or for assisting in the provision of, law enforcement services in Indian

country as provide in this chapter."  28 U.S.C. § 2802(a).  The United States argued in its Reply that

"[i]t is not clear whether or not" Coffey is "asserting a claim of negligence based on" these

arguments, but objected to her raising any theories beyond those the Court permitted in its Nov. 14,

2011 MOO.  Reply at 4-5.  It also asserts that Coffey cites no legal authority for the proposition that

25 U.S.C. § 2802 creates a cause of action or any enforceable duties in the context of this lawsuit.

<u>See</u> Reply at 5 ("There is nothing in the statute that requires that BIA incarcerate Native Americans in BIA detention facilities nor is there any language removing from the BIA the discretion to enter into contracts with private and state/county facilities . . . .").

First, Coffey's reliance on these statutory and other alleged sources of a duty raises a new theory beyond those Coffey has attempted to assert in the past, specifically that the BIA was negligent for not incarcerating Crutcher itself as opposed to contracting out that responsibility. When the Court granted in part and denied in part Coffey's request for leave to amend her pleadings on November 14, 2011, the Court permitted her to assert the following theories of wrongful death/negligence against the United States: (i) negligent screening; (ii) negligent transfer; and (iii) negligent hand off.  <u>See</u> Nov. 14, 2011 MOO at 1-2.  This new theory is not one of those three theories.  Consequently, she may not pursue that theory.  Second, nothing in 28 U.S.C. § 2802(a) imposes any affirmative duty for the BIA to incarcerate prisoners itself as opposed to contracting out those services, nor does the statute limit any discretion the BIA has to do so.  <u>See</u> 28 U.S.C. § 2802.

In conclusion, because New Mexico courts would recognize the appropriateness of liability of private individuals under like circumstances to those in this case and because genuine issues of material fact preclude the entry of summary judgment, the Court concludes that summary judgment is not appropriate.  Thus, the Court will deny the Motion.

**IT IS ORDERED** that Defendant United States of America's Motion and Memorandum to Dismiss Plaintiffs' Errata Amended and Consolidated Complaint [Doc. No. 118] Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, filed February 23, 2012 (Doc. 123), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Scott E. Borg
Barber & Borg, LLC
Albuquerque, New Mexico

*-- and --*

Robert R. Hager
Treva J. Hearne
Hager & Hearne
Reno, Nevada

  *Attorneys for the Plaintiff*

Kenneth J. Gonzales
 United States Attorney
Jan Elizabeth Mitchell
Dori Ellen Richards
 Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Defendant*