**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DIANA COFFEY, on her own behalf and on behalf
of the estate of ANDREW CRUTCHER, deceased,
and also, as next friend, on behalf of her minor
grandchildren, JOANELLE CRUTCHER,
RACHELLE CRUTCHER, ALEX BENALLY,
ANDREW CRUTCHER, VICK CRUTCHER,
KITANA CRUTCHER, and DREW CRUTCHER,

       Plaintiffs,

vs.                                                                    No. CIV 08-0588 JB/LFG

UNITED STATES OF AMERICA,

       Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

     **THIS MATTER** comes before the Court on the bench trial held on May 24 and 25, 2012.

The primary issues are: (i) whether the Court has jurisdiction to hear the Plaintiffs' lawsuit when

Plaintiff Diana Coffey's administrative claim did not specifically articulate the negligence theories

that she alleged at trial; (ii) whether the Bureau of Indian Affairs' decision to contract with the

McKinley County Detention Center ("MCDC"), including its decision to screen the MCDC as an

appropriate facility to house an American Indian inmate with Andrew Crutcher's medical condition,

falls under 28 U.S.C. § 2680(a), the Federal Tort Claims Act's discretionary-function exception; (iii)

whether the MCDC is the Defendant United States of America's independent contractor, therefore

precluding the Court from asserting jurisdiction to hear any tort claims against the United States

concerning Crutcher's treatment while he was in MCDC's custody; and (iv) whether the United

States' negligence, when the BIA transferred custody of Crutcher to the MCDC, caused Crutcher's

death.  The Court finds that, while Coffey did not articulate with specificity the claims that she is

alleging at trial, her administrative claim provided sufficient underlying facts and circumstances related to Crutcher's medical condition and medications to put the United States on notice of the negligence theories which she alleged at trial.  The Court concludes, therefore, that it has jurisdiction to hear at least some of Coffey's claims against the United States.  The Court finds that the BIA's decision to contract with the MCDC to provide detention services, including the decision whether to screen the MCDC as appropriate for American Indian inmates with certain medical conditions, was pursuant to the FTCA's discretionary-function exception.  Additionally, the Court finds that the MCDC is the United States' independent contractor and that the BIA's decision to award the underlying contract to McKinley County was pursuant to the FTCA's discretionary-function exception.  The Court concludes, therefore, that it lacks jurisdiction to hear any claims Coffey asserts against the United States based on the BIA's decision to contract with the MCDC, and lacks jurisdiction to hear any claims Coffey asserts against the United States based on Crutcher's treatment while in the MCDC's custody.  Finally, the Court finds that Crutcher's death was caused by a bacterial infection which he contracted after December 10, 2006, and that Crutcher's contraction of the bacteria, and his death from sepsis caused by infective endocarditis, was unrelated to his medical condition or needs existing on October 7, 2006, when the BIA handed him off to the MCDC's custody.  The Court concludes that to the extent that there was any negligence on the BIA's behalf, it did not contribute to bring about Crutcher's death, and the BIA, therefore, did not tortiously cause Crutcher's death or Coffey's alleged damages.  The Court thus concludes that, because the BIA did not tortiously cause Crutcher's death, the United States is not liable for any of Coffey's damages.

## FINDINGS OF FACT

The Court is familiar with the facts from the substantial pretrial motion practice and from

the two-day bench trial held on May 24 and 25, 2012.  Both parties have also submitted proposed findings of fact.  The Court has reviewed both sets of proposed facts and accepts some of these facts, rejects some, and finds some facts that neither party brought to its attention.  The Court's findings are set forth below.

### 1.   <u>Andrew Crutcher's Background and Medical History.</u>[1]

1.      Andrew Crutcher was an enrolled member of the Reno-Sparks Indian Colony.  <u>See</u> Trial Transcript at 65:1-3 (taken May 24, 2012)(Sanchez), filed July 13, 2012 (Doc. 172)("May 24, 2012 Tr.").

2.      Diana Sanchez, formerly Diana Coffey, the Plaintiff in this case, is Crutcher's mother.  <u>See</u> May 24, 2012 Tr. at 64:7-12, 65:1-2 (Sanchez, Hearne).

3.      Crutcher had a history of substance abuse.  <u>See</u> Deposition of Dr. Ram Challapalli at 11:2-3, 39:7-12 (taken April 5, 2011)("Challapalli Depo.").[2]

---

[1]The Court, throughout this Findings of Fact, Conclusions of Law, and Order, relies on <u>Stedman's Medical Dictionary</u> (28th ed. 2006) and <u>Merck Manual</u> (M. Beers, et al., eds. 18th ed.) 2006) as secondary resources and aids to the Court in understanding the facts in this case.  Neither party relies on these resources as support for its factual findings, and the Court also does not rely on these resources as support for its factual findings.  Rather, the Court uses these resources only for definitions and explanations of certain medical terms which the parties did not provide.

[2]Coffey moved at trial for admission of certain depositions that both parties had marked. <u>See</u> May 24, 2012 Tr. at 154:10-14 (Hearne).  The United States objected to portions of Patricia Broken-Leg Brill's deposition being admitted.  Accordingly, the parties agreed before trial that her deposition testimony would be read into the record rather than submitted.  <u>See</u> May 24, 2012 Tr. at 154:16-20 (Richards).  At trial, Coffey agreed that was the agreement and did not offer Broken-Leg Brill's deposition into evidence.  <u>See</u> May 24, 2012 Tr. at 154:23 (Hearne).  The United States also objected to admission of Arlan Melendez' testimony, asserting that it was not relevant to the case. <u>See</u> May 24, 2012 Tr. at 155:1-7 (Richards).  The Court concluded that it could not make a determination on relevance at the present time.  <u>See</u> May 24, 2012 Tr. at 155:17-20 (Court).  The United States did not object to admission into evidence of the remaining deposition testimony that Coffee submitted, including portions of Dr. Challapalli's deposition and portions of Judith A. Valle's deposition.  <u>See</u> May 24, 2012 Tr. at 155:1-23 (Hearne, Richards, Court).  There being no objection other than relevance to Melendez' deposition testimony and portions of Broken-Leg Brill's

4.      In 2004, Crutcher was diagnosed with nonischemic[3] cardiomyopathy[4] and congestive heart failure.[5]  His treating physician thought the origin of his medical condition was possibly substance abuse.  See Challapalli Depo. at 7:22-24, 29:14-25.

5.      To control his congestive heart failure, Crutcher received in 2004 a prescription for various heart medications, including a diuretic.  He also had a defibrillator[6] implanted in his chest.  See Challapalli Depo. at 9:17-22, 10:16-17; Plaintiff's Exhibit 1 at H&H Coffey 00028 (Andrew Crutcher's Medical Records Received from Dr. Challapalli and RENOWN Medical Center dated August 24, 2004)("Medical Records from Dr. Challapalli").

6.      The signs and symptoms of congestive heart failure are shortness of breath, which is congestion[7] in the lungs; swelling in the legs, which is congestion in the venous system; swelling

---

deposition, the Court thus admitted all of the deposition testimony Coffey offered other than Broken-Leg Brill's deposition.  See May 24, 2012 Tr. at 155:21-23 (Court).  Because neither party cites to any portion of Melendez' deposition to support their factual findings, and because the Court also did not find anything useful in the deposition, the Court also will not rely upon his deposition.

[3]Ischemia is a "[l]ocal loss of blood supply due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood vessel."  Stedman's Medical Dictionary 1001 (28th ed. 2006).

[4]Cardiomyopathy is a "[d]isease of the myocardium."  Stedman's Medical Dictionary, supra at 313.  The myocardium is the "middle layer of the heart, consisting of cardiac muscle."  Id. at 1271.

[5]"Heart failure (HF), often called congestive heart failure (CHF) or congestive cardiac failure (CCF), is an inability of the heart to provide sufficient pump action to distribute blood flow to meet the needs of the body."  Heart Failure, Wikipedia, http://en.wikipedia.org/wiki/Heart_failure (last visited August 24, 2012)(emphasis omitted).

[6]A defibrillator is "[a]ny agent or measure, e.g., an electric shock, that arrests fibrillation of the ventricular muscle and restores the normal beat" of the heart.  Stedman's Medical Dictionary, supra, at 500.  Fibrilation is "[e]xceedingly rapid contractions or twitching of muscular fibrils, but not of the muscle as a whole."  Id. at 722.  A fibril is "[a] minute fiber or component of a fiber."  Id. at 722.

[7]Congestion is "[p]resence of an abnormal amount of fluid in the vessels or passages of a part or organ; especially, used of blood due to either increased influx or to an obstruction to outflow."

in the abdomen or belly; heart murmur or abnormal heart sounds, exercise intolerance, and inability to lie flat in a bed.  See Trial Transcript at 244:5-7, 247:19-22, 268:13-22, 269:4-18 (taken May 25, 2012)(Court, Shadoff, Mitchell), filed July 13, 2012 (Doc. 173)("May 25, 2012 Tr."); Challapalli Depo. at 26:11-17.

       7.      Congestive heart failure is classified in four different classes from I to IV, with IV being the most serious.  Class I means that a person can do essentially everything the person wants to do; the person has the disease, but is completely compensated[8] -- not impaired in any fashion. Class II means that it takes very consequential activity to make the individual feel short of breath or tired.  See May 25, 2012 Tr. at 252:5-18 (Shadoff).

       8.      Either alcohol and/or methamphetamine use was the origin of Crutcher's cardiomyopathy, because, when he stopped using those substances, his heart function improved and, when he went back to using those substances, his heart function deteriorated, and he had congestive heart failure once again.  See May 25, 2012 Tr. at 247:9-20 (Mitchell, Shadoff).

       9.      In 2005, Crutcher had a normal aortic valve[9] without aortic regurgitation, a normal

---

Stedman's Medical Dictionary, supra, at 429.

   [8]Stedman's Medical Dictionary defines compensation as: "[a] process in which a tendency for a change in a given direction is counteracted by another change so that the original change is not evident."  Supra, at 418.

   [9]The aortic valve is the valve "between the left ventricle and the ascending aorta." Stedman's Medical Dictionary, supra, at 2086.  The left ventricle is "the lower chamber on the left side of the heart that receives the arterial blood from the left atrium and drives it by the contraction of its walls into the aorta."  Id. at 2114.  The aorta is "[a] large artery of the elastic type that is the main trunk of the systemic arterial system."  Id. at 114.  Arteries carry oxygenated blood from the heart and lungs to the rest of the body, while veins carry blood low in oxygen from the rest of the body back to the heart and lungs.  See id. at 144, 2095.

mitral valve[10] without mitral regurgitation,[11] a normal tricuspid valve[12] without tricuspid regurgitation, a normal pulmonic valve[13] without pulmonic regurgitation, and was exercising on a regular basis.  See Medical Records from Dr. Challapalli at H&H Coffey 00037, 00050.

      10.     Crutcher did not have a structural abnormality of his heart valves.  Crutcher did not have structural valvular disease of any kind.  See Defendant's Exhibit E at H&H Coffey 000311 (Report of Findings, Office of the Medical Investigator dated March 15, 2007)("Autopsy Report"); May 25, 2012 Tr. at 277:1-278:6 (Shadoff)(discussing the autopsy report).[14]

---

[10]The mitral valve is the valve "closing the orifice between the left atrium and left ventricle of the heart."  Stedman's Medical Dictionary, supra, at 2087.  The left atrium is "the left side of the heart that receives the blood from the pulmonary veins and from which it passes" to "the left ventricle."  Id. at 177.

[11]Regurgitation means "[a] backward flow, as of blood through an incompetent valve of the heart."  Stedman's Medical Dictionary, supra, at 1668.

[12]The tricuspid valve is the valve "closing the orifice between the right atrium and right ventricle of the heart."  Stedman's Medical Dictionary, supra, at 2087.  The right atrium is "the right side of the heart that receives the blood from the venae cavae and coronary sinus and to which it passes to the right ventricle."  Id. at 177.  The inferior vena cava is the vein "that receives the blood from the lower limbs and the greater part of the pelvic and abdominal organs."  Id. at 2108.  The superior vena cava "returns blood from the head and neck, upper limbs, and thorax to the posterosuperior aspect of the right atrium."  Id. at 2111.  The coronary sinus is "a short trunk receiving most of the cardiac veins."  Id. at 1775.  The right ventricle is "the lower chamber on the right side of the heart that receives the venous blood from the right atrium and drives it by the contraction of its walls into the pulmonary artery."  Id. at 2115.

[13]The pulmonic valve, also called the pulmonary valve, is the valve "at the entrance of the pulmonary trunk from the right ventricle."  Stedman's Medical Dictionary, supra, at 2087.

[14]The parties dispute whether Crutcher had a structural abnormality of his heart valves or some form of structural valvular disease.  Structural abnormalities in the heart can cause "heart valves to not open fully or to let blood leak back into the heart chambers."  Nat'l Heart Lung & Blood Inst., What is Heart Valve Disease?, National Heart Lung and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/hvd/ (last visited August 30, 2012).  These structural abnormalities can have various causes, including "[b]irth defects, age-related changes, infections, or other conditions."  Nat'l Heart Lung & Blood Inst., supra. Whether Crutcher had structural heart abnormalities is significant, because, as neither party disputes, those with structural

heart problems are more predisposed to endocarditis -- what both parties agree was the cause of Crutcher's death. The Merck Manual defines endocarditis as follows: "Infective endocarditis is infection of the endocardium, usually with bacteria (commonly, streptococci and staphylococci) or fungi. It produces fever, heart murmurs, petechia, anemia, embolic phenomena, and endocardial vegetations. Vegetations may result in valvular incompetence or obstruction, myocardial abscess, or mycotic aneurysm." Merck Manual at 724 (M. Beers, et al., eds. 18th ed. 2006). The Merck Manual notes:

> The normal heart is relatively resistant to infection. Bacteria and fungi do not easily adhere to the endocardial surface, and constant blood flow helps prevent them from settling on endocardial structures. Thus, 2 factors are generally required for endocarditis: a predisposing abnormality of the endocardium and microorganisms in the bloodstream (bacteremia).

Merck Manual, supra, at 724. The Merck Manual also relates: "Endocarditis can occur at any age. Men are affected about twice as often. IV drug abusers and immunocompromised patients are at highest risk." Merck Manual, supra, at 724.

At trial, Dr. Neil Shadoff, the United States' expert, testified that Crutcher did not have structural heart abnormalities. For this conclusion, he relied on several different facts, including: (i) Dr. Challapalli's medical records indicating that, at certain times, Crutcher had no regurgitation of blood from each valve that would suggest his heart problems were structural, see May 25, 2012 Tr. at 248:2-249:24 (Mitchell, Shadoff); (ii) Crutcher's medical history of drug and alcohol abuse, and not following a medication regime, would aggravate his heart condition based on a resurgence of his cardiomyopathy, see May 25, 2012 Tr. at 250:7-253:6 (Mitchell, Shadoff); (iii) Crutcher's relatively normal health condition and physical abilities when he was taking his medication, and not abusing drugs or alcohol, see May 25, 2012 Tr. at 250:7-253:6 (Mitchell, Shadoff); (iv) echocardiograms -- effectively an ultrasound of the heart -- taken after Crutcher had demonstrated signs of regurgitation in his valves indicated that those problems had resolved themselves, see May 25, 2012 Tr. at 310:2-10 (Shadoff); (v) the autopsy report states that Crutcher's uninfected heart valves -- the valves other than the tricuspid valve -- were "normally formed, thin and pliable and free of vegetations and degenerative changes," Autopsy Report at H&H Coffey 000311; May 25, 2012 Tr. at 277:1-278:6 (Shadoff); and (vi) the endocarditis infection took place in the tricuspid valve, which indicates that intravenous drug abuse may have played a role in the infection as opposed to a structural heart problem, see May 25, 2012 Tr. at 281:5-9 (Shadoff). In comparison, Dr. Joseph Paris, Coffey's expert, relies heavily upon Dr. Challapalli's medical records which demonstrated that Crutcher had regurgitation in his heart valves. See May 24, 2012 Tr. at 33:23-34:9 (Paris). Dr. Challapalli's, Crutcher's treating physician, stated in his deposition that Crutcher's "mintral regurgitation probably was not due to any structural defect in his heart valves." Challapalli Depo. at 58:20-59:2. Dr. Challapalli noted that there are "all sorts of different causes of, of mitral regurgitation." Challapalli Depo. at 59:1-2. Dr. Challapalli explained his rationale:

> What most likely caused his mitral regurgitation was his left ventricle was dilated and stretched, and as a result, since the, the surface area that the leaflets have

11.     Crutcher did not have coronary artery disease and did not have uncontrolled high blood pressure that would cause his cardiomyopathy.  See May 25, 2012 Tr. at 247:11-22 (Shadoff).

12.     When Crutcher engaged in substance abuse, i.e., use of alcohol or drugs, like he did in late 2005, his condition deteriorated, and he developed heart failure symptoms.  When he stopped drinking and/or using drugs, however, and resumed his medications, his condition would rapidly

---

to close on is greater when the left ventricle is dilated that's called anular dilation. And that's the mechanism of his mitral regurgitation.

So the mitral regurgitation in and of itself at 2 plus, which is moderate, may not be so severe, but it's an indication of the severity of his overall left ventricular systolic function, which is an indication of how severe his heart muscle weakness is.

Challapalli Depo. at 59:3-13.  Dr. Challapalli also stated, when asked if "alcoholic cardiomyopathy [can] be reversed," that it can be reversed if there is "[c]omplete abstinence from alcohol, and also usually replenishment of thiamine, [in] which those patients typically are depleted."  Challapalli Depo. at 61:7-16.

The evidence supports the conclusion that Crutcher did not have structural abnormalities in his heart valves or structural valvular disease.  Dr. Challapalli, Crutcher's treating physician, acknowledged that, while Crutcher had notable heart problems, his problems were "likely not due to any structural defect in his heart valve." Challapalli Depo. At 58:24-25.  He treated Crutcher over a long period of time and would have significant familiarity with Crutcher's heart condition.  See Challapalli Depo. at 9:4 (Challapalli).  Likewise, the autopsy report indicated that Crutcher's heart valves, other than the one infected with endocarditis, were "normally formed, thin and pliable and free of vegetations and degenerative changes."  Report of Findings, Office of the Medical Investigator at H&H Coffey 000311.  It is also telling that, on some occasions when Crutcher visited Dr. Challapalli, his heart valves had no regurgitation that would suggest he had structural problems with his heart valves.  See Challapalli Depo. at 26:2-17.  He had regurgitation problems more frequently when he was not taking care of his body, such as abusing drugs and/or alcohol, or not taking his medication. See Challapalli Depo. at 28:17-24, 39:7-13.  Furthermore, Dr. Paris does not explain why Dr. Challapalli's records, which no one disputes support a conclusion that Crutcher had notable heart problems, suggest that Crutcher had structural problems that would always be present regardless of Crutcher's lifestyle -- such as not abusing drugs and/or alcohol.  Dr. Challapalli, who made those records, does not believe that Crutcher had structural problems with his heart valves.  Consequently, the evidence more strongly supports the conclusion that Crutcher did not have structural heart valve problems.

improve, within a few weeks, to class I or perhaps class II heart failure symptoms.  See Plaintiff's Exhibit 2 at H&H Coffey 001347 (Documents Re: Andrew Crutcher, Received by Way of Subpoena to Reno-Sparks Tribal Health Center); Medical Records from Dr. Challapalli at H&H Coffey 00048; Challapalli Depo. at 39:7-19, 41:2-23.

13.    When he returned to substance abuse and stopped his medications, there would, after about four months, be a decline in heart function or decompensation.  See May 25, 2012 Tr. at 250:8-251:16 (Shadoff, Mitchell); Plaintiff's Exhibit 4 at H&H Coffey 000290-91 (Medical Records from Gallup Detention).[15]

14.    Crutcher had gaps in time when he did not fill his medication prescriptions for several months at a time.  See May 25, 2012 Tr. at 254:17-255:3 (Mitchell, Shadoff); Medical Records from Gallup Detention at H&H Coffey.

15.    Dr. Challapalli did not see Crutcher between May 2005, and January 2006.  See Challapalli Depo. at 38:7-11, 42:9-13; Medical Records from Dr. Challapalli at H&H Coffey 00048.

16.    A progress note record dated January 16, 2006, in Crutcher's medical records from Sierra Nevada Cardiology Associates is the last notation in the medical records indicating that Dr. Challapalli saw Crutcher; at that time, Crutcher had Class I to perhaps Class II heart failure symptoms.  See Challapalli Depo. at 38:7-11, 41:13-23, 42:9-13; Medical Records from Dr. Challapalli at H&H Coffey 00048.

17.    At that time, Crutcher's ability to function was essentially normal, and he had limited ability to function only with extreme exertion.  See May 25, 2012 Tr. at 253:3-6 (Mitchell, Shadoff).

    **2.    Crutcher's Conviction and Incarceration in Nevada Through the BIA.**

_____

[15]Decompensation means "[a] failure of compensation in heart disease."  Stedman's Medical Dictionary, supra, at 497.

18.     Congress provided that the BIA "shall be responsible for providing . . .  law enforcement services in Indian country . . . ." 25 U.S.C. § 2802.

19.     Following Crutcher's arrest for the discharge of a firearm on the Reno-Sparks Indian Reservation, in April 2006, Crutcher was tried in the Reno-Sparks Indian Colony Tribal Court and was convicted of a violent offense.  See Errata: Amended and Consolidated Complaint ¶ 11, at 4, filed February 1, 2012 (Doc. 118)("Errata Complaint").

20.     In May 2006, the tribal court sentenced Crutcher to 360 days in Detention Facility for a weapons offense and committed him to custody at an available detention facility, the Washoe County Detention Facility, a contract detention facility with the BIA.  See Errata Complaint ¶ 19, at 5.

21.     Crutcher's treating physician, Dr. Ram Challapalli, M.D., wrote a letter to the Tribal Court services to explain that Crutcher had a life-threatening heart condition.  See Challapalli Depo. at 66:10-22.

22.     The last time Dr. Challapalli treated Crutcher he was "stabilized," which means that he was functioning day-to day, he could perform normal daily activities, his blood pressure was stable, his heart rate was stable, and he was not complaining of symptoms of congestive heart failure, which would be swelling in the legs, shortness of breath, exercise intolerance, inability to lie flat in a bed.  See Challapalli Depo at 26:2-8, 12-17.

23.     Crutcher has a large chest and is "barrel chested."  Medical Records from Dr. Challapalli at H&H Coffey 00037.

24.     At the time of his incarceration in 2006, an observer would not have been able to tell that Crutcher had a bad heart.  He was living a normal life and would lift weights.  See May 24, 2012 Tr. at 75:2-5, 76:2-6 (Hearne, Sanchez).

25.     From a medical perspective, there were no medical conditions that would have made it infeasible to incarcerate Crutcher.  <u>See</u> May 25, 2012 Tr. at 257:10-14 (Mitchell, Shadoff).

26.     Crutcher's medical condition was controllable on an outpatient basis.  <u>See</u> May 25, 2012 Tr. at 257:15-16 (Mitchell, Shadoff).

27.     Medically, Crutcher could get back to virtually a normal lifestyle and exertional capacity.  <u>See</u> May 25, 2012 Tr. at 257:16-18 (Mitchell, Shadoff).

28.     As part of the Bureau of Indian Affairs Officer of Justice Services ("BIA-OJS"), the BIA is required to provide detention services or provide detention beds for American Indian inmates for tribal courts that do not have a tribal detention program or the ability to house inmates.  <u>See</u> May 24, 2012 Tr. at 173:10-20 (Mitchell, Anchondo).

29.     The United States and BIA picked up Crutcher for incarceration not because of a contract with the Reno-Sparks Indian Colony, but because of a fundamental trust responsibility to the Indian population to protect the public health and safety.  <u>See</u>, <u>generally</u>, <u>Cherokee Nation v. Georgia</u>, 30 U.S. (5 Pet.) 1, 17 (1831)(stating that the American Indian nations may "be denominated domestic dependent nations . . . . They are in a state of pupilage.  Their relation to the United States resembles that of a ward to his guardians."); <u>Cobell v. Norton</u>, 240 F.3d 1081, 1086 (D.C. Cir. 2001)("The federal government has substantial trust responsibilities toward American Indians . . . . Such duties are grounded in the very nature of the government-Indian Relationship.").

30.     During his incarceration at the Washoe County Detention Center, Crutcher completed his diploma and was recommended to go to community college when he was released from detention.  <u>See</u> May 24, 2012 Tr. at 78:25-79:14 (Hearne, Sanchez).

31.     In 2006, Vincente Anchondo was the Supervisory Correctional Program Specialist

for BIA, District III, Phoenix, Arizona.  His duties included oversight of Public Law 93-638[16]
contracts, which are contracts between the BIA and tribes that facilitate the tribes operating their
own detention programs under the Indian Self-Determination Act.  See May 24, 2012 Tr. at 172:7-
24, 235:1-10 (Mitchell, Anchondo).

  32. There is no regulation or requirement that directs the BIA to issue a procurement
contract with a specific entity for contract beds.  That process is based on the determination of the
Contracting Officer Technical Representative, the program area specialist, with the possible
assistance of the Supervisory Correctional Program Specialist from the region of the procurement
contract facility.  See May 24, 2012 Tr. at 173:19-175:9 (Mitchell, Anchondo).

  33. Detention services or beds for American Indian inmates are obtained by considering
a number of factors, including: (i) the location of the facility; (ii) who is willing to contract with BIA
and if they have the bed space to contract with BIA; (iii) what services the programs provide; and
(iv) what options are available.  See May 24, 2012 Tr. at 173:19-175:3 (Mitchell, Anchondo).

  34. Anchondo's duties as the Supervisory Correctional Program Specialist also included
providing detention services through a procurement contract-beds program -- a program in which
the BIA would contract with certain state detention facilities to take custody of tribal inmates.  See
May 24, 2012 Tr. at 172:25-173:3 (Anchondo).

---

[16]Public-Law 93-638 Contracts, also known as 638 contracts, are contracts between the
United States government and American Indian tribes in which the United States government
contracts with a tribe to provide services and obligations which the BIA would otherwise be required
to provide.  See 25 U.S.C. § 450f.  "The Indian Self-Determination and Education Assistance Act
of 1975 ('ISDEAA'), Public Law 93-638, authorizes federal agencies to contract with Indian tribes
to provide services on the reservation."  Snyder v. Navajo Nation, 382 F.3d 892, 896 (9th Cir.
2004)(citing 25 U.S.C. §§ 450-450n).  "The purpose of the ISDEAA is to increase tribal
participation in the management of programs and activities on the reservation."  Snyder v. Navajo
Nation, 382 F.3d at 896-97.

35.     In terms of making a decision where to place American Indian inmates, various matters are taken into consideration, including: (i) budgetary concerns; (ii) the number of beds BIA is filling in a certain area that would inhibit new arrests to come into the facility; and (iii) the facility's medical program, including proximity to a hospital.  See May 24, 2012 Tr. at 178:10-181:17 (Mitchell, Anchondo).

36.     The Washoe County Detention Facility provided detention services and beds to the BIA pursuant to a procurement contract.  See May 24, 2012 Tr. at 174:10-18 (Mitchell, Anchondo). The Reno-Sparks Indian Colony did not have a detention facility.  See May 24, 2012 Tr. at 173:4-9 (Mitchell, Anchondo).

### 3.     The BIA's Procurement Contract with MCDC.

37.     McKinley County is a county of New Mexico and is not a part of any Indian nation. See, generally, McKinley County, http://www.co.mckinley.nm.us/ (last visited Nov. 17, 2012).[17]

---

[17]Rule 201 of the Federal Rules of Evidence provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "A court has discretion to take judicial notice of such facts, whether requested or not."  In re Thornburg Mortg., Inc. Securities Litigation, No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at *1 (D.N.M. Dec. 21, 2009)(Browning, J.)(citing Fed. R. Evid. 201(c)).  Furthermore, courts may appropriately take judicial notice of the sovereign character of parties and historical facts related to sovereign actions.  See Puente v. Spanish Nat'l State, 116 F.2d 43, 45 (2d Cir. 1940)("Courts take judicial notice of the sovereign character of a defendant and, in case of doubt, address their own inquiries to the executive."); Cowlitz Tribe of Indians v. City of Tacoma, 253 F.2d 625, 626 (9th Cir. 1958)("As a matter of history of which the District Court could take judicial notice, the United States did occupy all this territory, as sovereign and possessor, and has acted as the proprietor or grantor of all the lands involved for century.").

That McKinley County is a New Mexico County and not part of any Indian nation meets both of the factors listed in rule 201(b).  That McKinley County is a New Mexico county, not part of any Indian tribe, is generally known within the District of New Mexico.  That McKinley County is a New Mexico county can also be accurately and readily determined from sources, the accuracy of which cannot be questioned.  See e.g., Office of the N. M. Secretary of State, New Mexico Blue Book 338, 339 (Kathryn A. Flynn, ed., July 2012); McKinley County, http://www.co.mckinley.nm.us/ (last visited Nov. 17, 2012).

In addition to being both generally known and accurately and readily determinable from multiple sources, McKinley County's origin, beyond just its status as a county, has been recounted in multiple New Mexico history books as a paramount example of politics in the old west. McKinley County was established as a New Mexico county on February 23, 1899, shortly after its bipartisan endorsement was brokered in exchange for support of Otero County's creation on January 30, 1899.  See Leon C. Metz, Pat Garret, The Story of a Western Lawman 215 (1974).  The legislative bill was the product of a plan to end a stand off, which had arisen out of an attempt to execute a Doña Ana County bench warrant, between Doña Ana County Sheriff Pat Garret -- recently having returned from a seventeen-year law enforcement hiatus after killing William ("The Kid") H. Bonney in Lincoln County -- and Oliver M. Lee -- a New Mexico state senator in 1922 and 1924, and director of the Federal Land Bank of Wichita, Kansas.  See William H. Keleher, The Fabulous Frontier 211 (1945).  The stand off began at Wildey Well Ranch on July 13, 1898, at daybreak, when Lee and Jim Gililland awoke to Garret's posse's gunshots tearing apart their beds on the top of the adobe building on which they slept.  See Keleher, supra, at 220-22.  While Lee and Gililland were fortunate that Garret and his posse missed them from the shed only thirty-seven feet away, Garret's deputy, Kent Kearney, taking three fatal shots, was not as lucky, his death ending the small possibility of Lee's and Gililland's peaceful surrender.  See Keleher, supra, at 221-22.  Lee, however, had friends in high places, including Albert Bacon Hall -- a prominent New Mexican and later United States Secretary of the Interior -- and William A. Hawkins -- a member of the New Mexico Council.  See Keleher, supra at 223.

Mr. Keleher explains the plan that eventually took away Garret's jurisdiction and ability to arrest -- or otherwise enforce the law upon -- Lee:

> Albert Bacon Fall and W.A. Hawkins devised a plan to have the Legislature of New Mexico create a new county out of portions of Doña Ana, Socorro, and Lincoln Counties.  The Argument was that the El Paso and Northeastern Railway was being built through that strip of the territory, that a new county was required to facilitate the business of the Territory and its inhabitants.

> The Prospects were not particularly favorable for the passage of the bill for the creation of a new county.  Thomas Benton Catron, always unfriendly toward Oliver M. Lee, and for many years hostile politically and otherwise to Albert Bacon Fall, was in the Territorial Council and virtually in command of that branch of the Legislature. There had been a long standing feud between Tom Catron and Governor Miguel A. Otero.  In the lower house, Major William H. H. Llewellyn was an important member and personally hostile to Oliver Lee.

> Hawkins and Fall, however, . . . obtained support from Governor Otero, because of a provision in the bill that proposed the new county should be named in his honor.  Never suspecting the scheme behind the new county idea, Tom Catron balked at the name "Otero County," but finally agreed to go along after obtaining from Fall and Hawkins a promise for his pet bill to create McKinley County in the western part of the territory.

-14-

38.     The BIA had a procurement contract with McKinley County to provide detention-bed services at the MCDC.  See May 24, 2012 Tr. at 174:19-23, 234:19-23 (Mitchell, Anchondo, Court).

39.     At some point in 2005, Anchondo, who at the time was the Lead Corrections Officer at the Truxton Canyon Adult Detention Facility ("Truxton Canyon"), determined that he needed to place inmates from Truxton Canyon at the MCDC.  See May 24, 2012 Tr. at 172:7-12, 175:10-19 (Anchondo, Mitchell).

40.     In September 2005, there was an existing procurement contract between the BIA and McKinley County for detention services at the MCDC and there were American Indian inmates housed at that facility.  See May 24, 2012 Tr. at 175:16-19, 176:1-177:22 (Anchondo, Mitchell).

41.     Anchondo, personally, performed a physical inspection of the MCDC with respect to the transfer of the inmates from Truxton Canyon to MCDC.  See May 24, 2012 Tr. at 175:24-177:14 (Mitchell, Anchondo).

---

After the Legislature adjourned, . . . Catron and others were soon aware that the "Otero County" bill had been put through largely to help . . . Lee out of his difficulties.  Examination of the boundary lines fo the new county disclosed that the White Sands country in which . . . it was alleged that [Colonel Fountain and his son Henry] had been murdered [by Lee and Gilliland], was no longer in Doña Ana County, but in Otero County; that Otero County and not Doña Ana County would thereafter have jurisdiction of the case[] against Oliver Lee . . . for murder of the Fountains.

Keleher, supra, at 223-24.  Thus, because Catron unwittingly supported Fall's bill to create Otero County, Fall and Hawkins championed bi-partisan support in passing Catron's bill to create McKinley County on February 23, 1899.  See Metz, supra, at 216.  This history of McKinley County's and Otero County's creation has been chronicled in several New Mexico historical sources.  See e.g., Metz, supra, at 214-16; Mrs. Tom Charles, Tales of the Tularosa 40-44 (1961); Keleher, supra, at 211-24.  The Court takes judicial notice that McKinley County is a New Mexico County, not part of, or potential subdivision of, any Indian Country, having been established by the New Mexico Legislature on February 23, 1899.

42.     In reaching a conclusion about the appropriateness of placing inmates at the MCDC, Anchondo saw no major issues with the facility.  The facility was easy to access and leave, because it was on a main United States interstate.  The officers were in uniform.  The facility had a good sally port.[18]  There was a process for booking.  There were medical personnel stationed at the facility, including either a nurse practitioner or a licensed practical nurse.  The kitchen had no issues.  And the MCDC had a drug and alcohol program.  See May 24, 2012 Tr. at 179:18-181:1, 200:10-14 (Anchondo, Mitchell).

43.     The Gallup Indian Medical Center ("GIMC") was not very far away -- approximately six blocks -- from the MCDC.  May 24, 2012 Tr. at 180:4-9 (Anchondo); Deposition of Judy A. Valle at 17:17-20 (taken July 21, 2011)("Valle Depo.").[19]

44.     The GIMC is a large Indian Health Service hospital which provides medical services for American Indians.  Medical personnel at the GIMC sometimes consult by telephone about the treatment of patients with specialized medical personnel at the Presbyterian Heart Hospital in Albuquerque, New Mexico, and with medical personnel at the University of New Mexico.  Medical personnel at the GIMC have the ability to treat patients with congestive heart failure and implanted defibrillators.  See May 25, 2012 Tr. at 243:3-5, 285:24-286:11 (Mitchell, Shadoff).

45.     The Contract between McKinley County and the BIA further states that McKinley

---

[18]A sally port is "a small exit point in a fortification for the passage of troops."  New Oxford American Dictionary 1542 (A. Stevenson & C. Lindberg eds., 3d ed. 2010).  The term is now also used to describe secured entrances for defendants at jails and courts.

[19]The United States did not object to admission into evidence of certain portions of Valle's deposition, the admissibility of which the parties agreed to before trial.  See May 24, 2012 Tr. at 155:1-23 (Hearne, Richards, Court).  There being no objection, the Court thus admitted into evidence the agreed-upon portions of Valle's deposition that Coffey offered.  See May 24, 2012 Tr. at 155:21-23 (Court).

County will not be reimbursed if a American Indian inmate is taken to any care facility other than Indian Health Services absent "extreme emergency." Defendant's Exhibit B at 15 (Modification of Contract, dated August 4, 2007)(emphasis in original).

46.     By imposing the threat of non-reimbursement, BIA ensured that McKinley County would almost never choose a hospital, rather than the Indian Health Services clinic, for a American Indian inmate, whether needed or not.  See Coffey Proposed FOF and COL at 13 (setting forth this fact).

47.     There were other American Indian inmates in the MCDC.  There had been no complaints from the inmates other than the distance from their homes.  The facility was a good fit for the BIA's needs.  See May 24, 2012 Tr. at 178:2-9, 181:2-3 (Mitchell, Anchondo).

48.     The MCDC was certified through the State of New Mexico as a county detention facility.  See May 24, 2012 Tr. at 230:7-10 (Mitchell, Anchondo).

49.     Under the Indemnification, Liability, and Insurance Clause in the procurement contract between the BIA and McKinley County, the BIA assumes no liability, and will not defend or indemnify, for any claims, judgments, or liabilities by third parties for property damage, personal injury, or civil liability arising out of the actions of McKinley County or its officers.  See May 24, 2012 Tr. at 185:11-23 (Mitchell, Anchondo).

50.     As part of the Statement of Work ("SOW") included in the procurement contract between the BIA and McKinley County, McKinley County is contractually responsible for obtaining tribal inmate medical records, provided the inmate has signed a release of information form.  See May 24, 2012 Tr. at 184:16-23 (Mitchell, Anchondo); Modification of Contract at 15.

51.     In September 2004, the United States Department of the Interior, Office of the Inspector General, published Neither Safe Nor Secure -- An Assessment of Indian Detention

Facilities.  See Plaintiff's Exhibit 8 at H&H Coffee 0382 ("Neither Safe Nor Secure").[20]

     52.    The MCDC, and facilities for which there was like procurement contracts, were not the subject of the investigation underlying Neither Safe Nor Secure.  See Neither Safe Nor Secure at H&H Coffey 000389; May 24, 2012 Tr. at 228:3-229:9 (Mitchell, Anchondo).

     53.  The Neither Safe Nor Secure report admits that the investigators "often found that complacency and resignation were the norm -- at all levels of BIA management -- with no evidence of a coordinated and comprehensive strategic plan to improve and manage the detention program." Neither Safe Nor Secure at 4.

---

[20]Coffey relies on this report's contents to establish that the BIA acted improperly.  Coffey offered the exhibit into evidence during the direct examination of Anchondo.  See May 24, 2012 Tr. at 218:4 (Hager).  The United States objected under rules 401 and 402 of the Federal Rules of Evidence, contending that, because Crutcher was transferred to MCDC under the procurement contract, which this report did not address, the report is irrelevant and inadmissible.  See May 24, 2012 at 218:5017 (Mitchell).  The Court determined that, while the report does not cover the government procurement contract at issue in this case between the MCDC and BIA, the report has some probative value on the issues, as it provides some discussion of detention standards.  See May 24, 2012 Tr. at 220:9-16 (Court).  Because the Neither Safe Nor Secure report has probative value to a fact of consequence in this case, even if that probative value is minimal, the Court overruled the United States' relevance objection, and admitted the Neither Safe Nor Secure report into evidence. See May 24 2012 Tr. at 220:16-17 (Court).

The Neither Safe Nor Secure report focuses on "detention facilities throughout Indian Country," specifically the following three classes of detention facilities:

     As of August 2004, the detention program consisted of 72 detention facilities in Indian Country -- 17 of which are operated by BIA-LES [BIA Law Enforcement Services], 46 receive BIA funding for detention services under [Public Law 93-638] contracts, and 9 are operated by tribes.  Of the 72 facilities, 27 house adult inmates, 11 house juveniles, and 34 house a combination of both adults and juveniles.

Neither Safe Nor Secure at H&H Coffey 000386, 000389.  McKinley County is a subdivision of the state of New Mexico and is not part of any Indian County.  See Findings of Fact No. 37, supra. Thus, contracts under Public Law 93-638 would not apply to a governmental entity such as McKinley County that is unassociated with Indian tribes.  See Snyder v. Navajo Nation, 382 F.3d at 896 ("Public Law 93-638, authorizes federal agencies to contract with Indian tribes to provide services on the reservation." (emphasis added)).  Accordingly, as it relates to the MCDC, the probative value of the Neither Safe Nor Secure report, if any, is minimal.

54.     The "BIA has failed to provide safe and secure detention facilities throughout Indian Country."  Neither Safe Nor Secure at H&H Coffey 000386.

55.     There is "a long history of neglect and apathy on the part of BIA officials, which has resulted in serious safety, security, and maintenance deficiencies at the majority of facilities. . . . Whether it lacks the organizational will, or infrastructure, or both, BIA cannot sustain its focus on the problems at its detention facilities long enough to resolve them."  Neither Safe Nor Secure at H&H Coffey 000386.

56.     The Neither Safe Nor Secure report was beneficial in that it facilitated the BIA acquiring additional funding for contract beds under procurement contracts.  See May 24, 2012 Tr. at 228:8-229:1 (Mitchell, Anchondo).

### 4.      The BIA's Transport Procedures.

57.     In the spring of 2006, BIA-OJS, because of budgetary considerations, had to make decisions concerning moving inmates from higher-priced facilities, that were for shorter-term inmates, to either BIA-operated programs or to contract facilities that had the same services but were not as costly.  See May 24, 2012 Tr. at 181:4-17 (Mitchell, Anchondo).

58.     In early October 2006, because of the need to move certain inmates into long term detention facilities and to free up space for new arrests arriving at the Washoe County Detention Facility, the BIA made the decision to transfer inmates from the Washoe County Detention Facility to the MCDC in Gallup, New Mexico, under the procurement contract between the BIA and McKinley County.  See May 24, 2012 Tr. at 185:24-186:11 (Mitchell, Anchondo).

59.     There were no BIA detention facilities in western Nevada or within a reasonable distance to use for inmates from Washoe County Detention Facility.  See May 24, 2012 Tr. at 181:18-182:24 (Mitchell, Anchondo).

60.     Based on a contract modification to the contract between the BIA and McKinley County, the contract between these entities provided for McKinley County to house inmates from Western Nevada Agency Tribes from October 1, 2006 through September 30, 2007.  See May 24, 2012 Tr. at 183:11-20 (Mithcell, Anchondo); Modification of Contract at 2.

61.     Under a contract such as this one, the receiving agency, in this case McKinley County, would retrieve medical records for the inmates that were housed under the contract.  See May 24, 2012 Tr. at 184:21-185:3 (Anchondo, Mitchell).

62.     The MCDC was not certified by the American Correctional Association ("ACA"), nor did BIA check to see if the facility met the ACA's standards.  See May 24, 2012 Tr. at 202:7 (Anchondo).

63.     No BIA employees worked at the MCDC.  See May 24, 2012 Tr. at 185:8-10 (Mitchell, Anchondo).

64.     Anchondo, as the current lead instructor at the BIA United States Indian Police Academy, instructs new BIA officers on the basic principles of corrections, including matters such as interpersonal communications, intake procedures, transport, security, as well as safety policies and procedures.  See May 24, 2012 Tr. at 162:10-11, 162:19-24 (Anchondo).

65.     One of the course materials used at the training academy which Anchondo has assisted in authoring pertains to the escorted transport program.  See May 24, 2012 Tr. at 163:1-5 (Mitchell, Anchondo).

66.     Anchondo, when he was acting in the capacity of a detention officer, has been involved in hundreds of inmate transports.  See May 24, 2012 Tr. at 164:6-19 (Mitchell, Anchondo).

67.     Anchondo has transported inmates from Washoe County or Reno to Gallup.  See May 24, 2012 Tr. at 163:20-23 (Mitchell, Anchondo).

68.     At the Native American Police Academy, BIA detention officers are not taught to obtain medical records on the inmates when transferring them from one facility to another because of concerns generated by the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA")(codified as amended at 42 U.S.C. §§ 17937-54).  May 24, 2012 Tr. at 165:14-166:3 (Mitchell, Anchondo).

69.     HIPAA is a federal law that Congress enacted to protect individuals' medical information from disclosure.  HIPAA may impose penalties ranging from a minimum of $100.00 for each violation, capped at $25,000.00 per year for violations of the same requirement, up to $50,000.00 for each violation, capped at $1,500,000 per year for violations of the same requirement. See May 24, 2012 Tr. at 165:20-166:23 (Anchondo, Mitchell); 42 U.S.C. §§ 1320d-5(a), 17937(b).

70.     The BIA's standard procedure was to have BIA detention officers performing a transfer receive medical information only when an inmate had a condition that might be of medical concern during the transport -- specifically if the condition could implicate the safety of the officers and/or the inmates.  See May 24, 2012 Tr. at 170:6-12, 205:7-10 (Anchondo).

71.     The BIA's standard procedure, given that it was playing the role of transferring inmates between two different detention facilities, was that the detention facilities would maintain the medical records for inmates rather than the BIA.  See May 24, 2012 Tr. at 205:21-24 (Anchondo).

72.     The predecessor of Judy Valle, R.N., a registered nurse employed at the MCDC, had contacted BIA and asked that the BIA stop sending inmates without proper medical records.  See Valle Depo. at 18:15-21.

73.     The BIA does not have funding from Congress to provide medically related services and does not staff the transport teams with medical personnel, or other individuals qualified to

perform medical screenings, although the transport teams have some basic first-aid training. See May 24, 2012 Tr. at 167:6-14 (Mitchell, Anchondo).

74.     Patricia Broken Leg-Brill is the Acting Deputy Associate Director for Corrections for the BIA-OJS. See May 24, 2012 Tr. at 142:16-24 (Richards, Broken-Leg Brill).

75.     Medical screenings are not conducted by BIA detention officers transferring inmates between detention facilities, nor is there any requirement that they do so. Medical screenings are conducted in the detention facilities. See May 24, 2012 Tr. at 145:2-14 (Richards, Broken-Leg Brill).

76.     The BIA detention officers picking up inmates for transfer expect that the inmates are healthy enough for transfer, unless the detention officers hear otherwise from the discharging detention facility. See May 24, 2012 Tr. at 147:6-16 (Richards, Broken-Leg Brill).

77.     The BIA knew or had reason to know that the transfer of an inmate with serious heart trouble would be a risk for his health and safety. See Coffey Proposed FOF and COL at 8 (setting forth this fact).

78.     The BIA focuses only on emergency issues during transport; thus, if Crutcher did not have asthma wheezing, a broken bone sticking out of his arm, or blood oozing from an open wound, the BIA would not notice nor consider any other non-glaring health problem. See Coffey Proposed FOF and COL at 13 (setting forth this fact).

79.     If there is a medical emergency during the transfer trip, the detention officers go to the nearest medical facility. See May 24, 2012 Tr. at 171:1-14 (Richards, Broken-Leg Brill).

80.     The BIA looked for nothing but problems during the transfer itself. See Coffey Proposed FOF and COL at 13 (setting forth this fact).

81.     The contract provision governing the transport and incarceration of American Indian

prisoners specifically provides that: "The Contractor will be responsible for providing medical screening of the inmate at the time of booking and the Agency's Police Officer or Designee, from the Tuba City District; or other if approved in evidence by the District IV Supervisory Corrections Specialist, shall provide information regarding any current medical concerns at the time of transportation and booking."  Modification of Contract at 15-16.

82.     BIA transport officers are trained at the BIA United States Indian Police Academy to ask the discharging officers if there are any concerns, including medical concerns, about the inmates to be transferred.  See May 24, 2012 Tr. at 162:19-163:5, 168:14-169:2 (Anchondo, Mitchell).

83.     A medical screening of an inmate is conducted at the facility where the inmate is initially taken for incarceration or at the facility, if applicable, to which the inmate may be transferred.   Maintenance of medical issues, i.e., issues that arise during medical screening that require treatment or follow up, takes place at the respective facility.  The transport officer has no role in the medical screening.  See May 24, 2012 Tr. at 148:12-149:3 (Richards, Broken-Leg Brill).

84.     The medical unit at the detention facility receiving the inmate performs a medical screening on the inmate, and arranges to obtain medical records and medication for that inmate.  See May 24, 2012 Tr. at 151:2-8 (Richards, Broken Leg-Brill).

85.     Detention facilities do not normally want to receive medication for inmates from other detention facilities, because of the burdens that come with receiving the medication from another facility, such as verifying that the medication is the correct one.  There are many medications that look alike, which creates the potential for giving an inmate the wrong medication. See May 24, 2012 Tr. at 164:23-165:8 (Anchondo).

86.     Under the BIA's arrangement with procurement contract facilities, it is the

responsibility of the receiving detention facility to obtain the medication or lists of medications for the incoming inmate.  See May 24, 2012 Tr. at 151:9-152:5 (Richards, Broken-Leg Brill).

87.     On October 7, 2006, Anchondo, a BIA employee and not an employee of the contractor, MCDC, made the decision to transfer inmates from the Washoe County Detention Facility to the MCDC.  See May 24, 2012 Tr. at 188:7-20 (Mitchell, Anchondo).

88.     There is no requirement that BIA officials conduct medical screenings before transporting an inmate.  See May 24, 2012 Tr. at 145:7-14 (Broken-Leg Brill).

**5.      BIA's Transfer of Crutcher**

89.     In October 2006, Anchondo made the decision to include Crutcher in the group of inmates transferred to the MCDC.   Anchondo never received information that Crutcher had congestive heart failure.  See May 24, 2012 Tr. at 186:12-22 (Mitchell, Anchondo).

90.     If Anchondo had information about an inmate's medical condition, knew that the inmate was medically stable, and was aware that the inmate would be transferred to a detention facility with a medical facility that was also close to a hospital like the GIMC, Anchondo would not have a problem with moving the inmate to the new facility.  See May 24, 2012 Tr. at 189:5-20 (Mitchell, Anchondo).

91.     In early October 2006, because of the BIA's decision to transfer inmates from the Washoe Detention Facility to the MCDC, a transfer team came from the BIA to facilitate the transfer.  See May 24, 2012 Tr. at 188:7-20 (Mitchell, Anchondo).

92.     The Contractor facility that discharged Crutcher, Washoe County Detention Facility, had prepared a discharge transfer form.  See Plaintiff's Exhibit 3 at H&H Coffey 001188 (Washoe County Detention Facility Records (dated October 7, 2006)).

93.     These medical transfer sheets are prepared in the ordinary course of business by

detention facilities for the purpose of transferring inmates with medical information.  See May 24, 2012 Tr. at 32:1-10 (Paris).

94.     The Medical Information Transfer Form, dated October 7, 2006, in Crutcher's medical records at the Washoe County Detention Facility related that Crutcher had no medical problems that would restrict his transfer, although the form also noted that Crutcher was taking a variety of medications.  See Plaintiff's Exhibit 3 at H&H Coffey 001188 (Washoe County Detention Facility Records (dated October 7, 2006))

95.     The Transfer Form was inconsistent, because the form listed Crutcher as taking six medications and having no health problems, and additionally did not list that Crutcher had an implanted defibrillator.  See May 24, 2012 Tr. at 50:14-51:20 (Paris).

96.     In early October 2006, BIA employees arrived at the Washoe County Detention Facility to pick up inmates for transport.  A number of other inmates from the Washoe County Detention Facility were secured and transported.  See Deposition of Lorna Pettigrew-Garner at 12:19-13:7 (taken July 1, 2011)("Pettigrew-Garner Depo.").

97.     Crutcher had received his daily medications at the Washoe County Detention Facility.  See Washoe County Detention Facility Records at H&H Coffey 001218.

98.     Lorna Pettigrew-Garner was one of the BIA detention officers on the transfer.  See Pettigrew-Garner Depo. at 11:19-23, 12:19-24.

99.     The BIA employees made the decision to transfer Crutcher without a medical screening.  See May 24, 2012 Tr. at 151:2-13 (Broken-Leg Brill).

100.     The transfer team received no paperwork associated with the transfer of any of the inmates, but were only told orally to go to the Washoe County Detention Center, pick up the inmates and transfer them.  See  Pettigrew-Garner Depo. at 13:8-14:2.

-25-

101.     The transfer team picking up the inmates from the Washoe County Detention Facility was informed that one of the inmates was schizophrenic and was provided his medication.  See Pettigrew-Garner Depo. at 14:17-15:18.

102.     The transfer team received no other medical information about any of the inmates, oral or written.  See Pettigrew-Garner Depo. at 15:14-24.

103.     Pettigrew-Garner did not see any medication for the prisoners.  See Pettigrew-Garner Depo. at 16:6-13.

104.     Neither Pettigrew-Garner nor the other officer transporting the inmates talked to or asked the inmates about their property, medical concerns, or medications.  See Pettigrew-Garner Depo. at 16:14-22.

105.     One of the inmates on the transfer that day, Johnny Christy, had received a diagnosis for schizophrenia and, when he was initially incarcerated, had taken his personal bottle of medication with him into the Washoe County Detention Facility as part of his personal property.  See May 24, 2012 Tr. at 117:10-20 (Richards, Christy).

106.     Christy's personal property, including his clothing and the medication he brought with him into the Washoe County Detention Facility, was bagged and inventoried for transport.  See May 24, 2012 Tr. at 117:10-20 (Richards, Christy).

107.     The transport team placed the inmates' personal property in the back of the transport van and placed any medication in the front of the van.  See Pettigrew-Garner Depo. at 15:3-12.

108.     There was no reason for the BIA transport officers to suspect that Crutcher had a defibrillator, because, when a person has a large chest, an implanted defribrillator is hidden under the collarbone and cannot normally be seen unless the person takes his or her shirt off.  See May 25, 2012 Tr. at 254:9-15 (Mitchell, Shadoff).

-26-

109.     Crutcher and some other inmates were transferred to the custody of MCDC detention officers in Peach Springs, Arizona.  See May 24, 2012 Tr. at 188:7-20 (Mitchell, Anchondo).

110.     The BIA was the only communication connection between the discharging facility, Washoe County Detention Facility, and the MCDC. See Coffey Proposed FOF and COL at 8 (setting forth this fact).

111.     The Tribe did not know that Crutcher was being transferred, Washoe County Detention Facility did not know where Crutcher was going, and the MCDC did not know from where Crutcher had arrived.  See Coffey Proposed FOF and COL at 8 (setting forth this fact).

112.     The MCDC took no part in the decision to transfer Crutcher from the Washoe County Detention Facility to the MCDC.  See Coffey Proposed FOF and COL at 8 (setting forth this fact).

113.     The MCDC also did not decide to transfer Crutcher without his medical records.  See May 24, 2012 Tr. at 151:2-18 (Broken-Leg Brill).

114.     The BIA failed to inform the MCDC of Crutcher's heart condition at the time of transportation and booking.  See May 24, 2012 Tr. at 148:12-149:3 (Broken-Leg Brill).

115.     The BIA-OJS and Tribal Police Officer did not provide any information to MCDC, at any time, regarding Crutcher's current medical records at the time of transportation and booking. See May 24, 2012 Tr. at 196:9-15 (Anchondo).

116.     The BIA could have gotten the Tribe's court services file and medical records on the inmates.  See May 24, 2012 Tr. at 208:20-209:6 (Anchondo).

117.     If Anchondo had seen the letter from Dr. Challapalli to the Tribal Court he would not have transferred Crutcher.  See May 24, 2012 Tr. at 189:5-20 (Anchondo).

**6.     Crutcher's Arrival at the MCDC.**

118.     On October 8, 2006, at 11:30 a.m., after Crutcher arrived at the MCDC, Valle

medically screened Crutcher in MCDC's medical unit.  See Defendant's Exhibit C at McKinley 000019 (Records from the McKinley County Adult Detention Center Pertaining to Andrew Crutcher (dated October 8, 2006))("McKinley County Records").

119.    There is no evidence that the MCDC was never given Crutcher's Medical Information Transfer Form.  See May 24, 2012 Tr. at 38:8-16 (Paris).

120.    On the MCDC's Resident Receiving Screening Report, Crutcher listed Diana Coffey as his emergency contact and listed her phone number.  See McKinley County Records at McKinley 000019.

121.    Crutcher wrote on the MCDC's Resident Receiving Screening Report: "I have congestive Heart Failure."  Under the section of the form asking for current medications, Crutcher wrote "[heart][21] meds & diuretics."  McKinley County Records at McKinley 000019.

122.    There were two deficiencies in the MCDC's medical screening of Crutcher on October 8, 2006 at the MCDC: (i) the lack of requesting prior medical information when Crutcher said that he had congestive heart failure, and was on cardiac medications and diuretics; and, (ii) the list of medications that Crutcher could not remember was not explored by other means.  See May 24, 2012 Tr. at 45:14-23 (Paris).

123.    Also listed on the form is the name of Crutcher's "current Provider/Facility," specifically "Reno-Sparks Indian Colony Health Cl."  The form listed the Health Clinic's telephone number and fax number.  McKinley County Records at McKinley 000019.

124.    Valle and Crutcher signed the MCDC's Receiving Screening Report. See McKinley County Records at McKinley 000019.

_____

[21]This form has a heart symbol rather than the word heart.  The Court does not reproduce the heart image here.

125.    On October 8, 2006, shortly after Crutcher arrived at the MCDC, MCDC employees in the medical unit knew that Crutcher had a diagnosis for congestive heart failure, were aware that he took heart medications and diuretics, and knew who his previous medical provider was -- the Reno-Sparks Colony Health Clinic.  See McKinley County Records at McKinley 000019.

126.    The MCDC did not know the severity of Crutcher's condition.  See Coffey Proposed FOF and COL at 8 (setting forth this fact).

127.    On October 8, 2006, shortly after Crutcher arrived at the MCDC, MCDC employees had the information available to them that would enable them to obtain Crutcher's medical records and medication list.  See May 24, 2012 Tr. at 49:1-50:2 (Mitchell, Paris).

128.    Pursuant to the terms of the contract between the BIA and McKinley County, the MCDC personnel were required to obtain a medical release signed by the inmate and request the tribal inmate's medical records.  See Modification of Contract at 15.

129.    MCDC employees did not obtain a medical release nor request Crutcher's medication records until January 18, 2007.  See McKinley County Records at McKinley 000009-10; Valle Depo. at 70:10-73:14.

130.    There is no evidence that Crutcher requested medical care from the time period between his initial medical screening at the MCDC and December 9, 2006.  See May 24, 2012 Tr. at 53:15-22, 61:11-17 (Mitchell, Paris).

131.    The MCDC medical staff knew of Crutcher's diagnosis and need for medications. However, no medications, no return visits and no diagnostic tests were scheduled." Plaintiff's Exhibit 5A at 4 (dated December 24, 2010)("Report by Dr. Paris").[22]

_____

[22]Dr. Paris submitted two expert reports in this case, numbered for trial as Plaintiff's Exhibits 5A and 5B.  When Coffey moved at trial to introduce the exhibits, which the parties, before trial,

132.    Crutcher was supposed to have the defibrillator attached to his body checked every three to four months and was taking several heart medications to avoid heart failure symptoms and, if Crutcher contracted an infection, the heart condition would require that he be treated aggressively. See Challapalli Depo. at 12:16-22, 14:21-23, 15:1-9, 16:5-22.

133.    Plaintiff Diana Coffey (whose current last name is Sanchez) spoke with Crutcher on the telephone a number of times after his transfer to the MCDC. See May 24, 2012 Tr. at 79:22-80:4 (Hearne, Sanchez).

134.    When Coffey spoke with Crutcher on the telephone in November he said that he was okay, but that he was concerned he did not have his medications. See May 24, 2012 Tr. at 80:23-81:3 (Hearne, Sanchez).

### 7.    The Treatment of Crutcher's Infection on His Thigh.

135.    On December 9, 2006, Crutcher filled out a health service request form with the MCDC stating that he had a "bump on the back of [his] leg that is very painful and is getting bigger."  McKinley County Records at McKinley 000021.

136.    On December 10, 2006, medical personnel at MCDC referred Crutcher for medical care at the GIMC for a "large erythemic area to L hamstring area."  McKinley County Records at McKinley 000024-25.

137.    Medical personnel at the GIMC saw Crutcher on December 10, 2006.  See Medical Records from Gallup Detention at H&H Coffey 000244.

---

had stipulated as admissible, Coffey noted that the United States had moved to exclude Plaintiff's Exhibit 5B, Dr. Paris' supplemental report.  See May 24, 2012 Tr. at 4:9-12 (Hearne).  The Court did not admit that exhibit.  See May 24, 2012 Tr. at 4:23-25 (Court).  On May 26, 2012, in its Memorandum Opinion and Order, the Court concluded that Dr. Paris could testify at trial to the information contained in his supplemental report, but that the Court would not receive Plaintiff's Exhibit 5B into evidence.  See Memorandum Opinion and Order at 1-2 (Doc. 170).

138.    On December 10, 2006, Crutcher did not have a fever.  His temperature was normal. His heart rate was in a reasonable range.  His respiration -- his breathing -- was normal.  There was a slight elevation in his blood pressure.  See Medical Records from Gallup Indian Medical Center at H&H Coffey 000244; May 25, 2012 Tr. at 258:15-259:9 (Mitchell, Shadoff).

139.    The medical personnel at the GIMC gave Crutcher a tetanus shot, put a dressing on his thigh wound along with a topical antibiotic, instructed him to take an oral antibiotic (Bactrim) for ten days, and told him to return in forty-eight hours to have the thigh abscess[23] checked.  See May 25, 2012 Tr. at 261:20-263:13 (Mitchell, Shadoff).

140.    On December 10, 2006, GIMC medical personnel obtained a bacterial culture from the fluid coming from the thigh abscess to do an antibiotic susceptibility test to rule out the presence of a Methicillin-resistant Staphylococcus aureus infection.[24]  Medical Records from Gallup Indian Medical Center at H&H Coffey 000244; May 25, 2012 Tr. at 259:10-17, 260:7-12 (Mitchell, Shadoff).

141.    An antibiotic susceptibility test is used to determine if the bacteria in the culture is resistant to particular antibiotics.  This test essentially provides a fingerprint of bacteria, which would also permit medical personnel to identify, with a greater degree of certainty, whether bacteria in one location of the body are the same as bacteria in another part of the body.  See May 25, 2012

---

[23]An abscess is "[a] circumscribed collection of purulent exudate frequently associated with swelling and other signs of inflammation."  Stedman's Medical Dictionary, supra, at 4.  Purulent means "[c]ontaining, consisting of, or forming pus."  Id. at 1606.  Exudate is "[a]ny fluid or semisolid that has exuded out of a tissue . . . , more specifically because of injury or inflammation."  Id. at 688.

[24]"Methicillin-resistant Staphylococcus aureus (MRSA) infection is caused by a strain of staph bacteria that's become resistant to the antibiotics commonly used to treat ordinary staph infections."  Mayo Clinic, MRSA Infection, Mayo Clinic, http://www.mayoclinic.com/health/mrsa/DS00735 (last visited August 30, 2012).

Tr. at 260:23-261:25 (Mitchell, Shadoff).

142.    The fingerprint of the bacteria obtained from an antibiotic susceptibility test is based on the antibiotics to which the bacteria are sensitive and to which antibiotics they are resistant.  See May 25, 2012 Tr. at 261:21-262:2 (Shadoff).

143.    At the GIMC, Crutcher received an antibiotic called Bactrim, which was an appropriate antibiotic to treat the bacterial infection on his thigh.  See May 25, 2012 Tr. at 259:18-260:22, 262:6-12 (Shadoff, Mitchell).

144.    On December 12, 2006, Crutcher had a follow-up appointment at the GIMC, and reported a significant decrease in swelling and pain of the thigh.  See Medical Records from Gallup Indian Medical Center at H&H Coffey 000241.

145.    On December 12, 2006, the medical personnel at GIMC obtained the results from the antibiotic susceptibility test performed on Crutcher's thigh abscess.  See Medical Records from Gallup Indian Medical Center at H&H Coffey 000258.

146.    The bacteria in the culture sample taken from Crutcher's thigh abscess was a staph infection[25] that was resistant to Penicillin and Ampicillin, but sensitive to the ten other antibiotics that were part of the test.  The infection was not Methicillin-resistant Staphylococcus aureus.  See Medical Records from Gallup Indian Medical Center at H&H Coffey 000258;  May 25, 2012 Tr. at 261:4-262:5, 262:16-19 (Shadoff, Mitchell).

147.    Bacteria are such that they can evolve and acquire resistance to antibiotics.  This process is a defense mechanism that allows bacteria to survive.  Once bacteria obtain resistance to

---

[25]Staph, or staphylococcus, is a bacteria that produces a variety of toxins and is potentially pathogenic.  See Stedman's Medical Dictionary, supra, at 1828.  It is commonly found on the skin, in skin glands, and on the nasal and other mucous membranes of warm-blooded animals, and in various food products.  See id. at 1828.

an antibiotic, any bacteria that are the offspring of the bacteria that acquired the resistance will maintain that resistance rather than lose it.  See May 25, 2012 Tr. at 272:6-273:3 (Shadoff).

148.    The medical personnel at GIMC who looked at Crutcher's thigh abscess when he returned on December 12, 2006, said that it was improving.  See Medical Records from Gallup Indian Medical Center at H&H Coffey 000241;  May 25, 2012 Tr. at 263:21-25 (Shadoff).

149.    Because the abscess was draining and the medical personnel prescribed a proper antibiotic that would respond to the bacterial infection, the medical personnel at GIMC appropriately treated Crutcher's thigh abscess.  See May 25, 2012 Tr. at 264:5-12 (Mitchell, Shadoff).

150.    A person in the medical field would, in the absence of a prolonged illness, fever, or signs that the patient's illness extends beyond the site of infection, normally treat an abscess with an oral antibiotic and then schedule a follow-up to ensure that the abscess was improving.  See May 25, 2012 Tr. at 264:13-17 (Mitchell, Shadoff).

151.    There would be no relationship between the medical effects of, or the treatment of, a patient's congestive heart failure and a thigh-abscess infection, unless the infection involves other parts of the body and puts a stress on the heart.  See May 25, 2012 Tr. at 264:18-22 (Shadoff).

152.    Unless a defibrillator has recently been implanted, the presence of a defibrillator on a patient's body would not impact the treatment of a thigh abscess.  Once an individual has had a defibrillator implanted in the individual's body for approximately one month, the body has coated the defibrillator in a way that significantly reduces the chance of infection at the implantation site.  See May 25, 2012 Tr. at 264:18-265:11 (Shadoff).

153.    Given that Crutcher did not have signs of illness that extended beyond his thigh abscess, such as a fever, a person in the medical profession would not likely have found it necessary to provide intravenously a higher dose of antibiotics to Crutcher as opposed to providing him

antibiotics orally.  See May 25, 2012 Tr. at 264:12-16 (Shadoff).

154.    Between December 12, 2006, and February 8, 2007, the day Crutcher died, the thigh

abscess infection had resolved itself.  See May 25, 2012 Tr. at 265:21-25 (Shadoff).

### 8. The Treatment of Crutcher's Medical Condition Before His Death in February 2007, and Crutcher's Death.

155.    On January 16, 2007, Crutcher had a cold that he thought was getting worse.  See

McKinley County Records at McKinley 000018.

156.    On January 18, 2007, Dr. Christopher Thomas, a doctor from a private clinic who

came to visit the MCDC several days a week to provide medical care for the inmates, saw Crutcher.

See Valle Depo. at 67:13-69:3.

157.    Dr. Thomas diagnosed sinusitis, noted congestive heart failure in Crutcher's history,

and asked for a referral to cardiology.  See McKinley County Records at McKinley 000018; May

25, 2012 Tr. at 266:11-14 (Mitchell, Shadoff).

158.    On January 18, 2007, Valle obtained a medical release that Crutcher signed, which

requested that the Reno-Sparks Indian Colony Health Clinic release to the GIMC Crutcher's

medication records.  Crutcher and Valle signed the release on January 18, 2007.  See McKinley

County Records at McKinley 000010.

159.    Valle sent the release by facsimile transmission to the Reno-Sparks Indian Colony

Health Clinic on January 18, 2007.  See McKinley County Records at H&H Coffey 000009.

160.    On January 18, 2007, the Reno-Sparks Indian Colony Health Clinic sent by facsimile

transmission a medication profile for Crutcher to the GIMC.  See Medical Records from Gallup

Detention at H&H Coffey 000239.

161.    Crutcher did not receive his heart medication while at the MCDC from October 6,

-34-

2006, until, at the earliest, January 27, 2007, if at all. <u>See</u> Medical Records from Gallup Detention at H&H Coffey at 000233.

162.    On January 26, 2007, Valle referred Crutcher to the GIMC urgent care clinic for an evaluation regarding his medications. <u>See</u> McKinley County Records at McKinley 000007.

163.    Medical personnel at the GIMC saw Crutcher on January 26, 2007. The medical records for that visit reflect, in the subjective portion of those records, that Crutcher stated that he was feeling well, had no shortness of breath, was not waking up from sleep with shortness of breath, had no chest pain, and was able to exercise. <u>See</u> May 25, 2012 Tr. at 314:15-25 (Mitchell, Shadoff); Medical Records from Gallup Detention at H&H Coffey at 000233.

164.    Andrew Crutcher was not significantly ill on January 26, 2007, when he was seen in the emergency room at the GIMC, because there were no findings of heart failure, he did not have a fever, and he had, if anything, a slightly higher than normal blood pressure. <u>See</u> May 25, 2012 Tr. at 274:12-21 (Shadoff); Medical Records from Gallup Detention at H&H Coffey 000233.

165.    At GIMC's physical examination of Crutcher on January 26, 2007, Crutcher had: "no ankle swelling; [was] feeling well; [had] no SOB; [had] no PND; [had] no CP; [was] able to exercise; [and was] occasionally working out." Medical Records from Gallup Detention at H&H Coffey 000233. These notations show that there was no swelling of the extremities, no shortness of breath -- indicating that the lungs were clear -- and there was no heart murmur or abnormal heart sounds. <u>See</u> May 25, 2012 Tr. at 268:19-22 (Shadoff).

166.    The absence of a heart murmur or abnormal heart sounds is significant, because in the past, when Crutcher had a decompensation -- a worsening of his heart failure -- routinely Dr. Challapalli noted both abnormal heart sounds and a heart murmur. <u>See</u> May 25, 2012 Tr. at 268:19-22 (Shadoff).

167.     On January 26, 2007, there was no swelling -- either in the abdomen, or in the legs, which indicates that Crutcher showed no signs of congestive heart failure on January 26, 2007.  <u>See</u> May 25, 2012 Tr. at 269:13-18 (Shadoff); Medical Records from Gallup Detention at H&H Coffey 000233.

168.     On January 26, 2007, Crutcher had no findings of heart failure, no fever, and only a slightly higher than normal blood pressure.  He was not significantly ill on that date.  <u>See</u> May 25, 2012 Tr. at 274:12-21 (Shadoff); Medical Records from Gallup Detention at H&H Coffey 000233.

169.     Crutcher had not been taking his heart medications between October 6 or 7, 2006, and the examination at the GIMC on January 26, 2007, yet his heart condition was compensated and he was doing well in comparison with the times when he had obvious congestive heart failure.  <u>See</u> May 25, 2012 Tr. at 269:19-270:2 (Shadoff).

170.     On January 26, 2007, Crutcher did not have any objective findings that would indicate signs and symptoms of congestive heart failure.  <u>See</u> May 25, 2012 Tr. at 268:9-16 (Shadoff).

171.     On January 26, 2007, Crutcher was prescribed medications for his congestive heart condition, referred for an appointment for January 29, 2007 at GIMC Internal Medicine, referred for an appointment to have an echocardiagram, and discharged at 3:42 p.m.  Medical Records from Gallup Detention at H&H Coffey 000233, 000237, 000238.

172.     Based on the January 26, 2007 physical findings, no reasonable physician would have considered that Crutcher had sepsis.  <u>See</u> May 25, 2012 Tr. at 304:20-305:1 (Shadoff).

173.     If a physician had considered that Crutcher had sepsis on January 26, 2007, the administration of IV antibiotics would not have been an appropriate treatment.  <u>See</u> May 25, 2012 Tr. at 305:2-8 (Shadoff).

174.     Ms. Valle began dispensing the heart medications to Crutcher on January 27, 2007. See McKinley County Records at H&H Coffey 000016; May 25, 2012 Tr. at 270:8-16 (Shadoff).

175.     Crutcher was seen for a follow-up appointment on January 29, 2007, in the GIMC Internal Medicine unit.  His vital signs were noted, and he was scheduled for an echocardiogram appointment on February 23, 2007.  Medical Records from Gallup Detention at H&H Coffey 000231, 000237.

176.     If Crutcher had an intravenous infection on either January 26 or 29, 2007, he more likely than not would have gone into heart failure, so his lung sounds would most likely not have been clear and his skin could have been mottled, because the circulatory support for his extremities would not be normal.  See May 24, 2012 Tr. at 55:14-56:6 (Challapalli).

177.     If Crutcher had signs and symptoms of endocarditis on January 29, 2007, he would have developed congestive heart failure, he would have developed signs of circulatory collapse -- which is low blood pressure -- he would have had fevers, chills, rigors, a sense of lack of energy, difficulty breathing and perhaps difficulty with mentation.  See May 24, 2012 Tr. at 70:14-25; 71:1-8 (Challapalli).

178.     There was nothing concerning about Crutcher's vital signs on January 29, 2007: he did not have a fever; his heart rate was at a reasonable range; his blood pressure was normal; he had excellent oxygen carry capacity; and he had an optimal blood pressure.  See May 25, 2012 Tr. at 270:18-271:11 (Shadoff).

179.     On February 8, 2007, at 1:00 p.m., a MCDC corrections officer who was conducting a cell check, saw Crutcher lying on his bunk, and he appeared ill.  See Plaintiff's Exhibit 7 at H&H Coffey 000351 ("BIA Internal Affairs Report").

180.     Crutcher was taken to the MCDC medical unit, where medical staff evaluated him

and determined that he needed to be taken to the hospital.  See BIA Internal Affairs Report at H&H Coffey 000351.

181.    Crutcher was transported to the GIMC Emergency Department by a MCDC employee.  See BIA Internal Affairs Report at H&H Coffey 000351-352.

182.    Crutcher was disoriented, with abnormal vital signs.  See Medical Records from Gallup Detention at H&H Coffey 000197-98.

183.    A fingerprint of the bacteria was taken and bacterial culture was grown from Crutcher's blood on February 8, 2007.  The Antibiotic Susceptibility Test Results showed that the Staph Aureus infection was sensitive to all of the antibiotics used in the test.  See Medical Records from Gallup Detention at H&H Coffey 000255; May 25, 2012 Tr. at 271:17-272:7(Shadoff).

184.    The Antibiotic Test Results showed that the Staph Aureus obtained from the culture on February 8, 2007, was not the same as the Staph Aureus bacterial infection which Crutcher had in December 2006, when he had an abscess on his thigh.  See May 25, 2012 Tr. at 272:8-14 (Shadoff).

185.    Crutcher had two chest x-rays taken on February 8, 2007, the first taken at 2:06 p.m. See Medical Records from Gallup Detention at H&H Coffey 000266.

186.    The chest x-ray obtained at 2:06 p.m. showed: "[h]eart is mildly enlarged without failure," with "[c]ardiomegaly no definite failure."  Medical Records from Gallup Detention at H&H Coffey 000266.

187.    Based on the radiology report, Crutcher's heart was mildly enlarged, which is consistent with his known cardiomyopathy; but, even at this point, when he was extraordinarily ill and dying, he had not developed congestive heart failure.  See May 25, 2012 Tr. at 273:3-16 (Shadoff).

-38-

188.    A second chest x-ray taken at 4:54 p.m., approximately one hour before Crutcher died, indicated: "[h]eart size appears mildly enlarged considering patient position but pulmonary vessels do not appear abnormally distended;" "[c]ardiomegaly without other findings to suggest decompensation of CHF."  Medical Records from Gallup Detention at H&H Coffey 000263-64. Accord May 25, 2012 Tr. at 275:6-9  (Shadoff).

189.    The second chest x-ray confirms that there was no evidence of congestive heart failure, meaning, there was no congestion in the lungs even when he was critically ill.  See May 25, 2012 Tr. at 273:18-274:1 (Shadoff).

190.    Crutcher's condition continued to deteriorate and a full code was called.  Despite considerable effort to resuscitate him, he was pronounced dead at 5:52 p.m., on February 8, 2007. See Medical Records from Gallup Detention at H&H Coffey 00198.

191.    It was only days before his death that Crutcher was critically ill with endocarditis and, on the day of his death, demonstrated the abnormalities of multiorgan failure from which he was not capable of improving.  See May 25, 2012 Tr. at 313:3-6 (Shadoff).

192.    Crutcher had a fulminant illness -- an acute illness, i.e., something that would be characterized by a time line of hours to days, resulting in his death.  See May 25, 2012 Tr. at 274:2-11 (Shadoff).

193.    If a patient has sepsis, with an infection that is widespread throughout the body, that patient would not survive for more than periods of days -- less than a week.  It would be extraordinarily rare to get into the category of weeks of survival with sepsis. See May 25, 2012 Tr. at 308:9-20 (Shadoff).

194.    The BIA did not treat Crutcher's body with respect for his American Indian burial traditions, because it did not make arrangements with Coffey or the Reno-Sparks Indian Colony to

ensure that Crutcher would be buried within three to four days, as the tribe believes is proper.  <u>See</u> May 24, 2012 Tr. at 84:6-16 (Sanchez, Richards).

195.    Max Dickens, a BIA investigator, conducted an investigation into the circumstances surrounding Crutcher's death, as is the usual course of conduct for an in-custody death.  <u>See</u> May 25, 2012 Tr. at 129:5-9 (Dickens).

196.    It was not the purpose of the investigation to determine what medical mistakes, if any, were made in connection with Crutcher's treatment.  <u>See</u> May 24, 2012 Tr. at 129:5-9 (Dickens).

197.    The purpose of Dickens' investigation conducted by Max Dickens was to conduct an administrative review of the circumstances surrounding Crutcher's in-custody death, including the possibility of potential criminal violations.  <u>See</u> May 24, 2012 Tr. at 131:9-13 (Dickens).

198.    No part of the review was intended to look at the BIA's transportation of Crutcher from Washoe County, to McKinley County.  <u>See</u> May 24, 2012 Tr. at 131:14-17 (Dickens).

199.    The results of the BIA's investigation were that McKinley County failed to adequately respond to Crutcher's emergency medical situation by transporting him to the hospital in a prison vehicle rather than ambulance when he was extremely ill, in violation of its own policy. <u>See</u> May 25, 2012 Tr. at 133:17-134:3 (Dickens).[26]

---

[26]Coffey puts forth the following in Coffey's Proposed FOF and COL: "Max Dickens, the investigator who allegedly investigated the in custody death of Crutcher, and the investigation itself, were typical of the inability of BIA to discern problems within its detention system."  Coffey Proposed FOF and COL at 10, 11 (setting forth this fact).  Coffey does not cite to any portion of the record to support this fact.  The Court could not find support for this statement in Dickens' testimony or in any other portion of the record.  It may be that Coffey believes this fact is a logical implication based on Dickens' limited review of the incident or on the fact that Dickens did not investigate the BIA's transport of Crutcher, or that it is a logical implication in light of the <u>Neither Safe Nor Secure</u> report.  In its findings of facts, however, the Court is limited to finding facts established at the trial and reasonable inferences from the facts.  The Tenth Circuit Patter Jury

200.    Because the MCDC was not a BIA-operated facility, any disciplinary action which might have resulted from the investigation would have been related to the procurement contract by which McKinley County incarcerated inmates.  See May 24, 2012 Tr. at 135:11-17 (Dickens).[27]

---

Instructions § 1.07 provides:

> While you must consider only the evidence in the case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in light of common experience.  An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

> By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

Tenth Circuit Pattern Jury Instructions § 1.07, at 15 (2011)(Evidence -- Direct and Circumstantial -- Inferences).  See, e.g., United States v. Rahseparian, 231 F.3d 1267, 1271-72 (10th Cir. 2000)("[W]e accept the jury's resolution of conflicting evidence . . . . [a]s long as the possible inferences are reasonable . . . .  We will not uphold a conviction, however, that was obtained by nothing more than piling inference upon inference, or where the evidence raises no more than a mere suspicion of guilt.")(internal quotations and citations omitted); United States v. Ortiz-Ortiz, 57 F.3d 892, 895 (10th Cir. 1995)("The evidence to be considered includes all direct and circumstantial evidence, together with all inferences reasonably to be drawn from that evidence. Indeed, a criminal conviction may be sustained on wholly circumstantial evidence.").  The Court cannot find as fact the broad implications that Coffey desires about a broad range of BIA investigations or even about Dickens' investigation from the facts established at trial, whether the implication is logical or true.  The Court, therefore, does not find that this fact proposed by Coffey was established at trial.

[27]Coffey proposes two findings of fact relating to Dickens' investigation and to the MCDC generally.  First, Coffey proposes that "[w]hatever problems existed at MCDC would not have been resolved or identified as a result of this investigation."  See Coffey Proposed FOF and COL at 11 (setting forth this fact).  Relying on the Neither Safe Nor Secure report, Coffey also puts forth: "Whether the BIA is using its own facilities or contracting with other facilities, its systematic failure to keep inmates safe and secure is pervasive and historic."  Coffey Proposed FOF and COL at 11 (setting forth this fact).  In regards to the first finding of fact Coffey set forth, Dickens makes clear in his testimony that the scope of his investigation did not cover the BIA's transport of Crutcher.  See May 24, 2012 Tr. at 131:14-17 (Dickens). Dickens does not testify that the investigation could not identify or resolve problems at MCDC.  It may be true, in light of Dickens performing the investigation on behalf of the BIA, a distinct and separate entity from the MCDC, that the investigation would not have resolved in any problems at the MCDC, but there is not support in the record to establish this assertion as fact.  In regards to the second fact, the Neither Safe Nor Secure report supports that the BIA had a history of failing to keep safe and secure its inmates in the

9.      **Crutcher's Autopsy.**

201.    An autopsy was performed on Crutcher at the Office of the Medical Investigator of New Mexico on February 9, 2007. See Coffey's Exhibit 14 at H&H Coffey 000309-16 (Autopsy Report, Office of the Medical Investigator)("Autopsy Report").

202.    At autopsy, there was no evidence in the external examination of Andrew Crutcher that the left thigh abscess that he had in December 2006 was present, active, or apparent. See May 25, 2012 Tr. at 281:11-14, 283:12-15, 284:3-5 (Mitchell, Shadoff); Autopsy Report at H&H Coffey 000310.

203.    The tricuspid valve of the heart had eroding vegetations of all leaflets. See May 25, 2012 Tr. at 277:1-2 (Shadoff); Autopsy Report at H&H Coffey 000311.

204.    The vegetations on the tricuspid valve confirm that Crutcher had endocarditis, an infection on the heart valve. See May 25, 2012 Tr. at 277:16-17 (Shadoff).

205.    The remaining heart valves were normally formed, thin, pliable, and free of vegetations and degenerative changes. See May 25, 2012 Tr. at 277:24-278:1 (Shadoff). The fact that the remaining heart valves had no abnormalities or vegetations confirms that Crutcher was not at any increased risk for any infection of the heart valves, because they were normal. See May 25, 2012 Tr. at 278:1-6 (Shadoff).

206.    Based on Andrew Crutcher's medical records from October 8, 2006, to February 8, 2007, there is no evidence, either by signs or symptoms, to indicate that Crutcher had

---

facilities that the report studied. The report did not, however, study the MCDC, nor did the report study facilities that were contracted under procurement contracts similar to the contract between the MCDC and the BIA in this case. The fact as put forth by Coffey lacks support in the record to the extent that it attempts to stretch the scope and implications of the report beyond the detention facilities studied for the report. The Court concludes therefore that the record does not support this proposed factual finding.

decompensated congestive heart failure.  See May 25, 2012 Tr. at 285:13-20, 318:8-13 (Shadoff).

207.    Crutcher did not have a structural valvular heart disease that would put him at risk for the development of endocarditis.  See May 25, 2012 Tr. at 285:2-12 (Shadoff).

208.    The defibrillator lead was in place within the right chamber, and there was no vegetation, i.e., infection, on the defibrillator.  See May 25, 2012 Tr. at 278:7-11 (Shadoff).

209.    Once a patient with a defibrillator is past the first month after implant, the chances of getting an infection on a defibrillator lead -- the wire -- is extraordinarily small, "perhaps one chance in 5,000 patient years."  May 25, 2012 Tr. at 278:14-18 (Shadoff).

210.    The bacterial culture of the blood that was obtained in the GIMC emergency room, which was Staph Aureus, was also obtainable at the time of autopsy from the blood, cerebrospinal fluid, both lungs, and the spleen.  Autopsy Report at H&H Coffey 000313.  See May 25, 2012 Tr. at 279:9-18 (Shadoff).

211.    The significance of the microbiology finding confirms that this was a fulminant, rapid, overwhelming infection that spread throughout Andrew Crutcher's entire body.  See May 25, 2012 Tr. at 279:18-20, 280:23-281:1 (Shadoff).

212.    Crutcher died of sepsis because of infective endocarditis, hypertensive cardiovascular disease was a significant contributing condition, and Crutcher's blood, cerebrospinal fluid, lungs, and spleen all grew coagulase positive Staphylococcus which, "commonly leads to infection in intravenous drug abusers."  Autopsy Report at H&H Coffey 000314.  See May 25, 2012 Tr. at 281:2-3 (Shadoff).

213.    Crutcher's defibrillator was not involved in his endocarditis or the cause of his death.  See May 25, 2012 Tr. at 284:11-15 (Shadoff).

214.    Cardiomyopathy or congestive heart failure, in the absence of a structural

-43-

abnormality of the heart valve, is not a risk factor for endocarditis. <u>See</u> May 25, 2012 Tr. at 284:22-25, 285:1 (Shadoff).

215.    Crutcher's congestive heart failure did not make him more likely to encounter and be infected with a bacteria that results in infective endocarditis. <u>See</u> May 25, 2012 Tr. at 284:16-285:1 (Shadoff).

216.    That the BIA transport officers did not obtain medical information about Crutcher from Washoe County Detention Facility employees and impart that medical information to the MCDC employees when the BIA officers handed off the inmates in Peach Spring, Arizona, did not play any role in Andrew Crutcher's death, because Crutcher did not have an issue with his defibrillator -- such as a discharge -- and he never developed clinical, overt, obvious congestive heart failure between October 7, 2006, and February 8, 2007. <u>See</u> May 25, 2012 Tr. at 287:5-10 (Shadoff).

217.    An individual, such as Crutcher, who has congestive heart failure but no signs or symptoms of either decompensated congestive heart failure or rhythm abnormality that results in a discharge of the defibrillator, can easily be treated or managed in a clinic setting such as found at the MCDC. <u>See</u> May 25, 2012 Tr. at 286:12-24 (Shadoff).

218.    That the MCDC employees did not give Crutcher his heart medications between October 8, 2006 and January 26, 2007, had nothing to do with his death on February 8, 2007, because he did not die from congestive heart failure. <u>See</u> May 25, 2012 Tr. at 287:11-17 (Shadoff).

219.    Crutcher died from a fulminant infection involving his tricuspid valve and multi-organ failure. His lungs, his liver, and his kidneys all failed in a very rapid and unfortunate fashion. <u>See</u> May 25, 2012 Tr. at 287:19-22 (Shadoff).

   **10.    <u>Coffey's Lawsuit Following Crutcher's Death</u>.**

220.    The BIA received an administrative tort claim -- known as a Standard Form 95 --

from the decedent's mother, Diana Coffey, on June 11, 2007.  See Coffey Proposed FOF and COL

at 4 (setting forth this fact).

221.    Coffey's Standard Form 95s, submitted to the Indian Health Services and the

Department of Health and Human Services, describe the basis for her claim as follows:

> While incarcerated in a Bureau of Indian Affairs contracted facility in Gallup,
> New Mexico, Andrew Crutcher, son of Diana Coffey, was denied necessary
> medication, his medical condition was ignored and is [sic] life was wrongfully
> terminated.  Andrew Crutcher was convicted of a misdemeanor crime on the Reno-
> Sparks Indian Colony by the RSIC Tribal Court.  He was ordered by the RISC Tribal
> Court to be transferred to the BIA contracted facility where he died.

Plaintiff's Exhibit 9 at H&H Coffey 001412, 00177, 00179 ("Administrative Claims Filings").

222.    The administrative claim was sent to the Department of Health and Human Services,

the Department of the Interior, the BIA at the Western Nevada Agency, the Regional Offices of the

BIA at both Phoenix, Arizona (the office with jurisdiction over the Western Nevada agency) and

Albuquerque (the office with jurisdiction over the State where the incident occurred).  See

Administrative Claims Filings at H&H Coffey 001412, 00177-0180.

223.    The administrative claim complained of "[w]rongful deaht of a 28 year old son and

father by neglect and denial of medication while incarcerated at a BIA contracted facility, the

McKinley County Adult Detention Center."  Administrative Claims Filings at H&H Coffey 00177.

224.    Coffey's administrative claim was necessarily broad on account of the United States'

and McKinley County's refusal to release any accounts or documentation related to Crutcher's

death.   See Coffey Proposed FOF and COL at 5.

225.    Coffey's assertions of (i) negligent screening; (ii) negligent transfer; and

(iii) negligent hand off, against the United States were not specifically asserted in the Standard

Forms 95.  See Administrative Claims Filings at H&H Coffey 00177.

226.    Coffey waited six months for a response from the government entity.  When she did not receive such a response, she filed a wrongful death claim in the United States District Court for the District of New Mexico on June 17, 2008.  See Civil Complaint for Damages for Wrongful Death and Civil Rights Violations, filed June 18, 2008 (Doc. 1)("Complaint").

## PROCEDURAL BACKGROUND

On January 12, 2009, Coffey filed an action against McKinley County, an Unknown Staff Nurse, and Unknown Detention Guards 1 through 10.  See Coffey v. McKinley County, No. 09-0028, Civil Complaint at 1 (D.N.M.)(Doc. 1).  On October 21, 2009, the Honorable Martha Vazquez, then-Chief United States District Judge for the United States District for the District of New Mexico,[28] consolidated the civil case docket number 08-0588, Coffey's case against the United States, with the civil case docket number 09-0028, Coffey's case against McKinley County, for discovery purposes.  See Order at 1-2, filed October 21, 2009 (Doc. 33).  Civil case No. 09-0028 against McKinley County was assigned to United States District Judge James Browning.  See Order at 3.  On November 14, 2011, the Court allowed Coffey to amend her pleadings, but did not permit her to assert a medical malpractice claim against the United States.  See Memorandum Opinion and Order at 2, filed November 14, 2011 (Doc. 110)("Nov. 14, 2011 MOO").  The Court permitted her to assert the following theories of wrongful death/negligence against the United States: (i) negligent screening; (ii) negligent transfer; and (iii) negligent hand-off.  See Nov. 14, 2011 MOO at 1-2.  The Court precluded Coffey from asserting any other theories, including a medical negligence theory, in its Nov. 14, 2011 MOO.  See Nov. 14, 2011 MOO at 1-2.

---

[28]The Honorable Bruce D. Black, United States District Judge, became Chief Judge of the District of New Mexico in 2010.

On November 28, 2011, the Court granted summary judgment in favor of the State defendants, including McKinley County, an Unknown Staff Nurse, and Unknown Detention Guards 1 through 10, leaving the United States of America as the only Defendant.  See Memorandum and Opinion Order at 1-2 (Doc. 113).

On January 23, 2012, Coffey filed her most recent pleading, her Amended and Consolidated Complaint.  See Doc. 116.  On February 1, 2012, Coffey filed an errata to her pleadings, but did not specify the reason for the errata.  See Doc. 118 ("Amended Complaint").  The United States filed an answer to this Errata Complaint.  See Defendant United States of America's Answer to Plaintiffs' Errata -- Amended and Consolidated Complaint, Doc. No. 118, filed February 10, 2012 (Doc. 119).

The basic premise of Coffey's negligent screening theory is that: (i) the Washoe County Detention Facility kept complete medical records for Crutcher; (ii) the BIA had no policy or procedure to take that information from the Washoe County Jail; (iii) there were not adequate procedures in place to screen inmates' medical conditions to ensure that transferring them would be appropriate; and (iv) the BIA did not transmit any information regarding Crutcher's medical condition to the MCDC officials when it transferred him to the MCDC's custody.  See Errata Complaint ¶¶ 20, 23, at 5, 6.  The basic premise of Coffey's negligent transfer theory is that: (i) the BIA transferred Crutcher "nearly 900 miles from his family" where he could not easily reach his family; (ii) the BIA transferred him to a facility, the MCDC, that "did not have adequate examinations or preventative medical care as adopted by other similar Detention Facilities in the United States"; and (iii) the BIA did not have procedures in place to transfer medical property, such as medications, as part of transferring inmates.  Errata Complaint ¶¶ 27-28, 31-33, at 7.  Coffey's negligent-hand-off theory relies on many of the same facts as the other two theories she has asserted, including that "[t]he BIA did not determine that the" MCDC "was adequate to house an inmate with

-47-

Andrew Crutcher's medical problems," specifically his congestive heart failure.  Errata Complaint ¶¶ 33, 35, at 7-8.  The Court distilled these three theories and their premises down to four alleged negligent acts or omissions: (i) the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Detention Facility; (ii) the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility; (iii) the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition; and (iv) given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition.  See Memorandum and Opinion Order at 43, filed May 2, 2012 (Doc. 141)("May 2, 2012 MOO").

The Court held a two-day bench trial on May 24-25, 2012.  After hearing witness testimony and considering all of the evidence presented in this matter, the Court makes the following Conclusions of Law:

## CONCLUSIONS OF LAW

1.      "The United States cannot be sued without its consent."  Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).

2.      "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction."  Garcia v. United States, 709 F. Supp. 2d at 1137-38.

3.      It is Congress' specific language in such waivers that strictly defines the subject matter of which courts may properly exercise jurisdiction.  See Fostvedt v. United States, 978 F.2d 1201, 1203 (10th Cir. 1992)("A waiver of sovereign immunity cannot be implied, but must be

explicitly expressed.")(citing <u>United States v. King</u>, 395 U.S. 1, 4 (1969)).

      4.      "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of [the plaintiff's] claims." <u>Garcia v. United States</u>, 709 F. Supp. 2d at 1138. <u>Accord</u> <u>Bork v. Carroll</u>, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)[29]("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); <u>Summa v. United States</u>, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in a Federal Tort Case Act case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing <u>Miller v. United States</u>, 710 F.2d 656, 662 (10th Cir. 1983)).

      5.      A claim against the United States based upon a trust relationship between the United States and an American Indian tribe is not a waiver of the federal government's sovereign immunity; rather, the plaintiff must assert and independent waiver of immunity to pursue a claim of violation of the trust relationship. <u>See</u> <u>Mitchell v. United States</u>, 463 U.S. 206 (1983)(holding that the plaintiffs, including the Quinault Tribe, could pursue claims for waste and mismanagement of timber lands, held in trust by the United States under the General Allotment Act of 1887, 25 U.S.C. § 331 - 58, because the plaintiffs brought suit under the Indian Tucker Act, 28 U.S.C. §§ 1505, an act in

---

      [29]<u>Garcia v. United States</u> is an unpublished order and judgment, but the Court can rely on it to the extent its reasoned analysis is persuasive in the present case. <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

      In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).

which Congress intended to waive sovereign immunity); <u>Naganab v. Hitchcock</u>, 202 U.S. 473 (holding that sovereign immunity barred equitable relief for breach of trust); <u>Nero v. Cherokee Nation of Oklahoma</u>, 892 F.2d 1457, 1464 (10th Cir. 1989)(holding that the plaintiffs' claim alleging breach of the trust relationship between the United States and members of the Cherokee Nation required an independent source of the United States' waiver of sovereign immunity).[30]

6.     The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 -80, ("FTCA") "provides a 'carefully limited waiver' of the federal government's sovereign immunity for certain claims alleging harm caused by United States employees or agents." <u>Carroll v. United States</u>, 661 F.3d 87, 93 (1st Cir. 2011)(quoting <u>Bolduc v. United States</u>, 402 F.3d 50, 62 (1st Cir. 2005)).

7.     In enacting the FTCA, Congress defined the terms and conditions under which the United States may be sued in tort.  28 U.S.C. § 1346(b) provides, in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

8.     "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." <u>Garcia v. United States</u>, No. 08-0295, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); <u>Richards v. United States</u>,

---

[30]Although neither party proposes this conclusion of law, in light of Coffey putting forth as a factual finding that the BIA's incarceration of Crutcher was pursuant to the United States' trust relationship with the American Indian tribes, rather than to any contract, <u>see</u> the Court's Finding of Fact 29, the Court thought Coffey might be asserting that the United States was liable for violating the trust.  Whether that is Coffey's intention does not affect the Court's reasoning or conclusions in this case, because, as this conclusion of law states, the United States has not waived its sovereign immunity for assertions of a breach of that trust relationship.

369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir.1970)).

9.     The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law.  See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").

10.     "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred." Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).

11.     "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief." Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

12.     The United States' sovereign immunity is waived for the negligent acts or omissions of government employees acting in the scope of their employment only.  See 28 U.S.C. § 1346(b); Curry v. United States, 97 F.3d 412, 414 (10th Cir. 1996).

13.     "Employees" of the government include officers and employees of federal agencies; "federal agencies" do not include contractors.  28 U.S.C. § 2671.  "The FTCA does not authorize suits based on the acts of independent contractors or their employees." Curry v. United States, 97 F.3d at 414 (citing United States v. Orleans, 425 U.S. 807, 814 (1973)).

14.     The United States is not liable under the FTCA's independent contractor exception

-51-

by virtue of entering contracts and demanding compliance with federal standards, "unless the United States actually supervises the 'day-to-day operations' of the endeavor." <u>Williams v. United States</u>, 50 F.3d 299, 306 (4th Cir. 1995)(quoting <u>Logue v. United States</u>, 412 U.S. 521, 529 (1973)).

15.    There are specific exceptions in the FTCA to the waiver of sovereign immunity. <u>See</u> 28 U.S.C. § 2680.  If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief.  <u>See</u> <u>Williams v. United States</u> 50 F.3d at 304-05.

16.    The United States Court of Appeals for the Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." <u>United States v. Agronics Inc.</u>, 164 F.3d 1343, 1345 (10th Cir. 1999).

17.    One of the exceptions to the FTCA provided in 18 U.S.C. § 2680 is the discretionary-function exception, which excepts liability under the FTCA for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

12 U.S.C. § 2680(a).

18.    The discretionary-function exception immunizes conduct of government employees that arises from legislative and administrative decisions grounded in social, economic, and political policy, "protect[ing] the Government from liability that would seriously handicap efficient government operations." <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 814 (1984)(quoting <u>United States v. Muniz</u>, 374 U.S. 150, 163 (1963)).

19.     For the discretionary-function exception to apply, two requirements must be met: (i) the complained-of act or decision is discretionary in the sense that it "involv[es] an element of judgment or choice;" and (ii) the governmental action or decision must be "based on considerations of public policy." United States v. Gaubert, 499 U.S. 315, 322-23 (1991)(quoting Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)).

20.     With respect to the policy requirement, applicability of the exception depends not on the intent of the government actor, "but on the nature of the actions taken and on whether they are susceptible to policy analysis." United States v. Gaubert, 499 U.S. at 325.

21.     Nor must the actor belong to the policymaking or planning ranks of government in order for the exception to apply; "[i]t is the nature of the conduct, rather than status of the actor, that governs whether the discretionary function applies in a given case." United States v. Gaubert, 499 U.S. at 325 (quoting Varig Airlines, 467 U.S. at 813).

22.     In Indian Towing Co. v. United States, 350 U.S. 61 (1955), the failure of Coast Guard maintenance personnel to ensure that a lighthouse remained illuminated, which resulted in a tug and barge running aground, could not be described as an exercise in judgment entitled to protection under the discretionary function exception, because such workers were not charged with deciding what level of maintenance inspections were necessary. See 350 U.S. at 64, 69.

23.     The federal government's decision to contract out a particular activity or function, or to hire independent contractors, is a discretionary function and excepted from the waiver of sovereign immunity under the FTCA. See Carroll v. United States, 661 F.3d at 104 ("The judgment to hire independent contractors presumably was based on an assessment of cost and efficiency concerns relating to the use of government-employee time."); McMichael v. United States, 751 F.2d 303, 307 (8th Cir. 1985)("The government's decision to award [a] contract . . . is an immune

discretionary function . . . . Deciding to award a government defense contract to a particular manufacturer involves weighing various facts and policies and thus is discretionary in nature.").

## I.    THE COURT HAS JURISDICTION TO HEAR COFFEY'S LAWSUIT, BECAUSE THE NOTICE PROVIDED IN HER ADMINISTRATIVE CLAIM WAS SUFFICIENT NOTICE THAT THE BIA SHOULD INVESTIGATE THE POSSIBILITY OF THE NEGLIGENCE WHICH COFFEY ALLEGES.

24.    "Challenges to jurisdiction can . . . be raised at any time prior to final judgment." Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004)(citing Capron v. Van Noorden, 6 U.S. (2 Cranch) 126 (1804)).

25.    There are certain procedural requirements in suing the United States under the FTCA to which a plaintiff must strictly adhere before a district court can exercise jurisdiction.  "The jurisdictional statute, 28 U.S.C. § 2675(a), 'requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim.'"  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005)(quoting Bradley v. United States ex. rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)).

26.    The Tenth Circuit has held that 28 U.S.C. § 2675(a)'s first requirement, the notice requirement, is "an eminently pragmatic one," Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852, meaning that "a claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable,'" Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884 (quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).

27.    Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s

notice requirement is a question of law.  Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884.

28.     In Estate of Trentadue ex rel. Aguilar v. United States, the government contended that the plaintiffs' administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval."  397 F.3d at 852.   The Tenth Circuit disagreed, holding that "plaintiffs' administrative claim provided notice that [the Department of Justice] should investigate the prison officials' conduct." 397 F.3d at 853.   The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotion distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

29.     The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Techs., Inc. v. United States, 221 F.3d 34 (1st Cir. 2000), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest, arose out of two separate incidences.  221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."  221 F.3d at 40.  The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in

substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40 (emphasis omitted).

30.     In Staggs v. United States ex rel. Dep't of Health and Human Servs., the Tenth Circuit held that the plaintiff's administrative claim, accusing the hospital of  "a substantial departure from the standard of care and . . . negligent management of her pregnancy and labor," was not sufficient to put the agency on notice that it should have investigated a claim based on lack of informed consent.   425 F.3d at 884.   The Tenth Circuit stated that "[n]othing in Staggs' administrative claims suggests that Staggs consented to a course of treatment or remained on such a course without being informed of her options and risks."  425 F.3d at 884.  The Tenth Circuit reasoned that, "given the length and factual specificity of Staggs' description of [the administrative] claim," because the claim was "without mention of consent or a suitable synonym, [the government agency] could have reasonably concluded that a claim of lack of informed consent was not intended and that an investigation into lack of informed consent was unnecessary."  425 F.3d at 885.

31.     Although the United States alleged for the first time in the pre-trial order on May 9, 2012, that the Court does not have subject matter over this dispute because Coffey failed to exhaust her administrative remedies, such delay does not preclude the United States from raising the issue. See Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. at 571("Challenges to jurisdiction can . . . be raised at any time prior to final judgment.").

32.     A blank Standard Form 95 form is two pages.  Coffey's Standard Form 95 claim, as completed and submitted to the government agencies, was only two paragraphs, or ninety words total.  See Administrative Claim Filings at H&H Coffey 00177.

33.     On May 30, 2007, Coffey filed a Standard Form 95 "Claim for Damages, Injury, or Death," which Coffey submitted to the Indian Health Services and the Department of Health and

Human Services, describing the basis for her claim as follows:

> While incarcerated in a Bureau of Indian Affairs contracted facility in Gallup, New Mexico, Andrew Crutcher, son of Diana Coffey, was denied necessary medication, his medical condition was ignored and is [sic] life was wrongfully terminated.  Andrew Crutcher was convicted of a misdemeanor crime on the Reno-Sparks Indian Colony by the RSIC Tribal Court.  He was ordered by the RISC Tribal Court to be transferred to the BIA contracted facility where he died.

> Wrongful death of a 28-yr old son and father by neglect and denial of medication while incarcerated.

Administrative Claim Filings at H&H Coffey 001412, 00177, 00179.

34.     On February 1, 2012, Coffey filed her Amended Complaint, alleging that:

> The BIA failed to properly screen Andrew Crutcher when it took custody of him and when he entered the custody of the McKinley County facility personnel in Peach Springs, Arizona.

> The BIA transported and handed Andrew Crutcher to McKinley County Adult Detention Facility where the facility was inadequate . . . .

> The direct result of the failure to inform the medical treatment facility, the failure to transport medications or prescriptions, the failure to contact Andrew Crutcher's doctor or local Indian Health Services, . . . the failure to properly screen Andrew Crutcher for medical condition resulted in the loss of his life.

Amended Complaint ¶¶ 57, 59, 66, at 12, 14.

35.     Although the First Circuit in Dynamic Image Techs., Inc. v. United States does not describe with specificity the length of the administrative claim at issue in the case, Coffey's administrative claim is not prolix and is thus distinguishable from the administrative claim in that case.  See Dynamic Image Techs., Inc. v. United States, 221 F.3d at 40 (describing the plaintiffs' administrative claim as "prolix").  Similarly, although the Tenth Circuit does not describe with specificity the length of the complaint in Staggs v. United States ex rel. Dep't of Health and Human Servs., the Tenth Circuit reasons that the failure to mention "consent" was notable, based upon "the length and factual specificity of Staggs' description of her claim."  425 F.3d at 885.  In contrast,

where the Standard Form 95 asks Coffey to describe the basis of her claim, Coffey's response is not lengthy or specific, as it is only two paragraphs, or ninety words, total. While the lack of length or specificity is not reason to find Coffey's administrative claim sufficient, it distinguishes Coffey's administrative claim in this case from both Dynamic Image Techs., Inc. v. United States and Staggs v. United States ex rel. Dep't of Health and Human Servs.. Moreover, the lengthy and factually specific administrative claim found insufficient in Staggs v. United States ex rel. Dep't of Health and Human Servs. failed to mention "consent," which was part of the negligence theory in that federal case, and the prolix claim in Dynamic Image Techs., Inc. v. United States did not mention the incident underlying the allegations in the federal case. Coffey's administrative claim is distinguishable, because Coffey's Standard Form 95, while short and plain, gives as the basis of her claim that, Crutcher was being denied necessary medical attention, that his medical condition was ignored, that this neglect happened while he was incarcerated, and also states that he was transferred.

36.     Coffey's administrative claim is analogous to the administrative claim in Estate of Trentadue ex rel. Aguilar v. United States. As the Tenth Circuit recognized that the administrative claim in Estate of Trentadue ex rel. Aguilar v. United States did not articulate the specific allegations for intentional infliction of emotional distress, so here Coffey's administrative claim does not articulate the particular theories of negligence she is seeking in federal court. Nonetheless, Coffey's facts as alleged in the administrative claim, surrounding the claim that his medical condition was ignored, that he was denied medication, and that he was transferred by the BIA, as in Estate of Trentadue ex rel. Aguilar v. United States, gave the BIA notice of the facts and circumstances surrounding Crutcher's medical needs and subsequent death to provide the BIA notice that it should have investigated the underlying conduct of Crutcher's transfer, and his medical records and medications. See Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.

-58-

37.     In regards to Coffey's first and fourth alleged wrongs -- her negligent screening theory -- that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Detention Facility, and that the MCDC was not an appropriate detention facility for Crutcher in light of his medical condition, Coffey's administrative claim states that Crutcher's medical condition was ignored, that Crutcher was convicted of a crime on the Reno-Sparks Indian Colony, and he was transferred to the BIA contracted facility where he died.  See Administrative Claim Filings at H&H Coffey 00142, 00177, 00179 ("Crutcher was convicted of a misdemeanor crime on the Reno-Sparks Indian Colony by the RSIC Tribal Court. He was ordered by the RISC Tribal Court to be transferred to the BIA contracted facility where he died.").  The administrative claim also alleges that Crutcher died by neglect and denial of medication while incarcerated.  See Administrative Claim Filings at H&H Coffey 00142, 00177, 00179 ("Wrongful death of a 28-yr old son and father by neglect and denial of medication while incarcerated"). From these statements, the BIA was put on notice that Crutcher's death was caused by neglect or ignorance of Crutcher's medical needs and medication.  An investigation into these circumstances, especially where Coffey includes allegations of Crutcher's transfer, is sufficient notice to the BIA that they should investigate what his medical needs and medications were, which, as their contract with the MCDC provides, would logically be determined by a screening at some point during his incarceration.  Whether the screening was the duty or obligation of BIA or the MCDC may prove relevant at trial, but such information would likely be found only through the BIA's investigation into Crutcher's medical needs and screenings.  The Court, therefore, concludes that Coffey's administrative claim provides sufficient notice of the circumstances of Crutcher's death and medical needs to place the BIA on notice that it should investigate whether Crutcher received medical screenings during his incarceration.

38.     In regards to Coffey's third alleged wrong -- her negligent transfer theory -- that the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility in light of his condition, Coffey's administrative claim states that, Crutcher was ordered by the Reno-Sparks Indian Colony Tribal Court to be transferred to the BIA contracted facility, that this facility was in Gallup, and that he died while incarcerated there.  Additionally, Coffey states that Crutcher was convicted of a crime on the Reno-Sparks Indian Colony and that he was transferred to the BIA contracted facility where he died.  Coffey's allegations that the Reno-Sparks Indian Colony Tribal Court, located over 900 miles from Gallup, ordered Crutcher's transfer to a BIA-contracted facility in Gallup, combined with Coffey's allegations that the MCDC's failure to provide Crutcher with medical care and his medications lead to his wrongful death, see Administrative Claim Filings at H&H Coffey 00142, 00177, 00179 ("Andrew Crutcher was convicted of a misdemeanor crime on the Reno-Sparks Indian Colony by the RSIC Tribal Court.  He was ordered by the RISC Tribal Court to be transferred to the BIA contracted facility [in Gallup, New Mexico] where he died . . . . by neglect and denial of medication while incarcerated"), put the BIA on notice that they needed to investigate whether this was a proper facility for Crutcher, in light of his history of congestive heart failure.  Because the BIA contracted with the MCDC to provide this medical care to BIA inmates specifically, an investigation into claims of failed medical care and neglect would likely implicate whether the MCDC was able to provide adequate medical care, and if so, whether it did so.  The results of such an investigation would likely provide evidence whether the MCDC had adequate examinations or preventive medical care facilities, whether the BIA adequately investigated the MCDC before signing the contract to ensure that it had the proper facilities, and also whether the BIA knew, when it transferred Crutcher to the MCDC, that the BIA conducted these examinations or had proper facilities to do so, and could therefore provide Crutcher with the care

-60-

needed.  Thus, the Court concludes that Coffey's administrative claim provided sufficient facts and circumstance to put the BIA on notice that its investigation into Crutcher's death should include investigating the facts and circumstances underlying Coffey's negligent transfer theory.

39.     In regards to Coffey's second alleged wrong -- her negligent hand-off theory -- that the BIA did not have procedures in place to facilitate transferring an inmate's medical information and property to a new facility, Coffey's administrative claim states that the Reno-Sparks Indian Colony Tribal Court ordered Crutcher to be transferred to the BIA contracted facility in Gallup, that this transfer was to a facility which was a BIA-contractor operation, and was not a BIA-run facility, and that he died while incarcerated there because of neglect of his medical needs and denial of his necessary medications.  Part of that investigation, it seems, would necessarily include examining whether the BIA has in place procedures and policies for the transfer of needed medications and medical information when they transfer prisoners between detention facilities, especially when transferring prisoners to BIA-contracted facilities which are a considerable distance away from each other.  Thus, the Court finds that Coffey's administrative claim provides sufficient facts surrounding Crutcher's death to put the BIA on notice to investigate the circumstances underlying her negligent hand-off theory.

40.     Although Coffey did not articulate in detail the particular negligence theories upon which she now seeks to hold the United States liable, because Coffey's administrative claim gives facts and circumstances related to Crutcher's medical needs and medications, and the BIA's transfer of Crutcher, the Court concludes that Coffey's administrative claim provided sufficient underlying facts and circumstances to put the BIA on notice of her subsequent allegations in this federal case. Coffey thus complied with the FTCA's procedural requirements pursuant to 28 U.S.C. § 2675(a), and the Court, therefore, can properly exercise its subject-matter jurisdiction in deciding this case.

See Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884 (noting that,

to meet 28 U.S.C. § 2675(a)'s notice requirement, "a claim should give notice of the underlying

facts and circumstances rather than the exact grounds upon which plaintiff seeks to hold the

government liable").

**II.    THE COURT LACKS JURISDICTION OVER ANY OF COFFEY'S CLAIMS CONCERNING THE CARE AND TREATMENT GIVEN TO CRUTCHER WHILE HE WAS INCARCERATED AT THE MCDC, AND COFFEY'S SECOND ALLEGED WRONG, THAT THE BIA DID NOT ADEQUATELY SCREEN WHETHER MCDC WAS AN APPROPRIATE FACILITY, BECAUSE THE BIA'S DECISION TO CONTRACT WITH MCKINLEY COUNTY IS PROTECTED UNDER THE FTCA'S DISCRETIONARY FUNCTION EXCEPTION, AND BECAUSE THE MCDC IS AN INDEPENDENT CONTRACTOR.**

41.    There are specific exceptions in the FTCA to the waiver of sovereign immunity.  See

28 U.S.C. § 2680.  If the claim does not fall within the FTCA's express provisions, or if it falls

within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny

relief.  See Williams v. United States 50 F.3d at 304-05 ("[W]hile the FTCA is a grant of jurisdiction

that provides for a limited waiver of sovereign immunity, if the discretionary function exception

applies to limit the waiver of sovereign immunity, the jurisdictional grant is not available, and the

federal court lacks jurisdiction to hear the case." (internal citations omitted)).

**A.    THE DISCRETIONARY-FUNCTION EXCEPTION TO THE FTCA SHIELDS FROM SUIT THE BIA'S DECISION TO AWARD THE CONTRACT TO MCKINLEY COUNTY FOR PROVISION OF DETENTION SERVICES, AND PRECLUDES THE COURT'S REVIEW OF COFFEY'S THIRD ALLEGED WRONG.**

42.    One of the exceptions to the FTCA provided in 28 U.S.C. § 2680(a) is the

discretionary-function exception, which immunizes conduct of government employees that arises

from legislative and administrative decisions grounded in social, economic, and political policy,

"protect[ing] the Government from liability that would seriously handicap efficient government

operations." Varig Airlines, 467 U.S. at 814 (quoting United States v. Muniz, 374 U.S. at 163).  For

the discretionary-function exception to apply, two requirements must be met: (i) the complained-of

act or decision is discretionary in the sense that it "involv[es] an element of judgment or choice;"

and (ii) the governmental action or decision must be "based on considerations of public policy."

United States v. Gaubert, 499 U.S. at 322-23 (quoting Berkovitz v. United States, 486 U.S. at 536-

37).

43.    In regards to the first prong of the discretionary-function analysis, the Tenth Circuit

has clarified what it means for a decision to be discretionary:

> [I]f a government official in performing [the official's] statutory duties must act
> without reliance upon a fixed or readily ascertainable standard, the decision [the
> official] makes is discretionary and within the exception of the Tort Claims Act.
> Conversely, if there is a standard by which [the official's] action is measured, it is
> not within the exception.

Barton v. United States, 609 F.2d 977, 979 (10th Cir. 1979).

44.    The Tenth Circuit has also clarified that the second prong of this analysis is directed

at determining whether the official's judgment or choice "is of the kind Congress intended to shield

through the exception. . . . that is, those decisions 'grounded in social, economic, and political

policy."  Boyd v. United States ex rel. Army, Corps of Engineers, 881 F.2d 895, 897 (10th Cir.

1989)(quoting Varig Airlines, 467 U.S. at 814).  The Tenth Circuit clarified:

> When making the second inquiry, we are not to consider the subjective intent of the
> particular actor or whether he or she was animated by a concern for public policy.
> Rather, we must consider whether the nature of the actions taken implicate public
> policy concerns, or are "susceptible to policy analysis."  We need not find that a
> government employee made a conscious decision regarding policy considerations in
> order to satisfy the second prong of the Berkovitz test.

Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004)(quoting United States v. Gaubert, 499

U.S. at 32).  However, when the government exercises its discretion and chooses to participate in

an activity, the discretionary-function exception does not protect the government from failing to provide due care in its performance of the activity.  See Indian Towing Co. v. United States, 350 U.S. at 69 ("The Coast Guard need not undertake the lighthouse service.  But once it exercised its discretion to [do so] . . . it was obligated to use due care . . . .").

> **1.     Because the BIA's Decision Whether the MCDC was Appropriate to House Crutcher Given his Medical Condition was a Matter of the BIA's Judgment or Choice, and One Which is Susceptible to Policy Analysis, the Discretionary-Function Exception Prevents the Court From Hearing Coffey's Asserted Third Alleged Wrong.**

45.     The third wrong that Coffey alleges against the BIA is that the BIA did not adequately screen whether the MCDC was an appropriate facility to house Crutcher in light of his condition.  She alleges that "[t]he BIA did not determine that the McKinley County Adult Detention Facility was adequate to house an inmate with Andrew Crutcher's medical problems."  Errata Complaint ¶ 33, at 7. In other words, the BIA decided to send Crutcher to the MCDC having never adequately assessed whether the MCDC was an adequate facility to place inmates having Crutcher's medical condition.  The Court's jurisdiction over Coffey's third alleged wrong therefore turns on whether the BIA's decision to screen whether a facility is appropriate for an inmate with Crutcher's medical condition -- congestive heart failure and an implanted defibrillator -- and, specifically, whether the BIA's decision to screen whether the MCDC was appropriate to house Crutcher particularly, was a matter of the BIA's judgment and choice, which is susceptible to policy analysis.

> **a.     The BIA's Decision Whether to Screen the MCDC as an Appropriate Facility to House Crutcher in Light of His Medical Condition was a Matter of the BIA's Judgment and Choice.**

46.     The BIA is required to provide detention services or to provide detention beds for American Indian inmates for tribal courts that do not have a tribal detention program or the ability to house inmates.  See May 24, 2012 Tr. at 173:10-16 (Anchondo).  There are no federal regulations

-64-

or requirements directing BIA to contract with a particular entity for contract beds.  The decision whether to enter into a procurement contract with particular facilities is rather based on the Contracting Officer Technical Representative's determination with possible assistance from the Supervisory Correctional Program Specialist from the region of the procurement contract facility. See May 24, 2012 Tr. at 174:23-175:9 (Anchondo, Mitchell).

47.     The BIA Contracting Officer Technical Representative's determination in selecting facilities with which to contract is without statutory or regulatory requirements or guidance.  The determination is also not based on "any fixed or readily ascertainable standard," Barton v. United States, 609 F.2d at 979, but is rather based upon several factors, including: (i) the location of the facility; (ii) who is willing to contract with BIA and if they have the bed space to contract with BIA; (iii) what services the programs provide; and (iv) what options are available.  See May 24, 2012 Tr. at 173:19-175:3 (Mitchell, Anchondo).  There is no evidence in the record that any regulation or statute requires the BIA Contracting Officer Technical Representative to use any of these factors specifically, or that there is a requisite standard by which these factors are weighed in the determination.  Because there is no standard by which the Contracting Officer Technical Representative's action is measured, the decision to award the contract to a particular entity, and what factors to consider in making that decision, therefore, meet the first prong of the discretionary-function test as they are matters within the BIA's judgment or choice.  See Barton v. United States, 609 F.2d at 979 ("[I]f there is a standard by which his action is measured, it is not within the exception.").

48.     Because the factors which the Contracting Officer Technical Representative considers in awarding a contract to a particular detention facility for contract-beds is a matter of the Contracting Officer Technical Representative's judgment or choice, the Contracting Officer

Technical Representative's choice to use as a factor whether the MCDC is an appropriate facility to house American Indian inmates with Crutcher's medical condition in deciding whether to contract with the MCDC in this case was also a matter of the Contracting Officer Technical Representative's judgment or choice.

> **b.      The BIA's Decision Whether to Screen the MCDC as an Appropriate Facility to House Crutcher in Light of His Medical Condition is One Which is Susceptible to Policy Analysis.**

49.     The Contracting Officer Technical Representative's decision to contract with facilities for detention services or beds for American Indian inmates is based on: (i) the location of the facility; (ii) who is willing to contract with BIA and if they have the bed space to contract with BIA; (iii) what services the programs provide -- such as rehabilitation services and educations services; and (iv) what options are available.  See May 24, 2012 Tr. at 173:19-175:3 (Mitchell, Anchondo).  Analyzing the location of the various contract facilities in relation to the location of the Indian tribes for which the BIA is contracting detention services is "susceptible to policy analysis," because the location is likely viewed through both a social and political lens.  Lopez v. United States, 376 F.3d at 1057.  Additionally, the farther away from the tribe the detention facilities' location, the greater expense the BIA and the tribe are likely to encounter in transporting inmates. Similarly, choosing to contract with a particular facility based on what services they provide, whether educational, rehabilitative, or any other services, again is susceptible to a social and political policy analysis.  When the particular factors that the BIA Contracting Officer Technical Representative uses is not required by statute or regulation, but rather is the Contracting Officer Technical Representative's judgment or choice, choosing the particular criteria to use and choosing not to include certain criteria necessarily involves policy analysis, because those choices are based on social and political policies or determinations, and to include more factors into the analysis

implicates economic policies and considerations.   Because the BIA Contracting Officer Technical Representative's choice to use certain factors, and because the BIA Contracting Officer Technical Representative's choice to contract with a particular facility based on the factors chosen, are susceptible to a policy analysis based on social, economic, and political policies, the Contracting Officer Technical Representative's decisions regarding awarding a procurement contract to a facility for American Indian Inmates thus meets the second prong of the FTCA discretionary-function exception.

50.     Because choosing the factors to analyze in awarding a contract to a particular detention facility for contract-beds is susceptible to policy analysis, the BIA Contracting Officer Technical Representative's choice to use as a factor whether the MCDC is an appropriate facility to house American Indian inmates with Crutcher's medical condition in this case was based on considerations of public policy.

c.     **The BIA's Decision Whether to Screen the MCDC as an Appropriate Facility to House Crutcher in Light of His Medical Condition is Shielded from Review Because of the FTCA Discretionary-Function Exception.**

51.     The United States Court of Appeals for the Fourth Circuit has noted: "The decision to hire an independent contractor to render services for the United States is precisely the type of decision that the exception is designed to shield from liability because it involves exercising judgment based on considerations of policy, and the case law clearly establishes that the award of contracts falls within the ambit of the discretionary-function exception." Williams v. United States, 50 F.3d at 310.  The BIA's decision whether to screen the MCDC as an appropriate facility to house an inmate with Crutcher's medical condition before awarding the MCDC the contract is supported by the protection afforded to selecting independent contractors under the FTCA discretionary-

function exception, because hiring an independent contractor necessarily involves analysis of several factors, such as screening for medical conditions, which are susceptible to policy analysis.

52.     The BIA's decision whether to screen the MCDC as an appropriate facility to house an American Indian inmate with Crutcher's medical condition meets the first prong of the FTCA discretionary-function exception, because it was a matter of the BIA Contracting Officer Technical Representative's judgment or choice to use as a factor whether the MCDC is appropriate to house American Indian inmates with Crutcher's medical condition.  The BIA's decision meets the second prong of the FTCA discretionary-function exception, because the BIA Contracting Officer Technical Representative's choice to use as a factor whether the MCDC is an appropriate facility to house American Indian inmates with Crutcher's medical condition in this case was based on considerations of public policy.  The Court, therefore, lacks jurisdiction to hear Coffey's third alleged wrong, because the BIA is protected from liability under the discretionary-function exception for its decision to screen whether the MCDC was an appropriate facility to house Crutcher in light of his medical condition.

53.     The BIA's immunity from liability for awarding the contract to the MCDC thus eliminates the Court's jurisdiction to hear any of Coffey's claims based on the BIA's negligent hiring or negligent contracting of the MCDC.  The Court therefore dismisses Coffey's claim without prejudice to the extent that it is based on Coffey's third alleged wrong of the BIA not adequately screening whether the MCDC was an appropriate facility to house Crutcher for lack of jurisdiction. See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010)(unpublished)("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.")(quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir.2006)).

    **2.**    **Because Coffey's First, Second, and Fourth Alleged Wrongs Involve the BIA's Decisions Made After it Decided to Transfer its American Indian Inmates, Although These Alleged Wrongs are Matters of the BIA's Judgment or Choice, Because they Implicate Safety Concerns for an Activity the BIA is Providing, the Discretionary-Function Exception Does Shield the BIA's Conduct from the Court's Review.**

54.    The first alleged wrong asserted by Coffey against the BIA is that "the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Detention Facility." May 2, 2012 MOO at 43. The analysis for whether the Court has jurisdiction to hear this wrong in light of the discretionary-function exception turns on whether the BIA's decision to perform an adequate medical screening of an American Indian inmate before the inmate's transfer is a matter of the BIA's judgment or choice, and is a judgment or choice susceptible to policy analysis.

55.    Coffey's second alleged wrong, that "the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility," implicates whether the BIA had in place procedures as safeguards to ensure the safety of its American Indian inmates during their transfer. The analysis for whether the Court has jurisdiction over this alleged wrong involves whether the BIA's decision to put in place procedures for the transfer of inmates, after it had exercised its discretion to transfer the inmates, fulfilled the BIA's duty to exercise due care in transferring the inmates.

56.    The Court, in its May 2, 2012 MOO, construed Coffey's fourth alleged wrong: "given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition." May 2, 2012 MOO at 43. The merits of Coffey's fourth alleged wrong turns on whether the BIA's transfer of

Crutcher to the MCDC was negligent under the circumstances, in light of the fact that the MCDC is 900 miles away from Crutcher's family, and 900 miles away from his doctor, and because he was transferred without his medical information and property.  The focus of this alleged wrong is similar to Coffey's first alleged wrong, and is distinguished from Coffey's third alleged wrong, because it turns on the BIA's decision with regard to its care of an individual American Indian inmate, as opposed to its decision with regard to an entity with which it may contract for services.  Because the BIA's decision to analyze an American Indian inmate's particular circumstances before deciding to transfer the inmate is a matter of the BIA's  judgment or choice, and is a judgment or choice susceptible to policy analysis, the Court would not have jurisdiction to hear Coffey's fourth alleged wrong but for the fact that the discretionary-function exception does not allow the BIA to disregard basic tort law once it has exercised its discretion to undertake to transfer an inmate.

> **a.    The BIA's Decision Whether to Medically Screen Crutcher and Whether to Analyze Crutcher's Particular Circumstances Before Transferring Him to the MCDC is a Matter of the BIA's Judgment and Choice.**

57.    There is no evidence in the record that the BIA is given guidance or required by statute, regulation, or policy to transfer inmates in the course of its required detention of the American Indian inmates.  The record also lacks evidence of any statute, regulation, or policy requiring the BIA to follow particular regulations about transferring a particular inmate between detention facilities.  The decision to transfer American Indian inmates and where to place those inmates is based on the BIA Supervisory Correctional Program Specialist's discretion, taking into consideration: (i) budgetary concerns; (ii) the number of beds BIA is taking up in a certain area that would inhibit new arrests to come into the facility; and (iii) the facility's medical program, including proximity to a hospital.  See May 24, 2012 Tr. at 178:10-181:17 (Mitchell, Anchondo).  There is no

evidence that any regulation, statute, or policy requires the BIA Supervisory Correctional Program Specialist to use any of these factors specifically when deciding whether to transfer particular inmates, or that there is an established standard by which these factors are weighed in the determination.  Because there is no standard by which to measure the Supervisory Correctional Program Specialist's decision where, why, or how to transfer inmates, the decision to use factors in the analysis whether to place particular inmates in a facility, or to transfer particular inmates to a facility, or what factors to use in making that decision, therefore, meets the first prong of the discretionary-function test as they are matters within the BIA's judgment or choice.  See  Barton v. United States, 609 F.2d at 979 ("[I]f there is a standard by which his action is measured, it is not within the exception.").  Similarly, because there are no statutes, regulations, or policies requiring the BIA to transfer its American Indian Inmates, its decision whether to put in place procedures to ensure the inmates' medical information is also transferred is within the BIA's judgment or choice.

> **b.    The BIA's Decision Whether to Medically Screen Crutcher, Whether to Analyze Crutcher's Particular Circumstances Before Transferring Him to the MCDC, and Whether to Put in Place Procedures for Transfer of Crutcher's Medical Information, are Not Choices Susceptible to Policy Analysis, Because Failing to Do So Would Not Be an Exercise of Ordinary Care in Performing the Transfer.**

        58.    In Indian Towing Co. v. United States, the United States contended that the Coast Guard's negligence in operating a lighthouse was precluded from judicial review pursuant to the FTCA's discretionary-function exception, because the Coast Guard's decision to construct the lighthouse is a discretionary judgment. 350 U.S. at 61-62, 69.  The Supreme Court reversed, holding that, although the choice to construct a lighthouse was discretionary, once the government undertook to perform the discretionary function or activity of building and operating a lighthouse, the government could not then disclaim liability for its negligent performance of the function under the

discretionary-function exception.  See 350 U.S. at 69.  The Supreme Court stated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its
> discretion to operate a light on Chandeleur Island and engendered reliance on the
> guidance afforded by the light, it was obligated to use due care to make certain that
> the light was kept in good working order; and, if the light did become extinguished,
> then the Coast Guard was further obligated to use due care to discover this fact and
> to repair the light or give warning that it was not functioning. If the Coast Guard
> failed in its duty and damage was thereby caused to petitioners, the United States is
> liable under the Tort Claims Act.

350 U.S. at 69.

59.    In Smith v. United States, 546 F.2d 872, 877 (10th Cir. 1976), the Tenth Circuit held

that the United States' decision "not to warn of the known dangers or to provide safeguards cannot

rationally be deemed the exercise of a discretionary function."  546 F.2d at 877.  The National Park

Service of the Department of the Interior argued that its decision not to post warning signs in the

undeveloped area of Yellowstone National Monument was "part of a policy decision to make Clear

Water Springs an undeveloped area, and, therefore, protected from judicial review pursuant to the

discretionary function exception."  546 F.2d at 876-77.  The Tenth Circuit reasoned that although

to leave areas undeveloped:

> may reasonably entail the omission of boardwalks, trails or footpaths and signs
> marking such ways . . . . it does not follow that the Government, as a landowner, is
> absolved of all duty under state law to erect safety devices or signs cautioning about
> conditions which have been left undisturbed as a policy matter.

546 F.2d at 877.  The Tenth Circuit concluded:

> If we were to accept the Government's broad interpretation of the discretionary
> exception, it is difficult to perceive which duties under tort law could not be avoided
> by a similar policy decision to ignore them. This would run counter to the Supreme
> Court's admonition that such exceptions to this remedial law be narrowly construed.

Smith v. United States, 546 F.2d at 877 (citing Dalehite v. United States, 346 U.S. at 31 & n. 24).

60.    The BIA is not explicitly required by statute, regulation, or policy to transfer its

-72-

Indian American inmates from one detention center to another.  The decision to do so is within their discretion, and as the decision here was based on monetary concerns, the decision to transfer inmates is likely susceptible to policy considerations.  Once the BIA "exercised its discretion" to transfer inmates, including Crutcher, from the Washoe County Detention Facility to the MCDC, "and engendered [the inmates'] reliance" on the BIA's making provisions for their safekeeping during and because of the transfer, the BIA "was obligated to use due care" in transferring the inmates relying on the BIA's safekeeping.  350 U.S. at 69.  Thus, if the BIA failed to exercise due care in transferring Crutcher by not ensuring that Crutcher was properly medically screened, or by not ensuring that his particular circumstances were analyzed to determine whether the transfer would expose him to an unreasonable risk of harm, or by not having addressed procedures to transfer Crutcher's medical information, then the United States may be liable under the FTCA.  See Indian Towing Co. v. United States, 350 U.S. at 69 ("If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.").

61.     Selecting factors to use in analyzing where to place American Indian inmates or whether to transfer the inmates, and if so where, involves economic policy considerations similar to those of selecting an independent contractor to provide services, because the more factors the BIA considers, the more money the BIA is likely to spend in analyzing those factors.  Should the BIA decide to medically screen each inmate considered for transfer, and to use that screening as a factor in its calculus, such a choice would likely also increase the cost associated with deciding whether and where to transfer an inmate.  As the Tenth Circuit recognized in Smith v. United States, however, in deciding whether and if to transfer a particular inmate, the BIA cannot assert that the discretionary-function exception protects its decision to ignore basic tort duties in performing that activity.  As the Tenth Circuit reasoned that the National Parks Service had the basic tort duty, as

a landowner, to warn the public of known dangers and to take reasonable measures to make them

safe, the BIA here, as custodian of inmates during their transfer, cannot ignore known tort duties by

contending that there is not a specific statutory or regulatory requirement for them to take known

dangers into consideration.  As in Smith v. United States, the BIA in this case, in deciding to transfer

an inmate between facilities, cannot assert that the decision "not to warn of the known dangers" --

such as an inmate's dangerous medical condition of which the BIA knows -- is not susceptible to

policy considerations.  546 F.2d at 877.  The BIA also argues that a decision to not provide

reasonable safeguards in deciding whether or where to transfer prisoners is susceptible to policy

analysis.  It would not heed the Tenth Circuit's direction to narrowly construe the exception were

the Court to conclude that, because there is no explicit statutory or regulatory requirement that the

BIA comply with fundamental safety concerns and tort law duties in deciding where and how to

transfer its inmates, the BIA's decision to ignore these fundamental safety concerns and tort law

duties is excepted from the United States' waiver of sovereign immunity for tort actions.  Such a

conclusion would rather allow this exception to swallow the rule.

62.    Once the BIA exercises its discretion in deciding to undertake to transfer inmates,

under Indian Towing Co. v. United States, its duty to take due care in performing the transfer is not

covered by the discretionary-function exception.  As the Tenth Circuit held in Smith v. United

States, if the BIA has decided to ignore basic tort law in making its decision whether and where to

transfer its inmates by not providing safeguards to allow for consideration of inmates' circumstances

which are known to present dangers, including dangerous medical conditions of which the BIA

knows, that decision cannot be deemed to be a discretionary function.  Because Coffey's first,

second, and fourth alleged wrongs implicate whether the BIA has made such a decision, they are not

excepted from the United States' waiver of sovereign immunity under the FTCA, and the Court thus

-74-

has jurisdiction to hear both these alleged wrongs.

> **B.   THE BIA IS NOT LIABLE FOR ANY ACTS OR OMISSIONS BY THE MCDC EMPLOYEES, BECAUSE THE FTCA'S INDEPENDENT-CONTRACTOR EXCEPTION PROTECTS IT FROM SUIT ON THAT BASIS.**

63.    Because the United States is liable under the FTCA for the actions of its employees only, "[t]he FTCA does not authorize suits based on the acts of independent contractors or their employees."  Curry v. United States, 97 F.3d at 414.  See 28 U.S.C. § 1346(b).  The FTCA's independent-contractor exception protects the United States from liability that may be imposed by into entering contracts with independent contractors, and demanding compliance with federal standards, "unless the United States actually supervises the 'day-to-day operations' of the endeavor."  Williams v. United States, 50 F.3d at 306.  As the Supreme Court has noted: "A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'"  United States v. Orleans, 425 U.S. at 814 (quoting Logue v. United States, 412 U.S. at 528).

64.    In Logue v. United States, the Supreme Court held that, where the FTCA provides liability for the United States for the acts of its employees, the definition of which includes federal agencies, Congress intended to adopt "the common-law distinction between the liability of an employer for the negligent acts of [its] own employees and [the employer's] liability for the employees of a party with whom [the employer] contracts for a specified performance."  412 U.S. at 526-27.  That distinction, the Supreme Court notes, "turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract."  412 U.S. at 527.  The Supreme Court noted that the contract in place between the Bureau of Prisons and the detention center with which it contracted to take custody of prisoners "contemplated that the day-to-

-75-

day operations of the contractor's facilities were to be in the hands of the contractor," 412 U.S. at

528,  and did not provide the United States Government with "authority to control the activities of

the [contractor]'s employees," 412 U.S. at 529.  The Supreme Court came to this conclusion based

on its analysis of the division of responsibility provided in the contract:

> The county undertakes to provide custody in accordance with the Bureau of Prisons'
> 'rules and regulations governing the care and custody of persons committed' under
> the contract.  These rules in turn specify standards of treatment of federal prisoners,
> including methods of discipline, rules for communicating with attorneys, visitation
> privileges, mail, medical services, and employment.  But the agreement gives the
> United States no authority to physically supervise the conduct of the Detention
> Facility's employees; it reserves to the United States only 'the right to enter the
> institution . . . at reasonable hours for the purpose of inspecting the same and
> determining the conditions under which federal offenders are housed.'

Logue v. United States, 412 U.S. at 529-30.

65.    Because there was a procurement contract between the BIA and McKinley County

in place throughout the duration of time in which Crutcher was in MCDC's custody, from October

2006 until his death in 2007, MCDC was an independent contractor of the United States.

66.    Although the BIA's contract with McKinley County requires the MCDC to obtain

tribal inmate records, and directs that McKinley County will not be reimbursed, except in

emergencies, for taking a contract-covered inmate to a non-Indian Health Services facility, as the

Supreme Court determined in Logue v. United States, these requirements do not give the BIA

control over the day-to-day operations of MCDC's employees.  Rather, as the Supreme Court

reasoned in Logue v. United States, because these contract provisions specify standards of treatment

of the prisoners regarding their medical treatment, these requirements are requiring MCDC's

detention of BIA's prisoners to accord with the BIA's rules and regulations.  The contract does not

provide the United States with sufficient authority "to control the physical conduct of the contractor

in performance of the contract."  Logue v. United States, 412 U.S. at 527.  Rather, under the

contract, the onus was on the MCDC to comply with these regulations and requirements, and to decide for itself the particular operations to obtain the contract-covered inmates' medical records, and where to take the contract-covered inmates when they required medical services.

67.     Because the contract did not provide the BIA with authority to control the detailed physical conduct of the MCDC's care for the American Indian inmates covered under the procurement contract, the MCDC was a contractor of the BIA and not a federal agency.  See United States v. Orleans, 425 U.S. at 814 ("A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'").

68.     Therefore, because MCDC was the BIA's independent contractor, rather than employee, the United States is not liable for any of MCDC's or McKinley County's conduct.  The Court thus dismisses Coffey's negligent transfer claim based on the allegations that, in light of Crutcher's medical condition, the MCDC was not an appropriate facility, to the extent that those allegations are based on the MCDC's employees failure to obtain Crutcher's medical records and medications.

**IV.     THE BIA'S CONDUCT DID NOT BREACH THE DUTY IT OWED TO CRUTCHER TO PROTECT HIM FROM AN UNREASONABLE RISK OF PHYSICAL HARM, BECAUSE THE BIA'S PROCUREMENT CONTRACT PROVIDED FOR ADEQUATE MEDICAL SCREENING, THE BIA HAD PROCEDURES IN PLACE TO FACILITATE THE TRANSFER OF CRUTCHER'S MEDICAL INFORMATION, AND, UNDER THE CIRCUMSTANCES, THE MCDC WAS AN APPROPRIATE FACILITY FOR CRUTCHER IN LIGHT OF HIS MEDICAL CONDITION.**

69.     The Supreme Court rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. at 65 ("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual

'under the same circumstances.'  But the statutory language is 'under like circumstances[]' . . . .").

70.    The United States' liability is coextensive with that of private individuals under the respective State's law, even if comparable government actors would have additional defenses or additional obligations under that State's law.  See Ewell v. United States, 776 F.2d at 248 ("The Federal Tort Claims Act makes the United States liable only to the extent that a private person would be liable under similar circumstances"); Proud v. United States, 723 F.2d at 705 ("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d at 895 ("This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute."(citing Proud v. United States 723 F.2d at 706-07)).

71.    "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis."  Coffey v. United States, 2012 WL 1596916, at *14 (quoting In re FEMA Trailer Formaldehyde Products Liability Litigation (Mississippi Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)).

### A.    THE COURT WILL APPLY NEW MEXICO LAW TO COFFEY'S ALLEGATIONS OF THE BIA'S WRONGFUL CONDUCT UNDERLYING HER NEGLIGENCE THEORIES.

72.    The FTCA addresses conflicts of law in 28 U.S.C. § 1346(b)(1).  Specifically, this subsection states that courts determine liability under the FTCA "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

73.  The government's liability under the FTCA is determined by the place in which the "acts

of negligence took place," rather than "where the negligence had its operative effect."  Richards v. United States, 369 U.S. at 10.

74.    Once a court has determined the State that governs the law of the place where the act or omission occurred, the court then applies "the whole law of the place where the negligence occurred," including that State's choice-of-law rules."  Richards v. United States 369 U.S. at 10.

75.    Coffey advances three negligence theories -- (i) negligent screening; (ii) negligent transfer; and (iii) negligent hand off -- which allegedly caused Crutcher's wrongful death.  The Court has distilled these down to four wrongs:

> (i) the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Jail; (ii) the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility; (iii) the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition; and (iv) given that Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition.

May 2, 2012 MOO at 43.  The alleged failure by the BIA's employees to medically screen Crutcher occurred in Reno, whether the failure to screen is alleged to have been when the BIA took custody of Crutcher from Washoe County Detention Facility, which was also providing detention services to the BIA pursuant to a procurement contract, or when the BIA took custody after Crutcher's conviction by the Reno-Sparks Indian Colony Tribal Court.  See Amended Complaint ¶ 11, at 4; May 24, 2012 Tr. at 174:10-18 (Anchondo).  The alleged act or omission that gives rise to Coffey's negligent screening theory, therefore, occurred in Nevada, and therefore, the act or omission that gives rise to Coffey's negligent screening theory occurred in Nevada, and the "whole law" of Nevada, including its choice-of-law rules, applies to that negligence theory.  Boodrug v. United States, 832 F.2d 136, 137 (10th Cir. 1987)("In suits brought under the Federal Tort Claims Act,

federal courts are required to apply the whole law of the State where the act or omission occurred.").

76.     Nevada applies the <u>Restatement (Second) Conflict of Laws</u>' "most significant relationship" test to determine which State's law to apply in tort actions.  <u>Gen. Motors Corp. V. Eighth Judicial Distr. Court of State of Nev. ex rel. Cnty. Of Clark</u>, 122 Nev. 466, 473, 134 P.3d 111, 116 (2006).

77.     The BIA's decision to transfer Crutcher to the MCDC, which Anchondo made, occurred while Anchondo was stationed in Phoenix, and Crutcher was transferred from BIA's detention officers' custody into the MCDC officers' custody in Arizona.  <u>See</u> May 24, 2012 Tr. at 172:10-20; 235:1-10 (Anchondo).  Coffey alleges that, in Arizona, when BIA detention officers transferred the custody of the inmates to the MCDC officers, they failed to provide the MCDC officers with Crutcher's proper medical records and other medical items, transferred Crutcher to a facility that could not provide Crutcher adequate medical, and did not have policies and procedures in place for transferring Crutcher's medication and medical records to the MCDC.  The alleged acts or omissions that give rise to Coffey's negligent transfer and negligent hand-off theories, therefore, occurred in Arizona.  The "whole law" of Arizona, therefore, including its choice-of-law rules, applies to that negligence theory.  <u>Boodrug v. United States</u>, 832 F.2d at 137.

78.     "Arizona courts follow the <u>Restatement (Second) of Conflict of Laws</u> (1971)(Conflict of Laws Restatement) to determine the controlling law."  <u>Winson v. Glasswerks PHX, LLC</u>, 204 Ariz. 303, 307, 63 P.3d 1040, 1044 (Ariz App. 2003)(citing <u>Bates v. Superior Court (Nationwide Ins. Co.)</u>, 156 Ariz. 46, 48, 749 P.2d 1367, 1369 (1988)).

791.     Arizona also applies the <u>Restatement (Second) Conflict of Laws</u>' "most significant relationship" test to determine which State's law to apply in tort actions.  <u>See Winson v. Glasswerks PHX, LLC</u>, 204 Ariz. at 307, 63 P.3d at 1044 ("Cases sounding in tort should be resolved under the

law of the state having the most significant relationship to both the occurrence and the parties with respect to the particular issue.").

80.    Arizona recognizes that, consistent with the Restatement (Second) of Conflict of Laws § 146, there is a general rule that the local law of the state where the injury occurs applies. See Baroldy v. Ortho Pharm. Corp., 157 Ariz. 574, 580, 760 P.2d 574, 580 (Ariz. App. 1988).

81.    Because Coffey's claim is for wrongful death, it is a claim for personal injury.  There is a presumption in both Nevada and Arizona, the states where the allegedly negligent conduct occurred, that, in a claim for personal injury, a court should apply the law of the place where the injury occurred, New Mexico in this case, based on the Restatement (Second) of Conflicts of Laws § 146.  See Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 474, 134 P.3d at 117;  Baroldy v. Ortho Pharm. Corp., 157 Ariz. at 580, 760 P.2d at 580.

82.    In personal injury actions, there is a presumption in both Nevada and Arizona that a court should apply the law of the place where the injury occurred, New Mexico in this case, based on the Restatement (Second) of Conflicts of Laws § 146.  See Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. at 474, 134 P.3d at 117;  Baroldy v. Ortho Pharm. Corp., 157 Ariz. at 580, 760 P.2d at 580.

83.    Under New Mexico law, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86.  To recover for Crutcher's wrongful death, therefore, Coffey must prove by a preponderance of the evidence that the BIA owed a duty to Crutcher, that the BIA's employees' conduct -- in failing to medically screen Crutcher, transfer Crutcher, or hand Crutcher off to the BIA's independent contractors -- breached the BIA's

duty, and that breach was the cause-in-fact and proximate cause of the plaintiff's damages.

84.     The finder of fact, the Court in this instance, "must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

**B.      UNDER NEW MEXICO LAW, THE BIA WAS NOT NEGLIGENT PURSUANT TO COFFY'S FIRST ALLEGED WRONG -- INADEQUATELY SCREENING CRUTCHER BEFORE HIS TRANSFER -- BECAUSE IT DID NOT BREACH ITS DUTY TO TAKE REASONABLE ACTION TO PROTECT CRUTCHER FROM AN UNREASONABLE RISK OF PHYSICAL HARM.**

85.     There are analogies in the private sector to those presented in Coffey's first alleged wrong that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Detention Facility.  Courts around the United States and New Mexico courts have recognized triable issues of negligence under simlar circumstances in the private sector.  Under the circumstances of the case, the BIA owed Crutcher a duty to conduct some screening of his medical condition to determine whether the transfer to the MCDC was appropriate. In light of the BIA's duty, because the BIA took action to provide adequate safeguards for the inmates' medical screenings in its procurement contract with contractor detention facilities, including the Washoe County Detention Facility and the MCDC, the BIA did not breach its duty to protect Crutcher from an unreasonable risk of physical harm.

**1.      The BIA Owed Crutcher the Duty to Take Reasonable Action to Protect Crutcher From an Unreasonable Risk of Physical Harm.**

86.     Courts around the United States have found that private individuals often have a duty to discover known risks of third parties, because the individuals' affirmative undertakings cause an

implicit assumption of duty to the third persons.  The Court of Appeals of Tennessee has affirmed a trial court's conclusion that a public school district "was negligent in failing to inform its employees of [a child's] health issues and" for failing "to implement a PE program for [the child], taking into account his health issues."  Small ex rel. Russell v. Shelby Cnty. Sch., No. W2007-00045-COA-R3-CV, 2008 WL 360925, at *1-2 (Tenn. Ct. App. 2008)(unpublished).  The Court of Appeals of California has concluded that an amusement park owner, because the owner is best situated to "minimize any risks associated with its rides," has "a duty to take reasonable steps to minimize those risks without altering the nature of the ride."  Nalwa v. Cedar Fair, LP, 126 Cal. Rptr. 3d 341, 353-54 (Cal. App.), granting petition for review 129 Cal. Rptr. 3d 668 (2011).  A Pennsylvania court upheld a jury verdict in a medical malpractice action where the evidence was consistent with the jury's conclusion that the doctors negligently prescribed large amounts of a penicillin-based medication to a patient when they should have discovered she was having an allergic reaction to the drug.  See Gunn v. Grossman, 748 A.2d 1235, 1239-40 (Pa. Super. Ct. 2000)("Dr. Crane testified that Appellants breached their duty of care by prescribing large doses of [a drug] when they should have discovered that decedent was suffering from an allergic reaction . . . .").

87.    New Mexico Courts have found a similar duty to discover and appreciate known risks in similar cases.  The Supreme Court of New Mexico has recognized that a doctor generally owes the "patient a duty to properly diagnose his relevant medical conditions."  Provencio v. Wenrich, 150 N.M. 457, 261 P.3d 1089, 1095 (2011).  One New Mexico case affirmed a finding of reckless conduct when a business charged with inspecting and repairing amusement park rides failed to do so, causing injury to the plaintiff.  See Atler v. Murphy Enters., Inc., 136 N.M. 701, 707, 104 P.3d 1092, 1098 (Ct. App. 2004).

88.     Significantly, New Mexico courts have adopted section 314A of the <u>Restatement</u> <u>(Second) of Torts</u>.[31]  <u>See</u> <u>Baldonado v. El Paso Natural Gas Co.</u>, 2008-NMSC-005, ¶ 15 n.3, 143 N.M. 288, 292 n.3, 176 P.3d 277, 281 n.3 ("We recognize that special relationships, such as the doctor-patient or employer-employee relationship, can create a duty to rescue." (citing <u>Restatement</u> <u>(Second) of Torts</u> § 314A)).  Section 314A(4) states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take reasonable action . . . to protect [their customers] against unreasonable risk of physical harm."  <u>Restatement (Second) of Torts</u> § 314A.  The duty is one of "reasonable care under the circumstances," which can depend upon facts such as whether the defendant knew or should have known "of the unreasonable risk, or of the illness or injury."  <u>Restatement (Second) of Torts</u> § 314A cmt. e.  Relying on the <u>Restatement (Second) of Torts</u> in an FTCA case, the Tenth Circuit found under Colorado law a duty to provide medical care for a prisoner in need of such care:

> Likewise, the Restatement (Second) of Torts § 314A (1965) imposes a duty on "[o]ne who is required by law to take . . . the custody of another under circumstances such as to deprive the other of his normal opportunities for protection," including the requirement "to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others."

<u>Kikumura v. Osagie</u>, 461 F.3d 1269, 1301 (10th Cir. 2006), <u>overruled on other grounds by</u> <u>Robbins</u>

---

[31]The New Mexico courts often look to the law as stated in the <u>Restatement (Second) of</u> <u>Torts</u>.  <u>See</u> <u>Montanez v. Cass</u>, 89 N.M. 32, 38, 546 P.2d 1189, 1195 (Ct. App.1975)("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), <u>rev'd on</u> <u>other grounds sub nom</u> <u>N.M. Elec. Serv. Co. v. Montanez</u>, 89 N.M. 278, 551 P.2d 634 (1976). <u>Accord</u> <u>Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)</u>, 805 F. Supp.2 d 1145, 1177 n.24 (D.N.M. 2011)(Browning, J.).  In <u>Schmitz v. Smentowski</u>, 109 N.M. 386, 785 P.2d 726 (1990), the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."  109 N.M. at 393, 785 P.2d at 736.

v. Oklahoma, 519 F.3d 1242.  This section of the <u>Restatement (Second) of Torts</u> is sufficiently analogous here, because the BIA officials who have custody of Crutcher are like those contemplated within subsection (4) of this section who are "required by law" to take or "who voluntarily" take "the custody of another under circumstances such as to deprive the other of his normal opportunities for protection."  <u>Restatement (Second) of Torts</u> § 314A.

89.   The clearest source of a duty under New Mexico law that applies to this first alleged wrong, therefore, is section 314A of the <u>Restatement (Second) of Torts</u>.  Section 314A(4) of the <u>Restatement Second of Torts</u> § 314A states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or injured, and to care for them until they can be care for by others."  <u>Restatement (Second) of Torts</u> § 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise reasonable care under the circumstances."  <u>Restatement (Second) of Torts</u> § 314A cmt. b.

90.   The Court concludes, therefore, that, because the BIA itself, rather than any BIA contractor, took custody of Crutcher to transfer him from the Washoe County Detention Facility to the MCDC, the BIA had the duty to take reasonable action to protect Crutcher from an unreasonable risk of physical harm.

## 2.   The BIA did not Breach its Duty When it Failed to Medically Screen Crutcher.

91.   "In New Mexico, negligence encompasses the concepts of foreseeability of harm to

the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983), overruled on other grounds by Folz v. State, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990).  New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (quoting Ramirez v. Armstrong, 100 N.M. at 541, 673 P.2d at 825)(internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186 ("The existence of a tort duty is a policy question that is answered by reference  to legal precedent, statutes, and other principles of law")(quoting Ruiz v. Garcia, 115 N.M. 269, 272, 850 P.2d 972, 975 (1993)).

92.    New Mexico Courts have construed what is reasonable under the circumstances by looking to foreseeability.  See  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194 ("[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances.").  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

93.    Whether the BIA breached its duty to take reasonable action to protect Crutcher from an unreasonable risk of harm turns on whether the BIA exercised reasonable care to do so under the

circumstances.

94.     The first alleged wrong is that the BIA did not perform adequate screening of Crutcher's medical condition before transferring him from the Washoe County Detention Facility. There is no requirement that the BIA officials perform medical screenings before transport.  The BIA does not have the resources to provide medical screenings, because Congress does not provide the BIA with funding to provide medical related services and does not staff transport teams with medical personnel. The BIA thus contracts with its contractor detention facilities to ensure that the inmates are properly screened nonetheless.   The BIA's procurement contracts with contract detention facilities provide that it is the contract detention facilities' responsibility to perform medical screenings of inmates.  See Modification of Contract at 15; May 24, 2012 Tr. at 145:2-14, 151:9-152:5 (Broken-Leg Brill).  Coffey's case, therefore, is not one where there is an absolute dereliction of the duty to medically screen inmates at all, and thus the Court cannot soundly find on that basis a breach of the duty to take reasonable action to protect inmates against unreasonable risk of physical harm.  The case rather presents the situation in which the BIA includes a provision in its procurement contract with contract detention facilities affirmatively requiring those facilities to medically screen the inmates at the time of booking: "The Contractor will be responsible for providing medical screening of the inmate at the time of booking . . . ."  Modification of Contract at 15.  Considering that the evidence shows that the inmates are in the custody of these contracting facilities at almost all times during their incarceration, except when the BIA is transporting them between facilities the Court cannot say that contracting with the contract detention facilities to perform the inmate's medical screening is unreasonable under the circumstances.  Because the inmates, and in this case, Crutcher, are in the contractor detention facilities' care for almost all of the time in which they are incarcerated, the BIA does not have a similar amount of control over the

inmates and their medical care as did the amusement park owner in <u>Nalwa v. Cedar Fair, LP</u>, 126 Cal. Rptr. 3d 341, and is not in the best position to appreciate and take care to guard against the risks that Crutcher's medical condition presented. That the BIA provides for its inmates' medical screenings by requiring the facility that has custody of the inmates to provide the medical screening and medical care may likely show that the BIA has also recognized that it is not in the best position to conduct screenings.

95.     Because the BIA's original contractor facility from which the inmates are being transferred medically screened the inmates under the provisions of the contract, and because the receiving contractor facility also has the duty to medically screen and care for the inmates upon their reception, the foreseeability of harm created by the BIA's transport is limited. The procurement contract with the contractor detention facilities provides that it is the responsibility of the receiving contractor facility to medically screen the inmates upon their arrival, and to obtain the medical records and list of medications on behalf of the inmates from the previous detention facility. <u>See</u> May 24, 2012 Tr. at 148:12-149:3, 151:2-8; 151:9-152:5 (Broken-Leg Brill). It is not reasonable to require the BIA to expect or even to foresee that a contractor detention facility would breach its contract with the BIA, even if the BIA may foresee that a detention facility may put itself at risk of liability by failing to medically screen the inmates, or to obtain their medical records and list of medications from the previous detention facility. Moreover, reasonable care under the circumstances includes taking into consideration the liability to which the BIA exposes itself under HIPAA by transporting personal health information such as the inmates' medical records and medication lists. Under these circumstances, with an expectation based on the procurement contract that the inmates will be medically screened, or at least that the receiving contractor detention facility will request their medical records and medications in a reasonable amount of time upon arrival,

reasonable care under the circumstances requires that the BIA officials transferring the inmates be provided information about any known medical issues or risks that could place the inmates at an unreasonable risk of physical harm during their transport and throughout at least a period at the beginning of their incarceration at the new detention facility.

96.     The discharge facility, the Washoe County Detention Facility, prepared a transfer form for Crutcher's departure, which related that Crutcher had no medical problems that would restrict his transfer, although the form noted that Crutcher was taking a variety of medications.  See Washoe County Detention Facility Records at H&H Coffey 001188.  Although the Transfer Form was inconsistent, because the form listed Crutcher as taking six medications and having no health problems, and additionally did not list that Crutcher had an implanted defibrillator, it was the Washoe County Detention Facility, rather than the BIA, who filled it out.  See May 24, 2012 Tr. at 50:14-51:20 (Paris).  In addition to the Transfer Form listing no medical problems and not listing Crutcher's defibrillator, the BIA officers had no reason to suspect the presence of Crutcher's defibrillator, because Crutcher was "barrel-chested," and an implanted defibrillator is not usually able to be seen on a person with a large chest unless the person is without a shirt.   At the time of transport, Crutcher had no physical symptoms or manifestations to suggest to the BIA officers that he was anything other than healthy  At the time of transfer, therefore, the only information that the BIA Officers had available to alert them to any medical condition Crutcher may have was the list of medications on the Transfer Form and Crutcher himself.  The BIA did not have any information available, or knowledge, that Crutcher had congestive heart failure or any other heart problem that would be of concern.

97.     Crutcher's heart condition at the time of the transfer was well compensated and, to the objective observer, he appeared well.  Moreover, because of his compensated condition, there

is no evidence that he was at any risk of exhibiting heart failure symptoms at any time in the future. Because Crutcher's medical condition would decompensate over a period of around four months only if he was not taking his medication while using drugs and/or alcohol, and because during his incarceration at Washoe County Detention Facility he was provided his medication and was not using drugs or alcohol, it was reasonable under these circumstances for the United States not to provide the BIA transfer officers with information about Crutcher's medical problems. Even though the BIA never obtained the medical transfer form which Washoe County Detention Facility prepared for Crutcher, such a failure did not, under the circumstances, create a foreseeable risk of harm to Crutcher, because the BIA reasonably expected that the MCDC would provide Crutcher with the medical services required under the procurement contract. It was unforeseeable that the medical problems of which the BIA was aware would pose a risk of harm during the 900 mile transfer from Washoe County Detention Facility to the MCDC, nor for the short time thereafter, before the MCDC medically screened Crutcher or obtained his medical records. In light of HIPAA concerns and the procurement contract in place with the MCDC, the United States and the BIA exercised reasonable care under the circumstances in deciding not to provide the BIA transfer officers with information regarding Crutcher's medical problems and medications. Crutcher being almost entirely in the custody of the contractor detention facilities, and only being in the BIA's custody, without medical records or Crutcher's medication, for a 900 mile trip, distinguishes the case from Small ex rel. Russell v. Shelby Cnty. Sch., in which the public school district failed to provide its employees with a child's health issues when implementing its physical education program. In Small ex rel. Russell v. Shelby Cnty. Sch., it was foreseeable, where the school district was implementing a physical education program, that children with health conditions prohibiting them from any level of physical activity may be placed in unreasonable risk of physical injury if the school district's employees did

not know the children could not participate.  It was not foreseeable here, given that Crutcher's condition took four months to decompensate to a dangerous level, that the BIA not having information of Crutcher's medical condition during the 900 mile trip would place him at an unreasonable risk of physical injury.  Similarly, the time period for Crutcher's condition to decompensate, four months, distinguishes this case from those in which a failure to appreciate a dangerous condition poses an immediate risk of physical harm.  See Gunn v. Grossman, 748 A.2d at 1239-40 (holding that a doctor was negligent in prescribing large amounts of penicillin-based medication, because the doctor should have discovered the patient was allergic given the patient's physical reactions to the medication); Atler v. Murphy Enters., Inc., 2005-NMCA-006, ¶ 18, 104 P.3d at 1098 (affirming a finding of reckless conduct when a business charged with inspecting and repairing amusement park rides each day failed to do so, causing injury to the plaintiff).

98.     The Court previously noted that, because "there appears to be no BIA requirement in place to require any form of medical screening before transport, there is a genuine issue of material fact whether the BIA engaged in conduct that breached its duty to Crutcher." May 2, 2012 MOO at 52.  Although there is no statutory or regulatory requirement requiring the BIA to conduct medical screenings or control its inmates' medical records, the BIA requires by contract its contractor facilities to screen their inmates at booking, when they receive transfer inmates, and to obtain their medical records.  Even in light of the United States' trust relationship with the American Indian tribes, including the Reno-Sparks Indian Colony, such a delegation of duty and responsibility is proper.  That the BIA is unable to undertake medical care of its inmates because Congress does not fund the BIA to staff medical personnel and perform medical screenings, makes this case distinguishable from the limited cases that have found safety measures cannot be discharged because of policy considerations.  See Marlys Bear Medicine v. United States ex rel. Secretary of Dept. Of

Interior, 241 F.3d 1208, 1216-17 (9th Cir. 2005)("The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. . . . [S]afety measures, once undertaken, cannot be shortchanged in the name of policy."). In this case, the BIA's decision to contract out the inmates' medical care and medical screenings is a policy decision; it is not a situation, as the Supreme Court addressed in Indian Towing Company v. United States, 350 U.S. at 61, in which the United States affirmatively undertook to perform an activity, and their conduct in the performance was negligent or unsafe. In Indian Towing Company v. United States, the Supreme Court stated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . . , it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the [Federal] Tort Claims Act.

350 U.S. at 69. The nature of the trust relationship between the BIA and the Reno-Sparks Indian Colony here does not therefore affect that the BIA had in place proper means providing for Crutcher's medical screening via delegating that responsiblity to its contract detention facility, who had the ability and resources to properly screen Crutcher.

99.     In light of the provision in the BIA's procurement contract requiring the contractor facilities to medically screen the inmates they receive and to obtain their medical records, and because Crutcher's medical condition was well-compensated and did not present a risk of harm to Crutcher  during the 900 mile transfer to Gallup, nor for the foreseeable time before the MCDC would obtain Crutcher's medical information, the Court concludes that there was no unreasonable risk of physical harm to Crutcher by the United States' and the BIA's conduct regarding Crutcher's medical screening, because the conduct did not pose a foreseeable risk of injury to inmates such of

Crutcher.  See May 2, 2012 MOO, at 51 (finding that a material issue of fact precluded entering summary judgment in favor of the United States in this case, because "[d]rawing all reasonable inferences in Coffey's favor, there is a potentially unreasonable risk posed by the BIA's conduct and a foreseeable risk of injury to inmates such as Crutcher.").

100.    Because the BIA did not breach the duty it owed to Crutcher, the Court therefore dismisses Coffey's claim to the extent that it is based on Coffey's first alleged wrong of the BIA's failure to medically screen Crutcher.

101.    Even if the United States breached the duty it owed to Crutcher, the breach did not cause Crutcher harm, because the breach would not have caused or produced the medical condition of which Crutcher died.

**C.    BECAUSE THE BIA PROVIDED PROCEDURES TO TRANSFER AN INMATE'S MEDICAL INFORMATION TO A CONTRACTOR DETENTION FACILITY, SUCH AS THE MCDC, COFFEY CANNOT PREVAIL UNDER THE SECOND ALLEGED WRONG -- THE BIA NOT HAVING PROCEDURES IN PLACE TO TRANSFER AN INMATE'S MEDICAL INFORMATION AND PROPERTY.**

102.    First, there are like analogies in the private sector to those presented in Coffey's second alleged wrong, that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.  Second, courts around the United States have recognized triable issues of negligence in those cases.  Third, New Mexico courts have recognized triable issues of negligence in like circumstances in the private sector.  Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to take some steps to ensure that the next facility would learn of his pertinent medical conditions.  Fifth, because the BIA procurement contract provided that it was the MCDC's responsibility to provide medical care to inmates, and because the BIA had procedures in place to transfer necessary information to the receiving

-93-

contractor detention facility, the BIA did not breach its duty to ensure the facility would learn of Crutcher's pertinent medical records.

> **1.      The BIA Owed Crutcher a Duty to Take Steps to Ensure That the Next Facility Would Learn of Crutcher's Pertinent Medical Records.**

103.    There are analogies to this alleged wrong in the private sector that impose a duty upon the BIA in this case.  See In re FEMA Trailer Formaldehyde Products Liability Litigation (Mississippi Plaintiffs), 668 F.3d at 288 ("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analog."). In the public school context, a New York court recognized that a school generally has an obligation to exercise reasonable care when relinquishing custody of a student to another person, including making sure that the person is a proper person with whom to send the student.  See Sprecher ex rel. Tenenbaum v. Port Wash. Union Free Sch. Dist., 166 A.D.2d 700, 700-01, 561 N.Y.S.2d 284, 285-86 (N.Y. App. Div. 1990).  Courts have recognized that there is a cognizable legal malpractice action that can arise from an attorney's failure to surrender the client's records to the client once the client has discharged the attorney.  See Lefebvre v. Cawley, No. 2009-194, 2010 WL 286731, at *3 (Vt. 2010)(unpublished)("Plaintiff fares no better with respect to his return-of-file claim.  That claim is based on defendant's ethical duty as an attorney under the Vermont Rules of Professional Responsibility . . . and thus is, at essence, a legal malpractice claim actionable upon a theory of negligence, not contract.").  One Tennessee court recognized the potential for negligence liability in a scenario where an "independent adjusting firm . . . . misplaced the claim file and failed to deliver it to plaintiff's attorney" in relation to an automobile claim, which resulted in a default judgment against the plaintiff.  Gay & Taylor, Inc. v. Amer. Cas. Co. of Reading, Pa., 53 Tenn. App. 120, 122-23, 381 S.W.2d 304, 305 (Tenn. Ct. App. 1964).  Similarly, a Kansas court recognized that

a "hospital could be sued when it negligently rendered direct medical care to a patient (by failing to provide the records of past X-rays when it had undertaken a duty to do so)." Cady v. Schroll, 235 P.3d 385, 2011 WL 2535004, at *4 (Kan. Ct. App. 2011)(unpublished table decision).

104.    New Mexico has a professional obligation for attorneys similar to that discussed in Lefebvre v. Cawley: "Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client.  The lawyer may retain papers as security for a fee only to the extent permitted by law."  N.M. Rules of Prof'l Conduct 1.16 cmt. 9.  Other jurisdictions have adopted similar laws.  See Tex. Rules of Prof'l Conduct 1.16 cmt. 9 (outlining the same requirement).  As the court in Lefebvre v. Cawley recognized, that obligation can serve as a basis for malpractice in some circumstances, when the lawyer improperly refuses to transfer possession of the client's records.  See 2010 WL 286731, at *3.  New Mexico courts have also recognized the failure to transfer or transmit information can lead to negligence liability in other contexts.  For instance, the Court of Appeals of New Mexico found it appropriate for a jury to award damages to an employee who sued a polygraph examiner for failing to transmit information to her employer that the polygraph results were inaccurate.  See Conant v. Rodriguez, 113 N.M. 513, 517, 828 P.2d 425, 428 (Ct. App. 1992), criticized on other grounds by Baker v. Benjamin, 117 N.M. 278, 817 P.2d 374 (1994).  While not identical to the present case, these analogies are strong enough to convince the Court that the laws of New Mexico would recognize that a jury could permissibly find liability for negligence based on Coffey's second alleged wrong that the BIA did not have procedures in place to facilitate transferring a prisoner's medical information and property to a new facility.

105.    The clearest source of a duty under New Mexico law that applies to the second alleged wrong is section 314A of the Restatement (Second) of Torts.  Section 314A(4) of the

Restatement (Second) of Torts § 314A states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." Restatement (Second) of Torts § 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise reasonable care under the circumstances." Restatement (Second) of Torts § 314A cmt. b.

106.    It is consistent with New Mexico precedent, precedent from around the United States, and the FTCA to impose upon the BIA the duty to put in place certain procedures designed to ensure that the receiving contract detention facility will learn of an inmate's pertinent medical conditions.

### 2.    The BIA did Not Breach its Duty When it Failed to Medically Screen Crutcher.

107.    The second alleged wrong is that the BIA did not have procedures in place to facilitate transferring Crutcher's medical information and property from Washoe County Detention Facility, that had Crutcher's detailed medical records, to the new facility, the MCDC, to which Crutcher was transferred.  In its May 2, 2012 MOO, the Court explained how this duty may apply to hypothetical scenarios the Court developed based on the limited facts of this case before the Court at the time:

> The specific conduct in which the BIA would need to engage to comply with that duty would likely vary under the factual circumstances presented.  For instance, there may be a scenario where the first facility had lost or did not maintain medical records, in which case the BIA could arrange for some information gathering of prisoner's medical condition at the next facility.  In that scenario, something as minimal as a questionnaire given to the prisoner about his or her medical needs

might be sufficient.  Additionally, it is easy to hypothesize a scenario where a prisoner was a diabetic or had some other condition that necessitated medication for the inmate to survive, in which case the BIA would likely need to transfer a prisoner's medication with the prisoner and to inform the next facility of that condition.  If an inmate had no significant medical problems, there would not likely be the same obligation to take steps to inform the next facility of the inmate's medical condition.  The issue of what course of action was appropriate under the circumstances presented is largely a question of breach rather than duty.

May 2, 2012 MOO at 57-58.

108.   The BIA has in place procedures for facilitating the transfer of medical records and medications from a contract detention facility, such as Washoe County Detention Center, to the new contract detention facility, such as the MCDC.  The procedure provided in the procurement contracts, such as the one that the BIA had with the MCDC, pursuant to which Crutcher was in custody at the MCDC, provided that the receiving agency, the MCDC, would obtain the medical records for the inmates housed under the contract.  See May 24, 2012 Tr. at 184:21-185:3 (Anchondo).  These procedures are found in the procurement contracts between the BIA and its contract detention facilities, in which the BIA requires that the detention facilities medically screen the inmates upon taking custody of them and obtain their medical records.  It is important to note that, in this case, the MCDC heeded the BIA's contract provisions.  The MCDC performed Crutcher's medical screening on October 8, 2006, the day after he arrived at the MCDC.  The procedures which the BIA put in place, therefore, to ensure that the receiving facility learned of the necessary medical needs of its new inmates worked as the BIA intended and likely foresaw that they would. A reasonable person under the circumstances would anticipate that a medical screening of Crutcher on October 8, 2006, by a medical practitioner, a nurse, would provide the MCDC with a more complete understanding of Crutcher's medical condition and needs than would the transfer of information by BIA transfer teams, which had no medical personnel or individuals qualified to

perform medical screenings. Under these circumstances, the Court cannot soundly say that a reasonable person or entity in the BIA's or the United States' position would foresee that the MCDC, when it had all of the information it needed to obtain Crutcher's medical records from the Washoe County Detention Facility on October 8, 2006, during the screening, and when it performed the medical screening of Crutcher, would fail to discover Crutcher's medical condition or his medication needs, or fail to obtain his medical records.

109.     By requiring the contractor detention facilities to ensure that they receive the proper medical records from the other contract detention facilities, and by requiring the MCDC to obtain the medical records from Washoe County Detention Facility under the contract here, the facts of this case are distinguishable from the analogous situation in which an attorney fails to turn over a clients records to the client or a new attorney. BIA was never the custodian of Crutcher's medical records or of his medication. Rather, Washoe County Detention Facility was the custodian of those records. Although there is no evidence the Washoe County Detention Facility refused to or failed to turn over Crutcher's medical records when asked to do so, the affirmative duty that it turn over data when its inmates are transferred would be Washoe Detention Facility's duty, rather than the BIA's. It is the Washoe County Detention Facility, not the BIA, who, in this case, would stand in the shoes of the refusing attorney in the legal malpractice cases analogized by the Court. See Lefebvre v. Cawley, 2010 WL 286731, at *3 ("Plaintiff fares no better with respect to his return-of-file claim. That claim is based on defendant's ethical duty as an attorney under the Vermont Rules of Professional Responsibility . . . and thus is, at essence, a legal malpractice claim actionable upon a theory of negligence, not contract."); N.M. Rules of Prof'l Conduct 1.16 cmt. 9 ( "Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client. The lawyer may retain papers as security for a fee only to the extent

permitted by law."). Here, although the BIA for the period of time in which it transferred Crutcher from the Washoe County Detention Facility's custody to the MCDC's custody had custody and possession of Crutcher, the BIA never had custody of Crutcher's medical records and thus, under the facts here, this case is not analogous to the situation in which an attorney fails to provide records to the client or new attorney after representation ceases.

110.     The BIA had in place procedures through which it exercised its duty of care in this case in light of the fact that it was notified of the one inmate that might have been at risk of physical harm during the transport. One circumstance underlying the BIA's decision to require the contracting detention facility to obtain the records, rather than having the BIA transport officers transfer them with the inmates, is the possible liability under HIPAA if the records were somehow disclosed, which could subject the BIA to liability of up to $1,500,000 per year. The Court cannot say that, in light of this possible liability, the decision to contract for the detention center to obtain the medical records rather than have the BIA officers carry the medical records of every prisoner, or any prisoner, is unreasonable. The BIA has in place a procedure for the new contractor detention facility to learn of the inmates' important medical needs independent of the need to perform a medical screening or the need to obtain the inmates' medical records. The transferring officers in this case received medication and medical information regarding one of the nine transferees, a schizophrenic, whom the Washoe County Detention Facility determined might be at risk of an emergency situation during the transport. While the BIA had a duty to protect the inmates in its custody, the transferees in this case, from an unreasonable risk of physical harm while they are in the BIA's custody, during the transfer, the duty was met, as the medical inmate and medications for the one inmate who may have been at risk of physical harm during the transport was properly addressed. This case presents a situation in which it appears that the BIA's contractor detention

facilities have procedures to ensure that the inmates are screened before transport to ensure that this emergency information is given to the BIA officers when necessary. The Washoe County Detention Facility Crutcher prepared a Medical Information Transfer Form for Cructcher's discharge before the BIA transferred him to the MCDC's custody. This Transfer Form is a standard business practice across detention centers which allows them to transfer pertinent medical information to the receiving facility -- information that may be of immediate need or concern to the receiving facility, and in the interim between the inmate's arrival and the time at which it could comply with its responsibility to medically screen the inmate or to obtain the inmate's medical records.  It is possible that, in light of the Transfer Form stating that Crutcher did not have medical problems, even if inconsistent or inaccurate, and based on this information, the BIA determined that there was no foreseeable risk to Crutcher to be without medical information until the MCDC requested and obtained his medical records upon his arrival at the facility.  On the other hand, it is possible that the Washoe County Detention Facility intended that the Transfer Form would be sent with Crutcher on the BIA transport, but it did not provide the BIA with the Transfer Form.  In that case, although the Transfer Form the Washoe County Detention Facility prepared for Crutcher was not provided to the BIA, there is no proof that any negligence in not providing the Transfer Form was the BIA's fault.  The Court, in its May 2, 2012 MOO, opined that "there may be a scenario where the first facility had lost or did not maintain medical records, in which case the BIA could arrange for some information gathering of prisoner's medical condition at the next facility."  May 2, 2012 MOO at 57.  The BIA procurement contract requiring the receiving facility to medically screen the inmates and obtain their medical records from the original facility meets the Court's test.

   111. The facts of this case, where the BIA only has actual custody of the inmates during a relatively short time in which it performs the transfer, are not analogous to the situations the Court

looked to in its May 2, 2012 MOO, as analogous, in which a custodian of records refuses or fails to provide the records to the requesting person or entity.  Because the BIA only had custody of Crutcher for a short time, and never had custody of any of his medical information, the situation in Gay & Taylor, Inc. v. Amer. Cas. Co. of Reading, Pa., in which an adjusting firm misplaced a claim file, failed to deliver it to the plaintiff's attorney and caused a default judgment to be entered against the plaintiff, are not analogous to this case.  See 381 S.W.2d at 305.  Similarly, a Kansas court recognized that a "hospital could be sued when it negligently rendered direct medical care to a patient (by failing to provide the records of past X-rays when it had undertaken a duty to do so)." Cady v. Schroll, 235 P.3d 385, 2011 WL 2535004, at *4 (Kan. Ct. App. 2011)(unpublished table decision). There is no evidence that BIA affirmatively undertook to transfer Crutcher's medical information.  Rather, the BIA, through its detention procurement contracts, has put in place procedures to ensure the inmates' medical information is transferred between contractor detention facilities by requiring the contractor facilities to do so.  The duty that adheres with the affirmative undertaking to transfer such information is thus a duty imposed upon the MCDC and the Washoe Detention Facility, not the BIA.

112.    The Court, in its previous May 2, 2012 MOO, hypothesized that a breach of the duty may depend upon the particular circumstances of individual inmates, including whether there were procedures in place to allow for transfer of medical information or medications that may be of imperative and immediate need, such as a diabatic and insulin.  See May 2, 2012 MOO at 57-58. Crutcher's medical record states that he had no medical problem that would restrict his transfer, but alerted the receiving facility that Crutcher was taking daily heart medication.  There is no evidence to suggest, or establish as fact, that any of Crutcher's heart medication was to prevent heart attack in an emergency, such as insulin may do in the case of a diabetic.  Rather, Crutcher's medication

was to be taken daily to ensure that his heart condition would not decompensate.  Moreover, it would take, and in this case did take, four months or more for Crutcher's heart condition to decompensate without medication when he was not using drugs or alcohol.  Crutcher's need for his heart medication, therefore, is not analogous to a diabetic's immediate, periodic, and permanent need for insulin.  While the BIA could transfer medications of inmates to the receiving facility to ensure that the inmates are provided them in the case that they cannot obtain those medications immediately, the receiving facilities usually do not wish for the BIA to do so because of problems the transfer presents in ensuring that the medication is properly administered.  See May 24, 2012 Tr. at 164:23-165:8 (Anchondo).  It is the responsibility of the receiving facility to secure the inmates' medication.  Thus, the BIA has in place a procedure and mechanism by which to facilitate the transfer of medical records and medications from a previous contract detention facility, such as Washoe County Detention Center, to the new contract detention facility, such as the MCDC.  That mechanism worked in this case, because the MCDC did receive Crutcher's medical records.  Although the MCDC did not receive Crutcher's medical records until January 18, 2007, and thus did not provide Crutcher with medication until that time, there is no evidence that any fault in the delay in obtaining records is attributable to anyone other than the MCDC, who is not a party to this case.

113.    In light of the provision in the BIA's procurement contract that requires the receiving facility to obtain the new inmates' medical records, because the BIA was never a custodian of Crutcher's medical records, and because the BIA received medical information for the inmate whose medical condition presented an unreasonable risk of harm during the transfer in this case, the BIA's transfer procedures in regards to transferring inmates' medical information did not present an unreasonable risk of physical harm to Crutcher during the 900 mile transfer to Gallup, nor for the

foreseeable time before the MCDC would obtain Crutcher's medical information.  The Court

concludes that there was no unreasonable risk of physical harm to Crutcher by the United States'

and the BIA's conduct in setting procedures for transferring the medical information and needs of

its prisoners, and the conduct did not pose a foreseeable risk of injury to inmates such of Crutcher.

114.    Because the BIA did not breach the duty it owed to Crutcher, the Court therefore

dismisses Coffey's claim to the extent that it is based on Coffey's second alleged wrong  that the

BIA did not have procedures in place to facilitate transferring a prisoner's medical information and

property to a new facility.

115.    Moreover, even if there were a breach of this duty, the breach was not the cause-in-

fact or proximate cause of Crutcher's death or other harm, because Crutcher's heart condition on

October 6, 2006, did not cause his death on February 8, 2007.

      **D.**    **BECAUSE THE DUTY THAT THE BIA OWED CRUTCHER UNDER NEW MEXICO LAW IN REGARDS TO COFFEY'S THIRD ALLEGED WRONG, TO TAKE REASONABLE CARE IN ENSURING THE MCDC WAS A COMPETENT AND CAREFUL CONTRACTOR TO INCARCERATE CRUTCHER, IMPLICATES THE BIA'S DISCRETIONARY FUNCTION OF AWARDING PROCUREMENT CONTRACTS, THE COURT LACKS JURISDICTION TO DECIDE WHETHER THE BIA BREACHED THIS DUTY.**

116.    First, there are like analogies in the private sector to those presented in Coffey's third

alleged wrong that the BIA did not adequately screen the MCDC to determine whether it was an

appropriate facility to house Crutcher in light of his condition.  Second, courts around the United

States have recognized triable issues of negligence in those cases.  Third, New Mexico courts have

recognized triable issues of negligence under like circumstances in the private sector.  Fourth, under

the circumstances of the case, the BIA owed Crutcher a duty to take reasonable steps to ensure that

the facility with which it contracts to provide detention services, the MCDC, is a competent and

careful contractor to incarcerate Crutcher.

117.    There are analogies in the private sector to Coffey's third alleged wrong.  One would be a private hospital contracting with an ambulance service without screening that ambulance service's credentials and the ambulance service then engaging in improper conduct that harms patients.  Another analogous scenario would be a business hiring a transportation service without screening their credentials and the transportation service injuring individuals while working for the business.  Another would be that a construction company selected a contractor to build part of a building without doing any investigation into the contractor's credentials, which resulted in that portion of the building collapsing and injuring the occupants.

118    Section 411 of the Restatement (Second) of Torts contemplates a situation where an employer hires a contractor in a negligent manner by failing to employ "a competent and careful contractor":

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)    to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)    to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411.

119.    Various courts, including New Mexico courts, have adopted this provision.  See, e.g., Talbott v. Roswell Hosp. Corp., 144 N.M. 753, 756, 192 P.3d 267, 271 (Ct. App. 2008).  For instance, the Supreme Court of Alaska adopted this provision in a case where a construction business hired a roofing company to install a roof on a building.  See Sievers v. McClure, 746 P.2d 885, 886, 891 (Alaska 1987)("The rule of section 411 of the Restatement is a rule of personal

negligence."). A Florida court recognized that a landlord has, under section 411, an obligation "to use reasonable care in selecting a competent independent contractor to make improvements or repairs in the premises occupied by a tenant." Suarez v. Gonzalez, 820 So.2d 342, 346 (Fla. Dist. Ct. App. 2002). A Kansas court found that application of section 411 was appropriate when the plaintiff suffered physical harm from a contractor's conduct. See McDonnell v. Music Stand, Inc., 20 Kan. App. 2d 287, 293-94, 886 P.2d 895, 900 (Kan. Ct. App. 1994).

120.    The Court has previously noted: "[A] defendant cannot avoid liability by merely closing its eyes and hiring a contractor . . . . [Nor can a defendant] avoid all responsibilities regarding the medical condition of prisoners in its custody by relying upon contractors." May 2, 2012 MOO at 61-62.

121.    The Court of Appeals of New Mexico in Talbott v. Roswell Hosp. Corp. recognized triable negligence questions when a business allegedly negligently employed an air ambulance service: "[T]he question regarding the lengths to which the Hospital was required to go to investigate the Business's reputation, based on the skill required to provide air ambulance services and the dangerousness of such work, was a factual one that was correctly left to the jury's discretion." 144 N.M. at 757, 192 P.3d at 271.[32] This theory of negligence -- negligent hire or

------

[32]Federal courts must determine what a state's Supreme Court would do if confronted with the same issue. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." 311 U.S. at 467. "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." Stoner v. N.Y. Life Insurance Co., 311 U.S. at 467. See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the

negligent employ -- is sufficiently similar to Coffey's third alleged wrong that the BIA did not adequately screen the MCDC to determine whether it was an appropriate facility to house Crutcher in light of his condition.

122.    Because the BIA's duty to take reasonable steps to ensure that the facility with which it contracts to provide detention services is a competent and careful contractor to incarcerate crutcher necessarily involves the BIA's discretion, the Court lacks jurisdiction to hear whether the BIA breached its duty in this case.

**E.    UNDER NEW MEXICO LAW, THE BIA DID NOT BREACH ANY DUTY OWED TO CRUTCHER PURSUANT TO COFFEY'S FOURTH ALLEGED WRONG, BECAUSE THE MCDC WAS NOT NEGLIGENT IN ITS DECISION TO TRANSFER CRUTCHER TO THE MCDC IN LIGHT OF CRUTCHER'S MEDICAL CONDITION.**

123.    First, there are like analogies in the private sector to those presented in Coffey's fourth alleged wrong that, given Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition.

---

Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court. . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . . In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . . Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

Second, courts around the United States have found triable issues in analogous situations. Third, New Mexico courts have recognized triable issues of negligence under like circumstances in the private sector. Fourth, under the circumstances of the case, the BIA owed Crutcher a duty to act reasonably in terms of sending him to another facility. Fifth, because the BIA had in place procedures to facilitate the MCDC's reception of Crutcher's medical information, and because the MCDC was an adequate facility in light of Crutcher's medical needs, the BIA did not breach the duty to act reasonably in sending him to the MCDC.

           **1.**      **The BIA had a Duty to Crutcher to Exercise Reasonable Care Under the Circumstances to Ensure that Crutcher's Transfer to a Particular Facility did not subject Crutcher to an Unreasonable Risk of Physical Harm.**

      124.    While many of the similar cases arise in the context of a state agency bringing an action against a parent, courts have recognized that a parent can be liable in cases where the parent's conduct amounts to gross negligence, such as for leaving "an unattended infant in a filled bathtub" or placing a child "on a twin bed without rails" that is "near a [hot] radiator." N.J. Div. of Youth and Family Servs. v. A.R., 419 N.J. Super. 538, 545-46, 17 A.3d 850, 855 (N.J. Super. Ct. App. Div. 2011). A New Jersey court recognized a cognizable negligence claim against a mother who attempted "to cross a street with [her] child at a dangerous location without making proper observation." Mancinelli v. Crosby, 247 N.J. Super. 456, 461, 589 A.2d 664, 666 (N.J. Super. Ct. App. Div. 1991). A California court discussed a similar negligence scenario where a babysitter left a child "unsupervised in the bedroom with [an] open window." Yolanda G. v. Furman, No. D042933, 2005 WL 281179, at *7 (Cal. Ct. App. 2005)(unpublished). Notably, courts have also applied section 314A of the Restatement (Second) of Torts when an individual voluntarily undertakes the custody of a child, thus triggering an obligation to protect the child from foreseeable

-107-

injury and unreasonable danger.  See Peyer v. Ohio Water Serv. Co., 130 Ohio App.3d 426, 434, 720 N.E.2d 195, 201 (Ohio Ct. App. 1998)(recognizing that "[a] jury may decide that, based on its resolution of the disputed facts, Section 314A(4) establishes a duty upon [the defendant]" who "voluntarily took custody of [an] eleven-year-old [child] with permission of [the child's] mother").

125.    The Court believes New Mexico would follow other jurisdictions that have found a negligence cause of action when a parent places a child in an unreasonable risk of physical harm. Notably, the Supreme Court of New Mexico has abolished the doctrine of parental immunity in light of policy consideration.  See Guess v. Gulf Ins. Co., 96 N.M. 27, 29, 627 P.2d 869, 871 (1981)("We hold that a suit may be maintained between a child and his or her representative and the parents or their personal representative.").  Because New Mexico law would allow a cause of action against the parents in a negligence case, it would more likely than not allow a cause of action against the babysitter under the same facts.  Moreover, like the Ohio court in Peyer v. Ohio Water Service Co., New Mexico courts have adopted section 314A of the Restatement (Second) of Torts.  See Baldonado v. El Paso Natural Gas Co., 2008-NMSC-005, ¶ 15 n.3, 176 P.3d at 281 n.3 ("We recognize that special relationships, such as the doctor-patient or employer-employee relationship, can create a duty to rescue." (citing Restatement (Second) of Torts § 314A)).   The Court concludes that New Mexico courts would apply that provision to a situation in the private sector under like circumstances to those presented in this case.

126.    The clearest source of a duty under New Mexico law that applies to the fourth alleged wrong is section 314A of the Restatement (Second) of Torts.  Section 314A(4) of the Restatement (Second) of Torts § 314A states that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty" to that common carriers owe, who have a "duty . . . to take

reasonable action . . . to protect [their customers] against unreasonable risk of physical harm" and to give the customer "first aid after [the defendant] knows or has reason to know that they are ill or injured, and to care for them until they can be care for by others."  Restatement (Second) of Torts § 314A.  Comment b to this section notes that "[t]he duty in each case is only one to exercise reasonable care under the circumstances."  Restatement (Second) of Torts § 314A cmt. b.

127.   The Court concludes that, "[w]hile there is no obligation under negligence principles to place Crutcher in the precise detention facility where he wants to be imprisoned, there is some basic duty to act reasonably in selecting a place to house him."  May 2, 2012 MOO at 69-70.  The BIA has a duty, therefore, when it decides to transfer an inmate to a new detention facility, to exercise reasonable care under the circumstances to ensure that the particular inmate's transfer to a particular facility does not subject the inmate to an unreasonable risk of physical harm.

**2.**      **The BIA did not, Under the Circumstances, Breach the Duty to Exercise Reasonable Care to Ensure that Crutcher's Transfer did not Subject Him to an Unreasonable Risk of Physical Harm, Because the MCDC was an Adequate Facility in Light of Crutcher's Medical Condition.**

128.   The Court, in its May 2, 2012 MOO stated: "when considering the three allegations alone that Crutcher was transported 900 miles, was transported away from his family, and was transported away from his doctor, there would not likely be a genuine issue of material fact as to the BIA's negligence."  May 2, 2012 MOO at 70.  This recognition was based on the fact that Crutcher's medical condition required sustained medical attention: he was supposed to have his defibrillator attached to his heart checked every three to four months, he was on his daily heart medications to avoid heart failure, and, if he contracted an infection, the infection might require aggressive treatment.  His family had knowledge of these needs, and although they could not provide the medical care, Crutcher's treating physician could.  The facts prove, however, by a preponderance

-109-

of the evidence, that the MCDC could also meet these medical needs. Anchondo noted that, in making his decision to contract with the MCDC, that there were medical personnel at the facility, including a nurse practitioner or licensed practical nurse, was a factor in his decision. In addition, the MCDC was approximately six blocks from the GIMC. The GIMC is a Indian Health Services hospital that provides medical services to American Indians, and is able to treat patients with congestive heart failure and implanted defibrillators. See May 25, 2012 Tr. at 243:3-5, 285:24-286:11 (Mitchell, Shadoff). Crutcher's particular medical needs, because of his heart condition and implanted defibrillator, could be met while he was in the MCDC's custody. Thus, although Crutcher's treating physician was located 900 miles away, because the medical care provided at the MCDC and the GIMC was able to meet Crutcher's medical needs, the Court cannot soundly conclude that the BIA's decision to transfer Crutcher to the MCDC exposed Crutcher at an unreasonable risk of physical harm. Transferring Crutcher to the facility cannot, therefore, rise to the level of gross negligence, such as leaving a child unattended in a bathtub or even leaving a young child in a room with a window open. See N.J. Div. of Youth and Family Servs. v. A.R., 17 A.3d at 855; Yolanda G. v. Furman, 2005 WL 281179, at *7. Rather, in light of Anchondo's knowledge of the MCDC's ability to provide medical care, and its proximity to the GIMC, which could treat congestive heart failure and implanted defibrillators, the BIA's decision to transfer Crutcher to the MCDC, even in light of all of Crutcher's circumstances, did not subject Crutcher to an unreasonable risk of harm.

129.    In its May 2, 2012 MOO, the Court reasoned that "[t]aking into account the alleged failure to transport medical information and property, however, adds another dimension to the alleged wrong," such that the BIA may have breached its duty by not screening the MCDC to ensure that it could meet Crutcher's needs. May 2, 2012 MOO at 70. The MCDC was screened and

determined adequate by Anchondo and the BIA to provide the medical care that Crutcher's heart condition required.  Similarly, the BIA provided procedures to ensure that the receiving contractor detention facility obtains inmates' necessary medical information where necessary, and had provisions in its procurement contract with the MCDC to provide for the inmates' medical screenings and for the receiving facility to obtain the medical information.  Although there is no evidence establishing, by a preponderance of the evidence, that the BIA affirmatively determined that, in light of the MCDC being 900 miles away from Crutcher's family and treating physician, and in light of Crutcher's medical information and property not accompanying him, it was appropriate to transfer Crutcher the MCDC.  Conversely, the evidence in the record proves, by a preponderance of the evidence, that the BIA also did not affirmatively decide to disregard any risk presented by the transfer of its inmates without their medical information and property. Rather, the BIA provided safeguards to ensure the known risks are considered in the inmates' transfer, by deciding to put the responsibility to ensure that the inmates transfer without their medical information does not expose them to an unreasonable risk of harm during the transfer on its contractor detention facilities.  That the BIA has put in place safeguards to prevent exposing the American Indian inmates to an unreasonable risk of physical harm when making the decision to transfer the inmates addresses the Court's concern that there was a failure to transfer medical information and property.  Although Crutcher's medical information was not obtained by the MCDC upon Crutcher's arrival at their facility, that does not change that the procurement contract in place between the MCDC and the BIA required them to do so.  Moreover, in light of the MCDC's failure to obtain Crutcher's records after Crutcher's medical screening on October 8, 2007,  any alleged negligence resulting from the MCDC's failure to obtain information regarding Crutcher's heart condition during that medical screening does not change that the procurement contract put the responsibility to provide adequate

-111-

medical care to Crutcher on the MCDC.  Considering the provisions in the BIA's procurement contract and considering the level of medical care that the MCDC and the GIMC were able to provide for Crutcher, the Court cannot soundly conclude that the BIA did not place Crutcher at an unreasonable risk of physical harm in transferring Crutcher to the MCDC, considering Crutcher's medical condition.

130.    Because the BIA's transfer of Crutcher did not put him at an unreasonable risk of physical harm because of his medical condition, the BIA did not breach any duty owed to Crutcher in transferring him to the MCDC.  The Court therefore dismisses Coffey's claim to the extent that it relies on the fourth alleged wrong that, given Crutcher was transported 900 miles, was transported away from his family, was transported away from his doctor, and was transferred without his medical information and property, the MCDC was not an appropriate facility in light of Crutcher's medical condition.

131.    Also, even if the BIA breached its duty to exercise reasonable care under the circumstances to ensure that Crutcher's transfer to a particular facility did not subject him to an unreasonable risk of physical harm, the failure to exercise reasonable care to ensure that Crutcher's transfer did not subject him to an unreasonable risk of physical harm would not be the proximate cause of Crutcher's death, because he did not die of any condition that he had when he was transferred to the MCDC and thus his medical information or property would not have affected the cause or circumstances of his death.

## V.    BECAUSE CRUTCHER DIED FROM SEPSIS WHICH WAS A RESULT OF INFECTIVE ENDOCARDITIS, UNRELATED TO HIS MEDICAL CONDITION, ANY CONDUCT OF THE UNITED STATES' EMPLOYEES DID NOT CAUSE CRUTCHER'S DEATH.

132.    New Mexico law leaves the issue of causation to the factfinder.  See Herrera v.

Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195 ("The issue of . . . cause is . . . for the jury or factfinder.").

     133.    The Supreme Court of New Mexico adopted the N.M.R.A.'s Civil Uniform Jury Instructions as setting forth New Mexico law on causation. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195 (setting out the law of proximate cause by quoting U.J.I. 13-305 N.M.R.A. (2003)); Wilcox ex rel. Estate of Wilcox v. Homestake Mining Co., No. CIV 04-534 JC/WDS, 2008 WL 4697013, at *4 (D.N.M. Oct. 23, 2008)(Conway, J.)(citing to U.J.I. 13-305 N.M.R.A. (2008) for the causation standard under New Mexico law).[33] New Mexico's Uniform Jury Instruction on causation provides:

> An [act][or] [omission] [or] [_____ (condition ) ] is a "cause" of [injury] [harm] [_____ (other ) ] if [, unbroken by an independent intervening cause,] it contributes to bringing about the [injury] [harm] [_____ (other ) ] [, and if injury would not have occurred without it]. It need not be the only explanation for the [injury] [harm] [_____ (other ) ], nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a "cause", [sic] the [act][or] [omission] [or] [_____ (condition ) ], nonetheless, must be reasonably connected as a significant link to the [injury] [harm].

U.J.I. 13-305 N.M.R.A.

     134.    That BIA transport officers did not medically screen Crutcher, did not obtain his medications or medical information  and impart that medical information to MCDC's employees, that they had inadequate policies in place to so, and whether the MCDC was an inappropriate facility to which to transfer Crutcher, in light of his medical condition, did not cause Crutcher's death. Crutcher did not have medical problems with his defibrillator, and did not develop symptoms of

---

[33]The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law. See State of New Mexico v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994).

congestive heart failure between October 7, 2006, when he left BIA custody, until his death on February 8, 2007. Crutcher's death was caused solely by Crutcher's bacterial infection acquired at some point after December 10, 2006. Crutcher did not have any structural defects of his heart valves which made him more susceptible to infection. There was no infection on the defibrillator, confirming that the defibrillator was not involved in Crutcher's development of endocarditis and that it was not causally related to his death. Similarly, even at the time when Crutcher was extraordinarily ill and dying, chest X-rays did not show congestive heart failure. Crutcher's death was caused by a bacterial infection acquired after December 10, 2006. The cause of Crutcher's death was not, therefore, a medical problem with his defibrillator, or congestive heart failure, to which a lack of medication may have contributed. That Crutcher was not more susceptible to acquiring the bacteria because of his previous medical needs or his lack of medication, and because his previous medical needs or his lack of medication was not causally linked to a possible increase of the speed at which the bacteria caused Crutcher's death, any negligence on the BIA's behalf did not "contribute[] to bringing about" Crutcher's death and is not "reasonably connected as a significant link to" Crutcher's death. Pearson v. Johnson Controls, N. N.M., LLC, 2011-NMCA-034, ¶ 20, 149 N.M. 740, 745-46, 255 P.3d 318, 323-24 (noting that U.J.I. 13-305 N.M.R.A. defines causation "as an act that 'contributes to bringing about the injury' and is 'reasonably connected as a significant link to the injury'"(quoting U.J.I. 13-305 N.M.R.A.)), cert. denied, 2011-NMCERT-003, 150 N.M. 620, 264 P.3d 521.

135.    Because Crutcher's death from sepsis was a result of infective endocarditis and was not caused by his medical condition in October 2006 -- congestive heart failure and an implanted defibrillator -- even though the Court has concluded that there was no failure to screen Crutcher at the time of his transfer, that there was no failure to transfer medical information between facilities

at the time of his transfer attributable to the BIA, and that the MCDC was a proper facility to place Crutcher even in light of his medical condition, had the Court concluded otherwise -- concluded that the BIA was negligent -- that negligence would not be a cause-in-fact of Crutcher's death.  Such negligence would not have "contribute[d] to bringing about the [death]."  U.J.I. 13-305 N.M.R.A. Such negligence would not have "occurr[ed] in combination with some other cause to produce the result."  U.J.I. 13-305 N.M.R.A.  Any such negligence by the BIA would not have been "reasonably connected as a significant link to the [death]."  U.J.I. 13-305 N.M.R.A.  Crutcher, therefore, cannot establish all the elements of the cause of action for the tort of negligence for personal injury against any of BIA's employees, if they were treated as individuals under New Mexico law.

136.    Because Coffey cannot establish all the elements of a cause of action for the tort of negligence, Coffey cannot succeed against a private individual in a tort action for Crutcher's wrongful death, and therefore cannot recover against the United States under the FTCA.  See Ewell v. United States, 776 F.2d at 248 ("The Federal Tort Claims Act makes the United States liable only to the extent that a private person would be liable under similar circumstances").  The United States, therefore, is not liable for the wrongful death of Andrew Crutcher and judgment should be entered in favor of the United States.

**IT IS ORDERED** that the Defendant United States of America is not liable to the Plaintiffs for Andrew Crutcher's death on February 8, 2007.  The Court will dismiss the Plaintiffs' wrongful death/negligence claim against the United States.  The Court will enter judgment for the Defendant and against the Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE

-115-

*Counsel*:

Scott E. Borg
Barber & Borg, LLC
Albuquerque, New Mexico

-- and --

Sheryl Serreze
National Legal Team
Reno, Nevada

-- and --

Robert R. Hager
Treva J. Hearne
Hager & Hearne
Reno, Nevada

       *Attorneys for the Plaintiffs*

Kenneth J. Gonzales
  United States Attorney
Jan Elizabeth Mitchell
  Assistant United States Attorney
Dori Ellen Richards
  Special Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Defendant*